NOT YET SCHEDULED FOR ORAL ARGUMENT

———————

No. 25-7050

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

JARED FISHMAN,

APPELLEE,

v.

DISTRICT OF COLUMBIA, *et al.*,

APPELLANTS.

———————

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

**BRIEF FOR APPELLANTS**

———————

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

GRAHAM E. PHILLIPS
Deputy Solicitor General

LUCY E. PITTMAN
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-3881
lucy.pittman@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—Jared Fishman was the plaintiff below and is the appellee here.  The District of Columbia, Lieutenant Patrick Loftus, and Officers Marck Jaeger, Jeremy Brady, Michael Tong, and Christopher Todaro were the defendants below and are appellants here.  There are no amici.

B. *Ruling under review*.—The ruling of the district court under review is the March 13, 2025 Memorandum Opinion and Order (ECF Nos. 59 and 60), entered by U.S. District Court Judge Richard J. Leon. The decision is not reported but is available at 2025 WL 819579.

C. *Related cases*.— This case has not previously been before this Court or any other court.  Undersigned counsel is unaware of any related case.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

STATEMENT OF THE ISSUES.................................................................4

STATEMENT OF THE CASE....................................................................4

    1.     Factual Background.......................................................................4

         A.    A witness calls 911 and reports that a child was abducted
             or abused ......................................................................4

         B.    Police interview the 911 caller and detain Fishman ..................5

         C.    Police interview Fishman...........................................................8

         D.    Officers interview Fishman's wife and younger child ..............9

         E.    Officers focus on determining whether the child was
             harmed.......................................................................12

    2.     Procedural History......................................................................14

         A.    The first amended complaint ....................................................14

         B.    The dismissal of five of the counts ...........................................15

         C.    The summary judgment decision ..............................................16

STANDARD OF REVIEW .......................................................................18

SUMMARY OF ARGUMENT ..................................................................19

ARGUMENT ..............................................................................................26

    I.     The District Court Erred In Denying Summary Judgment For
        The Officers On The Fourth Amendment Claims ..............................26

A.   Throughout Fishman's detention there was reasonable suspicion to believe that he had committed a crime (Count III) .................................................................................26

B.   Fishman's detention remained a *Terry* stop, but even if it became an arrest, the officers had probable cause (Count IV) .........................................................................................34

C.   At minimum, the officers were entitled to qualified immunity (Counts III and IV) ....................................................43

II.   The District Court Erred In Entering Judgment Against Officer Todaro Based On Evidence Of His Subjective Beliefs.......................46

III.   The Common Law False Imprisonment Claim Fails For The Same Reasons As The Fourth Amendment Claims (Count VI) .........48

CONCLUSION ........................................................................................52

# TABLE OF AUTHORITIES*

*Cases*

*Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980 (D.C. Cir. 2014) ............. 31, 32, 42, 49

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ............................................... 43

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) ................................ 18

*Beauchamp v. City of Noblesville*, 320 F.3d 733 (7th Cir. 2003) .......................... 40

*Bradshaw v. District of Columbia*, 43 A.3d 318 (D.C. 2012) ............................... 50

*Brinegar v. United States*, 338 U.S. 160 (1949) ..................................... 40

*Cady v. Dombrowski*, 413 U.S. 433 (1973) ........................................... 35

*Clubside, Inc. v. Valentin*, 468 F.3d 144 (2d Cir. 2006) ......................... 49

*Coffin v. United States*, 917 A.2d 1089 (D.C. 2007) .............................. 29

*Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991) ......................... 36

*Craig v. Singletary*, 127 F.3d 1030 (11th Cir. 1997) ............................. 47

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ....................................... 48

*Daniels v. United States*, 393 F.2d 359 (D.C. Cir. 1968) ....................... 40

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ........................................... 47

*District of Columbia v. Minor*, 740 A.2d 523 (D.C. 1999) .............................. 49, 50

*District of Columbia v. Murphy*, 631 A.2d 34 (D.C. 1993) ............................. 50, 51

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ................. 3, 32, 40, 42, 44, 45

*Dukore v. District of Columbia*, 799 F.3d 1137 (D.C. Cir. 2015) ......................... 44

---

\*          Authorities upon which we chiefly rely are marked with asterisks.

iv

*Dunn v. United States*, 976 A.2d 217 (D.C. 2009) ................................................ 29

*Elder v. Holloway*, 510 U.S. 510 (1994) .......................................................... 19

*Enders v. District of Columbia*, 4 A.3d 457 (D.C. 2010) ....................................... 18

*Fenwick v. Pudimott*, 778 F.3d 133 (D.C. Cir. 2015) ............................................ 43

*Graham v. Connor*, 490 U.S. 386 (1989) ......................................................... 40

*Harris v. U.S. Dep't of Veterans*, 776 F.3d 907 (D.C. Cir. 2015) .................... 49, 50

*Heien v. North Carolina*, 574 U.S. 54 (2014) .................................................... 41

*Hyde v. City of Willcox*, 23 F.4th 863 (9th Cir. 2022) .......................................... 48

*Illinois v. Gates*, 462 U.S. 213 (1983) .................................................... 27, 41

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ........................................................ 26

*In re Vitamins Antitrust Class Actions*, 215 F.3d 26 (D.C. Cir. 2000) .................. 48

*Jones v. United States*, 67 A.3d 547 (D.C. 2013) ............................................... 28

*Lee v. United States*, 831 A.2d 378 (D.C. 2003) ........................................... 28, 29

*LeFande v. District of Columbia*, 841 F.3d 485 (D.C. Cir. 2016) ......................... 19

*Maryland v. Pringle*, 540 U.S. 366 (2003) ...................................................... 40

*Michigan v. Summers*, 452 U.S. 692 (1981) .................................................... 38

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .................................................. 4, 48

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ......................................... 18

*Mullenix v. Luna*, 577 U.S. 7 (2015) .............................................................. 17

*Navarette v. California*, 572 U.S. 393 (2014) ........................................ 26, 27, 41

*Ornelas v. United States*, 517 U.S. 690 (1996) ................................................. 27

*Pendergrast v. United States*, 416 F.2d 776 (D.C. Cir. 1969) ................................ 42

*Perez Hernandez v. United States*, 286 A.3d 990 (D.C. 2022) ............................. 29

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ................................................... 40, 43, 44

*Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342 (D.C. Cir. 2007) ............... 19

*Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) ................................................... 44

*Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1996) .......................... 49, 50

*Scott v. United States*, 436 U.S. 128 (1978) ......................................................... 47

*Terry v. Ohio*, 392 U.S. 1 (1968) ........................................................................ 15

*Turner v. District of Columbia*, 532 A.2d 662 (D.C. 1987) ................................... 37

*United States v. Abdus-Price*, 518 F.3d 926 (D.C. Cir. 2008) .............................. 19

*United States v. Al-Sadawi*, 432 F.3d 419 (2d Cir. 2005) .................................... 31

*United States v. Anderson*, 923 F.2d 450 (6th Cir. 1991) ..................................... 47

*United States v. Arvizu*, 534 U.S. 266 (2002) ......................................................... 27

*United States v. Bass*, 996 F.3d 729 (5th Cir. 2021) ............................................ 34

*United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) ...................................... 34

*United States v. Burnett*, 827 F.3d 1108 (D.C. Cir. 2016) ............................... 27, 40

*United States v. Cortez*, 449 U.S. 411 (1981) ....................................................... 27

*United States v. Hawkins*, 595 F.2d 751 (D.C. Cir. 1978) .................................... 27

*United States v. Hill*, 131 F.3d 1056 (D.C. Cir. 1997) .......................................... 47

*United States v. Jones*, 973 F.2d 928 (D.C. Cir. 1992) ......................................... 38

*United States v. Mangum*, 100 F.3d 164 (D.C. Cir. 1996) .................................... 38

*United States v. Nurse*, 916 F.2d 20 (D.C. Cir. 1990) ............................................ 36

*United States v. Robinson*, 30 F.3d 774 (7th Cir. 1994) ......................................... 36

\**United States v. Sharpe*, 470 U.S. 675 (1985) ............................. 34, 35, 36, 37, 39

*United States v. Silva*, 742 F.3d 1 (1st Cir. 2014) .................................................. 47

*United States v. Smart*, 91 F.4th 214 (4th Cir. 2024) ............................................ 26

*United States v. Sokolow*, 490 U.S. 1 (1989) ......................................................... 39

*United States v. Southerland*, 486 F.3d 1355 (D.C. Cir. 2007) ............................. 47

*United States v. Tavolacci*, 895 F.2d 1423 (D.C. Cir. 1990) .................................. 38

*United States v. Tilmon*, 19 F.3d 1221 (7th Cir. 1994) .......................................... 38

*United States v. Washington*, 670 F.3d 1321 (D.C. Cir. 2012) .............................. 19

*United States v. Williams*, 951 F.2d 1287 (D.C. Cir. 1991) ................................... 27

*Wilson v. Layne*, 526 U.S. 603 (1999) ................................................................... 43

## *Statutes and Regulations*

D.C. Code § 4-1301.04 ........................................................................................... 37

D.C. Code § 16-1022 .............................................................................................. 28

D.C. Code § 22-404 ................................................................................................ 29

D.C. Code § 22-1101 .............................................................................................. 28

28 U.S.C. § 1291 ................................................................................................. 3, 48

28 U.S.C. § 1331 ....................................................................................................... 3

28 U.S.C. § 1367 ....................................................................................................... 3

42 U.S.C. § 1983 ............................................................................................. 2, 3, 14

**GLOSSARY**

| | |
|---|---|
| Ex. | Exhibit |
| JA | Joint Appendix |
| MPD | Metropolitan Police Department |
| RD | Electronic Case Filing Record Document |

# INTRODUCTION

This appeal arises from an order denying qualified immunity to five officers of the Metropolitan Police Department (MPD) who detained plaintiff Jared Fishman for about 25 minutes while they investigated a credible report of possible kidnapping or child abuse. Because this detention comported with the Fourth Amendment, or at minimum no existing precedent clearly established otherwise, the denial of qualified immunity should be reversed and judgment entered in the officers' favor.

The key events—most of which are captured on audio or video and are thus undisputed—began with a 911 call. A woman reported seeing a man exit a car and approach a little girl walking alone down the street; he screamed at the child, she pushed him, and he picked her up and threw her into the car. The eyewitness described the man and his vehicle (a green Audi), including its license plate number. Her report was transmitted to MPD officers, several of whom responded to the address associated with the vehicle. The first officer to arrive encountered Fishman on the front steps. Fishman matched the witness's description, he confirmed that he drove an Audi and had just returned home, and he added, unprompted, that "that guy who called in has no idea what's going on." When the officer sought clarification, Fishman stood up and started to go inside, ignoring the officer's repeated instructions to stay outside. The officer therefore grabbed Fishman, pulled him outside, and handcuffed him just as other officers arrived.

For the next 25 minutes, officers detained Fishman at a nearby streetcorner as they investigated what happened. They promptly interviewed Fishman, who said the little girl was J.M.-F., the younger of his two daughters. But despite their diligence, the officers were unable to speak with J.M.-F. for more than 20 minutes because Fishman's wife initially refused to permit it. After she eventually agreed, an officer calmly and gently interviewed J.M.-F. to determine if she had been hurt. She explained that she and Fishman had a "tiny fight," but she denied that her father hurt her. The officers released Fishman moments later.

Fishman sued the officers under 42 U.S.C. § 1983 for allegedly violating his Fourth Amendment rights. The district court agreed that the officers' initial seizure of Fishman was lawful because they had reasonable suspicion that he had kidnapped a child. But at summary judgment, the court concluded that, several minutes into Fishman's detention, the officers knew that Fishman was the girl's father, so they no longer had reasonable suspicion that he had committed a crime. The court therefore held that the remainder of Fishman's detention violated the Fourth Amendment. And it further held that the officers were not even entitled to qualified immunity, despite the court's concession that it was unaware of any case with parallel facts.

This Court should reverse. The district court's reasoning rested on a fatally flawed central premise: that the only relevant crime was kidnapping. As the eyewitness told officers, however, if the altercation she saw "wasn't an abduction, it

2

was child abuse." The facts known to the officers suggested that, by physically throwing a small child into a car, Fishman may have committed second-degree cruelty to children or assault. Either offense can be committed by a parent, and neither requires that the perpetrator specifically intend to cause injury or that injury result. The officers had reasonable suspicion—and indeed, probable cause—of these offenses throughout the entirety of Fishman's 25-minute detention, which was thus consistent with the Fourth Amendment. At minimum, the officers are entitled to qualified immunity because no controlling case or robust consensus of cases existed in February 2020 finding a Fourth Amendment violation on similar facts. *See District of Columbia v. Wesby*, 583 U.S. 48, 63-65 (2018).

## JURISDICTIONAL STATEMENT

This appeal involves plaintiff's Fourth Amendment claims brought under 42 U.S.C. § 1983 (against the individual officers) and common law false imprisonment (against all defendants). The district court had jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1367. On March 13, 2025, the district court denied the officers summary judgment on the Fourth Amendment claims, denied qualified immunity, and entered judgment against Officer Christopher Todaro. The district court also denied summary judgment to all defendants on the common law false imprisonment claim and entered judgment against Officer Todaro. Defendants noted their appeal on April 10. This Court has jurisdiction under 28 U.S.C. § 1291

3

to review the denial of qualified immunity on the Fourth Amendment claims. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in denying summary judgment for the officers on Fishman's Fourth Amendment claims.

2. Whether the district court erred in entering summary judgment against Officer Todaro on the Fourth Amendment and common law false imprisonment claims based on evidence of his subjective beliefs.

3. Whether the district court erred in denying summary judgment for the officers and the District on Fishman's common law false imprisonment claim.

## STATEMENT OF THE CASE

### 1. Factual Background.

#### A. A witness calls 911 and reports that a child was abducted or abused.

On February 17, 2020, a witness called 911 to report a child abduction or child abuse. Exhibit (Ex.) 6 (recording of the 911 call).[1] The witness "saw a little girl" about "six or seven" years old "walking by herself" when a "guy pull[ed] up" and "jumped out of his car." Ex. 6 at 00:30 to 00:45. The man "tried to talk to [the girl] and then he started screaming at her" and she "pushed him." Ex. 6 at 00:45 to 00:51.

---

[1] The video and audio files have been submitted to the Court's Box.com file repository.

The man then "grabbed" the girl, "threw her over his shoulder," and "threw her into the car."   Ex. 6 at 00:50 to 01:00.   The little girl "tried to get out [of the car] on the other side," but "when [the man] got in the driver's seat" he continued "grabbing her."   Ex. 6 at 01:00 to 01:05.   The witness explained that this was either "an abduction" or a "father manhandling his child in a really bad way."   Ex. 6 at 00:10 to 00:22.

The incident captured the attention of another bystander who tried to intervene.  Ex. 6 at 01:14 to 01:20, 02:14 to 02:20.  The bystander, a man driving a Suburban, pulled over to help, but the suspect shouted something about the child being his daughter.   Ex. 6 at 01:14 to 01:20, 02:14 to 02:20.   Surveillance video captured the Suburban's driver blocking traffic, getting out of the vehicle, and approaching a dark green vehicle, which made a U-turn and drove away.  Ex. 17 at 02:20 p.m. (time stamp in upper left corner).

The 911 caller described the suspect as a "white guy," "balding," and "in his 40s."  Ex. 6 at 03:01 to 03:14.  The suspect's vehicle was a dark green Audi, and the witness provided the license plate number.  Ex. 6 at 02:22 to 02:55.

**B.    Police interview the 911 caller and detain Fishman.**

Based on the 911 call, MPD officers were dispatched to investigate "a call for a kidnapping."  Joint Appendix (JA) 334.  They were looking for a "balding" "white male" who had "grabbed a girl, threw her over his shoulder, and threw her into a car,

and drove off."  JA 334; *see also* JA 326 (officers were told a "small child was thrown into a green Audi SUV").  Police were dispatched to two locations: the site of the incident and the address associated with the Audi's license plate.

At the incident location, at 36th Street and Woodley Road, NW, the 911 caller was interviewed by police, including Lieutenant Patrick Loftus.  Ex. 1.  The witness confirmed the details from her 911 call and added that the other concerned bystander, the driver of the Suburban, used his vehicle to block traffic to prevent the suspect from driving away because what they witnessed "was not normal."  Ex. 1 at 19:43:29 to 19:43:52.[2]  But the suspect drove off, shouting "something like" "I'm the dad, just stay out of it."  Ex. 1 at 19:43:42 to 19:43:59.  The witness explained that she was a mother and that if what she saw "wasn't an abduction, it was child abuse."  Ex. 1 at 19:44:00 to 19:44:04.  She continued: "No dad should be manhandling his daughter and throwing her in the car . . . she is trying to jump out the other side . . . for a six- or seven-year-old . . . it was just not right."  Ex. 1 at 19:44:04 to 19:44:20.

At the same time, police responded to a house on O Street, NW associated with the Audi's license plate.  Officer Marck Jaeger was the first to arrive.  He saw

---

[2]    For body-worn camera footage, the citations in this brief refer to the white timestamps in the top right corner of the footage.  This timestamp is consistent across the footage from all but one of the body-worn cameras and reflects Greenwich Mean Time.  Thus, for example, a timestamp of 19:43 corresponds to 2:43 p.m. local time in the District.  Exhibit 5 (Brady) is the only exception; its timestamp is local District time.

a man matching the description of the suspect from the 911 call sitting on the front steps.  Ex. 2 at 19:38:40 to 19:39:11.  Officer Jaeger approached to ask some questions.  Ex. 2 at 19:38:34 to 19:41:00.  The man on the steps, later identified as Fishman, confirmed that he drove an Audi and had just arrived home.  Ex. 2 at 19:40:13 to 19:40:24.  He then added, unprompted, that "that guy who called in has no idea what's going on."  Ex. 2 at 19:40:25.  Officer Jaeger responded: "maybe you could help me out with what's going on."  Ex. 2 at 19:40:27.  Fishman began to stand and told the officer to: "hold on a sec."  Ex. 2 at 19:40:30.  As Fishman turned towards the door of the house, he said, "You have to be fucking kidding me," and reached for the door handle.  Ex. 2 at 19:40:31 to 19:40:33.  Officer Jaeger asked Fishman to "hang tight for a second" and twice directed him, "don't go inside."  Ex. 2 at 19:40:32 to 19:40:36.  Fishman ignored him and continued to move into the house.  Ex. 2 at 19:40:33 to 19:40:38.  Officer Jaeger followed him over the threshold, grabbed him by the arm, and pulled him back outside.  Ex. 2 at 19:40:40 to 19:40:44.

Several things then occurred in rapid succession.  Fishman started to scream at Officer Jaeger.  Ex. 2 at 19:40:40 to 19:40:50.  Other officers arrived and helped Officer Jaeger place Fishman in handcuffs.  Ex. 2 at 19:40:40 to 19:40:50.  And two little girls appeared in the doorway, followed by a woman, and reacted to seeing Fishman screaming and being handcuffed.  Ex. 2 at 19:40:50 to 19:41:08.  The

7

younger girl started to cry: "It's my fault!"  Ex. 5 at 14:41:18 to 14:41:20.  The older girl explained, without any prompting by police, "he did not take my sister" and "my sister was misbehaving."  Ex. 5 at 14:41:20 to 14:41:24.  Officer Michael Tong suggested separating Fishman from the children and woman, directing Fishman to the end of the block.  Ex. 3 at 19:41:08 to 19:41:41.

### C.    Police interview Fishman.

At the end of the block, Officer Tong questioned Fishman.  Ex. 3 at 19:42:40 to 19:48:14.  Fishman explained that he had been having lunch at Cactus Cantina with his daughters.  Ex. 3 at 19:46:10, 19:46:30.  The younger daughter, J.M.-F., was "irritating" the older daughter, A.M.-F., and was "refusing to stop kicking her." Ex. 3 at 19:46:08 to 19:46:22.  When they left, J.M.-F. refused to get into the car, and so, according to Fishman, he "picked her up and put her in the car."  Ex. 3 at 19:46:22 to 19:46:25, 19:46:40 to 19:46:44.  He explained that as he did so, a large car stopped in front of him and the driver "asked if there was a problem."  Ex. 3 at 19:46:40 to 19:46:50.  Fishman responded that there was no problem "other than [his] kid was being a shit."  Ex. 3 at 19:46:40 to 19:46:50.  Fishman said that then they "came home," J.M.-F. "calmed down in the car," and the children are "now" in the house.  Ex. 3 at 19:46:49 to 19:46:55.

**D.    Officers interview Fishman's wife and younger child.**

At the same time, back at the house, Officer Christopher Todaro tried to explain the 911 report to the two children and the woman, who had not yet been identified.  Ex. 5 at 14:41:28.  The woman and younger child went back into the house and the older child started to give an account to Officer Todaro: "My sister was misbehaving and she would not get into the car and come home."  Ex. 5 at 14:41:45 to 14:41:51.  "She was not listening," the girl continued, so "my dad had to put her over his shoulder and bring her into the car."  Ex. 5 at 14:41:50 to 14:41:59.  The older child also said, "He did nothing wrong."  Ex. 5 at 14:41:57 to 14:41:59.  The woman and younger child then returned to the front door, interrupting the conversation.  Ex. 5 at 14:42:04.

From about 2:42 to 3:05 p.m., Officer Jeremy Brady tried to talk with the woman and the two children.  Ex. 5 at 14:42 to 15:05:21.  At the start of those twenty-three minutes, the woman and Officer Brady tried to calm the younger child, J.M.-F.  The woman explained the situation to J.M.-F.: "Somebody saw daddy pick you up but did not know that he was daddy."  Ex. 5 at 14:42:34 to 14:42:43.  Officer Brady explained that they needed to "talk to everybody individually."  Ex. 5 at 14:43:10; *see* Ex. 5 at 14:45:07 to 14:45:16 (woman explaining to J.M.-F. that, "when somebody makes a phone call like that, the police have to take certain steps").

As J.M.-F. continued crying, the woman took her inside. Ex. 5 at 14:45:20 to 14:45:35. The older child, A.M.-F., then started to talk with Officer Brady: "So what happened is my dad was frustrated, so when the guy asked . . . he gave an angry response." Ex. 5 at 14:46:19 to 14:46:28. Before Officer Brady could ask any follow-up questions, the woman called A.M.-F. back into the house. Ex. 5 at 14:46:28.

At about 2:46 p.m., the woman joined Officer Brady, who remained standing on the front steps. Ex. 5 at 14:46:34. Officer Brady tried to ask some questions, but she did not answer. Ex. 5 at 14:46:34. Instead, she explained that she wanted information from the officers. Ex. 5 at 14:46:34 to 14:46:40. Officer Brady answered her several questions about the police presence at her home and the handcuffing of Fishman, whom she identified as her husband. Ex. 5 at 14:46:33 to 14:50:40; *see* Ex. 5 at 14:51:05 to 14:51:11 (Brady informing another officer that "right now she's only wanting to ask questions, she's not wanting to talk much"). The woman then went inside to check on the children. Ex. 5 at 14:50:42.

Around 2:51 p.m., the woman, who now identified herself as Fiona Macaulay, explained that Fishman was J.M.-F.'s father. Ex. 5 at 14:51:17 to 14:52:29. Macaulay answered questions, but also argued with Officer Brady about questioning Fishman and the use of handcuffs. Ex. 5 at 14:52:00 to 14:54:30, 14:54:35 to 14:56:16.

Officer Brady asked to talk with J.M.-F., but Macaulay initially responded, "absolutely not." Ex. 5 at 14:56:13 to 14:56:17. Macaulay continued to argue with Officer Brady and demanded to know "what questions [he would] ask [J.M.-F.]. Ex. 5 at 14:57:21 to 14:58:09; *see* Ex. 5 at 14:59:55 (wanting "agreement" on what Officer Brady would ask J.M.-F.). Macaulay also directed how Officer Brady should interact with J.M.-F., instructing him to turn his radio off and to "smile when you speak to her." Ex. 5 at 15:00:35 to 15:00:54.

Once her requests were satisfied, Macaulay finally allowed Officer Brady to talk with J.M.-F. at about 3:02 p.m. Ex. 5 at 15:01:55. J.M.-F. explained that she had been in a "tiny fight" with her father but that the fight "kind [of] got a tiny bit bigger, but he didn't hurt" her. Ex. 5 at 15:02:28 to 15:02:33, 15:02:40 to 15:02:52. J.M.-F. had been kicking her sister, and she did not want to go home, so she ran away from the car. Ex. 5 at 15:02:58 to 15:03:07, 15:03:20 to 15:03:27, 15:03:40 to 15:03:43. J.M.-F. was "kind of scared." Ex. 5 at 15:03:53 to 15:03:58. J.M.-F. said that Fishman "had to lift [her] up" into the car but she was not hurt. Ex. 5 at 15:04:30 to 15:04:36. Officer Brady asked how Fishman picked her up: "Was it like a big hug? Or . . . did get you scared when he picked you up?" Ex. 5 at 15:04:40 to 15:04:45. He then suggested another possibility: "Was it just like an easy pick up?" Ex. 5 at 15:04:45 to 15:04:50. J.M.-F. replied that it was. Ex. 5 at 15:04:50. She denied being hurt and said she was okay. Ex. 5 at 15:05:04 to 15:05:14.

11

**E.    Officers focus on determining whether the child was harmed.**

While Officer Brady was trying to complete interviews of Macaulay and J.M.-F., Fishman continued to wait at the end of the block.  Ex. 7 at 19:48.  Sergeant Adam Bray arrived at the O Street location and was briefed on the unfolding investigation.  Ex. 4 at 19:56:00.  Lieutenant Loftus, who had been at the incident scene with the 911 caller, arrived at the O Street location at about 2:58 p.m.  Ex. 4 at 19:58:40.  Sergeant Bray explained to the Lieutenant that everyone involved had been stopped but that the officers were "still trying to work out the details."  Ex. 4 at 19:58:46 to 19:58:59.  Sergeant Bray explained that Macaulay was "not allowing [the officers] to talk to the kid."  Ex. 4 at 19:59:30 to 20:00:34.  The Lieutenant, who had heard firsthand the concerns of the witness, directed that "we need to verify that the kid is okay . . . make sure no injuries."  Ex. 4 at 20:00:34 to 20:0040.

At about 3:02 p.m., Sergeant Bray, unaware that Macaulay was just then allowing Officer Brady to talk with J.M.-F., began to talk with Fishman.  Ex. 4 at 20:02:14.  Fishman laughed as Sergeant Bray explained that there was a kidnapping allegation.  Ex. 4 at 20:03:07 to 20:03:15.  Sergeant Bray noted the importance of seeing and talking to J.M.-F. given that the 911 caller reported that a man had "grabbed a kid" and "threw the kid . . . into the car."  Ex. 4 at 20:04:00 to 20:04:16.  He also explained that Fishman's response, refusing to talk when the police arrived,

12

"starts raising flags." Ex. 4 at 20:04:23 to 20:04:30. The officers need to "make sure the kid is okay." Ex. 4 at 20:04:28 to 20:04:40.

Fishman agreed to allow officers to talk with J.M.-F. Ex. 4 at 20:04:50 to 20:04:58. He said that only J.M.-F. was involved: "My good child [A.M.-F.] was in the car; my pain in the ass child [J.M.-F.] was refusing to get into the car." Ex. 4 at 20:05:15 to 20:05:20. Sergeant Bray then directed the officers to remove the handcuffs and bring Fishman back to the house so that "we can get him to have the kids . . . come down." Ex. 4 at 20:05:36 to 20:05:45. Moments before Sergeant Bray returned to the house, with Fishman following behind him, Officer Brady completed the interview with J.M.-F. Ex. 5 at 15:05:16.

The officers then gathered on the sidewalk to share the information they had learned. Ex. 4 at 20:06:07 to 20:06:38. At about 3:06 p.m., after confirming that the children were seen, that there were no visible injuries, and that Officer Brady had talked with J.M.-F. and she was okay, Lieutenant Loftus directed the officers to complete a report to "check on the welfare of a juvenile" and explained to the officers that there might be follow up from the MPD's Youth Division but that for "right now" the officers were "done here." Ex. 8 at 20:06:24 to 20:06:58. He also instructed officers to notify the Child and Family Services Agency and MPD's Youth Division. Ex. 8 at 20:10:00 to 20:10:09.

13

**2.    Procedural History.**

**A.    The first amended complaint.**

Fishman originally filed suit on July 12, 2021.  Electronic Case Filing Record Document (RD) 1; JA 6.  He later filed a first amended complaint, JA 8, which named as defendants the District and five officers: Lieutenant Loftus and Officers Jaeger, Brady, Tong, and Todaro.  JA 15.  The amended complaint set forth eight counts, including constitutional claims brought under 42 U.S.C. § 1983 and common law tort claims.  JA 47-52.  The first two counts, brought against Officer Jaeger only, alleged that he violated the Fourth Amendment by entering Fishman's home without a warrant (Count I) and arresting him without a warrant (Count II).  JA 47-48.  The next two counts, brought against all the officers, alleged that they violated the Fourth Amendment by seizing Fishman without reasonable suspicion (Count III) and by arresting him without probable cause (Count IV).  JA 48-49.  Count V alleged common law trespass by Officer Jaeger.  JA 49-50.  Count VI alleged common law false imprisonment by all the officers and the District.  JA 50-51.  Count VII, brought against all the officers and the District, alleged negligence and was pleaded as an alternative to the Fourth Amendment counts.  JA 51-52.  And Count VIII alleged that Lieutenant Loftus violated the First Amendment by filing a bar complaint against Fishman in retaliation for Fishman's complaint about the officers.  JA 52.

14

###### B.    The dismissal of five of the counts.

On February 2, 2023, the district court dismissed Counts I, II, V, VII, and VIII. JA 54-75. As relevant to the claims on appeal, the district court dismissed the claims against Officer Jaeger that alleged Fourth Amendment violations for the initial seizure. JA 61-63. The court held that Fishman's complaint "failed to plead facts that would show that Officer Jaeger violated the Fourth Amendment by entering Fishman's home and seizing him without a warrant." JA 60-61. The court explained that Officer "Jaeger initiated a valid *Terry* stop" based on "the 9-1-1 call reporting a suspected child kidnapping, combined with Fishman's acknowledgement that he was the person about whom the report was filed." JA 62; *see Terry v. Ohio*, 392 U.S. 1 (1968) (holding that the Fourth Amendment permits investigatory stops based on reasonable suspicion). The district court also explained that Fishman "understood the police to have responded specifically to a report about him," and Officer Jaeger instructed him to remain outside, but Fishman tried to "escape the stop by retreating into his home." JA 63. "In light of the serious nature of the crime under investigation—child kidnapping—[Officer] Jaeger's use of force, including handcuffs, to prevent Fishman's attempt to avoid the *Terry* stop and [Officer] Jaeger's questions was also reasonable and did not transform the stop into an arrest." JA 63 (citations omitted).

15

**C.    The summary judgment decision.**

Following discovery, the parties cross moved for summary judgment. Fishman moved for partial judgment against Officer Todaro. JA 76. The District and the officers moved for judgment on all of the remaining counts. JA 289. On March 12, 2025, the district court granted Fishman's motion but denied judgment for the District and the officers. JA 403-20.

With respect to Count III, the district court held that the officers did not maintain reasonable suspicion during the entirety of the roughly 25-minute stop of Fishman. JA 413-14. In the court's view, "reasonable suspicion ended when the officers learned that [Fishman] was the father and that the younger daughter was acting up and at fault." JA 414. The court believed that "[o]fficers quickly learned from the family that the younger daughter had been misbehaving and could see for themselves that both girls were not only present but did not appear to have been physically harmed." JA 414. The court did not specify when exactly it believed that reasonable suspicion had dissipated.

With respect to Count IV, the court appeared to conclude that Fishman's detention exceeded the bounds of a *Terry* stop and became a full-blown arrest, though the court did not say so outright. *See* JA 414. Since an arrest requires probable cause, and "probable cause is a higher standard than reasonable suspicion,

16

it necessarily follow[ed]" from the court's analysis of Count III that it could not award the officers summary judgment on Count IV either.  JA 414-15.

As for Officer Todaro in particular, the district court entered judgment against him on the Fourth Amendment claims.  JA 415.  In doing so, it relied on evidence of Officer Todaro's subjective perception of events.  Specifically, the court found that Officer Todaro admitted in his deposition that he had no reason to believe the children were "lying" when he "heard from them that the younger daughter was misbehaving and that Fishman 'did not take' the younger daughter."  JA 415.  And after the first few minutes, he subjectively "believed that Fishman and Macaulay were the girls' father and mother."  JA 415.  "At that point," the court reasoned, "there was no reasonable suspicion of a kidnapping" and *a fortiori* no probable cause.  JA 415.  Fishman was "thus entitled to summary judgment as a matter of law on Counts III and IV against Officer Todaro."  JA 415.

With little additional analysis, the court also denied the officers qualified immunity.  JA 417-18.  The court conceded that it was "unaware of a case with parallel facts to this one," but reasoned that "'a case directly on point' is *not* required."  JA 418 (emphasis in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  The court concluded that "existing precedent clearly places the question beyond debate whether officers need to be able to articulate *a single reason* to hold an individual in handcuffs for over twenty minutes under either a reasonable

suspicion or probable cause standard," and that "[t]he record in this case shows not one reason!"  JA 418 (emphasis in original).[3]

The court also denied judgment for the officers and the District on Count VI, the common law false imprisonment claim.  False imprisonment claims, the court explained, "are 'indistinguishable as a practical matter' from false arrest claims." JA 415-16 (citing *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010)). The District and the officers "ha[d] not demonstrated the lawfulness of their arrest of Fishman lasting over 20 minutes," so they were not entitled to summary judgment. JA 416.  In contrast, Fishman "ha[d] successfully shown at this stage that Officer Todaro falsely imprisoned him."  JA 416.  The court did not explain further, but appeared to refer back to its analysis of Officer Todaro's liability under the Fourth Amendment.  *See* JA 416-17.

On April 10, the District and the officers timely noted an appeal.  JA 421.

## STANDARD OF REVIEW

This Court "review[s] the District Court's denial of summary judgment *de novo*."  *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006).  "Summary

---

[3]    In a pair of footnotes, the court wrongly concluded that the District had failed to "brief or explain why it is due summary judgment [on Counts III and IV] under *Monell* [*v. Department of Social Services*, 436 U.S. 658 (1978)], so it has waived those arguments on summary judgment."  JA 413 n.3; *see* JA 415 n.4.  Fishman brought Counts III and IV against the individual officers only, not the District, *see* JA 48, so *Monell* does not apply.

judgment is proper only when there is 'no genuine issue of any material fact,' or when 'the movant is clearly entitled to prevail as a matter of law.'" *LeFande v. District of Columbia*, 841 F.3d 485, 493 (D.C. Cir. 2016) (quoting *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1345 (D.C. Cir. 2007)). This Court also reviews de novo whether there was reasonable suspicion to justify a *Terry* stop or probable cause to justify an arrest. *United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008); *United States v. Washington*, 670 F.3d 1321, 1324 (D.C. Cir. 2012). "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law" that likewise "must be resolved *de novo* on appeal." *Elder v. Holloway*, 510 U.S. 510, 516 (1994).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's denial of summary judgment and hold that the defendants are entitled to judgment on Counts III, IV, and VI.

1.a. The officers, not Fishman, should have been awarded summary judgment on the Fourth Amendment claims. Officer Jaeger conducted a valid *Terry* stop when he detained Fishman based on reasonable suspicion that Fishman had committed a crime. Reasonable suspicion of kidnapping may have dissipated sometime during the detention, but suspicion of second-degree cruelty to children and assault existed throughout the stop. Cruelty to children occurs when a person intentionally

19

maltreats a child or engages in conduct which causes a grave risk of bodily injury to a child. And assault encompasses any offensive touching. Neither offense requires an intent to harm or proof of injury.

The facts known to the officers throughout the investigation would give an objectively reasonable police officer ample basis to suspect that Fishman had committed these crimes. The reliable eyewitness reported that Fishman "grabbed" a "little girl[,]" "threw her over his shoulder[,]" and "threw her into the car." This information was shared with officers before arriving at Fishman's home and was further corroborated through Lieutenant Loftus's firsthand interview of the eyewitness during the first few minutes of the stop. Such an account, of an adult male throwing a child, is more than enough to create reasonable suspicion of second-degree cruelty to children and assault. Throwing a small child into a car creates a grave risk of injury. And throwing a person against her will is an offensive touching.

The initial investigation did not eliminate reasonable suspicion. Fishman confirmed that he had just returned home and was the owner of the Audi identified by the eyewitness. He also, without prompting, confirmed that there had been a confrontation and perhaps a misunderstanding: "that guy who called in has no idea what's going on." Yet he refused to explain what had occurred and ignored Officer Jaeger's directive to remain outside. A reasonable officer could interpret Fishman's behavior as an attempt to flee.

The information later provided by Fishman and his daughters did not dispel reasonable suspicion. In the face of a credible eyewitness account, Fishman's statement that he merely "picked [J.M.-F.] up and put her in the car"—no mention of throwing—does not vitiate reasonable suspicion. Similarly, officers were not required to accept at face value A.M.-F.'s (the older daughter's) statement that Fishman "did nothing wrong." Children sometimes deny or minimize parental abuse. And the officers knew that two disinterested bystanders were sufficiently alarmed to call 911 and try to block Fishman from driving away.

The district court made a fundamental error in denying the officers' summary judgment on Count III: it considered whether reasonable suspicion existed for kidnapping only. It did not consider other crimes, despite the officers' repeatedly referring to kidnapping *or* child abuse in their summary judgment motion. The district court's reference to J.M.-F.'s misbehavior and the children's apparent lack of physical injury does not disprove the possibility that Fishman committed cruelty to children or assault.

b. Fishman's seizure did not exceed the boundaries of an investigative stop because the officers were diligent in pursuing an investigation to quickly confirm or dispel their suspicions, and the use of handcuffs was consistent with a *Terry* stop under these circumstances. Nothing in this record suggests that the officers were dilatory in their investigation. The stop lasted about 25 minutes, and during that

21

time, officers quickly investigated serious allegations involving a small child. Courts have approved stops of similar length with similarly or even less diligent efforts by officers.

Indeed, the length of the stop here was not attributable to the conduct of the officers but was dictated by the demands of the situation. Reasonable suspicion of kidnapping or physical abuse of a child requires that officers talk to the child. But officers could not talk with J.M.-F. right away. Macaulay (Fishman's wife) at first refused to answer questions and then refused to allow officers to talk with J.M.-F. After about 15 minutes of negotiation, Macaulay finally allowed Officer Brady to talk with J.M.-F.

During this time, it was reasonable to continue to detain Fishman. When investigating allegations of child maltreatment, officers should keep the child and potential abuser separate. Moreover, J.M.-F.'s interview was crucial. She might have given an account of the incident that would require arresting and charging Fishman.

Nor did the use of handcuffs convert the detention into an arrest. Courts have long recognized that *Terry* stops can involve handcuffing a suspect, especially under the circumstances here. Fishman disregarded explicit instructions to remain outside. Instead, he appeared to try to evade the stop and the officer's questions. The district court correctly recognized at an earlier stage of litigation that Officer Jaeger's use of

22

handcuffs to prevent Fishman's attempt to avoid the *Terry* stop was reasonable and did not transform the stop into an arrest.  This justification persisted throughout the 25-minute detention.

Alternatively, even if the stop exceeded the bounds of an investigative stop, the officers had probable cause to arrest Fishman for cruelty to children or assault. The officers had a firsthand account from a reliable witness that Fishman had thrown J.M.-F., a small, resisting child, into a car.  These facts readily satisfy the elements of cruelty to children and assault.  The district court's contrary conclusion was based on the same fundamental error—it ignored any crime other than kidnapping.  But when other relevant crimes are considered, as they must be, the totality of the circumstances gave the officers probable cause to arrest Fishman.

c.  Even if Fishman proves that the officers violated the constitution, they are entitled to qualified immunity because a reasonable officer could have believed that seizing Fishman was lawful, in light of clearly established law and the information that the officers possessed.  The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality.  Indeed, because of the imprecise nature of the Fourth Amendment's reasonableness standard, factually similar precedent is critical.  Fishman, as plaintiff, has the burden to identify a case that put the officers on notice that their conduct was unlawful.

23

He did not and cannot carry that burden. The district court acknowledged this problem, stating it was "unaware of a case with parallel facts to this one." It nonetheless found that factually similar case law was unnecessary because existing precedent places beyond debate that officers need to identify a reason to justify the detention. But the officers here plainly had a reason for detaining Fishman: a reliable eyewitness reported seeing Fishman commit a possible act of child abuse. The district court's contrary conclusion is the product of the same error that infected the rest of its Fourth Amendment analysis: the refusal to consider any crime other than kidnapping.

2. For similar reasons, the district court also erred in entering judgment against Officer Todaro. As explained in Section I, the officers did not violate the Fourth Amendment, or if they did, they are entitled to qualified immunity. These arguments apply fully to Officer Todaro. The district court's ruling against Officer Todaro was based on evidence of his subjective beliefs, specifically his testimony that he did not have reason to disbelieve the girls when A.M.-F. said that Fishman "did not take" J.M.-F. and that J.M.-F. was misbehaving. But an officer's actual motives are irrelevant in assessing the constitutional reasonableness of a stop or arrest. What matters is that the facts known to the officers objectively created probable cause (and reasonable suspicion) that Fishman had committed a crime.

24

3.   This Court should exercise pendent appellate jurisdiction over the common law false arrest claim.   The claim is inextricably intertwined with the Fourth Amendment claims.   In other words, if the Fourth Amendment claims fall then so too does the common law claim.   For the same reasons that there was no Fourth Amendment violation, there was also no false arrest.   But even if the officers were mistaken, they are shielded from liability under a common law immunity.   Under District of Columbia law, an officer is immune if he shows that he believed, in good faith, that his or her conduct was lawful, and this belief was reasonable.   The latter reasonableness standard mirrors that of qualified immunity.

The facts, evaluated from the perspective of the arresting officer, show that the officers were acting in good faith when they temporarily detained Fishman for 25 minutes during their investigation.   Those facts include that Fishman was "angry" and "frustrated," and that a reliable eyewitness saw him throw a resisting child into a car—conduct that may cause grave risk of bodily injury and at minimum could have been an offensive touching.   That the officers ended the stop as soon as they were able to complete their interview with J.M.-F. confirms that they were acting in good faith to decide whether she had been harmed.   And nothing in the record suggests any bad faith or malice.

# ARGUMENT

## I.    The District Court Erred In Denying Summary Judgment For The Officers On The Fourth Amendment Claims.

Two Fourth Amendment claims against the individual officers remain at issue. Count III presumes that Fishman's detention was a *Terry* stop but argues that it was nonetheless a Fourth Amendment violation because, within minutes of detaining Fishman, the officers lacked even reasonable suspicion of a crime justifying any continued detention. Count IV contends, alternatively, that Fishman's detention at some point became a full arrest and was a Fourth Amendment violation because the officers lacked probable cause. The undisputed evidence refutes both theories because, throughout Fishman's detention, the officers had grounds to suspect that he had committed second-degree cruelty to children or assault. And at minimum, the officers are entitled to qualified immunity because no factually apposite precedent established that their conduct was unconstitutional.

### A.    Throughout Fishman's detention there was reasonable suspicion to believe that he had committed a crime (Count III).

A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "Reasonable suspicion is a low bar." *United States v. Smart*, 91 F.4th 214, 223 (4th Cir. 2024). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by

26

a preponderance of the evidence, and obviously less than is necessary for probable cause," *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks and citation omitted)—which itself "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) (noting that even "innocent behavior frequently will provide the basis for a showing of probable cause").

Courts assessing reasonable suspicion must consider the "totality of the circumstances," allowing officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).  The facts leading to a stop are to be "viewed from the standpoint of an objectively reasonable police officer."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996).   And reasonable suspicion, like probable cause, "may be based on the 'collective knowledge of the police.'"  *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (quoting *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978)).  That is, "knowledge possessed by one officer is presumed to be shared by all others cooperating in the investigation." *United States v. Williams*, 951 F.2d 1287, 1290 (D.C. Cir. 1991).

Here, the district court correctly found that at the time Officer Jaeger initially seized Fishman, he had reasonable suspicion to believe that Fishman had kidnapped a child based on the witness report and his confirmation that Fishman was the driver of the car identified by the witness.  JA 63 (dismissing Counts I and II).  The question raised by Count III is whether the officers, collectively, maintained reasonable suspicion of a crime throughout Fishman's roughly 25-minute detention.  The answer is yes.

To be sure, reasonable suspicion of kidnapping dissipated at some point during Fishman's detention—though no earlier than when the officers confirmed the identities and relationships of everyone in the family, given that even a biological parent can engage in parental kidnapping.  *See* D.C. Code § 16-1022.  But the Court need not determine if or when reasonable suspicion of kidnapping dissipated because at all relevant times reasonable suspicion existed for two other crimes: second-degree cruelty to children and assault.

A person is guilty of second-degree cruelty to children if he "intentionally, knowingly, or recklessly . . . [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child."  D.C. Code § 22-1101(b)(1).  The defendant need not intend to harm the child; "intent to do the act that constituted the offense" is sufficient.  *Lee v. United States*, 831 A.2d 378, 382 (D.C. 2003); *see Jones v. United States*, 67 A.3d 547, 549-50 (D.C. 2013).  Nor need the child in fact be

injured; conduct that creates a grave risk of injury—even a minor injury—is sufficient. *See Coffin v. United States*, 917 A.2d 1089, 1093-94 (D.C. 2007); *Lee*, 831 A.2d at 382 (proper "focus[]" is "on the likelihood of injury rather than . . . the degree of injury sustained").

The crime of assault, D.C. Code § 22-404(a)(1), encompasses any battery, which includes any offensive touching. *Perez Hernandez v. United States*, 286 A.3d 990, 998-99 (D.C. 2022) (en banc). Although the defendant must have intended to touch the victim, "[t]here need not be a 'specific intent' to cause injury," *id.* at 1000, "[a]nd no physical injury need have resulted," *id.* at 997-98. Conduct as minor as a shove can constitute an assault. *See id.* at 998 (citing *Dunn v. United States*, 976 A.2d 217 (D.C. 2009)).

The facts known to the officers here would give an objectively reasonable police officer ample basis to suspect that Fishman had committed these crimes. The eyewitness 911 caller—the reliability of whose tip was confirmed as soon as Officer Jaeger began speaking with Fishman—reported that a man "grabbed" a "little girl" of just "six or seven," "threw her over his shoulder," and "threw her into the car." Ex. 6 at 00:30 to 00:35, 00:52 to 01:00. The eyewitness further reported that, even if the man was the girl's father, he was "manhandling his child in a really bad way." Ex. 6 at 00:10 to 00:22. This information, including that the man *threw* the little girl into a car, was relayed to the investigating officers before they detained Fishman.

29

Officer Jaeger, for instance, had been told that a man had "grabbed a girl, threw her over his shoulder, and threw her into a car, and drove off." JA 334. Officer Todaro likewise was told that a "small child was thrown into a green Audi SUV." JA 326. Roughly three to four minutes after Fishman was first detained, the officers obtained further corroboration through Lieutenant Loftus's firsthand interview of the eyewitness. *See* Ex. 1 at 19:43:23 to 19:44:20. She again characterized the incident as a man "manhandling" a "six- or seven-year-old" girl and "throwing her in the car." Ex. 1 at 19:42:46, 19:44:04 to 19:44:20. In her estimate, "if it wasn't an abduction, it was child abuse." Ex. 1 at 19:44:00 to 19:44:05. The witness added that the man's treatment of the child was so evidently "not normal" that another bystander (the driver of the Suburban) physically blocked the road in an effort to prevent Fishman from leaving. Ex. 1 at 19:43:38 to 19:43:48.

This account of an adult male throwing a resisting child into a car was more than enough to create reasonable suspicion of second-degree cruelty to children and assault. Physically throwing a small child in any context creates a grave risk of injury: the child could land wrong and be cut or contused, hit her head, or even break a bone. A child thrown into the confined interior of a car could easily hit a window, a door, or other hard surface. And being thrown against one's will is manifestly an offensive touching, even more so than a mere shove.

30

Although the eyewitness's account was enough on its own to create reasonable suspicion, Fishman's own peculiar conduct added to it. After confirming to Officer Jaeger that he had just returned home, Fishman added without prompting that "that guy who called in has no idea what's going on." Ex. 2 at 19:40:25. Fishman thus confirmed that some kind of confrontation had occurred and his behavior had appeared strange. But rather than explain what had occurred, Fishman appeared to break off the conversation and started to go inside. He continued to do so even after Officer Jaeger twice told him not to go inside. Ex. 2 at 19:40:32 to 19:40:36. Given what Officer Jaeger did and did not know at that time, a reasonable officer could interpret Fishman's behavior as an attempt to flee, evincing consciousness of guilt. *See, e.g., United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005) ("It is well-settled that flight can, in some circumstances, evidence consciousness of guilt."). At minimum, Fishman's refusal to clear up what he characterized as simply a misunderstanding was strange.

Nothing that happened during Fishman's 25-minute detention eliminated reasonable suspicion that he had committed cruelty to children or assault. To be sure, Fishman told officers that he merely "picked [J.M.-F.] up and put her in the car" and did not say he threw her. Ex. 3 at 19:46:22 to 19:46:25. But in the face of a credible eyewitness account, a suspect's protestation of innocence "does not by itself vitiate probable cause," let alone reasonable suspicion, a lower threshold.

31

*Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014); *see Wesby*, 583 U.S. at 61 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts.").    Similarly, the officers were not compelled to accept at face value A.M.-F.'s assertion early in the detention that Fishman "did nothing wrong," Ex. 5 at 14:41:57 to 14:41:59, or J.M.-F.'s eventual statement that Fishman's placement of her in the car was an "easy pickup," Ex. 5 at 15:04:37 to 15:04:50.  It is common knowledge that children sometimes falsely deny or downplay parental abuse for various reasons, including fear that their parents will be arrested, fear that they will be separated from their parents, or fear that their parents will retaliate against them.  In short, Fishman, A.M.-F., and J.M.-F., all had obvious motives to (consciously or unconsciously) minimize the incident and portray it as innocuous.    In contrast, the officers knew that two disinterested bystanders were sufficiently disturbed to call 911 and try to block Fishman from driving away.

Moreover, aspects of A.M.-F.'s and Fishman's statements to the officers *corroborated* the eyewitness's account.    A.M.-F. conceded that Fishman was "frustrated" and "angry."  Ex. 5 at 14:46:19 to 14:46:28.  She also described Fishman as having needed "to put [J.M.-F.] over his shoulder and bring her into the car," Ex. 5 at 14:41:50 to 14:41:59, which was consistent with the eyewitness's observation of "manhandling."   Fishman's own account appeared to confirm the intensity of his

32

anger: he told the officers the initial incident was his "kid . . . being a shit," and called J.M.-F. his "pain in the ass child" (in contrast to A.M.-F., his "good child"). Ex. 3 at 19:46:40 to 19:46:50; Ex. 4 at 20:05:15 to 20:05:20; *see also* Ex. 3 at 19:46:49 to 19:46:55 (Fishman explaining J.M.-F. "calmed down in the car"). A reasonable officer could view this language as supporting a suspicion that Fishman had been angry enough to physically throw J.M.-F. into the car, as the eyewitness reported.

In denying the officers summary judgment on Count III, the district court made a fundamental error: it considered only whether reasonable suspicion existed for *kidnapping*. JA 414 ("Defendant Officers have not shown that they had and maintained reasonable suspicion that Fishman had kidnapped anyone for the full period they detained him."). The district court never considered whether reasonable suspicion existed for other crimes. *See* JA 412-15. That is so even though the District's summary judgment filings repeatedly highlighted that the facts known to the officers supported suspicion of *either* kidnapping *or* child abuse, JA 305, 308-09; JA 391, 395-96, specifically disputed "that kidnapping is the only relevant crime," JA 308, and cited the cruelty-to-children statute, JA 309. The district court's failure to consider other crimes was inexplicable and erroneous.

Nor is the district court's conclusion salvaged by its belief that the "[o]fficers quickly learned" that J.M.-F. "had been misbehaving" and "did not appear to have

been physically harmed." JA 414. Misbehavior by J.M.-F. would not disprove that Fishman committed cruelty to children or assault, nor is physical harm an element of either offense. Given the totality of the circumstances, the officers had reasonable suspicion that Fishman committed these crimes throughout the entirety of his detention.

**B.     Fishman's detention remained a *Terry* stop, but even if it became an arrest, the officers had probable cause (Count IV).**

In Count IV of his complaint, Fishman contends that his detention was or became a full-fledged arrest that was not supported by probable cause. This claim fails as a matter of law. Fishman's seizure did not exceed the boundaries of an investigative stop because the officers were diligent in pursuing an investigation to quickly confirm or dispel their suspicions, and the use of handcuffs was consistent with a *Terry* stop under these circumstances. But even if the stop were considered an arrest, officers had probable cause to arrest Fishman for child cruelty or assault.

1. The detention did not exceed a *Terry* stop. "There is no 'constitutional stopwatch' on investigatory stops." *United States v. Bass*, 996 F.3d 729, 738 (5th Cir. 2021) (quoting *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc)). To assess "whether a detention is too long in duration to be justified as an investigative stop, [courts] consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."

34

*United States v. Sharpe*, 470 U.S. 675, 686 (1985). The Supreme Court has warned that a "court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id*. "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable.'" *Id.* at 686-87 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)). The Supreme Court's warning is pertinent here, where the officers were indeed "acting in a swiftly developing situation" in which the safety of a small child was in question.

Nothing in this record suggests that the officers were in any way dilatory in their investigation. The stop lasted about 25 minutes, and during that time officers quickly investigated serious allegations involving a small child. The investigation proceeded at two locations simultaneously. *See, e.g.*, Ex. 1 (Loftus from 36th Street); Ex. 3 (Tong from O Street). Officers shared information throughout the investigation, without delaying their investigation. *See, e.g.*, Ex. 1 at 19:46:46 to 19:47:33 (Loftus checking in from the 36th Street location); Ex. 4 at 19:59:30 to 20:01:10 (Bray and Loftus check in); Ex. 5 at 15:01:17 to 15:01:54 (Tong briefing Brady while Macaulay was inside the house). The officers interviewed the

35

eyewitness, Fishman, Macaulay, and J.M.-F.  *See* Ex. 1 (Loftus from 36th Street interviewing the witness); Ex. 3 (Tong interviewing Fishman); Ex. 5 (Brady interviewing Macaulay and J.M.-F.).

Courts in this and other jurisdictions have approved *Terry* stops of similar lengths with similarly (and even less) diligent actions by officers.  *See, e.g.*, *United States v. Nurse*, 916 F.2d 20, 24 (D.C. Cir. 1990) (upholding a "detention [that] lasted only twenty to thirty minutes, the amount of time necessary to conduct the canine sniff, and the sniff itself appears to have been conducted diligently, notwithstanding the first dog's failure to perform properly"); *Courson v. McMillian*, 939 F.2d 1479, 1491-92 (11th Cir. 1991) (holding that a thirty-minute detention where "the majority of the time" was "spent awaiting assistance" from backup units); *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994) (holding that a twenty-minute detention was not unreasonable where "the officers questioned both suspects about their identities and activities, contacted other officers to inform them of the encounter, and made a number of calls to verify [a suspect's] identity").

Here, the length of the stop "was simply the result of . . . the demands of [the] particular situation," not the dilatory actions of the officers.  *Sharpe*, 470 U.S. at 688 (internal quotation marks omitted); *see id.* at 687-88 (noting the "delay in this case was attributable almost entirely to the evasive actions of" one of the suspects).  The particular situation—the possible kidnapping or physical abuse of a child—

demanded that the officers speak to J.M.-F. directly to determine (as best they could) if she had been taken against her will, injured, or maltreated in some fashion, as the eyewitness had reported. But it took a while before the officers could speak with J.M.-F., for reasons outside the officers' control. Macaulay initially refused to answer questions and instead demanded a variety of information from the officers. Ex. 5 at 14:46:34 to 14:46:40. She initially also would not allow the officers to talk with J.M.-F. Ex. 5 at 14:56:13 to 14:56:17 ("absolutely not"). From about 2:46 to 3:02 p.m., Officer Brady negotiated with Macaulay, responding to her questions and addressing her demands to facilitate access to J.M.-F. Ex. 5 at 14:46 to 15:02. Finally, at around 3:02 p.m., Macaulay allowed Officer Brady to talk with J.M.-F. and he was able to hear her account of the incident. The officers were thus diligent in "pursu[ing] a means of investigation"—interviewing J.M.-F. herself—"that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686.

Moreover, officers could reasonably conclude that "during [this] time it was necessary to detain" Fishman. *Id.* To start, it was reasonable to detain Fishman to keep him separated from J.M.-F. until the officers were able to interview her, lest Fishman say or do anything to influence her account. Interviewing a child in the presence of a potential abuser would be a "seriously flawed" method of investigation. *Turner v. District of Columbia*, 532 A.2d 662, 671 (D.C. 1987); *cf.* D.C. Code § 4-1301.04(c)(3)(A) (requiring child abuse investigations to include

"[s]eeing the child . . . *outside of the presence of the caretaker or caretakers*" (emphasis added)).  In addition, J.M.-F. might have given a damning account of the incident that would have justified arresting and charging Fishman on the spot.  "Police may hold a person under *Terry* in order to pursue 'the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.'"  *United States v. Tavolacci*, 895 F.2d 1423, 1428 (D.C. Cir. 1990) (quoting *Michigan v. Summers*, 452 U.S. 692, 702 (1981)).  The officers were thus justified in detaining Fishman until they had heard what J.M.-F. had to say.

Finally, the fact that Fishman was handcuffed did not convert his detention into a full arrest.  This Court, like others, has long recognized that a *Terry* stop can involve handcuffing a suspect.  *See, e.g.*, *United States v. Jones*, 973 F.2d 928, 931 (D.C. Cir. 1992) ("A *Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable."), *reh'g granted and opinion vacated in part on other grounds*, 980 F.2d 746 (D.C. Cir. 1992); *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) ("[H]andcuffing—once highly problematic—is becoming quite acceptable in the context of a *Terry* analysis").  That makes sense, since "[a] brief but complete restriction of liberty is valid under *Terry*."  *United States v. Mangum*, 100 F.3d 164, 170 (D.C. Cir. 1996) (internal quotation marks omitted).

Here, handcuffing was reasonable given Fishman's effort to go inside despite Officer Jaeger's instructions to stay outside, which appeared to be an attempt at flight.  Indeed, for just this reason, the district court correctly recognized at an earlier stage of litigation that Officer Jaeger's "use of force, including handcuffs, to prevent Fishman's attempt to avoid the *Terry* stop and Jaeger's questions was also reasonable and did not transform the stop into an arrest."  JA 63.  This justification persisted throughout the entirety of Fishman's seizure.  The district court's contrary conclusion rested on its view that reasonable suspicion dissipated entirely a few minutes into the seizure, but that view was wrong for the reasons described above. *See supra* Section I.A.  The officers had reasonable suspicion that Fishman committed a crime the entire time, and it was reasonable for officers to be concerned that Fishman might flee based on his initial interaction with Officer Jaeger and the possibility that J.M.-F. might provide incriminating evidence.

Of course, from the comfort of a desk chair and with the benefit of hindsight, it might seem unnecessary to have kept Fishman handcuffed.  But such second guessing is exactly what the Supreme Court has warned against.  *Sharpe*, 470 U.S. at 686-87; *see also United States v. Sokolow*, 490 U.S. 1, 10-11 (1989) (explaining the importance of not "unduly hamper[ing] the police's ability to make swift, on-the-spot decisions").

2. Alternatively, even if the stop exceeded the bounds of *Terry*, the officers had probable cause to arrest Fishman. A warrantless arrest "is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Probable cause cannot be reduced to a precise formula, but "[t]he 'substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" *Id.* at 371 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "Probable cause is more than bare suspicion but is less than beyond a reasonable doubt and, indeed, is less than a preponderance of the evidence." *Burnett*, 827 F.3d at 1114. Put otherwise, it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," and it "is not a high bar." *Wesby*, 583 U.S. at 57 (internal quotation marks omitted). Probable cause is analyzed "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (*Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003); *see Daniels v. United States*, 393 F.2d 359, 361 (D.C. Cir. 1968) (noting that an officer will usually not have "firsthand knowledge to constitute probable cause" but

must rely on information from "the putative victim or an eye witness[] who it seems reasonable to believe is telling the truth"). Indicia of reliability include the witness's provision of specific details, such as license plate numbers, descriptions of the suspect and victim, and the basis for her knowledge; the use of the 911 system (given the risk that false reporters will be tracked down); and confirmation by officers of at least some of the witness's account. *Navarette*, 572 U.S. at 398-401; *see also Gates*, 462 U.S. at 234 ("[E]xplicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles [a] tip to greater weight than might otherwise be the case.").

Here, in light of these principles, the eyewitness's report gave the officers probable cause to believe that Fishman had committed cruelty to children or assault by throwing a child into his car. Her report had numerous indicia of reliability: she used the 911 system; she made clear that she was an eyewitness; she provided a detailed description of the events, Fishman, and his car (including its make, color, and license plate); and officers confirmed aspects of her account as soon as they encountered Fishman at his home. And, as explained earlier, the incident she described—a grown man throwing a small, resisting child into a car—could readily satisfy the elements of cruelty to children and assault. *See supra* pp. 28-30. At minimum, an officer could reasonably believe this incident, which is enough for probable cause. *Cf. Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("[R]easonable

suspicion can rest on a mistaken understanding of the scope of a legal prohibition."). From the start of the seizure, then, officers had probable cause to arrest Fishman.

Even if one doubted whether the eyewitness's original 911 report was enough to create probable cause, her subsequent conversation with Lieutenant Loftus surely did. *See* Ex. 1 at 19:43:23 to 19:44:20. In that interview she reiterated her account of the man "throwing" the girl, averred that "if it wasn't an abduction, it was child abuse," and explained that, given the apparent severity of the conduct, another bystander also tried to intervene and block Fishman from leaving. *See supra* p. 6. This interview occurred just minutes into Fishman's detention, at which point the seizure plainly remained a valid *Terry* stop (at minimum).

For the reasons already discussed, the investigation that followed did not dispel the reasonable grounds for belief that Fishman committed the offenses of child cruelty and assault. *See supra* pp. 30-34. As noted, A.M.-F., J.M.-F., and Fishman all had motives to minimize the incident, whereas a disinterested, reliable witness reported physical abuse. "[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 583 U.S. at 61; *see Amobi*, 755 F.3d at 990 (suspect's claim of innocence did not defeat probable cause); *Pendergrast v. United States*, 416 F.2d 776, 784 (D.C. Cir. 1969) ("The indicia of guilt need not be absolute, or even fully consistent; they may leave some room for doubt, and even for error.").

The district court's conclusion that the officers lacked probable cause rested on the same fundamental error already discussed: the failure to consider any crime other than kidnapping. *See supra* pp. 33-34. When considering other relevant crimes, however, the totality of the circumstances gave the officers probable cause to arrest Fishman, rendering his seizure lawful even if it moved beyond a mere *Terry* stop.

### C. At minimum, the officers were entitled to qualified immunity (Counts III and IV).

Even if a plaintiff proves that an officer violated the constitution, the defense of qualified immunity applies so long as "a reasonable officer could have believed that [his action] was lawful, in light of clearly established law and the information the officers possessed." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). In other words, "[t]o defeat a defense of qualified immunity, a plaintiff must show not only that an official violated a constitutional right but also that the right was clearly established at the time of the violation." *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (internal quotation marks omitted). To be clearly established, the "contours" of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 779. This means that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has "repeatedly told courts . . . not to define clearly established law

43

at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 572 U.S. at 779 (ellipses in original) (internal citation and quotation marks omitted).

The Supreme Court has noted that the specificity requirement "is especially important in the Fourth Amendment context." *Wesby*, 583 U.S. at 64 (internal quotation marks omitted). Given the "imprecise nature" of the Fourth Amendment's reasonableness standard, which "cannot be reduced to a neat set of legal rules," factually apposite precedent is critical. *Id.* (internal quotation marks omitted). Unless the violation is "obvious," a plaintiff has the burden to "identify a case that put [the officer] on notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021); *see Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) ("It is [plaintiffs'] burden to show that the particular right in question—narrowly described to fit the factual pattern confronting the officers—was clearly established." (citation omitted)).

Fishman cannot carry his burden to defeat the officers' entitlement to qualified immunity. As of February 2020, there existed no "controlling case or robust consensus of cases . . . finding a Fourth Amendment violation under similar circumstances." *Wesby*, 583 U.S. at 65 (internal quotation marks omitted). Indeed, the district court candidly admitted it was "unaware of a case with parallel facts to

44

this one." JA 418. The officers are likewise unaware of any such case. Nor is this "the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id*. at 64 (internal quotation marks omitted). As the preceding analysis shows, *see supra* pp. 26-43, it is at minimum highly debatable whether the officers violated the Fourth Amendment.

The district court's basis for denying qualified immunity does not withstand scrutiny. The court believed that case law finding a Fourth Amendment violation on similar facts was unnecessary because "existing precedent clearly places . . . beyond debate [that] officers need to be able to articulate *a single reason* to hold an individual in handcuffs for over twenty minutes under either a reasonable suspicion or probable cause standard." JA 418 (emphasis in original). But the officers here plainly had a reason for detaining Fishman: a reliable eyewitness reported seeing Fishman commit an act of possible child abuse; the officers worked diligently to interview the potential victim, J.M.-F., but were delayed by circumstances outside their control; and the officers reasonably sought to keep Fishman separated from J.M.-F. and to prevent his flight until she was interviewed. The district court's contrary conclusion can be explained only as the product of the same key error that infected the rest of its analysis: the refusal to consider any crime other than kidnapping. When other possible crimes are taken into consideration, as they must

45

be, it becomes clear that officers in this scenario could not know that their conduct violated the Fourth Amendment in the absence of factually similar case law. Since none existed, the officers are at minimum entitled to qualified immunity.

## II. The District Court Erred In Entering Judgment Against Officer Todaro Based On Evidence Of His Subjective Beliefs.

The district court did not merely deny Officer Todaro's motion for summary judgment but *granted* Fishman's partial cross-motion and entered judgment *against* Officer Todaro. That was error. For the reasons explained above in Section I, the officers did not violate the Fourth Amendment, or if they did, they are entitled to qualified immunity. These arguments apply fully to Officer Todaro. He did not engage in any distinctive conduct that differed from that of the other officers. Indeed, his body-worn camera footage shows that he had a minimal role in Fishman's detention: he did not initiate the stop, he did not make the decision to handcuff Fishman, and he conducted no interviews. *See* Ex. 7 (Todaro's body-worn camera footage). He was largely in a backup role, standing near the front stoop and later on the corner during and after Officer Tong's interview of Fishman. Ex. 7.

The district court reached its mistaken judgment about Officer Todaro based entirely on evidence of his subjective beliefs about whether Macaulay and the daughters were lying. The court noted that Officer Todaro "admitted in his deposition" that, after hearing from Macaulay and the daughters "that the younger daughter was misbehaving and that Fishman 'did not take' the younger daughter,"

46

"he had no reason to believe the girls were lying." JA 415. Since "Officer Todaro believed that Fishman and Macaulay were the girls' father and mother," the court reasoned, he had "no reasonable suspicion of a kidnapping" and thus no basis to keep Fishman detained. JA 415.

The district court's consideration of Officer Todaro's subjective view was erroneous. "The constitutional reasonableness of a . . . stop [or arrest] does not depend on the actual motivations of the individual officers involved." *United States v. Hill*, 131 F.3d 1056, 1059-60 (D.C. Cir. 1997). Nor does it depend on whether an officer subjectively believes that probable cause (or reasonable suspicion) exists. *See, e.g.*, *United States v. Silva*, 742 F.3d 1, 8 (1st Cir. 2014); *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc); *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991). And an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). The "relevant determination is whether the 'circumstances, viewed objectively, justify' the action taken." *Hill*, 131 F.3d at 1059-60 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); *see United States v. Southerland*, 486 F.3d 1355, 1358-59 (D.C. Cir. 2007) ("Whether a stop is reasonable turns on whether the facts 'viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion' that a [legal] violation occurred.").

It is thus irrelevant whether Officer Todaro subjectively believed that Fishman had kidnapped J.M.-F.; whether he subjectively considered other crimes, such as cruelty to children; or whether he subjectively believed that Fishman's continued detention was legal. What matters is that the facts known to the officers collectively (including Officer Todaro) *objectively* created probable cause (and *a fortiori* reasonable suspicion) that Fishman had committed a crime. Therefore, Officer Todaro did not violate the Fourth Amendment. At minimum, he is entitled to qualified immunity, which likewise turns on "the *objective* legal reasonableness of an official's acts." *Crawford-El v. Britton*, 523 U.S. 574, 590 (1998) (emphasis added) (internal quotation marks omitted); *see id.* at 588 ("Evidence concerning the defendant's subjective intent is simply irrelevant to th[e] defense.").

## III. The Common Law False Imprisonment Claim Fails For The Same Reasons As The Fourth Amendment Claims (Count VI).

1. The Court has jurisdiction to review the district court's disposition of Fishman's common law claim of false imprisonment. The Court has jurisdiction over this appeal under 28 U.S.C. § 1291 to review the denial of qualified immunity on the Fourth Amendment claims. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). And the Court's "pendent appellate jurisdiction" allows it "to reach questions that are inextricably intertwined with ones over which [it has] direct jurisdiction." *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 31 (D.C. Cir. 2000) (internal quotation marks omitted); *see, e.g.*, *Hyde v. City of Willcox*, 23 F.4th 863, 875 (9th

48

Cir. 2022) (exercising pendent appellate jurisdiction over "an otherwise nonappealable ruling" that was "inextricably intertwined" with a qualified immunity decision). "Issues are inextricably intertwined if there is substantial factual overlap bearing on the issues raised." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 161 (2d Cir. 2006) (internal quotation marks omitted).

Here, the district court's ruling on Fishman's common law claim of false imprisonment is inextricably intertwined with its decision to deny the individual officers qualified immunity on the Fourth Amendment claims. "In the District of Columbia, the torts of false arrest and false imprisonment are indistinguishable." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911-12 & n.2 (D.C. Cir. 2015). And "[c]onstitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action." *Amobi*, 755 F.3d at 989 (citing *Scott v. District of Columbia*, 101 F.3d 748, 753-54 (D.C. Cir. 1996); *District of Columbia v. Minor*, 740 A.2d 523, 529 (D.C. 1999) (noting that common law false arrest and constitutional claims rose or fell together)). That makes sense, as they turn on precisely the same facts and raise the same basic legal question of whether those facts justified the seizure. Thus, the Court should exercise jurisdiction over the common law false arrest claim.

2.  The district court's decision on the common law claim should be reversed. The elements of false arrest are: "(1) detention or restraint against one's will within

boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." *Harris*, 776 F.3d at 911-12.   These elements "are substantially identical" to the "elements of a constitutional claim for false arrest." *Scott*, 101 F.3d at 753.  For the reasons laid out above in Sections I.A and I.B, the detention of Fishman was not unlawful.   The officers conducted a *Terry* stop that was legally justified with reasonable suspicion, and even if there was an arrest, it was supported by probable cause. *See Harris*, 776 F.3d at 911-12 ("The existence of probable cause for arrest defeats claims for false arrest and imprisonment.").

But even if the officers were mistaken, they are still shielded from liability. "Under District of Columbia law, a police officer may justify an arrest by demonstrating that '(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable." *Scott*, 101 F.3d at 754-55 (quoting *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993)).   Although this common law standard adds "the requirement of good faith," it otherwise "resembles the section 1983 . . . qualified immunity standard[]." *Minor*, 740 A.2d at 531.  Both elements are satisfied here.

"In evaluating an officer's claim that he or she acted in good faith in making an arrest, the trier of fact must consider the information that was available to the officer from the perspective of the arresting officer, not of the plaintiff." *Bradshaw v. District of Columbia*, 43 A.3d 318, 324 (D.C. 2012) (brackets omitted) (quoting

*Murphy*, 631 A.2d at 36-37 & 37 n. 4)).  Here, the facts show that the officers were acting in good faith.  The facts known to the officers included that Fishman was "angry" and "frustrated," and that a reliable eyewitness saw him throw a resisting child into a car.  Ex. 5 at 14:46:19 to 14:46:34; Ex. 1 at 19:44:04 to 19:44:20.  This conduct may cause grave risk of bodily injury, or at minimum, could have been an offensive touching.  Those facts fully support a "good faith belief that [officers] were acting lawfully in making the arrest," which is separate from "whether [Fishman] had in fact committed [child cruelty]."  *Murphy*, 631 A.2d at 38 (noting that the latter issue is not relevant).  That the officers ended the stop as soon as they were able to complete their interview with J.M.-F. confirms that they were acting in good faith to determine whether she had been harmed during the fight she had with Fishman.  *See, e.g.*, Ex. 4 at 20:00:30 to 20:00:40, 20:04:00, 20:06:20 to 20:06:59.  And nothing in the record suggests any bad faith or malice.  In addition, for the reasons explained in Section I.C regarding why qualified immunity applies, it was reasonable for the officers to believe that their detention of Fishman was lawful.

## CONCLUSION

The Court should reverse and remand with instructions to enter judgment for

appellees on Counts III, IV, and VI.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

GRAHAM E. PHILLIPS
Deputy Solicitor General

/s/ Lucy E. Pittman
LUCY E. PITTMAN
Senior Assistant Attorney General
Bar Number 483416
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-3881
(202) 741-5925 (fax)
lucy.pittman@dc.gov

August 2025

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,693 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Lucy E. Pittman
LUCY E. PITTMAN