NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 25-7050

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JARED FISHMAN,
APPELLEE,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**JOINT APPENDIX**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

GRAHAM E. PHILLIPS
Deputy Solicitor General

LUCY E. PITTMAN
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-3881
lucy.pittman@dc.gov

CHARLES GERSTEIN
JASON HARROW

Gerstein Harrow LLP
400 7th St NE, Ste. 304
Washington, D.C. 20004
jason@gerstein-harrow.com
(323) 744-5293

# TABLE OF CONTENTS

District Court Docket ..................................................................................1

First Amended Complaint ...........................................................................15

District Court's Memorandum Opinion (2/2/2023) ..................................54

Plaintiff's motion for partial summary judgment ....................................76

Plaintiff's memorandum of points and authorities ..................................78

Plaintiff's statement of material facts ......................................................94

Plaintiff's Ex. A (Officer Todaro body-worn camera)—Sealed .........101*

Plaintiff's Ex. B (Officer Todaro deposition) ........................................103

Defendant Officer Todaro's opposition ..................................................219

Defendant Officer Todaro's response to statement of material facts ...................229

Defendant Officer Todaro's Ex. A (Officer Todaro deposition excerpts) ............237

Defendant Officer Todaro's Ex. B (Officer Brady deposition excerpt) ...............243

Defendant Officer Todaro's Ex. C (Officer Jaeger deposition excerpt) ...............247

Defendant Officer Todaro's Ex. D (Officer Welch deposition excerpts) .............253

Defendant Officer Todaro's Ex. E (Sergeant Bray deposition excerpts) .............259

Defendant Officer Todaro's Ex. F (Lieutenant Loftus deposition excerpts) .........271

Plaintiff's reply in support of his motion for partial summary judgment .............277

Defendants' motion for summary judgment and statement of material facts ........289

Defendants' Ex. 1 (Lieutenant Loftus's body-worn camera at 36th Street) ........313*

Defendants' Ex. 2 (Officer Jaeger body-worn camera)—Sealed .......................313*

Defendants' Ex. 3 (Officer Tong's body-worn camera)—Sealed .......................313*

Defendants' Ex. 4 (Sergeant Bray's body-worn camera)—Sealed ....................313*

Defendants' Ex. 5 (Officer Brady's body-worn camera)—Sealed....................313*

Defendants' Ex. 6 (911 call) ........................................................................313*

Defendants' Ex. 7 (Officer Todaro's body-worn camera)—Sealed...................313*

Defendants' Ex. 8 (Lieutenant Loftus's body-worn camera at O Street)—
Sealed ..........................................................................................................313*

Defendants' Ex. 17 (Surveillance video) ......................................................313*

Defendants' Ex. 9 (Officer Tong deposition excerpts)..........................................315

Defendants' Ex. 10 (Officer Brady deposition excerpt)....................................320

Defendants' Ex. 11 (Officer Todaro deposition excerpts).................................323

Defendants' Ex. 12 (Officer Jaeger deposition excerpt) ...................................331

Defendants' Ex. 13 (Sergeant Bray deposition excerpts)...................................336

Defendants' Ex. 14 (Officer Welch deposition excerpt) ...................................345

Defendants' Ex. 15 (Lieutenant Loftus deposition excerpts) ...............................349

Defendants' Ex. 18 (Fishman deposition excerpt) .................................................355

Defendants' Ex. 16 (Investigative Summary).........................................................358

Plaintiff's opposition..................................................................................360

Plaintiff's response to statement of material facts ...................................372

Plaintiff's Ex. A (Sergeant Bray deposition excerpts).............................384

Defendants' reply in support of their motion for summary judgment..................391

District Court's Memorandum Opinion (3/13/2025)...............................403

District Court's Order and Memorandum Opinion (3/13/2025) ..........................420

Notice of Appeal ..................................................................................................421

*Video and audio files were submitted to the Court's Box.com file repository.

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,JURY,TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:21-cv-01847-RJL

FISHMAN v. DISTRICT OF COLUMBIA et al
Assigned to: Judge Richard J. Leon
Demand: $500,000
Case in other court:  USCA, 25-07050
Cause: 42:1983 Civil Rights Act

Date Filed: 07/12/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**JARED FISHMAN**                                   represented by **Emily Gerrick**
GERSTEIN HARROW
1001 G Street NW
Suite 400e
Washington, DC 20001
714-875-1189
Email: emily@gerstein-harrow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Seth Harrow**
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
323-744-5293
Email: jason@gerstein-harrow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Lewis Gerstein**
GERSTEIN HARROW LLP
400 7th Street NW
Suite 304
Washington, DC 20004
202-670-4809
Email: charlie@gerstein-harrow.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**                            represented by **Amanda Torres**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 6th Street NW
Washington, DC 20001

## JA 1

202-807-0368
Email: amanda.torres@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martha J. Mullen**
OFFICE OF ATTORNEY GENERAL/DC
Public Interest Division/Civil Enforcement
Section
400 6th Street NW
Washington, DC 20001
(202) 724-6612
Fax: (202) 730-0635
Email: martha.mullen@dc.gov
*TERMINATED: 05/17/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael K. Addo**
OFFICE OF ATTORNEY GENERAL/DC
441 Fourth Street, NW
6th Floor North
Washington, DC 20001
(202) 724-6539
Fax: (202) 715-0585
Email: michael.addo@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Egan Bryant**
MASSACHUSETTS OFFICE OF THE
ATTORNEY GENERAL
Civil Litigation Division
One Ashburton Place
18th Floor
Boston, MA 02108
617-963-2275
Email: benjamin.e.bryant@mass.gov
*TERMINATED: 10/11/2022*

**Courtney Gladstone**
DISTRICT OF COLUMBIA OFFICE OF
THE ATTORNEY GENERAL
Civil Litigation Division
400 6th Street NW
Washington, DC 20001
202-807-0380
Email: courtney.gladstone@dc.gov
*ATTORNEY TO BE NOTICED*

**Michelina J. Partipilo**
D.C. OFFICE OF THE ATTORNEY
GENERAL
Civil Litigation Division, Section IV

**JA 2**

District of Columbia live database

400 6th St. NW
Washington, DC 20001
202-805-7619
Email: michelina.partipilo@dc.gov
*TERMINATED: 04/24/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PATRICK LOFTUS**                                    represented by   **Amanda Torres**
*Lietenent, of the Metropolitan Police*                                (See above for address)
*Department of the District of Columbia, in*                           *LEAD ATTORNEY*
*his individual capacity*                                              *ATTORNEY TO BE NOTICED*

                                                                       **Martha J. Mullen**
                                                                       (See above for address)
                                                                       *TERMINATED: 05/17/2024*
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Michael K. Addo**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Benjamin Egan Bryant**
                                                                       (See above for address)
                                                                       *TERMINATED: 10/11/2022*

                                                                       **Courtney Gladstone**
                                                                       (See above for address)
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Michelina J. Partipilo**
                                                                       (See above for address)
                                                                       *TERMINATED: 04/24/2025*
                                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**MARCK JAEGER**                                     represented by   **Amanda Torres**
*Officer, of the Metropolitan Police*                                 (See above for address)
*Department of the District of Columbia, in*                          *LEAD ATTORNEY*
*his individual capacity*                                             *ATTORNEY TO BE NOTICED*

                                                                       **Martha J. Mullen**
                                                                       (See above for address)
                                                                       *TERMINATED: 05/17/2024*
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

                                                                       **Michael K. Addo**
                                                                       (See above for address)
                                                                       *LEAD ATTORNEY*
                                                                       *ATTORNEY TO BE NOTICED*

**JA 3**

**Benjamin Egan Bryant**
(See above for address)
*TERMINATED: 10/11/2022*

**Courtney Gladstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michelina J. Partipilo**
(See above for address)
*TERMINATED: 04/24/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN DOE, 2**                                    represented by   **Amanda Torres**
*Officer, currently unidentified officer of the*                    (See above for address)
*Metropolitan Police Department of the*                             *LEAD ATTORNEY*
*District of Columbia, in his official capacity*                    *ATTORNEY TO BE NOTICED*
*TERMINATED: 09/07/2021*

**Martha J. Mullen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Courtney Gladstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN DOE 3**                                     represented by   **Amanda Torres**
*Officer, currently unidentified officer of the*                    (See above for address)
*Metropolitan Police Department of the*                             *LEAD ATTORNEY*
*District of Columbia, in his individual*                           *ATTORNEY TO BE NOTICED*
*capacity*
*TERMINATED: 09/07/2021*

**Martha J. Mullen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Courtney Gladstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN DOE 4**                                     represented by   **Amanda Torres**
*Officer, currently unidentified office of the*                     (See above for address)
*Metropolitan Police Department of the*                             *LEAD ATTORNEY*
*District of Columbia, in his individual*                           *ATTORNEY TO BE NOTICED*
*capacity*
*TERMINATED: 09/07/2021*

**Martha J. Mullen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Courtney Gladstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEREMY BRADY**                    represented by    **Amanda Torres**
*Officer*                                            (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Martha J. Mullen**
                                                     (See above for address)
                                                     *TERMINATED: 05/17/2024*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michael K. Addo**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Benjamin Egan Bryant**
                                                     (See above for address)
                                                     *TERMINATED: 10/11/2022*

                                                     **Courtney Gladstone**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michelina J. Partipilo**
                                                     (See above for address)
                                                     *TERMINATED: 04/24/2025*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL TONG**                    represented by    **Amanda Torres**
*Officer*                                            (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Martha J. Mullen**
                                                     (See above for address)
                                                     *TERMINATED: 05/17/2024*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michael K. Addo**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Benjamin Egan Bryant**
                                                     (See above for address)
                                                     *TERMINATED: 10/11/2022*

**JA 5**

**Courtney Gladstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michelina J. Partipilo**
(See above for address)
*TERMINATED: 04/24/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRISTOPHER TODARO**                 represented by **Amanda Torres**
*Officer; All of the Metropolitan Police*              (See above for address)
*Department of the District of Colimbia, All*           *LEAD ATTORNEY*
*In Their Inidividual Capacity*                         *ATTORNEY TO BE NOTICED*

                                                       **Martha J. Mullen**
                                                       (See above for address)
                                                       *TERMINATED: 05/17/2024*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michael K. Addo**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Benjamin Egan Bryant**
                                                       (See above for address)
                                                       *TERMINATED: 10/11/2022*

                                                       **Courtney Gladstone**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michelina J. Partipilo**
                                                       (See above for address)
                                                       *TERMINATED: 04/24/2025*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/12/2021 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 402 receipt number ADCDC-8591755) filed by JARED FISHMAN. (Attachments: # 1 Civil Cover Sheet, # 2 Summons for the District of Columbia, # 3 Summons for Lt. Patrick Loftus, # 4 Summons for Officer Marck Yeager)(Gerstein, Charles) (Entered: 07/12/2021) |
| 07/12/2021 | | NOTICE OF ERROR re 1 Complaint; emailed to charlie@gerstein-harrow.com, cc'd -1 associated attorneys -- The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (adh, ) (Entered: 07/12/2021) |

**JA 6**

5/1/25, 1:51 PM
District of Columbia live database

| 07/13/2021 | 2 | ERRATA *Adding Individual Defendants' Addresses to Complaint* by JARED FISHMAN. (Gerstein, Charles) (Entered: 07/13/2021) |
| 07/13/2021 | | Case Assigned to Judge Richard J. Leon. (zsb) (Entered: 07/13/2021) |
| 07/13/2021 | 3 | SUMMONS (3) Issued Electronically as to DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS. (Attachments: # 1 Notice and Consent)(adh, ) (Entered: 07/13/2021) |
| 07/16/2021 | 4 | REQUEST FOR SUMMONS TO ISSUE *for Jeremy Brady, Currently Identified as Doe 2* filed by JARED FISHMAN. (Attachments: # 1 Summons for Michael Tong Currently Identified As Doe 3)(Gerstein, Charles) (Entered: 07/16/2021) |
| 07/20/2021 | 5 | SUMMONS (2) Issued Electronically as to JOHN DOE, 2, JOHN DOE 3. (zjf) (Entered: 07/20/2021) |
| 07/27/2021 | 6 | REQUEST FOR SUMMONS TO ISSUE *as to Christopher Todaro, currently identified in the Complaint as John Doe 4* filed by JARED FISHMAN.(Gerstein, Charles) (Entered: 07/27/2021) |
| 07/27/2021 | 7 | MOTION to Substitute Party by JARED FISHMAN. (Attachments: # 1 Text of Proposed Order)(Gerstein, Charles) (Entered: 07/27/2021) |
| 07/27/2021 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 7/27/2021.) ( Answer due for ALL D.C. DEFENDANTS by 8/17/2021 (Gerstein, Charles); Modified text on 8/3/2021 (ztth). (Entered: 07/27/2021) |
| 07/27/2021 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PATRICK LOFTUS served on 7/27/2021 (Gerstein, Charles) (Entered: 07/27/2021) |
| 07/28/2021 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOHN DOE, 2 served on 7/28/2021 (Gerstein, Charles) (Entered: 07/28/2021) |
| 07/28/2021 | 11 | STANDING ORDER. Signed by Judge Richard J. Leon on 07/28/2021. (lcrjl3) (Entered: 07/28/2021) |
| 08/03/2021 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARCK JAEGER served on 7/31/2021 (Gerstein, Charles) (Entered: 08/03/2021) |
| 08/03/2021 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOHN DOE 3 served on 7/29/2021 (Gerstein, Charles) (Entered: 08/03/2021) |
| 08/05/2021 | 14 | SUMMONS (1) Issued Electronically as to JOHN DOE 4. (zjf) (Entered: 08/05/2021) |
| 08/05/2021 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOHN DOE 4 served on 8/5/2021 (Gerstein, Charles) (Entered: 08/05/2021) |
| 08/11/2021 | | MINUTE ORDER. Plaintiff's 7 Motion to Substitute Parties asks this Court to substitute three named police officers in the place of "John Doe Defendants." Plaintiff does not cite a Federal Rule of Civil Procedure or other authority as the basis for request, in violation of the Local Rules. See LCvR 7(a) ("Each motion shall include or be accompanied by a statement of the specific points of law and authority that support the motion[.]"). The proper route for such relief appears to be a motion to amend the complaint under Federal Rule of Civil Procedure 15(a). See 6 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1474 (3d ed. April 2021 update) ("[A] party may make a Rule 15(a) amendment to add, substitute, or drop parties to the action."); accord Davis v. United States, 196 F. Supp. 3d 106, 122 (D.D.C. 2016). However, such motions must include, "as an exhibit, a copy of the proposed pleading as amended." LCvR 15.1. Plaintiff's motion does not include such an exhibit. In light of the foregoing, it is hereby ORDERED that |

JA 7

| | | |
|---|---|---|
| | | plaintiff's 7 Motion to Substitute Parties is DENIED without prejudice. SO ORDERED. Signed by Judge Richard J. Leon on 08/11/2021. (lcrjl3) (Entered: 08/11/2021) |
| 08/18/2021 | 16 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, by DISTRICT OF COLUMBIA, PATRICK LOFTUS. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Bryant, Benjamin) (Entered: 08/18/2021) |
| 08/23/2021 | 17 | MOTION to Dismiss by DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Bryant, Benjamin) (Entered: 08/23/2021) |
| 08/25/2021 | | MINUTE ORDER. Upon consideration of defendants the District of Columbia and Patrick Loftus's 16 Consent Motion to Extend Time to Respond to the Complaint, it is hereby ORDERED that the motion is GRANTED nunc pro tunc. SO ORDERED. Signed by Judge Richard J. Leon on 08/25/2021. (lcrjl3) (Entered: 08/25/2021) |
| 09/07/2021 | 18 | AMENDED COMPLAINT against All Defendants with Jury Demand filed by JARED FISHMAN.(Gerstein, Charles) (Entered: 09/07/2021) |
| 09/14/2021 | 19 | NOTICE of Appearance by Jason Seth Harrow on behalf of JARED FISHMAN (Harrow, Jason) (Entered: 09/14/2021) |
| 09/20/2021 | 20 | REQUEST FOR SUMMONS TO ISSUE filed by JARED FISHMAN. (Attachments: # 1 Summons, # 2 Summons)(Gerstein, Charles) (Entered: 09/20/2021) |
| 09/20/2021 | 21 | SUMMONS (3) Issued Electronically as to JEREMY BRADY, CHRISTOPHER TODARO, MICHAEL TONG. (zjf) (Entered: 09/20/2021) |
| 09/21/2021 | 22 | MOTION to Dismiss *Plaintiff's Amended Complaint* 18 by JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Bryant, Benjamin) (Entered: 09/21/2021) |
| 10/05/2021 | 23 | Memorandum in opposition to re 22 MOTION to Dismiss *Plaintiff's Amended Complaint* 18 filed by JARED FISHMAN. (Attachments: # 1 Exhibit A)(Gerstein, Charles) (Entered: 10/05/2021) |
| 10/07/2021 | 24 | Consent MOTION for Extension of Time to File Response/Reply as to 22 MOTION to Dismiss *Plaintiff's Amended Complaint* 18 *to October 22, 2021* by JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Bryant, Benjamin) (Entered: 10/07/2021) |
| 10/07/2021 | | MINUTE ORDER. Upon consideration of defendants' 24 Consent Motion to Extend Defendants' Deadline to File a Reply Brief In Support of Their Pending Motion to Dismiss, it is hereby ORDERED that the motion is GRANTED. Defendants shall file their reply brief on or before 10/22/2021. SO ORDERED. Signed by Judge Richard J. Leon on 10/07/2021. (lcrjl3) (Entered: 10/07/2021) |
| 10/22/2021 | 25 | REPLY to opposition to motion re 22 MOTION to Dismiss *Plaintiff's Amended Complaint* 18 filed by JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Appendix Attachments A to C)(Bryant, Benjamin) (Entered: 10/22/2021) |
| 10/27/2021 | 26 | MEET AND CONFER STATEMENT. (Bryant, Benjamin) (Entered: 10/27/2021) |
| 02/22/2022 | | MINUTE ORDER. Upon consideration of plaintiff's 18 Amended Complaint, it is hereby ORDERED that defendants' 17 Motion to Dismiss the now-inoperative complaint is |

JA 8

| | | DENIED AS MOOT. SO ORDERED. Signed by Judge Richard J. Leon on 02/22/2022. (lcrjl3) (Entered: 02/22/2022) |
|---|---|---|
| 10/11/2022 | 27 | NOTICE OF SUBSTITUTION OF COUNSEL by Michael K. Addo on behalf of JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG Substituting for attorney Benjamin Bryant (Addo, Michael) (Entered: 10/11/2022) |
| 02/01/2023 | 28 | ENTERED IN ERROR.....NOTICE *of Pendency of Motion to Dismiss and Request for Rule 16 Conference* by JARED FISHMAN re 22 Motion to Dismiss, (Gerstein, Charles) Modified on 2/1/2023 (znmw). (Entered: 02/01/2023) |
| 02/01/2023 | | NOTICE OF ERROR regarding 28 Notice (Other). The following error(s) need correction: Incorrect format (Letter)- correspondence is not permitted (LCvR 5.1(a)). Please refile. (znmw) (Entered: 02/01/2023) |
| 02/01/2023 | 29 | NOTICE *of Pendency of Motion and Request for Rule 16 Conference* by JARED FISHMAN re 22 Motion to Dismiss, (Gerstein, Charles) (Entered: 02/01/2023) |
| 02/01/2023 | 30 | MOTION for Hearing *Rule 16 Conference* by JARED FISHMAN. (See Docket Entry 29 to view document). (znmw) Modified on 4/21/2023 (zsmc). (Entered: 02/02/2023) |
| 02/02/2023 | 31 | MEMORANDUM OPINION. See attached OPINION for details. Signed by Judge Richard J. Leon on 2/2/2023. (lcrjl3) (Entered: 02/02/2023) |
| 02/02/2023 | 32 | ORDER granting in part and denying in part defendants' 22 Motion to Dismiss. See attached ORDER for details. Signed by Judge Richard J. Leon on 2/2/2023. (lcrjl3) (Entered: 02/02/2023) |
| 02/03/2023 | | MINUTE ORDER. Upon consideration of the parties' 26 Joint Meet and Confer Report and plaintiff's 29 Notice of Pendency of Motion and Request for Rule 16 Conference, the parties are hereby ORDERED to submit a proposed scheduling order within 14 days. SO ORDERED. Signed by Judge Richard J. Leon on 2/3/2023. (lcrjl3) (Entered: 02/03/2023) |
| 02/06/2023 | 33 | NOTICE of Appearance by Martha J. Mullen on behalf of All Defendants (Mullen, Martha) (Entered: 02/06/2023) |
| 02/07/2023 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 33 NOTICE of Appearance by Martha J. Mullen on behalf of All Defendants (Mullen, Martha). Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/14/2023. (znmw) Modified on 2/10/2023 (znmw). (Entered: 02/07/2023) |
| 02/09/2023 | 34 | NOTICE OF SUBSTITUTION OF COUNSEL by Martha J. Mullen on behalf of All Defendants Substituting for attorney Michael K. Addo (Mullen, Martha) (Entered: 02/09/2023) |
| 02/09/2023 | 35 | NOTICE of Proposed Order *Scheduling Order* by JARED FISHMAN re Order, (Gerstein, Charles) (Entered: 02/09/2023) |
| 03/07/2023 | | MINUTE ORDER. Upon consideration of 35 Proposed Scheduling Order, it is hereby ORDERED that the parties shall adhere to the following schedule: Deadline to Amend the |

JA 9

| | | |
|---|---|---|
| | | Pleadings & Join Additional Parties - March 17, 2023; Deadline to Exchange Initial Disclosures - March 24, 2023; Plaintiff's Rule 26(a)(2) Expert Disclosures - May 1, 2023; Defendant's Rule 26(a)(2) Expert Disclosures - June 1, 2023; Close of Discovery - June 30, 2023; Dispositive Motion Filing Deadline - July 17, 2023; Opposition to Dispositive Motion Filing Deadline - July 31, 2023; Reply In Support of Dispositive Motion Filing Deadline - September 7, 2023. The Court shall schedule a Pretrial Conference at a later date. SO ORDERED. Signed by Judge Richard J. Leon on 3/7/2023. (lcrjl3) (Entered: 03/07/2023) |
| 03/07/2023 | | Set/Reset Deadlines: Deadline to Amend the Pleadings & Join Additional Parties - March 17, 2023; Deadline to Exchange Initial Disclosures - March 24, 2023; Plaintiff's Rule 26(a)(2) Expert Disclosures - May 1, 2023; Defendant's Rule 26(a)(2) Expert Disclosures - June 1, 2023; Close of Discovery - June 30, 2023; Dispositive Motion Filing Deadline - July 17, 2023; Opposition to Dispositive Motion Filing Deadline - July 31, 2023; Reply In Support of Dispositive Motion Filing Deadline - September 7, 2023. (smc) (Entered: 03/08/2023) |
| 04/11/2023 | 36 | Consent MOTION for Extension of Time to File Answer by JEREMY BRADY, DISTRICT OF COLUMBIA, JOHN DOE, 2, JOHN DOE 3, JOHN DOE 4, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO. (Mullen, Martha) (Entered: 04/11/2023) |
| 04/13/2023 | 37 | Joint MOTION for Extension of Time to Complete Discovery by JARED FISHMAN. (Attachments: # 1 Text of Proposed Order)(Gerstein, Charles) (Entered: 04/13/2023) |
| 04/14/2023 | | MINUTE ORDER. Upon consideration of 36 Defendants' Consent Motion to Late File Their Answer to the First Amended Complaint, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendants shall file their answer on or before 4/14/2023. SO ORDERED. Signed by Judge Richard J. Leon on 4/14/2023. (lcrjl3) (Entered: 04/14/2023) |
| 04/14/2023 | | Set/Reset Deadlines: Answer due by 4/14/2023 (zjch, ) (Entered: 04/14/2023) |
| 04/14/2023 | | MINUTE ORDER. Upon consideration of the parties' 37 Joint Motion to Modify Scheduling Order, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the parties shall adhere to the following schedule: Plaintiff's Rule 26(a)(2) Expert Disclosures - May 22, 2023; Defendants' Rule 26(a)(2) Expert Disclosures - September 12, 2023; Close of Discovery - September 30, 2023; Post-Discovery Status Conference - October 16, 2023; Dispositive Motion Filing Deadline - October 21, 2023; Opposition to Dispositive Motion Filing Deadline - October 31, 2023; Reply in Support of Dispositive Motion Filing Deadline - November 12, 2023. The Court shall schedule a Pretrial Conference at a later date. SO ORDERED. Signed by Judge Richard J. Leon on 4/14/2023. (lcrjl3) Modified close of discovery deadline on 4/14/2023 (zjd). (Entered: 04/14/2023) |
| 04/14/2023 | 38 | *Defendants'* ANSWER to 18 Amended Complaint by JEREMY BRADY, DISTRICT OF COLUMBIA, JOHN DOE, 2, JOHN DOE 3, JOHN DOE 4, MARCK JAEGER, PATRICK LOFTUS.(Mullen, Martha) (Entered: 04/14/2023) |
| 04/14/2023 | | Set/Reset Deadlines/Hearings: Plaintiff's Rule 26(a)(2) due by 5/22/2023. Defendants' Rule 26(a)(2) due by 9/12/2023. Discovery shall conclude on 9/30/2023. Dispositive Motions due by 10/21/2023. Oppositions to Dispositive Motions due by 10/31/2023. Replies in Support of Dispositive Motions due by 11/12/2023. (zjd) (Entered: 04/14/2023) |
| 05/26/2023 | 39 | NOTICE of Appearance by Emily Gerrick on behalf of JARED FISHMAN (Gerrick, Emily) (Entered: 05/26/2023) |
| 06/01/2023 | 40 | NOTICE of Appearance by Amanda Torres on behalf of All Defendants (Torres, Amanda) (Entered: 06/01/2023) |

| 06/28/2023 | 41 | Consent MOTION for Protective Order by JEREMY BRADY, DISTRICT OF COLUMBIA, JOHN DOE, 2, JOHN DOE 3, JOHN DOE 4, MARCK JAEGER, PATRICK LOFTUS. (Mullen, Martha) (Entered: 06/28/2023) |
|---|---|---|
| 07/10/2023 | 42 | ORDER. Upon consideration of defendants' 41 Consent Motion for Protective Order, it is hereby ORDERED that the motion is GRANTED. See attached Protective Order for details. Signed by Judge Richard J. Leon on 7/7/2023. (lcrjl3) (Entered: 07/10/2023) |
| 08/02/2023 | 43 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Samuel Rosen, Filing fee $ 100, receipt number ADCDC-10250383. Fee Status: Fee Paid. by JARED FISHMAN. (Attachments: # 1 Declaration)(Gerstein, Charles) (Attachment 1 replaced on 8/3/2023) (znmw). (Entered: 08/02/2023) |
| 08/09/2023 | | MINUTE ORDER. Upon consideration of 43 Motion for the Admission of Samuel Rosen to Practice Pro Hac Vice, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that attorney Samuel Rosen be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Richard J. Leon on 8/9/2023. (lcrjl3) (Entered: 08/09/2023) |
| 09/19/2023 | | MINUTE ORDER. It is hereby ORDERED that the post-discovery status conference currently scheduled for October 16, 2023, is VACATED and continued until October 19, 2023, at 4:00 PM in Courtroom 18 (in person) before Judge Richard J. Leon. It is further ORDERED that the parties shall submit a joint status report one week in advance of the post-discovery status conference advising the Court on what the parties intend to discuss at the conference. Signed by Judge Richard J. Leon on 9/19/2023. (lcrjl3) (Entered: 09/19/2023) |
| 09/20/2023 | | Set/Reset Hearings: Post-Discovery Status Conference set for 10/19/2023 at 4:00 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. (smc) (Entered: 09/20/2023) |
| 09/29/2023 | 44 | MOTION for Extension of Time to Complete Discovery by JEREMY BRADY, DISTRICT OF COLUMBIA, JOHN DOE, 2, JOHN DOE 3, JOHN DOE 4, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Torres, Amanda) (Entered: 09/29/2023) |
| 10/02/2023 | | NOTICE OF ERROR re 44 Motion for Extension of Time to Complete Discovery; emailed to amanda.torres@dc.gov, cc'd 8 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following for future filings; do not refile document**, 2. Future filings may be ENTERED IN ERROR, 3. Invalid attorney signature; signature on document must match PACER log in. (znmw, ) (Entered: 10/02/2023) |
| 10/02/2023 | 45 | Memorandum in opposition to re 44 Motion for Extension of Time to Complete Discovery, filed by JARED FISHMAN. (Attachments: # 1 Declaration of Jason Harrow with Exhibit, # 2 Text of Proposed Order)(Harrow, Jason) (Entered: 10/02/2023) |
| 10/03/2023 | | MINUTE ORDER. Upon consideration of 44 Defendants' Opposed Motion to Modify the Scheduling Order, 45 Plaintiff's Opposition to Defendants' Opposed Motion to Modify the Scheduling Order, and the entire record herein, it is hereby ORDERED that defendants' motion is GRANTED IN PART and DENIED IN PART, nunc pro tunc. The Court finds good cause the extend the deadlines for discovery and dispositive motions briefing to allow additional time for plaintiff's deposition and to facilitate settlement discussions. However, the Court declines to adopt the deadlines proposed by defendants. It is instead ORDERED that the parties shall adhere to the following amended schedule: Close of Discovery - October 30, 2023; Dispositive Motions - November 20, 2023; Oppositions to Dispositive Motions - December 1, 2023; Replies in Support of Dispositive Motions - December 12, |

5/1/25, 1:51 PM                                    District of Columbia live database

| | | |
|---|---|---|
| | | 2023. It is further ORDERED that the post-discovery status conference currently set for October 19, 2023, is VACATED and will be rescheduled by the Court at a later date. SO ORDERED. Signed by Judge Richard J. Leon on 10/3/2023. (lcrjl3) (Entered: 10/03/2023) |
| 10/30/2023 | | MINUTE ORDER. It is hereby ORDERED that the post-discovery status conference previously scheduled for October 19, 2023, is rescheduled for November 16, 2023, at 3:30 PM in Courtroom 18 (in person) before Judge Richard J. Leon. It is further ORDERED that the parties shall submit a joint status report one week in advance of the post-discovery status conference advising the Court on what the parties intend to discuss at the conference. SO ORDERED. Signed by Judge Richard J. Leon on 10/30/2023. (lcrjl3) (Entered: 10/30/2023) |
| 10/31/2023 | | Set/Reset Hearings: Post-Discovery Status Conference set for 11/16/2023 at 3:30 PM in Courtroom 18- In Person before Judge Richard J. Leon. (smc) (Entered: 10/31/2023) |
| 11/13/2023 | 46 | Joint STATUS REPORT by JARED FISHMAN. (Gerrick, Emily) (Entered: 11/13/2023) |
| 11/15/2023 | | MINUTE ORDER. Upon consideration of the parties' 46 Joint Status Report, it is hereby ORDERED that the post-discovery status conference currently scheduled for November 16, 2023, at 3:30 PM and continued without date. If defendants seek additional time to file their dispositive motions beyond the current November 20, 2023 deadline, defendants may file a motion to that effect, to include the reasons why a further extension is warranted. The Court will schedule a trial date and pretrial conference at a later date. SO ORDERED. Signed by Judge Richard J. Leon on 11/15/2023. (lcrjl3) (Entered: 11/15/2023) |
| 11/20/2023 | 47 | MOTION for Partial Summary Judgment by JARED FISHMAN. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order, # 4 Exhibit A (Notice of Video), # 5 Exhibit B (Todaro Transcript))(Harrow, Jason) (Entered: 11/20/2023) |
| 11/27/2023 | 48 | MOTION for Extension of Time to File *Opposition to Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment* by JEREMY BRADY, DISTRICT OF COLUMBIA, JOHN DOE, 2, JOHN DOE 3, JOHN DOE 4, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Torres, Amanda) (Entered: 11/27/2023) |
| 11/27/2023 | 49 | RESPONSE re 48 MOTION for Extension of Time to File *Opposition to Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment* filed by JARED FISHMAN. (Harrow, Jason) (Entered: 11/27/2023) |
| 11/28/2023 | | MINUTE ORDER. Upon consideration of 48 Defendants' Opposed Motion to Modify the Scheduling Order, plaintiff's 49 Memorandum of Points and Authorities in Partial Opposition to Defendants' Motion to Modify the Scheduling Order, and the entire record herein, it is hereby ORDERED that defendants' motion is GRANTED IN PART and DENIED IN PART, nunc pro tunc. The parties shall adhere to the following briefing schedule: Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment - December 13, 2023; Plaintiff's Reply in Support of Partial Summary Judgment - December 27, 2023; Defendants' Motion for Summary Judgment - December 27, 2023; Plaintiff's Opposition to Defendants' Motion for Summary Judgment - January 19, 2024; Defendants' Reply in Support of Summary Judgment - February 2, 2024. Should the parties agree to a different briefing schedule, they are welcome to file a motion with their joint proposal. SO ORDERED. Signed by Judge Richard J. Leon on 11/28/2023. (lcrjl3) (Entered: 11/28/2023) |
| 12/13/2023 | 50 | Memorandum in opposition to re 47 Motion for Partial Summary Judgment, filed by CHRISTOPHER TODARO. (Attachments: # 1 Statement of Facts, # 2 Exhibit A, # 3 |

**JA 12**

| | | Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Text of Proposed Order)(Torres, Amanda) (Entered: 12/13/2023) |
|---|---|---|
| 12/14/2023 | 51 | MOTION for Extension of Time to File *Motion for Summary Judgment* by JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Torres, Amanda) (Entered: 12/14/2023) |
| 12/15/2023 | 52 | RESPONSE re 51 MOTION for Extension of Time to File *Motion for Summary Judgment* filed by JARED FISHMAN. (Gerstein, Charles) (Entered: 12/15/2023) |
| 12/21/2023 | | MINUTE ORDER. Upon consideration of 51 Defendants' Opposed Motion to Modify the Scheduling Order, plaintiff's 52 Memorandum of Points and Authorities in Opposition to Defendants' (Latest) Motion to Modify the Scheduling Order, and the entire record herein, it is hereby ORDERED that the motion is GRANTED. The parties shall adhere to the following amended schedule: Plaintiff's Reply in Support of Partial Summary Judgment - January 10, 2024; Defendants' Motion for Summary Judgment - January 10, 2024; Plaintiff's Opposition to Defendants' Motion for Summary Judgment - February 2, 2024; Defendants' Reply in Support of Summary Judgment - February 16, 2024. Defendants are advised that absent truly extraordinary circumstances, this is the last opposed request for an extension of the summary judgment briefing deadlines that will be granted by this Court. SO ORDERED. Signed by Judge Richard J. Leon on 12/21/2023. (lcrjl3) (Entered: 12/21/2023) |
| 01/10/2024 | 53 | REPLY to opposition to motion re 47 MOTION for Partial Summary Judgment *Plaintiff's Reply in Support of Summary Judgment* filed by JARED FISHMAN. (Gerrick, Emily) (Entered: 01/10/2024) |
| 01/10/2024 | 54 | MOTION for Summary Judgment *on behalf of Defendants* by JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit)(Torres, Amanda) (Entered: 01/10/2024) |
| 02/02/2024 | 55 | Memorandum in opposition to re 54 Motion for Summary Judgment, filed by JARED FISHMAN. (Attachments: # 1 Statement of Facts Plaintiffs Response To Defendants Statement Of Undisputed Material Facts In Support Of Defendants Opposed Motion For Summary Judgment, # 2 Exhibit Plaintiff's Exhibit A)(Gerrick, Emily) (Entered: 02/02/2024) |
| 02/16/2024 | 56 | REPLY to opposition to motion re 54 MOTION for Summary Judgment *on behalf of Defendants* filed by JEREMY BRADY, DISTRICT OF COLUMBIA, JOHN DOE, 2, JOHN DOE 3, JOHN DOE 4, MARCK JAEGER, PATRICK LOFTUS. (Mullen, Martha) (Entered: 02/16/2024) |
| 02/20/2024 | 57 | NOTICE of Appearance by Michelina J. Partipilo on behalf of All Defendants (Partipilo, Michelina) (Entered: 02/20/2024) |
| 05/17/2024 | 58 | NOTICE OF WITHDRAWAL OF APPEARANCE as to JEREMY BRADY, DISTRICT OF COLUMBIA, MARCK JAEGER, PATRICK LOFTUS, CHRISTOPHER TODARO, MICHAEL TONG. Attorney Martha J. Mullen terminated. (Mullen, Martha) (Entered: 05/17/2024) |
| 03/13/2025 | 59 | MEMORANDUM AND OPINION GRANTING 47 plaintiff's motion for partial summary judgment and DENYING 54 defendants' motion for summary judgment. See attached memorandum opinion for details. Signed by Judge Richard J. Leon on 03/12/2025. (lcrjl3) (Entered: 03/13/2025) |

## JA 13

| 03/13/2025 | 60 | ORDER GRANTING 47 plaintiff's motion for partial summary judgment and DENYING 54 defendants' motion for summary judgment. See attached order for details. Signed by Judge Richard J. Leon on 03/12/2025. (lcrjl3) (Entered: 03/13/2025) |
| 04/10/2025 | 61 | NOTICE OF APPEAL TO DC CIRCUIT COURT by JEREMY BRADY, MARCK JAEGER, MICHAEL TONG, PATRICK LOFTUS, CHRISTOPHER TODARO, DISTRICT OF COLUMBIA. Fee Status: No Fee Paid. Parties have been notified. (Partipilo, Michelina) (Entered: 04/10/2025) |
| 04/11/2025 | 62 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 61 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 04/11/2025) |
| 04/14/2025 |  | USCA Case Number 25-7050 for 61 Notice of Appeal to DC Circuit Court filed by MICHAEL TONG, JEREMY BRADY, PATRICK LOFTUS, MARCK JAEGER, DISTRICT OF COLUMBIA, CHRISTOPHER TODARO. (zjm) (Entered: 04/15/2025) |
| 04/24/2025 | 63 | NOTICE OF SUBSTITUTION OF COUNSEL by Courtney Gladstone on behalf of All Defendants Substituting for attorney Michelina Partipilo (Gladstone, Courtney) (Entered: 04/24/2025) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 05/01/2025 11:23:50 | | |
| **PACER Login:** | martaoag | **Client Code:** |  |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01847-RJL |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JARED FISHMAN, 2703 O St. NW, Washington, DC, <br><br> Plaintiff, <br><br> v. <br><br> THE DISTRICT OF COLUMBIA; and LIETENANT PATRICK LOFTUS, OFFICER MARCK JAEGER, OFFICER JEREMY BRADY, OFFICER MICHAEL TONG, and OFFICER CHRISTOPHER TODARO, all of the Metropolitan Police Department of the District of Columbia, all in their individual capacity, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 21-cv-1847<br>)  Jury Trial Demanded<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FIRST AMENDED COMPLAINT**

1.      On February 17, 2020, Plaintiff Jared Fishman took his two daughters to a restaurant. When they left, Fishman's younger daughter was acting up in a way familiar to almost every parent of a toddler: refusing to get in the car. So Fishman picked the child up and put her in the car. Unbeknownst to Fishman, a passerby called the police and, based on that call, Officer Marck Jaeger, who was at a nearby 7-11, drove to Fishman's house. There Jaeger encountered Fishman sitting on the front stoop, shoeless, playing Bob Dylan's "Simple Twist of Fate" on an acoustic guitar.

2.      When Jaeger asked Fishman to clear up what was going on, Fishman sighed, stood up, said "hang on a sec," and walked into his house, leaving his door mostly open. Jaeger pushed Fishman's door further open, took two steps into his house, took him to the ground, dragged him out onto the street, and handcuffed him. At that moment, Officers Brady, Tong, and Todaro arrived, and two young girls appeared at the front door, which was still open. The older girl immediately explained that her sister had been misbehaving and her father had done nothing wrong, as the younger girl begged the officers to release her father. Moments later, the girls' mother appeared and explained that the girls are her children and Fishman is their father. But the Defendants, instead of immediately releasing Fishman, walked him to the end of his block and held him there, handcuffed and shoeless, as his neighbors gawked at him, for more than 25 minutes.

3.      Throughout his detention, Fishman protested that Jaeger had no right to enter his house and, therefore, that Jaeger had illegally searched and seized him.

In retaliation, Defendant Lieutenant Patrick Loftus, above his official title, and using his official address and email address, filed two ethics complaints against Fishman that contained false, misleading, and unsupportable contentions.

4.    Because no reasonable officer could have thought the circumstances permitted him to barge into Fishman's home without a warrant, because no reasonable officer could have believed that there was any justification for detaining Fishman after his wife and children confirmed that he did nothing wrong, and because a government official used his office to retaliate against Fishman's protected speech, Defendants violated Fishman's constitutional rights. And because the individual officer defendants violated the common law of the District of Columbia in the course of their employment, they and the District are liable to Fishman. He brings this action seeking compensation for the harms he suffered.

## Parties

5.    Jared Fishman is a 44-year-old father of two daughters. He is a civil-rights lawyer. For 14 years, he worked for the Civil Rights Division of the United States Department of Justice, and he now runs a non-profit initiative dedicated to developing data-based solutions for a more equitable criminal justice system.

6.    Officer Marck Jaeger is a police officer with the Metropolitan Police Department of the District of Columbia. During the incident giving rise to this Action he was wearing an Axon body-worn camera labeled X81012311. Jaeger initially approached Fishman, barged into his home, and, within view of girls who were obviously his children, handcuffed him on apparent suspicion of kidnapping.

7.      Officer Jeremy Brady is a police officer with the Metropolitan Police Department of the District of Columbia. He is a light-skinned man in his twenties or thirties, and during the incident giving rise to this Action he was wearing a yellow vest and an Axon body-worn camera labeled X6039B1P8. He initially interviewed Fishman's wife and daughter and refused to effect Fishman's release or even to tell other officers what he knew despite acknowledging that the girls were Fishman's daughters and that they reported no concerns other than that they wanted to see their father released.

8.      Officer Michael Tong is a police officer with the Metropolitan Police Department of the District of Columbia. During the incident giving rise to this Action, he was wearing an Axon body-worn camera labeled X81014714. Based on body-worn-camera footage of the incident giving rise to this Action and a police report generated the same day, his name is likely Michael Tong. He interviewed Fishman on the corner at the end of his block and unreasonably kept him in handcuffs after Fishman voluntarily explained the events of the day in a manner that perfectly matched his wife's and daughters' accounts and evinced no improper behavior whatever, let alone a crime.

9.      Officer Christopher Todaro is a police officer with the Metropolitan Police Department of the District of Columbia. During the incident giving rise to this Action he was wearing an Axon body-worn camera labeled X81137651. He interviewed Fishman's family alongside Brady and continued to participate in his detention despite acknowledging that the girls were Fishman's daughters and that

they reported no concerns other than that they wanted to see their father released and despite hearing Fishman confirm that the two girls were his daughters.

10.    Lieutenant Patrick Loftus is the commanding officer of the Second District of the Metropolitan Police Department of the District of Columbia. He arrived towards the end of the incident giving rise to this Action, told Fishman and his wife that Jaeger's actions were justified and that Fishman should be thankful that officers responded as they did, and retaliated against Fishman's protected speech by filing bar and ethics complaints against him under color of his office as a government official.

11.    Jaeger, Brady, Tong, Todaro, and Loftus are sued in their individual capacities for actions taken under color of law. Plaintiff has relied on the representations of counsel for the District of Columbia to ascertain the identities of the individual officers.

12.    The District of Columbia is sued under the doctrine of *respondeat superior* for claims based on D.C. common law only.

**Jurisdiction and Venue**

13.    Fishman brings this Action under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment rights to be free from unreasonable entry into his home without a warrant, seizure without reasonable suspicion, arrest without probable cause, and retaliation in violation of the First Amendment; and under the common law of the District of Columbia, alleging trespass and negligence. This Court has subject-matter jurisdiction over Fishman's § 1983 claims under 28 U.S.C. § 1331, and the Court may exercise supplemental jurisdiction over Fishman's common-law claims

under 28 U.S.C. § 1367. Venue is proper in this district because all of the events complained of occurred in this district.

### A Mistaken 9-1-1 Call

14.    On February 17, 2020, Fishman took his two daughters to Cactus Cantina on Wisconsin Avenue in the District of Columbia.

15.    During their meal, Fishman's younger daughter was bothering his older daughter by kicking her under the table. The two girls argued, and when the family left the restaurant, Fishman's younger daughter refused to get in the car.

16.    Fishman and the older daughter let the younger daughter walk around for a few minutes, figuring that she would eventually relent and get in the car.

17.    She didn't, and so Fishman did what any good parent would do in the situation: He picked up his younger daughter and put her in her car seat in the back of his car. And the younger daughter did as many recalcitrant young children would do in the situation: She vigorously protested.

18.    Moments after Fishman secured his younger daughter and got into the driver's seat, a man in his late fifties came to Fishman's window and asked if everything was alright. Fishman told the man that his "daughter was being a pain in the ass," that everything was fine, and that he was taking her home.

19.    The man walked away and Fishman, irritated but calm, drove south on Wisconsin Avenue towards his home in Georgetown. As the family was driving home, Fishman's younger daughter calmed down. When they got home, the family went inside and Fishman's daughters asked their mother if they could watch TV, which she said they could, and which they did.

20.     Sometime after Fishman left the restaurant, though, a woman called 9-1-1. Fishman never saw this woman, and he had no idea anyone had called the police.

21.     The woman said she had seen an "incident." "I don't know if it was an abduction, or a father manhandling his child . . . . I saw this little girl walking by herself, she was probably six or seven, so I pulled over to see if she was by herself or with an adult. Then I saw this guy pull up, and he tried to talk to her, then he started screaming at her, and she pushed him, and he just threw her into the car . . . . Then this other guy pulled over and tried to help, and he said 'it's my daughter,' but the other guy wasn't convinced."

22.     The woman then described her location and explained that although she did not get Fishman's license plate, the other passerby had. The woman gave the 9-1-1 operator a description of Fishman and Fishman's car, and read out his license plate.

23.     After collecting identifying information, the 9-1-1 operator responded "there's not much we can do with the information you gave, but I'm still gonna send an officer to the location . . . . It looked like she was just walking down the street?"

24.     The woman responded that the girl looked "sad" and that she was "way too young to be by herself," and so the woman explained that she pulled over to see "if there was a parent walking behind her, or something."

25.     At 2:33 PM, the 9-1-1 operator put out a radio run for nearby police officers reporting the call and listing a code "KIDUNK-KIDNAP/ABDUCT-STRANGER OR RELATIONSHIP UNKOWN." The radio run listed Fishman's

license plate and described him as a bald white male, possibly in his 40s. Based on the registration of Fishman's car, the dispatcher found Fishman's address and put out a radio run to respond to that address.

## Jaeger Responds

26.    Jaeger heard the call with Fishman's address while he was parked in a police car in front of the 7-Eleven on 27th and P St, Northwest, which is a block away from Fishman's house.

27.    Jaeger drove to Fishman's block, finding Fishman's car parked on the street.

28.    "I'm in the block of that vehicle," Jaeger told the dispatcher. "The person is sitting on the front steps at that address. I'm going to go up and speak to him."

29.    On the radio, others were speaking. The radio traffic made it clear that multiple police officers were on the way to Jaeger's location. One person said, "we are overhead and have a visual on the officer." A helicopter was audibly hovering overhead.

30.    Jaeger parked his car and walked up to Fishman, who was sitting on his front steps, calmly playing an acoustic guitar, wearing white socks and no shoes. Jaeger heard a few bars of "Simple Twist of Fate," by Bob Dylan. Fishman stopped playing as Jaeger approached.

31.    "Hey how are you doing, sir?," Jaeger asked from the foot of Fishman's steps.

32.    "How's it going," Fishman calmly responded.

33.    "You don't drive an Audi, do you?," Jaeger asked.

7

**JA 22**

34.    "I do," Fishman calmly responded.

35.    "Did you just get home?," Jaeger asked.

36.    "I did just get home," Fishman responded, slightly irritated but fully calm.

37.    Fishman now realized that someone near Cactus Cantina must have called the police, and Fishman figured it must have been the man he spoke to.

38.    So Fishman said to Jaeger: "And that guy who called in has no idea what's going on."

39.    "Maybe you can help me with what's going on," Jaeger said.

40.    Fishman sighed, exasperated but calm. "Hold on one sec," he said. He then quietly said to himself "you've gotta be kidding me," slowly stood up, and walked into his house.

41.    "Hey," Jaeger said, a bit firmer than earlier, but still calm, "hang tight for a second, don't go inside."

42.    As Fishman stepped over the threshold of his doorway, Jaeger walked up the steps and said "don't go inside."

43.    Fishman, at least three full steps inside his home, past the bottom of the stairs leading to the second floor, said "you don't have the right to enter my house."

### Jaeger Enters Fishman's Home and Arrests Him

44.    After Fishman had stepped inside his home, Jaeger pushed the door, which had been mostly open, all the way open.

45.    Jaeger, with his feet in Fishman's home, screamed "step out."

46.     Jaeger grabbed Fishman by his arms (twisting his left arm and holding his right), dragged him onto his front steps, and took him to the ground as Fishman was shouting "You do not have the right to enter my house. I am not doing anything, and you do not have the right to enter my house."

47.     Jaeger shouted at Fishman, demanding that he put his hands behind his back, which Fishman did.

48.     At least three other officers, including Brady, Tong, and Todaro, arrived at Fishman's house as Jaeger was handcuffing him.

### Jaeger Detains Fishman Even Though Any Suspicion Immediately Dissipated

49.     As Jaeger was putting handcuffs on Fishman, with at least three other officers—including all of the Officer Defendants here—don the scene and a helicopter overhead, two girls appeared in Fishman's doorway.

50.     The younger girl shrieked and cried, within earshot of Jaeger, Brady, and Tong, asking the officers to stop what they're doing.

51.     The older girl said that her father had done nothing wrong, and that instead "it is my sister, she was misbehaving."

52.     The younger girl frantically pleaded with the officers, saying "he hasn't done anything wrong, please, please."

53.     Fishman asked "who is in charge here?"

54.     The officers began to walk Fishman away from his house.

55.     Fishman, concerned for his younger daughter, who was shrieking inconsolably, said "I would like to do this in front of my kids."

56.    One of the officers said "no."

57.    At this point, Jaeger, Brady, and Tong were in front of Fishman's house and they could all hear what Fishman's children and Fishman had said in paragraphs 50–56 of this complaint.

58.    Tong walked with Fishman, who did not resist, and at least one other unidentified officer, down O Street to the corner of 27th Street.

59.    At the same time, Todaro arrived and began speaking with Fishman's children through the front door of Fishman's home.

60.    Jaeger then walked back to the house, stood at the bottom of the steps and observed the scene silently, as Brady stood at the top of the stairs with Fishman's daughters and wife.

61.    Fishman's younger daughter was still very upset. She screamed "Please don't arrest him, he hasn't done anything wrong."

62.    Fishman's older daughter then said "He did not take my sister. My sister was misbehaving, and he brought her into the car."

63.    Jaeger, Brady, and Todaro saw Fishman's wife, and the mother of their children, in the doorway holding the younger daughter as the younger daughter said "It was my fault, he didn't do anything wrong." The mother quickly retreated to console the younger daughter, who was screaming and crying. The officers could hear Fishman's wife consoling their younger daughter, describing Fishman as "daddy" and explaining that there had merely been a misunderstanding.

64.    Within seconds of handcuffing Fishman, no reasonable person—let alone a reasonable law-enforcement officer with any level of training and experience—could possibly have believed that he possessed any evidence of a crime, let alone of a kidnapping: Jaeger, Brady, Tong, and Todaro immediately saw two girls who identified themselves as Fishman's children in Fishman's home, both of whom said that Fishman had done nothing wrong and both of whom quickly explained exactly what had happened. The officers saw a woman who was obviously the children's mother, also in Fishman's home, comforting her screaming child. And Fishman told them that he would like to stay with *his* kids. The law required that Fishman be immediately released. He was not.

## Jaeger, Brady, Tong, and Todaro Continue Fishman's Detention Despite Conclusive Evidence that he Did Nothing Wrong

65.    As Tong held Fishman in handcuffs at the end of his block, Brady and Todaro interviewed Fishman's family through the front door of their home and Jaeger watched, periodically walking up and down the block and talking to other officers.

66.    As described above, Fishman's wife immediately came to the doorway and picked up Fishman's younger daughter, who was still shrieking "no" and "please don't," begging the officers not to arrest her father. And Fishman's older daughter explained that her father "did not take my sister," that "she was misbehaving [and] he brought her to the car."

67.    Fishman's older daughter was calm, and her body language appeared to indicate that she was baffled by the police response.

68.    Fishman's wife carried Fishman's younger daughter into the home, attempting to calm her down, but both could still be seen from the street and the steps.

69.    Todaro told Fishman's older daughter: "We got a call that a male picked up a child and put her over his shoulder and took her in a car, and abducted her, so of course we take that very seriously and so . . . we're just investigating." He asked her whether "she [was] there the whole time."

70.    The older daughter told Todaro "I was in the car in the front seat, my sister was misbehaving and she wouldn't get into the car and come home. We didn't want her to get taken or anything. And she wasn't listening and my dad had to put her over his shoulder and get her into the car. He did nothing wrong."

71.    A few seconds later, Fishman's younger daughter reappeared, again protesting that her father had done nothing wrong. Brady asked for the younger daughter's name, which she gave him.

72.    Moments later, Fishman's wife, in full view and earshot of Brady and Todaro, told the younger daughter "what happened was that someone misunderstood, someone saw daddy pick you up and didn't know it was daddy."

73.    Fishman's wife and younger daughter came to the door as his wife was still trying to explain to her daughter what was happing.

74.    Brady asked for Fishman's older daughter's name, which she gave him. Fishman's wife, kneeling to comfort Fishman's younger daughter, told Brady "I think what would help is if you could bring him back here so she can see him." Brady then

explained that he would not do that because he needed to speak to everyone separately, but attempted to comfort Fishman's younger daughter by telling her that her father was right at the end of the block.

75.    Meanwhile, as Brady spoke with Fishman's family at his house, Jaeger and Todaro walked between Fishman, who was in handcuffs and the end of the block, and Fishman's house. Jaeger's body-worn camera was blocked for some of this time, but he can be heard saying "I'm trying to get a sergeant out here," and he can hear another person saying that a sergeant is on his way.

76.    When the footage came back on, Jaeger slowly walked back to Fishman's house, where he could see Brady interviewing Fishman's older daughter.

77.    Jaeger then went to speak with another officer (not a party here), who is Black and in his 20's or 30's. Both were speaking very quietly. They were in front of Fishman's house.

78.    Jaeger said: "So concerned citizen stopped bald man who grabbed a girl, put her, girl over his shoulder, put her in a car and drives off."

79.    The other officer asked: "And it's his daughter?"

80.    Jaeger said: "That's what it looks like now."

81.    Meanwhile, within earshot of Jaeger, Brady was speaking with Fishman's wife and younger daughter and Todaro went between Fishman's home and the corner where Fishman was detained. Todaro saw Brady calmly interviewing Fishman's family and heard Fishman give Tong identifying information for himself and his daughters.

82.    Brady, attempting to calm Fishman's younger daughter, said "Can I tell you what's going to happen with your daddy. We're just going to talk to him. And if nothing happened, we're just going to bring him right back home. Nothing bad is going to happen to him."

83.    Brady said to Fishman's wife "So we got a call for a child abduction and . . . they described the vehicle, and was that your husband and your daughter?"

84.    Fishman's wife said "yes" to both questions.

85.    After Brady explained how he arrived at the same, Fishman's wife said: "I would like to go to where my husband is right now." Brady responded that they had to keep everybody separated.

86.    Brady then said: "As I mentioned to your daughter, nothing happened, we're going to take a report of what we got a call for, what our actions were, and then we're going to get you guys back together."

87.    Fishman's wife said: "My number one priority is my daughter, could you bring him back just so she can see him and see that he's okay, and then you can question him?" Brady said no.

88.    Fishman's wife asked Brady to pass the message on to his colleagues that her daughter is obviously traumatized and that it would really help her just to see her father. Brady said "they know that—they know she is very upset, they were the first two here, but this is our procedure. We don't want to keep you separated any longer than we have to."

89.     Throughout his conversation with Fishman's wife, Fishman's younger daughter was visible periodically, crying but beginning to calm down.

90.     Brady did not pass the message along, and instead decided to ask some questions himself. He took identifying information from Fishman's wife, and she confirmed that she and Fishman are married and that they are the parents of the children.

91.     Brady asked Fishman's wife if the younger daughter was upset about anything or if "anything was going on," or if there were "any issues." Fishman's wife said she had no information about what happened that morning because she wasn't there, but said "did she refuse to get in the car and he put her in the car? Yeah, that sounds possible . . . . If you need to do more questioning—and I can't imagine why, you got here and he's playing guitar with the two kids in the house—but if you need to, could you please bring him back here? This is scary."

92.     Brady said that Fishman was in handcuffs and that Fishman's wife probably didn't want her daughter to see her father in handcuffs. Fishman's wife said that was right, but said "for obvious reasons, he should not be in handcuffs." To this, Brady responded: "we have certain protocols, based on the allegations, that we have to follow, until we can rule it otherwise."

93.     Brady asked if he could interview Fishman's younger daughter.

94.     Fishman's wife said: "Absolutely not."

95.    Brady said: "We just want to talk to her to make sure everything is okay," to which Fishman's wife responded, "What did you hear her saying just now, what did you hear her expressing?"

96.    Brady then said: "She said nothing happened, but I would like to actually talk to her."

97.    After some more back and forth, Brady said he could not conclude his investigation and release Fishman until he had spoken to all the people involved, including Fishman's younger daughter. Fishman's wife asked what her rights were, and Brady told her "you can deny speaking with us, but that may delay everything. If you don't want your daughters to speak to us, I'll speak to my officials," who he said were on their way.

98.    Fishman's wife initially refused again to let Brady speak to her younger daughter, concerned that the daughter was already traumatized by the experience and that she would be further scared. Brady explained that he would be asking only straightforward questions about whether anything was wrong.

99.    Fishman's wife picked up the younger daughter and explained that part of a police officer's job is "to keep everybody safe." Fishman's wife asked her daughter to step inside for a second and continued to ask Brady about the questions he would ask the younger daughter, concerned that he would further frighten and traumatize her. Once they had confirmed that Brady would ask only where they were and whether the younger daughter was hurt, and that Brady would turn down the noise on his radio and would smile when he spoke to the younger daughter, Fishman's wife

agreed to let her daughter speak to Brady, who again had said "we have to do our diligence before we can wrap this up."

100.    After a few minutes, Fishman's wife came to the door with her younger daughter and instructed the daughter to answer Brady's questions. Brady asked Fishman's younger daughter what happened, and she explained that she had a fight with her sister, ran away from the car, and that her father picked her up and put her in the car. She said she was not hurt. Brady asked if there was any yelling or if it was difficult for her father to pick her up. Fishman's younger daughter said that she may have yelled but that her father picked her up gently and easily.

101.    Jaeger, Brady and, and, and Todaro had, so far, done nothing to cause Fishman to be released despite not only knowing that there was no evidence of any impropriety, let alone any crime, but *saying* that there was no evidence of a crime. Instead, Brady appeared to believe that he was required by some "protocol" to continue to handcuff Fishman and separate him from his family.

## Tong and Todaro Do Nothing Despite Conclusive Evidence that Fishman is Wrongly Detained

102.    Tong arrived on the scene shortly after Fishman was handcuffed. When he first arrived, he saw Fishman on the ground in front of his steps, and two girls in the doorway of the house, one of them screaming "please, no."

103.    While Jaeger, Brady, and Todaro were interviewing Fishman's family, Tong took Fishman to the corner of 27th Street NW.

104.    When Tong encountered Fishman, his glasses were askew on his face.

105.    As Tong began taking Fishman down the block, Fishman said "I would like to do this in front of my kids."

106.    Tong responded "No, no, no, we're not going to do this in front of your kids. If you want to talk to a supervisor, we can do that later but let's just walk around the corner here."

107.    Fishman said: "That guy entered my house without probable cause . . . so he entered, I told him I did not want to speak with him. I went into my house, and he entered my house without probable cause." Fishman asked if Tong would remove the handcuffs, and Tong said no.

108.    Tong asked Fishman if he was injured at all, and Fishman responded "Yeah I'm injured, the guy threw me to the fucking ground. Can you straighten my glasses?" Tong straightened Fishman's glasses and asked Fishman what injuries he had. Fishman said he had injured his left arm, but said "Can we move on? I want to move on because I know what happened" and refused Tong's offer of medical attention.

109.    Fishman then asked if he could go back to his house, to which Tong responded "Okay, I don't know who you are. Could you give me your name, date of birth, all that information?" Fishman said: "I would like to know why I'm being stopped," to which Tong responded "Listen, I'm asking you for information."

110.    "I understand," Fishman said, "and I am asking you, I have the right to know why I'm being stopped, detained, and handcuffed in front of my own house."

111.    Tong said: "I don't have enough information to answer your question." Fishman asked again why he was being detained and why an officer illegally entered his house, and Tong responded again that he did not have enough information to answer the question.

112.    Fishman asked if Tong was under arrest, and another officer said "you're being detained."

113.    Tong then asked Fishman for identifying information, which he reluctantly provided, noting throughout that he wanted to know why he was being detained and asking whether he needs to contact a lawyer. Fishman asked that Tong run a check for his identifying information "in NCIC"—Fishman had already given his name, date of birth, and address, and Tong was asking him how tall he was and how much he weighed—so that "I can get out of handcuffs and get back to my family." Tong persisted in asking for more identifying information.

114.    Tong then asked Fishman what happened in the past hour or so.

115.    Fishman responded, calmly and fully cooperatively: "I went to lunch with my two children. During that lunch, my youngest daughter kept irritating her older sister. Refusing to stop kicking her. We left. My younger daughter refused to get in the car. Walked down 36th street. Started to walk up towards Wisconsin. She refused."

116.    Tong interjected to ask where the family was having lunch.

117.    Fishman continued: "At Cactus Cantina. She refused to get in the car. I was trying to get her in the car safely. It took us about twenty minutes trying to get

19

**JA 34**

her in the car. She didn't. I picked her up, I put her in the car. That was the time that big car stopped in front of me. Asked me if there was a problem. I said there was none other than my kid was being a shit. And then we came home. My daughter calmed down in the car and we're now in the house. Both of my kids are now in the house, moving on with our day."

118.    Tong then asked for identifying information for Fishman's daughters, which he provided.

119.    After he was done providing identifying information for his daughters, Fishman asked if Tong would remove the handcuffs and said: "I'm not going anywhere." Tong refused. Fishman asked if Tong would scratch Fishman's face, which another officer at the scene said they could not do.

120.    "Mother of God," Fishman said, "I'll do it over the damn fire hydrant." He then bent down and rubbed his face along a nearby fire hydrant.

121.    Tong then left Fishman in the custody of Todaro and another officer at the corner and walked back to Fishman's house.

122.    At Fishman's house, Tong encountered another officer, who asked him what happened. Tong told the other officer: "So he's saying he was dining with his family. It was Cactus Cantina, the only one there is Wisconsin and Macomb. And the two daughters were irritating each other. So then he picked up the older daughter, put her in the car. And then a car stopped in front of him and asked him if there was an issue. He said there was no issue. He drove home and that was it."

123.    Yet another officer then approached Tong, and Tong repeated the same version of events that Fishman had told him, except that he again switched the age order of Fishman's daughters.

124.    One of the other officers then told Tong that Lieutenant Loftus was going "up to 36th street," which is near Cactus Cantina, "and then here."

125.    Tong and Todaro so far had done nothing to secure Fishman's release, even though they knew from the moment he arrived on the scene that the children in question were Fishman's, even though Fishman had just fully explained the events of the morning in a manner consistent with how his daughters had independently done so, and even though the officers had no evidence whatever that Fishman had committed any crime.

## Fishman is Finally Released

126.    After Tong returned to Fishman's home, Fishman stood silently on the corner in the custody of Todaro and another officer for several minutes.

127.    As Fishman stood handcuffed in his socks in the physical custody of two uniformed police officers—one of them held Fishman's arm throughout—and a police helicopter circled overhead, several pedestrians walked past and observed the scene, which was also visible from the windows of all of the houses on the east side of 27th street and many of the windows on the west side of the street too. One of Fishman's neighbors walked out of a house on the west side of 27th street and saw the scene, walking by slowly to gawk at it. A few cars drive by slowly as well.

128.   A few minutes after Tong left Fishman, the officer who had him in custody moved him a bit by pushing him on his handcuffed arms. This officer told Fishman that someone was taking a picture of him.

129.   About nineteen minutes after Fishman was initially tackled and arrested in his home, a Metropolitan Police Department sergeant, whose name (based on body-worn-camera footage and a police report) is likely Adam Bray, arrived on the scene.

130.   Jaeger immediately told the sergeant his version of events: "So basically, the whole call comes out, you heard that part. I get here, I see him matching the description, playing a guitar on the steps. I go up to talk to him. I ask him is this your car, did you just get home all that stuff. And then he goes I'm done talking to you, tries to go in the house and then I grab him, pull out the handcuffs. Now I guess he said his shoulder hurts but he doesn't want any medical attention."

131.   The sergeant asked Jaeger where Fishman is and asked "what's the issue?"

132.   Jaeger responded "I don't know. I kinda stepped back cause they all seem kinda mad at me for putting him in handcuffs." When the sergeant asked who was mad at him, Jaeger responded, but the recording of his response is not audible.

133.   Jaeger then said "The guy in handcuffs not talking to anybody. And the wife's kind of upset about it because she said it's scary."

134.   This was false: Fishman had explained what happened to Tong within minutes of being brought to the corner.

135.    The sergeant then asked Jaeger "Where's the kid?," and Jaeger responded that "the kid's inside—it definitely sounds like it was his daughter." "And who's the guy?," the sergeant asked. "She's saying it's biological mother and father of the daughter inside," Jaeger responded. "Well why is the guy not talking?," the sergeant asked, to which Jaeger responded "I think he's upset because I stepped into the house to grab him." The sergeant asked why Fishman was stepping into the house, and Jaeger said "because he didn't want to talk to me."

136.    This too was false: Fishman had not said he did not want to talk to Jaeger when he walked into the house, and although he later told Tong that he had not wanted to talk to Jaeger, he had said that only because Jaeger illegally entered his house. In fact, Fishman had said "hold on one sec," indicating that he would be back, and Fishman's door was mostly open when Jaeger entered.

137.    The sergeant then walked away from Jaeger and, after a couple minutes of waiting, encountered Lieutenant Patrick Loftus, who arrived in a police car with a woman who appeared to be in her 20's and was wearing civilian clothes.

138.    Loftus explained through the rolled-down window of his car that the incident had begun with a report from a passerby that a man had picked up a girl and put her in a car.

139.    The sergeant then told Loftus: "So Jaeger went up and he saw a guy that matches the description playing the guitar sitting on the steps. And he went up and talked to him. And started talking to him and the guy said I'm done, I don't want to talk to you anymore and he went to go step inside the house. And as he went to go

23

**JA 38**

step in the house Jaeger grabbed him and said no you're not free to go." To this Loftus nodded and said "Good! Absolutely!"

140.    False again: Fishman was already well inside his house when Jaeger stepped inside to remove him, as Jaeger himself had just said.

141.    The sergeant continued: "And he put him in handcuffs and walked him around the corner and now the woman in the purple, who I haven't spoken to is speaking to [an officer whose name was redacted from body-worn-camera footage] appears to be the mother and she's claiming she's the biological mother. She's also claiming the person around the corner is the biological father. The child is in the house, but she's not allowing us to talk to the kid. That's where I'm at right now."

142.    False yet again: although Fishman's wife had initially protested when Brady asked to interview the younger daughter, the younger daughter had in fact spoken to Brady, and she had already said that Fishman had done nothing wrong about fifteen minutes before the sergeant arrived. And even before doing that, Fishman's younger daughter had protested that her father had done nothing wrong the moment he was being handcuffed.

143.    Lieutenant Loftus then explained that he was concerned that Fishman was insufficiently grateful for the police presence that day: "I definitely want to see this kid . . . make a notification to youth division, just to let them know, especially if they're not trying to be cooperative. Like if it was a complete misunderstanding, yeah sure check them out, they're okay, I apologize, thanks for, I'm glad you guys did this if this was a legit kidnapping, I appreciate . . . . So that makes me a little concerned."

144.    After this exchange, the sergeant walked over to the corner, where he found Fishman still in handcuffs.

145.    After Fishman explained that Jaeger had barged into his house and handcuffed him, the sergeant told Fishman that the police are investigating a kidnapping.

146.    This was the first time—more than 21 minutes after he was initially arrested—that anyone explained to Fishman that anyone suspected a kidnapping.

147.    Fishman laughed, and the sergeant said "It might seem silly to you, but we take it pretty seriously." Fishman explained that "It's my children. They're my children. They live in this house. I'm sure they've told you that. Or told whomever they've spoken to."

148.    The sergeant responded: "We haven't spoken to anybody. That's kind of why like you're still in cuffs and I want to get you out of cuffs and that's why you're, I don't know who the woman is in the purple."

149.    Fishman then attempted to explain why it would not be suspicious if his children and wife refused to speak to police officers, not knowing at the time that both of his children and his wife had, in fact, spoken to the officers and confirmed that Fishman had done nothing wrong: "The woman is my wife," Fishman said. "I'm a Department of Justice Civil Rights Attorney [which Fishman was at the time of the incident], I prosecute police officers who violate the Constitution as a job. My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child."

150.    The sergeant then said: "Okay, well the reason we're responding the way we're responding is because the way it was conveyed to the police is that you grabbed, somebody matching your description, grabbed a kid, threw the kid into the car, which then alerted us to say well we have a lookout for the car. Officers canvassing for the car, they see the car, they see someone who matches your description, the description of the lookout that we have, we stop you. Then all of a sudden, you don't want to talk, so it just starts raising flags, like we want to make sure the kid is okay. . . . [T]he only thing that we need to do is make sure that the child is okay and is yours and then that's why. And I see you standing here in your socks. I understand that you were sitting on your own steps."

151.    Fishman responded: "I would appreciate the cuffs being removed. I can show you the child, she will tell you that I am her father. That she was being a pain in the ass, refusing to get into my car. But I'm going to need to get the cuffs off my hands and I'm happy to tell my child. My older daughter was there, will tell you that her sister was being a pain in the ass. My good child was in the car, my pain in the ass child was refusing to get in the car. We gave her about fifteen minutes to walk around the block. She was getting up to Wisconsin, I said it was getting unsafe, so I picked her up and I put her in my car."

152.    Fishman did not know that his children had already said that at least 19 minutes earlier, and that the sergeant's only stated reason for detaining him—to "make sure that the child is okay and is yours"—had already been accomplished.

153.    The sergeant then ordered an officer to take Fishman out of handcuffs, which the other officer did.

154.    Fishman had been in handcuffs for a little more than 25 minutes.

155.    He still did not have shoes on.

156.    It had been 25 minutes since all the Officer Defendants heard and saw the events described in paragraphs 50–56 of this Complaint.

157.    It had been approximately 24 minutes and thirty seconds since Todaro and Tong heard and saw the events described in paragraphs 59–60 of this Complaint.

158.    It had been at least 19 minutes since Tong heard and saw the events described in paragraphs 116–118 of this Complaint.

159.    After Fishman was taken out of handcuffs, he, the sergeant, and other officers walked back to his house.

160.    Loftus then argued with Fishman's wife about whether, in fact, Fishman's detention was justified and whether Jaeger permissibly entered Fishman's home, ending the conversation by noting that he would "be the one doing the investigations for any type of complaint or anything like that. Everything is justified, I know you might be frustrated at the situation. But again you should feel good at the response if this was a legitimate kidnapping your daughter would be safe. We take calls very seriously . . . . Again, this was 100% justified, I do all the investigations. Your husband has no right to refuse when we're investigating something like that we're going to detain him based on the information that we're dealing with a kidnapping . . . . Everything's all on camera."

161.    Fishman said to Loftus, discussing Jaeger, "The guy kicked down my door after I . . .," and Loftus interjected "your door is working fine" and contended that Fishman "can't tell [Jaeger] that [Fishman didn't want to speak to him] when we're investigating a kidnapping." Fishman said: "I know that I was retreating into my house and then he slammed me to the stairs."

162.    Loftus then tells the family that he and his colleagues are mandatory reporters to the Youth and Family Services Division and, therefore, that a child-abuse investigation would be opened.

163.    Loftus and the rest of the officers then left.

164.    On March 26, 2020, a detective with the Youth and Family Services Division confirmed to Fishman that the investigation into Fishman's conduct had been closed as "unfounded": MPD had concluded that Fishman had not abused either of his children.

## Fishman Seeks Records and Alleges Constitutional Violations

165.    On March 6, 2020, Fishman filed a formal request for records under the District of Columbia's Freedom of Information Act.

166.    That request reads, among other things, that Fishman "was the victim of police misconduct."

## Loftus Files Materially False Ethics Complaints Against Fishman in Retaliation for Fishman's Complaints Against Other Officers

167.    On April 29, 2020, Loftus filed a grievance complaint with the Maryland State Bar, of which Fishman is a member.

168.  On the complaint, Loftus listed as his address "Metropolitan Police Department Second District 3320 Idaho Ave. NW." He lists his official MPD email address, and refers to himself in the signature block as "Lt. Patrick Loftus."

169.  Loftus's complaint indicates that he had filed another complaint with the United States Department of Justice Office of Professional Responsibility and Office of Inspector General on February 17, 2020, the day Fishman was arrested.

170.  Loftus's complaint alleges that Fishman made "deceitful and intentional misrepresentations regarding being slammed to the ground and his door being broken." These statements, Loftus's complaint alleges, are "extremely concerning for an officer of the court." Loftus contends that "Body Worn Camera footage . . . clearly capture[s] . . . Mr. Fishman lower[ing] himself to a seated position on his stairs."

171.  This is false. Jaeger pulled Fishman to the ground, twisting Fishman's arm.

172.  Loftus's complaint alleges that Fishman "spontaneously stated on Body Worn Camera 'I'm a Department of Justice Civil Rights attorney. I prosecute police officers who violate the constitution.' Mr. Fishman's career was not material to our investigation into a kidnapping. Further, Mr. Fishman intentionally, knowingly, and voluntarily identified his employer and made the subsequent statement 'I prosecute police officers who violate the constitution' to use his official position as an attorney with the United States Government to intimidate the officers, to influence the officers, or to gain preferential treatment."

173.    This is false. Fishman explained his position in direct response to the sergeant's false statement to Fishman that Fishman's family was not speaking to the police. Fishman said nothing about his employer for more than 20 minutes, and only after it had become clear that he was in no legal jeopardy. Fishman was not attempting to use his official position to intimidate anyone or gain any preferential treatment; he wanted only to dispel whatever suspicion may have arisen—and none in fact had—from Fishman's family's supposed silence (which was false anyway) by explaining that silence would not indicate wrongdoing because his family had a reason not to trust police officers.

174.    Loftus's complaint evinces that he had watched the body-worn-camera footage of the incident giving rise to this Action.

175.    Loftus's complaint then adds two paragraphs outlining the supposed evidence against Fishman (arising from Loftus's reported conversations with witnesses near Cactus Cantina) and stating that MPD's "Youth and Family Services Division conducted an investigation into allegations of physical abuse," without noting that this investigation concluded that there had been no physical abuse, which of course there had not been.

176.    These paragraphs add nothing to the complaint because whether there was evidence as Loftus cites has nothing to do with the subject of the complaint, which is whether Fishman misrepresented the facts or misused his authority.

177.    Loftus does not, and cannot, contend that these supposed facts have any bearing on Fishman's capacity to practice law because all the investigations into Fishman's conduct on February 17, 2020, concluded that he had done nothing wrong.

178.    Loftus added these paragraphs to damage Fishman's reputation in retaliation for Fishman's statements that Jaeger illegally entered his home.

179.    Loftus's filed his complaints against Fishman in retaliation for Fishman's statements to him that Jaeger had violated the Constitution and Fishman's allegations in his FOIA requests.

180.    Fishman responded to Loftus's complaint a few weeks later.

181.    On June 6, 2021, Fishman emailed disciplinary counsel for the Maryland State Bar to ask about the status of Loftus's complaint.

182.    On June 7, 2021, disciplinary counsel sent Fishman and Loftus a letter noting that the complaint had been dismissed without prejudice. The letter did not provide substantive reasoning, but it noted that Loftus mentioned that body-worn-camera footage captured the incident but had not yet provided it.

### **The Harm to Fishman**

183.    Fishman was thrown to the ground and dragged out of his own home in front of his shrieking, traumatized child. This caused him physical pain and emotional distress.

184.    He was separated from his family against his will, unable to comfort his child and assure her that he was okay. This caused him emotional distress.

185.   He was held, in handcuffs and socks, for 25 minutes despite protesting that this was unnecessary and uncomfortable. This caused him physical pain and emotional distress.

186.   His neighbors saw him surrounded by police officers, on a block full of police cars, as a police helicopter hovered audibly overhead for almost half an hour. This caused him emotional distress and harmed his reputation.

187.   He was forced to spend hours of his time responding to meritless ethics complaints.

188.   He was made to worry that Loftus would damage his professional reputation, with his employer and others, causing him emotional distress.

## Claims for Relief

### *Count One*: Warrantless Entry into Fishman's Home in Violation of the Fourth Amendment (Against Jaeger) Under 42 U.S.C. § 1983

189.   Fishman incorporates all prior paragraphs here.

190.   Jaeger entered Fishman's home without a warrant and without permission to do so after Fishman had slowly and calmly walked inside his home.

191.   No exigent circumstances justified Jaeger's entry.

192.   Because Jaeger entered Fishman's home without a warrant or any valid exception to the warrant requirement, Jaeger is liable to Fishman under 42 U.S.C. § 1983.

### *Count Two*: Illegal Warrantless Arrest in Fishman's Home in Violation of the Fourth Amendment (Against Jaeger) Under 42 U.S.C. § 1983

193.    Fishman incorporates all prior paragraphs here.

194.    Jaeger entered Fishman's home without a warrant and without permission to do so after Fishman had slowly and calmly walked inside his home.

195.    No exigent circumstances justified Jaeger's entry.

196.    Jaeger physically seized Fishman within his home.

197.    Because Jaeger arrested Fishman in his home without a warrant or any valid exception to the warrant requirement, Jaeger is liable to Fishman under 42 U.S.C. § 1983.

### *Count Three*: Seizure of Fishman Without Reasonable Suspicion in Violation of the Fourth Amendment (Against All Individual Officer Defendants) Under 42 U.S.C. § 1983

198.    Fishman incorporates all prior paragraphs here.

199.    Individual Officer Defendants handcuffed Fishman and restrained his physical liberty for more than 25 minutes even though within seconds of seizing him Individual Defendants were presented with evidence that dissipated any suspicion that the prior 9-1-1 call may have given them.

200.    Individual Officer Defendants continued to restrain Fishman's physical liberty as more and more evidence appeared conclusively showing that Fishman had done nothing improper, let alone criminal.

201.    Individual Officer Defendants therefore seized Fishman without reasonable suspicion in violation of the Fourth Amendment, and they are liable to Fishman under 42 U.S.C. § 1983.

### *Count Four*: Arrest of Fishman Without Probable Cause in Violation of the Fourth Amendment (Against All Individual Officer Defendants) Under 42 U.S.C. § 1983

202.   Fishman incorporates all prior paragraphs here.

203.   Individual Officer Defendants handcuffed Fishman and restrained his physical liberty for more than 25 minutes even though within seconds of seizing him Individual Officer Defendants were presented with evidence that dissipated any suspicion that the prior 9-1-1 call may have given them.

204.   Individual Officer Defendants continued to restrain Fishman's physical liberty as more and more evidence appeared conclusively showing that Fishman had done nothing improper, let alone criminal.

205.   Individual Officer Defendants' prolonged detention of Fishman constituted an arrest.

206.   Individual Officer Defendants therefore detained Fishman without probable cause in violation of the Fourth Amendment, and they are liable to Fishman under 42 U.S.C. § 1983.

### *Count Five*: Trespass (Against Jaeger and the District of Columbia) Under the Common Law of the District of Columbia

207.   Fishman incorporates all prior paragraphs here.

208.   Jaeger entered Fishman's property without Fishman's permission.

209.   Because Jaeger had not secured a warrant and was not protected by any exception to the constitutional warrant requirement, his entry onto Fishman's property was not privileged, and, therefore, constituted a trespass under the common law of the District of Columbia.

210.    And because Jaeger acted within the scope of his employment as an Officer of the Metropolitan Police Department of the District of Columbia, the District is liable under the doctrine of *respondeat superior*.

211.    On July 21, 2020, Fishman's prior counsel noticed the Mayor of the District of Columbia that Jaeger had committed, among other violations, trespass to property.

### *Count Six*: **False Imprisonment (Against Individual Officer Defendants and the District of Columbia) Under the Common Law of the District of Columbia**

212.    Fishman incorporates all prior paragraphs here.

213.    Individual Officer Defendants handcuffed Fishman and restrained his physical liberty for more than 25 minutes even though within seconds of seizing him Individual Officer Defendants were presented with evidence that dissipated any suspicion that the prior 9-1-1 call may have given them.

214.    Individual Officer Defendants continued to restrain Fishman's physical liberty as more and more evidence appeared conclusively showing that Fishman had done nothing improper, let alone criminal.

215.    Individual Officer Defendants' words, as captured on body-worn-camera footage, indicate that they all subjectively knew that the children were Fishman's and that there was no evidence of criminal child abuse, and to the extent that the officers did not subjectively know those things their states of mind were unreasonable.

216.    Individual Officer Defendants acted within the scope of their employment as Officers of the Metropolitan Police Department of the District of Columbia, and so the District is liable under the doctrine of *respondeat superior*.

217.    On July 21, 2020, Fishman's prior counsel noticed the Mayor of the District of Columbia that Individual Defendants had committed, among other violations, false imprisonment.

### *Count Seven*: Negligence (Against Individual Officer Defendants and the District of Columbia) Under the Common Law of the District of Columbia, Pleaded in the Alternative to Counts One, Two, Three, and Six

218.    Fishman incorporates all prior paragraphs here.

219.    Individual Officer Defendants had a duty as police officers to reasonably communicate the information they knew to each other to expeditiously secure Fishman's release when (at the latest) they had learned that his children had confirmed his version of events.

220.    Individual Officer Defendants breached that duty by failing to communicate necessary information to each other.

221.    To the extent any Individual Officer Defendants did not intentionally cause Fishman to be jailed after it was obvious that there was no evidence of any crime, those Individual Defendants failed to exercise reasonable care in alerting their fellow officers that there was no evidence of any crime.

222.    Individual Officer Defendants' failure to alert each other that there was no evidence of any crime caused Fishman to be detained longer than he would have

been had Individual Officer Defendants acted as a reasonably prudent police officer should have under the circumstances.

223.    Fishman's prolonged detention harmed him by causing him emotional distress and damaging his reputation among his neighbors.

224.    On July 21, 2020, Fishman's prior counsel noticed the Mayor of the District of Columbia that Individual Defendants had committed, among other violations, negligence.

### *Count Eight*: Retaliation in Violation of the First Amendment (Against Loftus) Under 42 U.S.C. § 1983

225.    Fishman incorporates all prior paragraphs here.

226.    Fishman complained to Loftus, the sergeant, and other Officer Defendants that Jaeger's entry into his home had been unlawful.

227.    This speech is protected by the First Amendment.

228.    Loftus, acting under color of law, filed a bar complaint that lacked a reasonable basis in fact and law because Fishman complained about Jaeger's unlawful entry into his home.

229.    Loftus added gratuitous and misleading allegations against Fishman in an attempt to damage his reputation.

230.    Being the subject of a meritless bar complaint would deter a person of ordinary firmness from engaging in constitutionally protected criticism of police officers' conduct.

231.    Loftus therefore violated Fishman's First Amendment rights.

## **Prayer for Relief**

Plaintiff Jared Fishman respectfully requests:

- An award of compensatory damages;
- An award of one dollar in nominal damages for unlawful entry into Fishman's home;
- An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and
- All other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
611 Pennsylvania Ave SE, No. 317
Washington, DC 20003
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,         )
                              )
      **Plaintiff**          )
                              )
      **v.**                 )       **Civil Case No. 21-1847 (RJL)**
                              )
**THE DISTRICT OF COLUMBIA, and**  )
**LIEUTENANT PATRICK LOFTUS,**  )
**OFFICER MARCK JAEGER,**       )
**OFFICER JEREMY BRADY,**      )
**OFFICER MICHAEL TONG, and**    )
**OFFICER CHRISTOPHER TODARO,** )
**of the Metropolitan Police Department**  )
                              )
      **Defendants**         )
                              )

## MEMORANDUM OPINION
February 2, 2023 [Dkt. # 22]

On February 17, 2020, officers of the Metropolitan Police Department ("MPD")
investigating a report of a child kidnapping conducted a *Terry* stop of Jared Fishman
outside Fishman's Washington home. Fishman sued the District of Columbia and five
individual police officers, alleging that the MPD stop and a subsequent bar referral made
by the on-scene police lieutenant violated Fishman's rights under the First Amendment,
Fourth Amendment, and District law. The District and officers moved to dismiss. Because
Fishman has pleaded sufficient facts to make out a violation of his clearly established rights
as to some, but not all, of his claims, I will **GRANT in part** and **DENY in part** the
defendants' Motion to Dismiss [Dkt. # 22].

# BACKGROUND

### I.     Factual Background

On February 17, 2020, Fishman and his two young daughters were eating lunch at a restaurant in Washington, DC.  Am. Compl. ("Compl.") [Dkt. # 18] ¶ 14.  Fishman's younger daughter began misbehaving during the meal, and, after leaving the restaurant, refused to get in Fishman's car.  *Id.* ¶ 15.  After several minutes, when Fishman realized that his daughter did not intend to cooperate, he picked her up and placed her in her car seat inside his vehicle.  *Id.* ¶ 17.  Moments later, an unidentified man knocked on Fishman's window to ask whether there was any problem.  *Id.* ¶ 18.  Fishman responded that his daughter was misbehaving and he was taking her home.  *Id.*  He then drove to his Georgetown home.  *Id.* ¶ 19.

Shortly thereafter, an unidentified woman called 9-1-1, *id.* ¶ 20, and told MPD that she had observed a man pull up to a six or seven year old girl, "scream[] at her," and throw her into the car after "she pushed him," leading the caller to believe that she had witnessed a child kidnapping, *id.* ¶ 21.  The woman provided a description of Fishman's car and his license plate to the dispatcher.  *Id.* ¶ 22.  The dispatcher then put out a call to nearby MPD officers, using a code to indicate a possible child kidnapping.  *Id.* ¶ 25.  The call included Fishman's license plate and, based on his vehicle registration, his home address.  *Id.*

Responding to the call, Officer Marck Jaeger was the first to arrive at Fishman's house.  *Id.* ¶ 26–29.  Jaeger parked, observed Fishman on the front steps, identified himself, and asked to speak with Fishman.  *Id.* ¶¶ 30–39.  Fishman, who "realized that someone near Cactus Cantina must have called the police," *id.* ¶ 37, sighed, told Jaeger to "hold on

one sec," muttered under his breath, and stood up to enter his home, *id.* ¶ 40. But before Fishman stepped over the threshold of his doorway, Officer Jaeger told him "Hang tight for a second, don't go inside." *Id.* ¶¶ 41–42. Fishman disregarded Jaeger and entered the house. *Id.* ¶ 42–43. Jaeger immediately followed him inside, seized Fishman, and handcuffed him. *Id.* ¶ 44–48. Three other MPD officers—Jeremy Brady, Michael Tong, and Christopher Todaro—arrived while Jaeger was handcuffing Fishman. *Id.* ¶ 48.

While Officer Jaeger was handcuffing Fishman, Fishman's two daughters appeared in the doorway of the home. *Id.* ¶ 49. The younger girl—the alleged victim—"shrieked and cried …, asking the officers to stop what [they were] doing." *Id.* ¶ 50. She "frantically pleaded with the officers" to release Fishman, "saying 'he hasn't done anything wrong, please, please.'" *Id.* ¶ 52. Her older sister told the officers that Fishman had done nothing wrong and that "it is my sister, she was misbehaving." *Id.* ¶ 51. As he was led away, Fishman asked the officers if they could "do this"—resolve the situation—"in front of my kids," but was turned down. *Id.* ¶¶ 54–56. Jaeger then turned Fishman over to Officer Tong, who walked Fishman down the block and out of sight. *Id.* ¶ 58; *see generally id.*

While Tong steered Fishman away from the home, Officers Brady and Todaro stayed at the Fishmans' front steps and spoke with Fishman's wife and children. *Id.* ¶ 59–63. Both Fishman's wife and his older daughter explained to the officers that the girl whom the witness had observed being placed in the car was Fishman's younger daughter. *Id.* ¶¶ 66, 70, 72. The officers insisted that they needed to speak with the alleged kidnapping victim herself. *Id.* ¶¶ 97–99. After initially expressing some reservations, Fishman's wife agreed to let Officer Brady interview her younger daughter. *Id.* ¶¶ 97–100. The girl told

3

Brady that she had had a fight with her older sister, ran from the car, and was picked up by her father. *Id.* ¶ 100. She stated that she was not hurt and that her father had picked her up gently. *Id.*

Approximately 15 minutes after Fishman's daughter told Officers Brady and Todaro what had happened, Sergeant Adam Bray arrived on the scene. *Id.* ¶ 129. Bray first spoke with Officer Jaeger, learning that "it definitely sounds like [the alleged victim] was his daughter." *Id.* ¶ 135. Bray then waited "a couple minutes" until the arrival of Lieutenant Patrick Loftus. *Id.* ¶ 137. After briefly conferring with Loftus, *id.* ¶¶ 138–43, Bray walked over to where Fishman was being held and began speaking with him, *id.* ¶¶ 144–48. This conversation was the first time any of the officers on the scene told Fishman that he was suspected of child kidnapping. *Id.* ¶ 146. When Bray asked Fishman why his family would be reluctant to speak with them, Fishman responded that he was a DOJ civil rights attorney and "I prosecute police officers who violate the Constitution as a job. My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child." *Id.* ¶ 149. At the time of the events in question, Fishman was a Department of Justice Civil Rights Division attorney. *Id.* Bray explained the nature of the 9-1-1 call, *id.* ¶ 150, and ordered another unidentified officer to remove Fishman's handcuffs, *id.* ¶ 153. Fishman and Bray returned to Fishman's house, and, after a short argument between the Fishmans and Lieutenant Loftus about the appropriateness of the MPD officers' actions, the police departed. *Id.* ¶¶ 159–63.

Fishman was detained for approximately 25 minutes, *id.* ¶ 154, including approximately 21 minutes *after* Officer Brady elicited a description of the day's events

4

**JA 57**

from Fishman's younger daughter. *See id.* ¶¶ 129, 142, 146. Neither Officer Brady nor

Officer Todaro informed Officer Tong that Fishman's daughter had identified him as her

father and provided an explanation for the events witnessed by the 9-1-1 caller. *Id.* ¶¶ 101,

103. But Brady and Jaeger made several comments in Tong's presence suggesting they

believed Fishman to be the father of the alleged victim, implying that no crime had

occurred. *See, e.g., id.* ¶¶ 79–80, 96, 100.

About two months later, on April 29, 2020, Lieutenant Loftus filed a bar complaint

with the Maryland State Bar and a separate complaint with the DOJ Office of Professional

Responsibility ("OPR"). Loftus alleged that Fishman's statement to the officers that he

was a DOJ civil rights attorney who prosecuted officer misconduct was an improper

attempt "to use his official position as an attorney with the United States Government to

intimidate the officers, to influence the officers, or to gain preferential treatment." *Id.*

¶ 172. Loftus also implied in this filing that Fishman was the subject of an ongoing

investigation by MPD's Youth and Family Services Division into alleged child abuse, *id.*

¶ 175, but somehow failed to note that the investigation had concluded more than a month

earlier that there was no basis for any charges, *id.* ¶ 164.

## II. Procedural background

Fishman filed the operative Amended Complaint on September 7, 2021 against the

District of Columbia, Lieutenant Loftus, and Officers Jaeger, Brady, Todaro, and Tong

(collectively "Officers" or "Officer Defendants"). *See generally id.* Fishman brings eight

counts, including five § 1983 claims and three claims under D.C. law. First, he alleges that

Officer Jaeger violated his Fourth Amendment rights by (I) entering his home without a

**JA 58**

warrant and (II) conducting a warrantless arrest in his home.  Next, he alleges that, after dispelling any reasonable suspicions they may have originally held, the Officer Defendants (III) maintained their investigatory stop despite the absence reasonable suspicion or, in the alternative, (IV) arrested him without probable cause.  Based on the same underlying facts, Fishman also brings (V) trespass, (VI) false imprisonment, and (VII) negligence claims under District law against both the Officers and the District.  Finally, he alleges that Lieutenant Loftus (VIII) impermissibly retaliated against him by filing the state bar and OPR complaints seeking to retaliate against Fishman for his protected free speech.

The District has moved to dismiss all claims, citing qualified immunity, failure to state a claim, and other defenses under District law.  *See* Defs.' Mot. to Dismiss ("Mot. to Dismiss") [Dkt. # 22].  The motion has been fully briefed.  *See* Pl.'s Memo. of Ps. and Auths. in Opp. to Defs.' Mot. to Dismiss ("Opp.") [Dkt. # 23]; Defs.' Reply in Supp. of Their Mot. to Dismiss ("Reply") [Dkt. # 25].

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In resolving a motion to dismiss, the court accepts as true all well-pleaded allegations in the complaint and draws all reasonable factual inferences in favor of the plaintiff.  *Bernier v. Allen*, 38 F.4th 1145, 1149 (D.C. Cir. 2022).

6

**JA 59**

The Officers argue that qualified immunity requires dismissal of Fishman's federal claims. Qualified immunity exempts police officers from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, a claimed right must be "particularized" rather than a "broad general proposition" so that the "'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) *and Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In assessing whether a right is "clearly established," our Circuit looks "'to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view,' ... if there is one." *Lash v. Lemke*, 786 F.3d 1, 7 (D.C. Cir. 2015) (quoting *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) *as amended* (Mar. 29, 2011) (internal quotations omitted)). A plaintiff is not required to identify a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). If qualified immunity attaches, the proper remedy is dismissal. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

## DISCUSSION

### I.   Fourth Amendment claims

Fishman brings four claims alleging violations of his Fourth Amendment rights. As to Counts I and II, Fishman has failed to plead facts that would show that Officer Jaeger

violated the Fourth Amendment by entering Fishman's home and seizing him without a warrant. Those claims must be dismissed. However, Fishman's third and fourth claims, which are predicated on his continued detention after the police dispelled the reasonable suspicion that gave rise to the *Terry* stop, survive the Officers' motion to dismiss because each count adequately alleges the violation of a clearly established right.

### A.    Officer Jaeger did not violate Fishman's Fourth Amendment rights by entering his home and seizing Fishman

Fishman argues that Jaeger violated the Fourth Amendment by (1) entering Fishman's home without a warrant and (2) seizing Fishman in his home. Because the Complaint fails to plead any violation of Fishman's rights, much less one that has been clearly established, those claims must be dismissed.

"The Fourth Amendment permits brief investigative stops … when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014); *see also Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 592 (D.D.C. 2018) (citation omitted). A police officer can "seize" a person, and thus initiate a *Terry* stop, by "accost[ing] an individual and restrain[ing] his freedom to walk away." *Brown v. Texas*, 443 U.S. 47, 50 (1979). "Whether police action amounts to a 'show of authority' requires the court to ask whether a 'reasonable person' 'in view of all the circumstances surrounding the incident, … would have believed that he was not free to leave.' " *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992)). In assessing whether a reasonable person would believe that to be the

8

case, courts assess factors including whether the officer "wore a uniform" and "whether the officer's 'use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled.'" *Id.* (quoting *Wood*, 981 F.3d at 539) (citations omitted). Once initiated, a suspect cannot terminate a valid *Terry* stop by retreating into his home. *United States v. Santana*, 427 U.S. 38, 42–43 (1976). In assessing whether the facts witnessed by the responding officers constitute exigent circumstances, the court should consider the "gravity of the underlying offense." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). And officers may use reasonable force, including the use of handcuffs, to prevent a suspect's flight during an investigative stop. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

Here, Jaeger initiated a valid *Terry* stop before Fishman stepped over the threshold, and therefore Jaeger did not violate Fishman's Fourth Amendment rights by entering his home and seizing him. First, the 9-1-1 call reporting a suspected child kidnapping, combined with Fishman's acknowledgement that he was the person about whom the report was filed, was more than sufficient to establish the reasonable suspicion required to initiate a *Terry* stop. *See Navarette*, 572 U.S. at 396. And Jaeger had in fact "seized" Fishman before he attempted to end the encounter by retreating into his home. *See Brown*, 443 U.S. at 50. While the Amended Complaint does not specify whether Jaeger was in uniform, Fishman does not suggest that he had any reason to believe that Jaeger was not a police officer. Indeed, Jaeger was driving a marked police car and parked immediately outside Fishman's home. Compl. ¶ 30. In addition, Fishman's complaint concedes that he was subjectively aware that a witness may have called the police after observing him place his

daughter in his vehicle. *Id.* ¶ 37. His comment to Officer Jaeger that "that guy who called in has no idea what's going on" implies that he understood the police to have responded specifically to a report about *him*, even though he was correct in believing that the information provided to the police was flawed. *Id.* ¶ 38. These facts, combined with the presence of a police helicopter "audibly hovering overhead," would suggest to a reasonable person that he was not free to disregard the instructions of the officer to whom he was speaking. *See Castle*, 825 F.3d at 632. Most importantly, Fishman could not have reasonably inferred that he was free to leave because Jaeger expressly (1) asked for his help "with what's going on," (2) instructed him to "hang tight for a second, don't go inside," and (3) repeated "don't go inside" as Fishman moved. Compl. ¶¶ 39–42. At a minimum, the first two statements were made before Fishman had entered his home. *Id.* ¶¶ 39–41. The *Terry* stop was initiated at that moment, while Fishman was still outside, because he could not have reasonably believed himself free to leave. *See Castle*, 825 F.3d at 632.

Nor could Fishman escape the stop by retreating into his home. *See Santana*, 427 U.S. at 43. In light of the serious nature of the crime under investigation—child kidnapping—Jaeger's use of force, including handcuffs, Compl. ¶¶ 47–48, to prevent Fishman's attempt to avoid the *Terry* stop and Jaeger's questions was also reasonable and did not transform the stop into an arrest, *see Graham*, 490 U.S. at 396; *Welsh*, 466 U.S. at 753. Under the totality of the circumstances, then, Jaeger did not violate Fishman's rights in this instance by entering Fishman's home and forcibly seizing him despite the absence of a warrant. Because Jaeger did not violate any right protected by the Fourth Amendment in taking either action, he is entitled to qualified immunity on Counts I and II.

10

**JA 63**

**B.     The Officers are not entitled to qualified immunity on Fishman's claims that the *Terry* stop outlasted any reasonable suspicion**

While Officer Jaeger was entitled to initiate the *Terry* stop given his reasonable suspicion that Fishman had committed a crime, that reasonable suspicion was dispelled within minutes.  The Officers' failure to terminate the *Terry* stop and release Fishman violated his clearly established Fourth Amendment rights.  As such, Fishman's third and fourth claims against the Officer Defendants—that the officers lacked reasonable suspicion or probable cause to detain Fishman after his daughter provided Officers Brady and Todaro with information sufficient to show no crime had occurred—can proceed.

Police officers may maintain a *Terry* stop for as long as reasonably necessary while the officers diligently investigate the facts that generated the reasonable suspicion underlying the *Terry* stop in the first place. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985); *United States v. Vinton*, 594 F.3d 14, 24 (D.C. Cir. 2010). A reviewing court must engage in a fact-specific inquiry to ensure that *Terry* stops last "no longer than is necessary to effectuate the purpose of the stop." *United States v. Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion)). In making that assessment, a court considers the information available to the officers at each relevant time before and during the stop. *United States v. Brown*, 334 F.3d 1161, 1165 & n.2 (D.C. Cir. 2003). However, "a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). "Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable

11

**JA 64**

suspicion violates the Fourth Amendment." *United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018).

In this case, as discussed, Officer Jaeger had reasonable suspicion to detain and question Fishman. And the other officers on the scene were justified in relying on Officer Jaeger's "assessment of circumstances sufficient to warrant" Fishman's seizure. *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010). But the relevant question to resolve these claims is not whether the officers had a reasonable suspicion sufficient to justify *initiating* the *Terry* stop; it is whether the officers *prolonged* the *Terry* stop after that reasonable suspicion was dispelled. *See United States v. Hutchinson*, 268 F.3d 1117, 1122 (D.C. Cir. 2001) (remanding to consider "whether the temporal duration of the stop was unlawfully extended because the police pursued a means of investigation that was beyond the scope of the purpose of the stop").

The crux of Fishman's argument is that the realization that the alleged kidnapping victim was Fishman's own daughter dispelled any reasonable suspicion they may have held, and that Fishman's continued detention therefore violated his Fourth Amendment rights. *See* Compl. ¶¶ 198–206. It is black-letter law that a *Terry* stop must "last no longer than is necessary to effectuate the purpose of a stop." *Royer*, 460 U.S. at 499 (plurality opinion). In this case, the purpose of the stop was to investigate whether a child had been kidnapped. As Fishman implicitly concedes in his Complaint, *see id.* ¶¶ 7–9, the officers reasonably believed that they needed to speak to Fishman's daughter, the alleged victim, in order to verify that she was not, in fact, the victim of a kidnapping. But even discounting Fishman's suggestion that the innocent nature of the situation should have been obvious to

12

**JA 65**

the officers from the moment the girls appeared in his doorway, the Complaint alleges

sufficient facts to establish that Officers Jaeger, Brady, Todaro, and Tong each reached the

conclusion that no crime had been committed well before the *Terry* stop was terminated.

*See* Compl. ¶¶ 79–80, 82, 86, 92, 95–97, 99, 106, 122–123, 135 (noting instances in which

Officer Defendants made statements suggesting that they believed Fishman's version of

events to be true).

The critical piece of the officers' investigation was the interview of Fishman's

younger daughter, conducted by Officer Brady in which she stated unequivocally that she

had not been kidnapped. *Id.* ¶ 142. That information dispelled any remaining reasonable

suspicion underlying the stop. *See Hall*, 867 F.3d at 153; *Bey*, 911 F.3d at 147. But

Fishman's Amended Complaint suggests that that interview occurred only *four* minutes

after Fishman was detained, and more than *twenty-one* minutes before he was released.

*See* Compl. ¶ 142 (placing Brady's interview of Fishman's daughter "about fifteen

minutes" prior to the arrival of Sergeant Bray); *id.* ¶ 129 (placing Bray's arrival "about

nineteen minutes" after Fishman's detention); *id.* ¶ 154 (alleging that Fishman was

handcuffed for 25 minutes). As soon as Brady obtained that information, the officers

lacked reasonable suspicion to maintain the *Terry* stop. *See Hutchinson*, 408 F.3d at 800;

*Bey,* 911 F.3d at 147.[1]  Our Circuit Court has held that prolonging an investigative stop by

---

[1] Fishman also alleges that the officers did not even ask Fishman any questions to corroborate his daughter's statement for the first seventeen minutes after receiving that information. *See* Compl. ¶¶ 129, 142, 146. If true, that would constitute an independent basis for finding that the officers' failed to conduct a diligent investigation in the time period after eliciting the daughter's statement. *See Sharpe*, 470 U.S. at 686.

13

two to five minutes can violate a suspect's Fourth Amendment rights *if* the police lack a valid investigative purpose for doing so. *See Hutchinson*, 408 F.3d at 799. Maintaining a *Terry* stop for twenty-one minutes with no valid purpose, then, violates a clearly established right. *Cf. id.* And even if the police had required additional information from Fishman at that time, they failed to take any diligent measures to obtain that information, despite the fact that Fishman remained in their custody. *See* Compl. ¶ 146 (alleging that the police first asked Fishman about the kidnapping allegations "more than 21 minutes" after he was handcuffed); *Hutchinson*, 408 F.3d at 800 (citing *Sharpe*, 470 U.S. at 686).

The Amended Complaint alleges sufficient facts to find that the police officers effectively seized Fishman after having dispelled any reasonable suspicion as alleged in Count III. *Hutchinson*, 408 F.3d at 800. Moreover, the Complaint alleges sufficient facts for a jury to find that the officers transformed the heretofore permissible *Terry* stop into an arrest despite the absence of probable cause by continuing to detain Fishman absent a valid investigative reason, as alleged in Count IV. *See Hall*, 867 F.3d at 153. For the same reasons that the officers' reasonable suspicions underlying the *Terry* stop could not survive the interview with Fishman's younger daughter, no reasonable officer could have believed that probable cause existed to *arrest* Fishman for child kidnapping. Therefore, the Officers' motion to dismiss is denied as to Counts III and IV.

## II.    First Amendment claim

Fishman has pleaded sufficient facts to establish a claim of unlawful retaliation. However, Lieutenant Loftus is entitled to qualified immunity because he was not on notice

14

**JA 67**

that filing a bar notice in retaliation for Fishman's protected speech would violate a clearly established right.

### A.    Fishman has pleaded the elements of a retaliation claim

To make out a First Amendment retaliation claim, a plaintiff must allege "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation and internal quotations omitted).  Loftus concedes the first element is satisfied but contests (2) and (3).  Fishman, however, has alleged sufficient facts to satisfy both.

The second prong of the three-part test requires that retaliatory conduct would have been sufficient "to deter a person of reasonable firmness." *Id.*  While our Circuit Court has not addressed this question, district courts in other circuits have found that the filing of a bar complaint was sufficient to deter a person of reasonable firmness on similar facts. *See Weise v. Colorado Springs, Colorado*, 421 F. Supp. 3d 1019, 1046 (D. Colo. 2019); *Christopherson v. Poutsch*, No. 14-cv-152, 2015 WL 13662707, at *19 (D.N.M. Apr. 30, 2015); *Danchuk v. Mayor & Council of the Borough of Mount Arlington*, No. 15-cv-2028, 2017 WL 3821469, at *6 (D.N.J. Aug. 31, 2017).  The Court agrees.

Loftus' first argues that a person of reasonable firmness would not be deterred because the attorney "would expect to be exonerated by the bar."  But Loftus ignores the costs and risks associated with defending against a complaint and improperly privileges

15

**JA 68**

bad-faith complaints, which would logically be the most likely to result in exoneration. And Loftus' second argument, that a bar referral "should have no bearing on the speech of an attorney of reasonable firmness," Mot. to Dismiss at 24, relies on a misreading of a Sixth Circuit case, *Mezibov v. Allen*. The Sixth Circuit held that pointed *criticism* of a defense attorney by a prosecutor following a trial—not the filing of a complaint alleging professional misconduct—would not deter an attorney of reasonable firmness from zealously defending his client in court. *Mezibov v. Allen*, 411 F.3d 712, 721–23 (6th Cir. 2005). Furthermore, the Sixth Circuit had already held that the retaliation claim failed because there was no First Amendment-protected speech, *id.* at 720–21, so the entire discussion Loftus cited is dicta.

As to the third part of *Aref*'s three-part test, Loftus also contests the existence of any causal link between Fishman's speech and the bar complaint. To establish that link, Fishman can show that the retaliatory action was motivated by "subjective animus" and that it was "objectively unreasonable." *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019). Fishman has alleged sufficient facts to meet both prongs. Loftus' bar complaint included allegations related to child abuse, while failing to mention that the police investigation had already concluded that there was no evidence to support that allegation. *See* Compl. ¶¶ 162–64, 175. In light of Loftus' undisputed awareness after the conclusion of the *Terry* stop that there was no evidence to suggest Fishman had engaged in child abuse, his inclusion of allegations of that misconduct in the bar complaint suggest both that Loftus was motivated by "subjective animus" and that the inclusion of that charge was "objectively unreasonable."

16

**JA 69**

If Loftus could identify any "nonretaliatory grounds" for filing the bar complaint, Fishman's claims would fail. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford–El v. Britton*, 523 U.S. 574, 593 (1998)). He cannot. Rather than attempt to identify any such nonretaliatory grounds, Loftus offers a lengthy description of the contents of the body-worn camera footage and argues that "No amount of discovery can disprove the reasonableness of [his] belief" that Fishman was improperly attempting to influence the officers by identifying himself as a DOJ attorney. Mot. to Dismiss at 24–26. But that misstates the standard. And, in any event, even if Loftus subjectively believed that Fishman acted improperly by making that truthful statement, that does not explain why Loftus filed a bar complaint that included allegations of child abuse that Loftus *knew* to be unfounded at the time he filed his complaint. *See* Compl. ¶¶ 175–77.

Finally, Loftus argues that Fishman's suit is barred by the *Noerr-Pennington* doctrine, which holds that persons who petition the Government for redress of their grievances are immune from liability for such activity under the First Amendment. *See Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 89–90 (D.C. Cir. 2015) (Kavanaugh, J.). Our Circuit Court has not addressed whether government entities can qualify as "persons" to whom *Noerr-Pennington* immunity applies. It does not. While at least one other circuit has held that the doctrine can protect speech by government actors, *see* Opp. at 32–33, the underlying logic of the exception suggests that "*Noerr-Pennington* protection does not apply to the government, of course, since it is impossible for the government to petition itself within the meaning of the First Amendment." *Video Int'l Prod., Inc., v. Warner-Amex Cable Commcn's Corp.*, 858 F.2d 1075, 1086 (5th Cir. 1988); *cf. City of*

17

*Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379–80 (1991) ("The federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government. [The *Noerr-Pennington*] doctrine, like *Parker*, rests ultimately upon a recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'"). Fishman's retaliation claim is not barred by the *Noerr-Pennington* doctrine.

**B.     Loftus did not violate a clearly established right**

Although Loftus violated Fishman's First Amendment rights by filing a retaliatory bar complaint, Fishman's related § 1983 claim must be dismissed because Fishman has not identified any binding precedent to establish that filing such a complaint would violate a clearly established right. *See Lash*, 786 F.3d at 7. And while Fishman has cited cases from other circuits for the proposition that "filing bad-faith complaints of misconduct in retaliation for protected speech is unconstitutional," none of those cases relate to the filing of a bar complaint. *See Greisen v. Hanken*, 925 F.3d 1097, 1114 (9th Cir. 2019) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (alterations omitted), and citing *Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016)) (adverse employment action); *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003) (complaint letter to billboard company); *Goldstein v. Galvin*, 719 F.3d 16, 30–31 (1st Cir. 2013) (retaliatory prosecution); *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) (on-air disclosure of employee disciplinary history); *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006) (instruction to public employees not to speak with reporters); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999)) (urging of government and congressional investigations).

18

**JA 71**

Nor did Fishman cite any Supreme Court or D.C. Circuit cases for even the more general proposition that such bad-faith complaints violate a clearly established right in the first instance. As such, even though Loftus violated Fishman's First Amendment rights by filing the bar complaint, Loftus is entitled to qualified immunity because that right was not clearly established on April 29, 2020. *See Reichle*, 566 U.S. at 665.

### III.    Claims under District law

Fishman also brings three claims under D.C. law: a claim for trespass for Officer Jaeger's entry into his home (Count V); a claim for false arrest for restraining his physical liberty without basis (Count VI); and a claim for negligence alleging a breach of a supposed duty for the officers to communicate amongst themselves and secure Fishman's release after dispelling the reasonable suspicion underlying the *Terry* stop. (Count VII). The District is named as a defendant on all three claims under the doctrine of respondeat superior. As Fishman concedes, the trespass claim rises and falls with the corresponding § 1983 claims against Jaeger, so that claim is dismissed for the reasons outlined previously. Fishman's negligence claim must also be dismissed for failing to identify an applicable duty. But Fishman may proceed on his false imprisonment claim.

#### A.    Qualified Privilege

The District moved to dismiss citing the doctrine of qualified privilege. Mot. to Dismiss at 33. Under D.C. law, a court should dismiss an action against a police officer on qualified-privilege grounds only if "the officer can demonstrate that (1) he or she 'believed, in good faith, that his [or her] conduct was lawful,' and (2) this 'belief was

reasonable.'" *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993), *aff'd on rehearing*, 635 A.2d 929.  Unlike qualified immunity, the standard for qualified privilege is *subjective*, meaning that the police officer's conduct is not weighed against an objective standard but requires the officer to actually hold a good faith belief in the lawfulness of his action.  *E.g. Liser v. Smith*, 254 F. Supp. 2d 89, 104 (D.D.C. 2003) ("In contrast to the subjective 'good faith' standard that governs false arrest claims under D.C. law . . ., the federal qualified immunity standard is an objective one.").  The District cannot make this showing in this case with respect to Fishman's false arrest claim, so its motion fails.

Fishman alleges that the individual officers unlawfully detained Fishman despite subjectively believing that Fishman's daughter was who she claimed to be and that, as a result, there was no basis to believe that a crime had taken place.  Compl. ¶ 215.  As the Court has already found, Fishman was unlawfully detained after the officers succeeded in interviewing Fishman's daughter to ascertain her identity for the reasons discussed above.  As to the officers' subjective beliefs at that time, Fishman cites statements by the Officers sufficient to show that, within minutes of detaining Fishman, they subjectively believed no crime had occurred.  *See* Compl. ¶¶ 79–80, 82, 86, 92, 95–97, 99, 106, 122–123, 135.  Furthermore, even if the Officers held such a belief, the same facts that dispelled their reasonable suspicion are sufficient to make such a belief unreasonable. Because either basis would be sufficient to defeat qualified privilege, the District's motion fails as to Count VI. *See Murphy*, 631 A.2d at 36.

### B.     Negligence

Fishman also brings a negligence claim as an alternative basis for liability on the same facts underlying his false imprisonment claim.[2]  To establish negligence, Fishman must show that (1) the defendants owed him a duty, (2) breach of that duty, and (3) an injury proximately caused by that breach.  *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014) (citations omitted).  The failure to allege any one element is fatal to the claim.

Fishman's negligence count fails as a matter of law because he has not identified a duty for a police officer aware of exculpatory evidence to communicate that information to fellow officers.  As defendants argue, even if an officer did uncover exculpatory information that would dispel the reasonable suspicion regarding the commission of a crime, that officer has no duty to inform the separate officer who has actually detained a suspect in the course of a *Terry* stop to effectuate the suspect's release.  Mot. to Dismiss at 35.  Fishman argues that such a duty does exist, citing two decisions issued by the 7th and 9th Circuits.  *See* Opp. at 29–30 (citing *Williamson v. Curran*, 714 F.3d 432, 442 (7th Cir. 2013) *and Lee v. Gregory*, 363 F.3d 931, 935 (9th Cir. 2004).  But those cases stand for the proposition that a police officer is liable for false arrest if the officer *who made the arrest* knew that, despite the existence of a facially valid warrant, no probable cause existed to arrest a suspect.  That rule does not imply that an officer who is aware of information

---

[2] The District argues that Fishman could not prevail on both a false arrest claim and a negligence claim for the same underlying conduct, but Fishman is permitted to "state as many claims … as [he] has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).

21

**JA 74**

that would dispel reasonable suspicion or probable cause with respect to a particular suspect owes a duty *to that suspect* to promptly communicate that information to other police officers. Moreover, Fishman has not cited any case from the D.C. Court of Appeals (or our Circuit) for that proposition. Nor has he identified any basis for the Court to find that such a duty exists here in the first instance. Therefore, Fishman's negligence claim must also be dismissed.

## CONCLUSION

For the reasons given above, Officer Jaeger and Lieutenant Loftus are entitled to qualified immunity as to Counts I, II, and VIII. Moreover, Fishman has failed to state a claim as to Counts V and VII. But Fishman's allegations are sufficient to make out a claim that the Officers' illegally prolonged the *Terry* stop of Fishman or illegally arrested him without probable cause, so Defendants' Motion to Dismiss is denied as to Counts III and IV. Finally, Fishman has overcome Defendants' claim of qualified privilege as to the same conduct, so Defendants' motion is denied as to Count VI. Accordingly, Defendants' Motion to Dismiss [Dkt. # 22] will be **GRANTED in part** and **DENIED in part**. An Order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge

22

**JA 75**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JARED FISHMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE DISTRICT OF COLUMBIA; and ) | Case No. 21-cv-1847 |
| LIEUTENANT PATRICK LOFTUS, ) | Jury Trial Demanded |
| OFFICER MARCK JAEGER, OFFICER ) | |
| JEREMY BRADY, OFFICER ) | |
| MICHAEL TONG, and OFFICER ) | |
| CHRISTOPHER TODARO, all of the ) | |
| Metropolitan Police Department of the ) | |
| District of Columbia, each in his ) | |
| individual capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff Jared Fishman moves for partial summary judgment on liability against Defendant Officer Christopher Todaro of the Metropolitan Police Department. Fishman makes this motion on the grounds that, based on facts about which there can be no genuine dispute, Todaro violated Fishman's Fourth Amendment rights during the investigation that took place at Fishman's home on the afternoon of February 17, 2020, by detaining him long after reasonable suspicion to do so had dissipated, and that Todaro is not shielded by qualified immunity. In support of this motion, Fishman submits a Memorandum of Points and Authorities, a Statement of Material Facts as to Which There is No Genuine Dispute and exhibits in support, and a Proposed Order.

Respectfully submitted,

/s/ Charles Gerstein
Charles Gerstein
(D.C. Bar No. 1033346)
Emily Gerrick
(D.C. Bar No. 90010592)
Samuel Rosen
(D.C. Bar No. 90012245)
GERSTEIN HARROW LLP
810 7th St NE, Ste. 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

/s/ Jason Harrow
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JARED FISHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA; and | ) |
| LIEUTENANT PATRICK LOFTUS, | ) |
| OFFICER MARCK JAEGER, OFFICER | ) |
| JEREMY BRADY, OFFICER | ) |
| MICHAEL TONG, and OFFICER | ) |
| CHRISTOPHER TODARO, all of the | ) |
| Metropolitan Police Department of the | ) |
| District of Columbia, all in his | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 21-cv-1847
Jury Trial Demanded

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................. ii

I.      PRELIMINARY STATEMENT........................................................... 1

II.     UNDISPUTED FACTS AND PROCEDURAL BACKGROUND ...................... 2

III.    ARGUMENT ..................................................................................... 4

        A.      Todaro Knew That no Kidnapping Had Occurred Two Minutes
                Into His Investigation.................................................... 6

        B.      Todaro Continued to Detain Fishman for More Than 20 Minutes ...... 10

        C.      Todaro Independently Violated Clearly Established Law by
                Failing to Diligently Investigate for Almost 17 Minutes..................... 11

IV.     CONCLUSION ................................................................................. 12

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....................................................... 5

*Terry v. Ohio*, 392 U.S. 1 (1968) .........................................................................passim

*United States v. Bey*, 911 F.3d 139 (3rd Cir. 2018)...................................................... 10

*United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003)............................................. 6

*United States v. Castle,* 825 F.3d 625 (D.C. Cir. 2016)................................................ 5

*United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001) ........................................... 6

*United States v. Hutchinson* 408, F.3d 796 (D.C. Cir. 2005)..................................... 12

*United States v. Sharpe*, 470 U.S. 675 (1985) ............................................................ 11

**Statutes**

D.C. Code § 16-1022 ....................................................................................................... 7

D.C. Code § 22-2001 ....................................................................................................... 7

## PRELIMINARY STATEMENT

Plaintiff Jared Fishman alleged in his complaint that Defendants, the District of Columbia and five members of the Metropolitan Police Department (MPD), violated his Fourth Amendment rights by unduly prolonging their *Terry* stop of Fishman on the afternoon of February 17, 2020. In its opinion denying Defendants' motion to dismiss Fishman's Fourth Amendment claims and denying the defense of qualified immunity, this Court recognized that the "crux of Fishman's argument is that the realization that the alleged kidnapping victim was Fishman's own daughter dispelled any reasonable suspicion that they may have held, and that Fishman's continued detention therefore violated his Fourth Amendment Rights." (Doc. 31 at 12.) And this Court agreed with Fishman that a Fourth Amendment violation had been plausibly pleaded when it held that "the Complaint alleges sufficient facts to establish that Officer[] . . . Todaro . . . reached the conclusion that no crime had been committed well before the *Terry* stop was terminated." (Doc. 31 at 13.)

Discovery has now concluded, and the evidence uncovered confirms that the facts of the complaint—all of which were recorded on video—are beyond any dispute, let alone a genuine dispute. Indeed, Todaro *admitted* at his deposition that he (a) knew within three minutes of Fishman's detention, as any reasonable officer would, that the children in Fishman's house were his own and that the woman they were with was their mother, and (b) was investigating and had reasonable suspicion of no crime other than kidnapping. Todaro also admitted that the children's explanation of the day's events, given approximately two minutes after Fishman was placed into

1

handcuffs, was consistent with what the 9-1-1 caller had alleged and that he had no reason to believe the girls were lying.

Given this evidence, the same reasoning in the Court's prior opinion requires that the Court grant summary judgment for Fishman against Todaro: under the circumstances, Todaro could not have reasonably believed that Fishman had kidnapped anyone. Fishman is therefore entitled to judgment as a matter of law against him. The issue of damages for this violation of Fishman's rights would be left for later resolution (along with the liability of other Defendants).

## UNDISPUTED FACTS AND PROCEDURAL BACKGROUND

As this Court is aware, this case arises from MPD's investigation of allegations that Fishman had kidnapped a young girl. This allegation, relayed to MPD by a bystander's 911 call, was the product of a simple misunderstanding; the alleged victim was in fact Fishman's younger daughter, whom Fishman had picked up and placed in his car when she refused to go home following a lunch outing.

Fishman filed his initial complaint on July 12, 2021, and filed an amended complaint on September 7, 2021. Among Fishman's claims were that the MPD officers who investigated the kidnapping allegation were liable to Fishman under 42 U.S.C. § 1983 for violation of his Fourth Amendment rights. (Doc. 18, Amended Complaint, at 32.) Specifically, Fishman claimed that he had suffered both unreasonable detention and arrest without probable cause. (*Id*. at 33.) Defendants moved to dismiss these Fourth Amendment claims, invoking the defense of qualified immunity, and in February of 2023 this Court denied that motion. (Doc. 31.) The parties subsequently set a schedule for discovery and all pre-trial events.

Discovery—which included both extensive review of each on-scene officer's body-worn camera (BWC) footage from the events in question and depositions of all Defendants—has now concluded. The information gathered there confirms, beyond dispute, what Fishman alleges in his complaint: that within minutes of arriving at his home on February 17, 2020, MPD officers knew that the alleged kidnapping victim was Fishman's daughter and that Fishman had not kidnapped anyone, and that MPD nevertheless detained Fishman for over 20 additional minutes before finally letting him go.

Fishman now moves for summary judgment against Officer Christopher Todaro. Todaro was the second officer to arrive on scene (Statement of Material Facts as to Which There is No Genuine Dispute ["SUMF"] ¶ 3); he helped another officer place Fishman into handcuffs (*id.* ¶ 4) and later detained Fishman on the corner of Fishman's street for over 20 minutes (*id.* ¶¶ 21–29). Just over two minutes into his investigation, however, Todaro knew what any reasonable officer would have known under the circumstances: that Fishman had not committed a kidnapping and that the child in question was his own daughter. In these initial minutes, Todaro spoke with each member of Fishman's immediate family—namely, Fishman's wife Fiona and their daughters J.M-F. and A.M-F., the former of whom was the alleged kidnapping victim. J.M-F. pleaded with Todaro to not arrest her father, and specifically said that he'd done nothing wrong. (*Id.* ¶ 7.) Then A.M-F. explained to Todaro that she had been out with her father and sister and that Fishman had to pick up J.M-F. and put her into the car when she refused to go home. (*Id.* ¶¶ 11, 14.) Next, Fiona consoled a

crying J.M-F. by explaining that the kidnapping allegation was all a big mistake—
that someone had seen Fishman pick up J.M-F. and "didn't know he was Daddy." (*Id.*
¶ 17.) All of this occurred within three minutes of Fishman being placed into
handcuffs. (*Id.*)

Todaro testified at his deposition both that he believed the girls' accounts and
that these exchanges and conversations convinced him that Fishman and Fiona were
the girls' parents. (*Id.* ¶¶ 15, 16.) At this point in his investigation, then, Todaro,
objectively *and* subjectively, wholly lacked reasonable suspicion—let alone probable
cause—that Fishman had committed a kidnapping. But Todaro did not release
Fishman. Instead, for roughly 20 minutes, Todaro stood next to a handcuffed
Fishman in near-total silence, asking no questions of Fishman and conducting no
further investigation. (*Id.* ¶¶ 21–29.) At each second of these 20 minutes, Todaro had
both the authority and the duty to end the *Terry* stop. When an MPD sergeant finally
uncuffed Fishman, he did so entirely on the basis of information that Todaro
possessed within minutes of arriving on the scene. (*Id.* ¶ 27.)

## ARGUMENT

Fishman now moves for partial summary judgment on the issue of liability for
detention beyond the dissipation of reasonable suspicion against Todaro. Summary
judgment is appropriate when "the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law." Fed.
R. Civ. P. 56(a). In considering a motion for summary judgment, this Court must
decide "whether the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). Here, there is no factual disagreement at all: This motion relies entirely on video footage of the events in question and Todaro's own description of the events. The only question is who prevails as a matter of law, and this Court has essentially already answered that question in Fishman's favor in ruling on Todaro's motion to dismiss the amended complaint. (Doc. 31.)

"Pursuant to the Fourth Amendment, a police officer who seizes a person on less than probable cause 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' support 'a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Castle,* 825 F.3d 625, 634 (D.C. Cir. 2016) (citations omitted). Courts must "assess those facts within an objective framework: '[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in his belief' that the suspect is breaking, or is about to break, the law.'" *Id.* at 635 (citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968) (establishing standard for constitutionality of investigative stops).

Although the facts on which Fishman relies in this motion come exclusively from either Todaro's video footage or Todaro's own version of the facts as explained at his deposition, the discovery process in this case has, of course, produced evidence beyond these two sources. But "the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances *as the officer on the scene experienced them*." *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir.

2001) (emphasis added). In this Circuit, this means that courts "cannot take into account" any facts that "were not known to the investigating officer[] at the time of the search." *United States v. Brown*, 334 F.3d 1161, 1166 & n2 (D.C. Cir. 2003). Thus, if a fact emerges in discovery but the officers on the scene were unaware of that fact, then that fact is irrelevant to their liability.

Taken together, Todaro's BWC footage and deposition testimony show that there is no dispute, let alone a "genuine dispute," that Todaro knew within minutes of arriving on scene that Fishman had not committed a kidnapping and that he had reasonable suspicion of no other crimes. But instead of acting on this information and concluding the *Terry* stop—as the Constitution requires he do—Todaro continued to detain Fishman for roughly 20 additional minutes.

This Court has already ruled that those facts as pleaded defeat qualified immunity and lead to liability for Defendants. Since they have now been confirmed beyond genuine dispute, judgment on liability is appropriate against Todaro.

## A. Two Minutes Into The *Terry* Stop, Todaro Knew That No Kidnapping Had Occurred

Todaro was dispatched to Fishman's home on the afternoon of February 17, 2020, so that he could investigate a kidnapping. (SUMF ¶ 1.) At no point during his time at Fishman's home was Todaro investigating any other crime. (*Id.* ¶¶ 2, 33.) Fishman does not contest here, and has never contested in this case, that Todaro had reasonable suspicion that a kidnapping occurred during the early seconds of his time on scene. This reasonable suspicion, however, dissipated entirely after roughly two minutes.

6

District of Columbia law makes clear that custodial parents cannot kidnap their own children, *see* D.C. Code § 22-2001, except for instances in which one parent "intentionally conceal[s] a child from the child's other parent," *see* D.C. Code § 16-1022. Todaro thus may have had reasonable suspicion that Fishman committed a kidnapping only until the moment he knew both that Fishman was the father of the alleged kidnapping victim and that Fishman had not "intentionally conceal[ed]" the alleged victim from her other parent.

Not only would any reasonable officer have known both of these crucial facts within roughly two minutes of his arrival on scene, but Todaro admitted in his deposition that he knew them at that time. Thirty seconds after Todaro's arrival, after he and his colleagues placed Fishman in handcuffs, Todaro saw three people in the doorway of Fishman's home: Fishman's wife, Fiona; Fishman's elder daughter, A.M-F.; and Fishman's younger daughter J.M-F., the alleged kidnapping victim. (SUMF ¶ 6.) Todaro asked all three people to move away from the house's front stairs, where Fishman sat handcuffed, and to "come back in the house." (*Id.* ¶ 9.) All three complied; J.M-F. sat on the floor, crying and pleading with officers, "please don't arrest him, please—he hasn't done anything wrong," before Fiona picked her up and consoled her. (*Id.* ¶ 10.) At this point in his investigation, as Todaro admits, he believed that Fiona was J.M-F.'s mother. (*Id.* ¶ 11.)

A.M-F. then stepped in front of her mother and sister and addressed Todaro directly. "He did not take my sister," said A.M-F. "My sister was misbehaving, so he brought her into the car." (*Id.* ¶ 12.) Todaro then told A.M-F. his perspective on the

situation: "We got a call that there was a male who picked up a child, put her over his shoulder, and took her into the car—abducted her. Of course we take that very seriously." (*Id.* ¶ 13.) When Todaro finished speaking, Fiona took J.M-F. further into the house and said to Todaro, "please don't leave, stay right there." (*Id.* ¶ 14.)

A.M-F. stayed behind with Todaro, and the two resumed their conversation. Todaro asked A.M-F. whether she had been with Fishman and J.M-F. the whole time. (SUMF ¶ 15.) "I was in the car, in the front seat," A.M-F. responded. "My sister was misbehaving, and she wouldn't get into the car and come home. We didn't want her to get taken or anything, and she was not listening, so my dad had to put her over his shoulder and bring her into the car. He did nothing wrong." (*Id.*) At this point in the investigation, Todaro admits that he had no reason to believe that the girls were lying to him. (*Id.* ¶ 16.) At the moment that A.M-F. finished her explanation, approximately three minutes after Fishman had been detained and placed into handcuffs by Todaro, Todaro believed, as any reasonable officer would, that Fishman was the "father" of both girls. (*Id.* ¶ 17.)

Todaro's belief that Fishman was the father of J.M-F. and A.M-F. categorically ruled out the possibility that Fishman had kidnapped J.M-F. in the traditional sense. *See* D.C. Code § 22-2001. And even if it was perhaps still technically possible, albeit extremely unlikely, that Fishman had violated D.C.'s parental kidnapping statute by "intentionally conceal[ing]" J.M-F. from Fiona,[1] *see* D.C. Code § 16-1022, that chance

---

[1] At the moment that officers handcuffed Fishman on the steps of his home, J.M-F. was inside, *with* her mother, not concealed from her. (SUMF ¶ 7), which makes

vanished into impossibility after an additional minute of investigation. As Todaro continued to speak with Fishman's wife and children, J.M-F. remained visibly upset. (*Id.* ¶ 18.) Unprompted, Fiona—who was inside the house with J.M-F. while A.M-F. spoke to Todaro, and was therefore not privy to that exchange—knelt down to J.M-F. and explained the situation. "You know what happened, sweetie?" said Fiona. "Somebody misunderstood. Somebody saw Daddy pick you up and they didn't know he was Daddy. They didn't know he was Daddy, so they thought, 'maybe this is just, like, a man who's taking a child.'" (*Id.*) When, in response, J.M-F. cried "no!," Fiona turned and pointed towards Todaro. (*Id.* ¶ 19.) "But these officers know," she reassured J.M-F. "They know the situation. They know the situation, and everything is ok. Somebody misunderstood." (*Id.*) It was now undeniable that Fishman had not committed a parental kidnapping or any other kind of kidnapping. Moreover, at this point in his investigation, Todaro *admitted that he believed* that Fiona and Fishman were the parents of the girls to whom Todaro had been speaking. (*Id.* ¶ 20.) No reasonable officer could have believed otherwise.

Todaro knew roughly three minutes after helping to handcuff Fishman what any reasonable officer under the circumstances would have known: that Fishman had not kidnapped anyone. And because he was not investigating any crime besides kidnapping (SUMF ¶¶ 2, 33), Todaro lacked reasonable suspicion for a *Terry* stop. The Fourth Amendment demanded that Fishman be released from police custody at

_____

it very difficult to see how the possibility of parental concealment could have been in play.

that moment.

### B. Todaro Continued to Detain Fishman for More Than 20 Minutes

After less than three minutes of investigation, Todaro knew, as any reasonable officer would have known, that Fishman had not committed a kidnapping—the only crime that Todaro was investigating—and was therefore required to release Fishman. As this Court has already noted, the law is clearly established that "[o]nce reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment." (Doc. 31 at 11–12 (quoting *United States v. Bey*, 911 F.3d 139, 147 (3rd Cir. 2018))). But rather than end the *Terry* stop, Todaro detained Fishman for over 20 additional minutes, during which time he conducted no further investigation.

After speaking with Fishman's wife and children, Todaro left the front steps of Fishman's house to move another MPD officer's car out of the middle of the street. (SUMF ¶ 21.) Shortly after completing this task, Todaro walked to the corner where MPD officers were detaining Fishman. (*Id.*) Todaro watched as a handcuffed Fishman shared the names and dates of birth of his wife and daughters with another MPD officer. (*Id.* ¶ 22.) Todaro continued to watch as Fishman asked that that the handcuffs be removed and officers denied his request. (*Id.* ¶ 23.)

Two of the three officers that had been detaining Fishman then left the corner, and Todaro stayed behind near Fishman. (*Id.* ¶ 24.) Todaro then stood directly next to Fishman in total silence for almost eight minutes, keeping Fishman in his custody. (*Id.* ¶ 25.) During this time Todaro asked no questions of either Fishman or the other

10

officer who stood nearby. (*Id.*) Todaro briefly broke his silence to thank Fishman for his "patience" and to tell him that an MPD sergeant was on his way to the scene. (*Id.*) But for roughly five additional minutes no sergeant appeared, and Todaro's silent wait continued while Fishman remained handcuffed on the corner of his street. (*Id.*) Todaro remained next to Fishman but stayed virtually silent and asked no questions of anyone, let alone of Fishman. (*Id.*) As this Court has already held (Doc. 31), Todaro violated clearly established law of which any officer should have been aware and Fishman is thus entitled to summary judgment on liability against him.

### C.    Todaro Independently Violated Clearly Established Law by Failing to Diligently Investigate for Almost 17 Minutes

In its ruling on Defendants' motion to dismiss, this Court noted that Fishman's complaint alleged that for "seventeen minutes" officers "did not even ask Fishman any questions to corroborate" what they'd learned from his daughter. (Doc. 31 at 13 n.1.) This Court concluded that, "[i]f true, that would constitute an *independent basis* for finding that the officers failed to conduct a diligent investigation in the time period after eliciting the daughter's statement." (*Id.* (emphasis added) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985))).

Discovery has confirmed the truth of this allegation: Todaro's unredacted body-worn-camera footage shows that during the roughly twenty minutes between the moment Todaro knew that Fishman had not kidnapped anyone and the moment the *Terry* stop finally concluded, he not only failed to conduct a diligent investigation but conducted no investigation at all. (SUMF ¶¶ 21–30.) For most of this period, Todaro stood next to Fishman in silence. (*Id.*) In this Circuit, this Court has held, clearly

established law holds that "prolonging an investigative stop by two to five minutes can violate a suspect's Fourth Amendment rights if the police lack a valid investigate purpose for doing so." (Doc. 31 at 13–14 (citing *United States v. Hutchinson* 408, F.3d 796, 799 (D.C. Cir. 2005))). Todaro committed precisely this violation but for a much longer time and Fishman is thus entitled to partial summary judgment against him on liability.

## CONCLUSION

For the foregoing reasons, this Court should enter partial summary judgment in favor of Fishman against Todaro on the issue of liability for unreasonably prolonging Fishman's detention beyond the dissipation of reasonable suspicion. The question of damages and the other Defendants' liability will remain for trial.

Respectfully submitted,

/s/ Charles Gerstein
Charles Gerstein
(D.C. Bar No. 1033346)
Emily Gerrick
(D.C. Bar No. 90010592)
Samuel Rosen
(D.C. Bar No. 90012245)
GERSTEIN HARROW LLP
810 7th St NE, Ste. 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

/s/ Jason Harrow
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com

12

(323) 744-5293

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JARED FISHMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE DISTRICT OF COLUMBIA; and ) | |
| LIEUTENANT PATRICK LOFTUS, ) | |
| OFFICER MARCK JAEGER, OFFICER ) | |
| JEREMY BRADY, OFFICER ) | Case No. 21-cv-1847 |
| MICHAEL TONG, and OFFICER ) | Jury Trial Demanded |
| CHRISTOPHER TODARO, all of the ) | |
| Metropolitan Police Department of the ) | |
| District of Columbia, each in his ) | |
| individual capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

**JA 94**

Pursuant to Local Rule 7(h), Plaintiff Jared Fishman submits this statement of material facts to which there is no genuine issue:

1.    On February 17, 2020, Officer Christopher Todaro of the Metropolitan Police Department (MPD) was dispatched to the home of Plaintiff Jared Fishman to investigate the kidnapping of a young girl. (Exhibit A, Unredacted Body-Worn Camera Footage of Officer Christopher Todaro, at 4:18–4:23.)

2.    As Officer Todaro approached the home, he believed he had reasonable suspicion to believe a kidnapping had occurred because he had been told that a 9-1-1 caller had described a man matching Fishman's description throwing a small child into a car registered to Fishman's address. (Exhibit B, Transcript of Deposition of Officer Christopher Todaro, at 22/1–23/3.)

3.    The alleged kidnapping was the only crime that Officer Todaro was investigating at Fishman's home. (*Id*. at 21/21-25.)

4.    Todaro was the second MPD officer to arrive at the scene. (Ex. A at 3:29-3:33.)

5.    Seconds into his arrival, Todaro helped another officer grab Fishman and place him in handcuffs. (*Id*. at 3:32-3:44.)

6.    Moments later, a group of MPD officers walked Fishman to the corner of his street. (*Id*. at 7:50-8:03.)

7.    Todaro remained on the front steps and spoke with Fishman's wife, Fiona, and two daughters, Arabella and Juliet, all of whom had witnessed Fishman being handcuffed. (Ex. A at 3:53.)

8.    Fishman's younger daughter, Juliet, pleaded with Todaro and his colleagues to not arrest Fishman. (*Id.* at 3:53–4:06)

9.    Todaro asked all three people to move away from the house's front stairs, where Fishman sat handcuffed, and to "come back in the house." (*Id.*)

10.    All three complied; Juliet sat on the floor, crying and pleading with officers, "please don't arrest him, please—he hasn't done anything wrong," (*id.* at 4:08), before Fiona picked her up and consoled her. (*Id.* at 4:12)

11.    At this point, less than two minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro believed that Fiona was Juliet's mother. (Ex. B at 30/11-18.)

12.    Fishman's elder daughter, Arabella, then said "He did not take my sister. My sister was misbehaving, so he brought her into the car." (Ex. A at 4:18.)

13.    Todaro then told Arabella: "We got a call that there was a male who picked up a child, put her over his shoulder, and took her into the car—abducted her. Of course we take that very seriously." (*Id.* at 4:25.)

14.    When Todaro finished speaking, Fiona took Juliet into the house and said, to Todaro, "please don't leave, stay right there." (*Id.* at 4:30.)

15.    Todaro then asked Arabella whether she had been with Fishman and Juliet the whole time. (*Id.* at 4:33.) In response, Arabella said, "I was in the car in the front seat. My sister was misbehaving, and she wouldn't get into the car and come home. We didn't want her to get taken or anything, and she was not listening, so my

dad had to put her over his shoulder and bring her into the car. He did nothing wrong." (*Id.* at 4:35.)

16.    At this point in the investigation, less than two minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro did not believe he had any reason to think the girls were lying, and he believed that their explanation of the events was consistent with the allegations of the 9-1-1 caller. (Ex. B at 33/14-17.)

17.    At this point, less than three minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro believed that Fishman was the "father" of both girls. (*Id.* at 37/5-6.)

18.    Todaro remained on the front steps while Fishman's wife, Fiona, consoled a still-crying Juliet in the doorway. (Ex. A at 5:20.) "You know what happened, sweetie?" said Fiona. "Somebody misunderstood. Somebody saw Daddy pick you up and they didn't know he was Daddy. They didn't know he was Daddy, so they thought, 'maybe this is just, like, a man who's taking a child.'" (*Id.* at 5:39.)

19.    At this, Juliet screamed "No!" (*Id.*) Fiona then turned and pointed towards Todaro. "But these officers know," she reassured Juliet. "They know the situation. They know the situation, and everything is ok. Somebody misunderstood." (*Id.* at 5:40.)

20.    At this point in the investigation, less than three minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro "definitely kn[ew]" that Fishman was Juliet's father. Ex. B at 38/23–24.

21.    After speaking with Fiona, Juliet, and Arabella, Todaro remained on the steps of the house for roughly one minute. (Ex. A at 5:47-6:46.)  He then left the house, moved an MPD cruiser that was parked in the middle of the street, and walked to the corner where Fishman was being held. (*Id.* at 6:46-7:42.) Roughly four minutes had passed since Todaro's exchange with Arabella. (*Id.*)

22.    Todaro stood on the corner and watched as Fishman spoke with another MPD officer. During this exchange, Fishman shared the names and dates of birth of his wife and daughters. (*Id.* at 8:32-10:45.)

23.    During this time, Todaro watched as Fishman asked those officers to remove his handcuffs and the officers declined. (*Id.* at 10:50.)

24.    Two of the three officers that had been detaining Fishman then left the corner, and Todaro stayed behind near Fishman. (*Id.* at 11:00.)

25.    Todaro and a colleague then stood next to a handcuffed Fishman in near total silence for almost eight minutes. (*Id.* at 11:00-18:34.) Todaro briefly broke this silence to thank Fishman for his "patience" and to tell him that an MPD sergeant was on his way to the scene. (*Id.* at 18:34.)

26.    Todaro believed that he was "waiting for" a "supervisor to come and conduct their investigation themselves to give us some guidance on what's going on." (Ex. B at 47-48/22-4.) Todaro was aware that the approval of a supervisor is not required to release someone from a *Terry* stop. (*Id.* at 11/17.)

27.    After roughly five more minutes of Fishman standing next to Todaro, handcuffed and in silence on the corner of his street, Todaro asked a colleague about

the location of the sergeant. (Ex. A at 23:16.) Around two minutes after that, the

sergeant, Adam Bray, appeared. (*Id.* at 25:05.)

28.    As Todaro watched, Sergeant Bray told Fishman that the only thing that

officers needed to confirm before Fishman could be uncuffed was that "the child

[meaning Juliet] is OK, and is yours." (*Id.* at 27:25.) Bray continued, "I see you

standing there in your socks, I understand that you were sitting on your own steps,

and I want this all to be worked out as quick as we can." (*Id.*)

29.    Todaro already knew that Fishman was the girl's father (Ex. B  at 37/5–

6, 38/23–24) and had already seen the girl and determined that she "seemed in good

health" and was fine apart from the distress of seeing her father arrested in front of

her. *Id.* at 65/8–14. However, he did not tell Sergeant Bray either of these things. Ex.

A at 27:25–28:37.

30.    One minute later, after a brief exchange between Bray and Fishman

that uncovered no new information about this mistaken kidnapping, Bray instructed

the officers to uncuff Fishman and Fishman walked back to his house. (*Id.* at 28:37.)

31.    After he was uncuffed, Fishman walked back to his house, followed by

Todaro and other officers, and sat on his front stoop with his wife. *Id.* at 28:38–29:41.

32.    The officers then explained to the couple what had initiated the call,

answered some questions, and left. *Id.* at 29:41–32:46.

33.    At all points during Fishman's detention, the only crime Todaro was

investigating and believed he had reasonable suspicion of was a potential kidnapping.

(Ex. B at 31/7–10, 35/3–6, 36/3–6, 37/18–21, 60/21–23).

34.    Fishman was detained and in handcuffs for approximately 25 minutes.

Ex. A at 3:32–28:38.

Respectfully submitted,

/s/ Charles Gerstein
Charles Gerstein
(D.C. Bar No. 1033346)
Emily Gerrick
(D.C. Bar No. 90010592)
Samuel Rosen
(D.C. Bar No. 90012245)
GERSTEIN HARROW LLP
810 7th St NE, Ste. 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

/s/ Jason Harrow
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JARED FISHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA; and | ) |
| LIEUTENANT PATRICK LOFTUS, | ) Case No. 21-cv-1847 |
| OFFICER MARCK JAEGER, OFFICER | ) Jury Trial Demanded |
| JEREMY BRADY, OFFICER | ) |
| MICHAEL TONG, and OFFICER | ) |
| CHRISTOPHER TODARO, all of the | ) |
| Metropolitan Police Department of the | ) |
| District of Columbia, all in his | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## NOTICE OF FILING OF EXHIBIT

**JA 101**

Pursuant to Local Civil Rule 5.4(e), I hereby notice the Court that Exhibit A to Plaintiff's Motion for Partial Summary Judgment, which is a video file of the body-worn-camera footage of Defendant Christopher Todaro, exists in a format that does not permit filing through the Court's ECF filing system and is maintained in the possession of Plaintiff's counsel. It can be made available to the Court at its request. Because this footage contains the images and identities of minor children, I respectfully request that it remain out of the public record.

Respectfully submitted,

/s/ Charles Gerstein
Charles Gerstein
(D.C. Bar No. 1033346)
Emily Gerrick
(D.C. Bar No. 90010592)
Samuel Rosen
(D.C. Bar No. 90012245)
GERSTEIN HARROW LLP
810 7th St NE, Ste. 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

/s/ Jason Harrow
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

1

**JA 102**

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 107 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 1 of 116

1

```
 1               UNITED STATES DISTWRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3    _____

 4    JARED FISHMAN,

 5            Plaintiff,

 6       v.                            Case No:

 7    DISTRICT OF COLUMBIA,            1:21-cv-01847-RJL

 8    PATRICK LOFTUS, MARCK JAEGER,

 9    JEREMY BRADY, MICHAEL TONG, &

10    CHRISTOPHER TODARO

11            Defendants.

12    _____

13                 VIDEOTAPED DEPOSITION

14    _____

15

16    WITNESS:        CHRISTOPHER JOHN TODARO

17    DATE:           Thursday, August 24, 2023

18    START TIME:     11:34 a.m., EST

19    END TIME:        2:19 p.m., EST

20    REMOTE LOCATION:   Remote Legal platform

21    REPORTER:       Shenay Crawford, CDR-1966

22    JOB NO.:        19062

23

24

25
```

2

```
 1                    A P P E A R A N C E S

 2

 3        GERSTEIN HARROW LLP

 4        810 7the Street North East, Suite 301

 5        Washington, District of Columbia 20002

 6        By:  EMILY GERRICK, ESQUIRE

 7             emily@gerstein-harrow.com

 8             SAMUEL ROSEN, ESQUIRE

 9             sam@gerstein-harrow.com

10        Appearing for Plaintiff

11

12        OFFICE OF ATTORNEY GENERAL

13        FOR THE DISTRICT OF COLUMBIA

14        400 Sixth Street Northwest

15        Washington, District of Columbia 20001

16        By:  MARTHA J. MULLEN, ESQUIRE

17             martha.mullen@dc.gov

18        Appearing for Defendants

19

20

21

22

23

24

25
```

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 109 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 3 of 116

3

1                I N D E X   O F   T E S T I M O N Y

2

3    EXAMINATION OF CHRISTOPHER JOHN TODARO:              PAGE

4        By Ms. Gerrick                                   7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 110 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 4 of 116

4

```
1              I N D E X   O F   E X H I B I T S

2                   (available for download)

3

4    EXHIBIT   DESCRIPTION                         PAGE

5      A       General Order for Handling            19

6              Kidnapping/Extortion Cases

7      B       Body Camera Video Recording           23

8      C       General Order for Welfare Checks      79

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 111 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 5 of 116

5

```
 1                 P R O C E E D I N G S

 2                 THE REPORTER:  Good morning.  We are now

 3       on the record.  Today's date is August 24th, 2023, and

 4       the time is approximately 11:34 a.m., Eastern Time.

 5                 My name is Shenay Crawford, and I'm the

 6       officer designated by Remote Legal at 381 Park Avenue

 7       South, New York, New York, to take the record of this

 8       proceeding.

 9                 This is the deposition of Christopher

10       Todaro taken in the matter of Jared Fishman versus

11       District of Columbia, Patrick Loftus, Marck Jaeger,

12       Jeremy Brady, Michael Tong, and Christopher Todaro, Case

13       Number 1:21-cv-01847-RJL, filed in the United States

14       District Court for the District of Columbia.

15                 Would all counsel please identify

16       themselves for the record, starting with the noticing

17       attorney?

18                 MS. GERRICK:  Yes.  Thank you.  Emily

19       Gerrick for the plaintiff, and with law firm Gerstein

20       Harrow.  With me is Samuel Rosen.

21                 MS. MULLEN:  Good morning.  My name is

22       Martha Mullen.  I'm with the Office of the Attorney

23       General, and I represent all Defendants in this

24       litigation, including the deponent today.

25                 THE REPORTER:  Thank you so much.
```

1                This deposition is being taken remotely

2    on behalf of the plaintiff, and is being conducted

3    pursuant to the procedural rules and laws of the State

4    which governs this matter.

5                As such, all parties agree to this means

6    of capturing the official record, which may include

7    recording by audio and/or audiovisual means, and agree

8    not to oppose admission of this proceeding on the basis

9    of the personnel or method by which this testimony in

10   this proceeding was captured.

11               Do parties so stipulate?

12               MS. GERRICK:  Yes.

13               MS. MULLEN:  Yes.  The defense

14   stipulates.

15               THE REPORTER:  Thank you.

16               Mr. Todaro, are you still with us?  It

17   doesn't look like we have your video any longer.

18               We may have lost the witness.  Let's

19   temporarily go off the record at 11:35 a.m., Eastern

20   Time.

21       (Off the record.)

22               THE REPORTER:  We are back on the record

23   at 11:38 a.m., Eastern Time.

24               Would the witness please state their full

25   name for the record?

```
 1                    MR. TODARO:  Christopher John Todaro.

 2                    THE REPORTER:  Mr. Todaro, please raise

 3   your right hand.

 4                    Sir, do you solemnly swear or affirm that

 5   the testimony you will give today in this proceeding

 6   will be the truth, the whole truth, and nothing but the

 7   truth?

 8                    MR. TODARO:  I do.

 9   WHEREUPON,

10      C H R I S T O P H E R   J O H N   T O D A R O

11   having been called as a witness, being duly sworn by the

12   notary public present, testified as follows:

13                    THE REPORTER:  You may rest your hand.

14   The witness has been sworn.

15                    Counsel, you may proceed.

16                    MS. GERRICK:  Thank you very much.

17                         EXAMINATION

18   BY MS. GERRICK:

19       Q    I want to start just -- can you tell me your

20   current rank, just so I'm referring to you correctly?

21       A    Current rank is a sergeant for the

22   Metropolitan Police Department.

23       Q    Thank you.  All right.  So, Sergeant Todaro;

24   is that right?  Is that --

25       A    Yes, ma'am.
```

```
1        Q    Okay.  Thank you.  All right.  In preparation

2   for today's deposition, did you watch any videos such as

3   body worn camera footage?

4        A    Yes.

5        Q    Did you watch your own body worn camera

6   footage, other officers at the scene?  Can you tell me

7   what exactly you watched?

8        A    I watched my body worn camera footage.

9        Q    Thank you.  And in preparation for this

10  deposition, did you review any documents?  And don't

11  answer if they were documents prepared by your attorney.

12  I'm talking about original documents such as reports or

13  general orders.

14       A    No.

15       Q    Thank you.  And the video that you reviewed

16  related to an incident involving Sir Jared Fishman on

17  February 17th, 2020, correct?

18       A    Correct.

19       Q    Okay.  And sitting here today, is there

20  anything that you would have done differently relating

21  to that incident?

22       A    No.

23       Q    Thank you.  I'm going to start just by asking

24  some questions about your training, experience, and

25  background.
```

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 115 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 9 of 116

9

```
 1              Can you tell me your highest education level?

 2       A     I completed three years, 70 credits of

 3  college.

 4       Q     Great.  And where was that?

 5       A     At multiple universities.  West Virginia

 6  University, Montgomery College, and Coastal Carolina

 7  University.

 8       Q     Great.  Thank you.  And how long have you been

 9  a police officer?

10       A     It'll be seven years in November.

11       Q     And was that all with MPD?

12       A     Yes, ma'am.

13       Q     Great.  And do you have any other law

14  enforcement -- have you worked in law enforcement

15  anywhere else?

16       A     No.

17       Q     And can you tell me what your understanding is

18  of what a Terry stop is?

19       A     From what I understand, a Terry stop is

20  involuntary detention of a person who is potentially

21  involved in criminal activity.  And it allows the police

22  to investigate this potential criminal activity.

23       Q     And under your understanding of a Terry stop,

24  what level of suspicion do you need in order to detain

25  someone pursuant to a Terry stop?
```

```
 1        A    Reasonable suspicion is the key.

 2        Q    Great.  Thank you.  And under your

 3   understanding, at what point would you need to release

 4   somebody from a Terry stop?

 5              MS. MULLEN:  Objection as to the form of

 6   the question.  It's a hypothetical, missing facts that

 7   are unknown.

 8              MS. GERRICK:  I would certainly be able

 9   to answer this question --

10              MS. MULLEN:  You're a lawyer.  You're a

11   lawyer.  He's not.

12              MS. GERRICK:  -- based on -- and I'm

13   asking about his understanding of a Terry stop.

14   Objection noted.  You may proceed.

15              MS. MULLEN:  You can go ahead, Officer.

16   If you -- if you can answer the question, please do.

17              THE WITNESS:  What was the question,

18   again?

19   BY MS. GERRICK:

20        Q    Under your understanding, at what point do you

21   need to release somebody from a Terry stop?

22        A    Once the investigation is determined there's

23   no criminal activity.

24        Q    Great.  Thank you.  And under your

25   understanding, what justification do you need to put
```

```
 1    somebody in handcuffs?

 2              MS. MULLEN:  Objection as to the form of

 3    the question, but you can answer.

 4              THE WITNESS:  For my safety, the -- the

 5    person safety, suspect, or -- or anybody else.  Also,

 6    for MPD, when we transport anybody, they go in our cars,

 7    they have to be put into handcuffs as well.

 8    BY MS. GERRICK:

 9       Q    Thank you.  All right.  I'm going to -- let's

10    see.  So, yeah.  For certain crimes, do you need a

11    supervisor's -- if you were -- if you were a police

12    officer before you were promoted, do you need for

13    certain crimes a supervisor's approval before releasing

14    somebody from a Terry stop?

15              MS. MULLEN:  Well, objection as to form.

16              You can answer.

17              THE WITNESS:  No.

18    BY MS. GERRICK:

19       Q    Thank you.  All right.  I want to talk about

20    different ways that you can get reasonable suspicion.

21              So, you can have reasonable suspicion that a

22    crime occurred if you see evidence of the crime with

23    your own eyes; is that correct?  That's one way --

24       A    Correct.

25       Q    -- that you --
```

```
 1        A     Correct.  Yes.

 2        Q     And if you -- can you also get reasonable

 3   suspicion if a witness calls the police and describes

 4   something that might be evidence of a crime?

 5        A     Yes.

 6        Q     Which would you say is generally more

 7   reliable, seeing something with your own eyes or having

 8   it reported to you by witness?

 9              MS. MULLEN:  Objection to the form of the

10   question.

11   BY MS. GERRICK:

12        Q     Just so you know, when there's an objection.

13   You can still answer.

14        A     Okay.  Thank you.  I appreciate that.  My own

15   eyes, if I witness it.

16        Q     Great.  Thank you.  Do people in your

17   experience sometimes call the police about things they

18   think should be crimes, but are actually not crimes?

19        A     Yes.

20        Q     Can you give me some examples?

21        A     Someone called the police because there's a

22   bunch of pile of leaves in the road, or their neighbor's

23   AC unit is making too much noise, or, yeah, see two

24   people arguing.

25        Q     Great.  Thank you.  And so in those examples,
```

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 119 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 13 of 116

13

1   let's say someone tells you about them, do you -- what

2   would you do?  Would you go investigate it further or

3   would you just be like, that's not a crime.  Sorry.

4                MS. MULLEN:  Well, objection as to form.

5                You can answer.

6                THE WITNESS:  Go investigate it further

7   is what I would do.

8   BY MS. GERRICK:

9       Q   Okay.  So, if someone called about piled

10  leaves on the front lawn, you'd go investigate it

11  further?

12      A   Yes.

13      Q   Okay.  Thank you.  And is that true for

14  anything that somebody would call about and, say -- to

15  complain about, but you know it's not actually a crime?

16               MS. MULLEN:  Well, objection as to the

17  form of these questions.

18               You can go ahead and answer.

19               MS. GERRICK:  I don't understand the

20  question.  Can you repeat it?

21  BY MS. GERRICK:

22      Q   Yes.  So, we were talking about things where

23  somebody tells you -- calls you about something, or

24  calls the police, or tells you about something that they

25  think should be a crime, but you know is not actually a

1    crime.  You would still go and investigate that further?

2        A    Yes.  There's many times where they call, and

3    it doesn't seem like anything's obscure, but when we get

4    there, there is actual criminal activity that has

5    happened.

6        Q    Great.

7        A    Some people have trouble conveying what they

8    see over the phone.  When someone gets there in person,

9    it's easier for them.

10        Q    Great.  Thank you.  And as of February 17th,

11    2020, what training had you had relating to handling

12    kidnapping investigations?

13            MS. MULLEN:  I'm sorry.  I didn't hear

14    the last part of your question.

15    BY MS. GERRICK:

16        Q    As of the date of the incident, February 17th,

17    2020, what training had you had relating to handling

18    kidnapping investigations?

19        A    Training from my academy and reading the

20    general order.

21        Q    Great.  Thank you.  And have you had any

22    experience with kidnapping cases?

23        A    No.

24        Q    Thank you.  Generally, when somebody is

25    detained for questioning and you want to separate them

1    from other witnesses, where is it advisable to put them?

2              MS. MULLEN:  Objection as to form.

3              You can answer.

4              THE WITNESS:  I don't understand the

5    question.

6    BY MS. GERRICK:

7    Q    So let's say that you have someone detained

8    for questioning pursuant to a Terry stop, and there are

9    other witnesses around, and you want to separate them.

10   Where would you generally -- what are places that you

11   could put the witness while you --

12   A    Oh.

13             MS. MULLEN:  I --

14             MS. GERRICK:  -- questioning them?

15             MS. MULLEN:  I'm objecting to the form.

16             But go ahead, Sergeant.

17             THE WITNESS:  Yes, ma'am.  You want to

18   separate all parties to -- to hear each story

19   individually so there's no -- how do I say it?  No

20   influence on one person's story or another.

21             So, we generally separate them, going

22   into a different room, go down the block.  Just remove

23   them from eyesight is the -- is the goal.

24   BY MS. GERRICK:

25   Q    All right.  Thank you.  And I've heard that

1    officers will often put -- when they want to separate

2    people, put the person they're questioning in the back

3    of a police car for questioning.  Does that ever happen

4    in your experience.

5        A    For questioning?  I've never done that.

6        Q    Why not?

7        A    I haven't found it necessary in my, you know,

8    almost seven years.

9        Q    So is it generally preferable to have them say

10   -- like what -- let's say that they're outside their

11   home, would you prefer to question them while they're in

12   handcuffs near their home, out on the street, or prefer

13   to question them in the back of the police car where

14   nobody can see as easily?

15       A    Preferably on the street, for myself, to

16   eliminate any objects or something that could be used as

17   a weapon against me or leverage.

18       Q    Are there objects that could be used against

19   you in the back of the -- your own police car?

20       A    Yes.  The door.  If you have the door open.

21   You open the door, you -- you open yourself up to have

22   the person kick the door.  Which has happened many

23   times, which could injure me, the suspect.

24       Q    You can't lock the doors?

25       A    You can, but then you're talking through a

1    cage.  Which I don't like to do to a person.  If I -- if

2    I know that they're not going to -- you know, if -- if

3    they're going to get arrested, then that's one thing,

4    but I -- I don't like to talk to people through cages.

5    We have a cage on our window to block the -- the door,

6    so.

7        Q    Understood.  If somebody is handcuffed outside

8    of their home for questioning, are you ever worried that

9    they might be a spectacle for their neighbors and

10   passersby?

11       A    No.

12       Q    Why is that not a consideration?

13       A    I'm there to investigate a crime.  I'm not

14   there to do anything else opposed to the person's

15   personal life in that -- in that regard.

16       Q    Understood.  All right.  I am going to pull up

17   an exhibit.  One moment.  All right.

18            Do you see a document on your screen that

19   says, "General Order."  "Handling Kidnapping/Extortion

20   Cases"?

21       A    Yes, ma'am.

22       Q    Thank you.  So, the Metropolitan Police

23   Department has -- oh, sorry.  One second.

24            So, you were investigating on February 17th,

25   2020, you're investigating a potential kidnapping; is

1   that correct?

2       A    Correct.

3       Q    And is this document familiar to you?

4       A    Yes.  It's our general order for handling

5   kidnapping/extortion cases.

6       Q    Great.  Thank you.  And --

7               MS. MULLEN:  Is this going to be marked

8   as Exhibit Number 1?

9               MS. GERRICK:  Sure.  I think that they

10  have done it as Exhibit A in the past, but yes.

11              MS. MULLEN:  That's fine. Whatever the

12  preference is.  We don't care.

13              MS. GERRICK:  Great.  And just -- I'm not

14  actually the person marking the exhibits, but --

15              MS. MULLEN:  Right.  But it has to be

16  clear for the record what we're talking about, what

17  document it is.

18              THE REPORTER:  Right.  So --

19              MS. MULLEN:  And if it's going to be an

20  exhibit, it needs to be marked.

21              THE REPORTER:  Right.  So, should it be

22  Exhibit A or Exhibit 1?

23              MS. GERRICK:  I'm fine either way.  I

24  think last time we did it as Exhibit A.  So, let's just

25  stick with that again.

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 125 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 19 of 116

19

 1          (Exhibit A marked for identification.)

 2                    THE REPORTER:  Okay.  Okay.

 3                    MS. GERRICK:  Thank you.

 4    BY MS. GERRICK:

 5      Q    All right.  On page 2 of the document, do you

 6    see something called "Procedural Guidelines"?

 7                    MS. MULLEN:  I can't --

 8                    THE WITNESS:  Yes.

 9                    MS. MULLEN:  I can't see it.  I can see

10    the first half of the document.  And -- I -- it breaks

11    up after, "Background."  So after, "Background" I can't

12    see anything more on the document.

13                    MS. GERRICK:  All right.  Let me try to

14    "Bring All To Me".

15                    MS. MULLEN:  Thank you.

16                    MS. GERRICK:  And you can't scroll

17    through the document?

18                    MS. MULLEN:  I don't know.  Can I?  I can

19    scroll.

20                    MS. GERRICK:  Okay.

21                    MS. MULLEN:  I didn't know I had that

22    capability.  So where do you want us to be?

23                    MS. GERRICK:  Page 2 --

24                    MS. MULLEN:  On page 2?

25                    MS. GERRICK:  -- of the document.

```
 1   BY MS. GERRICK:

 2      Q    And I'm just going to give you a moment to

 3   read through part A.1. here where it says procedural

 4   operations -- "Procedures for Kidnapping/Extortions."

 5           You can let me know when you're done.

 6                MS. MULLEN:  We're reading through A.1.,

 7   and then all the other paragraphs?

 8                MS. GERRICK:  Yeah.  A through H on this

 9   page.

10                MS. MULLEN:  Okay.  Thank you.

11                THE WITNESS:  Okay.  I read it.

12   BY MS. GERRICK:

13      Q    Great.  Thank you.  And to the best of your

14   knowledge, do you know if these procedures were followed

15   on February 17th, 2020?

16                MS. MULLEN:  Well, objection as to form.

17   You had, you know, you have all these different officers

18   doing different things.  He can testify as to what he

19   did.

20                THE WITNESS:  Agreed.  I -- I can't

21   testify for everything here.  I don't know what other

22   people did, so --

23   BY MS. GERRICK:

24      Q    So for part D, "Broadcast the flash look-

25   out..."  Did you have any -- did you have any knowledge
```

1   of a flash look-out being broadcasted?

2       A    In regards to a flash look-out that wasn't

3   necessary because we got the lookout from the two

4   witnesses that called 9-1-1.

5            So, flash look-out would be like if we got on

6   scene, and then we spoke to the witnesses, and we told

7   the other officers and police in the -- in the area who

8   we're looking for.  We had that information from the --

9   the good samaritans who called the police.

10      Q    Great.  Thank you.  And was there, as far as

11  you know, a request under F, did -- was there a request

12  for an official to respond to the scene based on that?

13      A    Yes.  There was a request for an official

14  respond to the scene.

15      Q    Great.  And can you tell me what SDD stands

16  for in part G and part H?

17      A    I don't remember.

18      Q    Okay.  Great.  All right.  I think we can

19  close this exhibit.  It's marked as Exhibit A.  All

20  right.

21           So, we've talked about reasonable suspicion

22  broadly.  On February 17th, 2020, what crime or crimes

23  did you have reasonable suspicion to believe occurred as

24  it related to Mr. Fishman.

25      A    A kidnapping?

USCA Case #25-7050    Document #2131053        Filed: 08/20/2025    Page 128 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 22 of 116

22

```
 1      Q    Great.  And did you have reasonable suspicion

 2   to believe that a kidnapping had occurred as you

 3   approached the house?

 4      A    Yes.

 5            MS. MULLEN:  I'm sorry.  I didn't hear

 6   the question.  I know he's already answered.

 7            MS. GERRICK:  I just asked if he had

 8   reasonable suspicion to believe that a kidnapping has

 9   occurred -- had occurred when he approached Mr.

10   Fishman's house on that day.

11            MS. MULLEN:  Thank you for repeating it.

12   I appreciate that.

13            MS. GERRICK:  No problem.

14   BY MS. GERRICK:

15      Q    And as you're approaching the house, what have

16   you been told about the situation?

17      A    There was a witness that saw a -- an adult

18   male matching description given, which I don't remember

19   from that day, to be honest.  And it was a child --

20   small child was thrown into a green Audi SUV.

21            The license plate, D.C. license plate, was

22   seen by the -- the witness and was run through our

23   system and showed the registration was registered to an

24   owner who lived at the O Street location in Georgetown.

25            So, when I pulled into the block and saw the
```

1    exact vehicle in question that the suspect was driving

2    and saw my other colleague, Officer Jaeger, speaking to

3    an adult male --

4        Q    Great.  Thank you.  Yeah.  I'm just trying to

5    get a sense of what you knew going into the scene.

6    Thank you.

7        A    Yes.  No problem.

8        Q    All right.  Great.  I am going to go ahead and

9    pull up the body cam video, and I'm going to represent

10   that this is what was shared to me by counsel through

11   discovery.  So let me go ahead and share that now.

12       (Exhibit B marked for identification.)

13   BY MS. GERRICK:

14       Q    And so, what I'm going to do is going to be

15   playing from this video.  I'll stop at certain points

16   and ask questions about it.

17       A    Okay.

18       Q    And if at any point you're -- yeah.  Yeah.  If

19   at any point anything looks, yeah, wrong, then let me

20   know.  But this should be your body camera footage.

21   Great.

22       A    Okay.

23       Q    Okay.

24           MS. MULLEN:  Did we -- I believe we

25   produced it as his body cam footage.

```
 1                    MS. GERRICK:  Yes.

 2                    MS. MULLEN:  So, if you're playing what

 3    we produced --

 4                    MS. GERRICK:  Correct.

 5                    MS. MULLEN:  -- it should be Sergeant

 6    Todaro's body cam footage.

 7                    MS. GERRICK:  Correct.

 8    BY MS. GERRICK:

 9        Q    All right.  I'm going to start playing now.

10        (Video played.)

11    BY MS. GERRICK:

12        Q    I'm just going to fast forward a little bit

13    while there's silent driving.

14        A    Okay.

15        (Video played.)

16    BY MS. GERRICK:

17        Q    I'm stopping at minute 3:53 of the video.  So,

18    is that you saying, "Let's get back into the house real

19    quick"?

20        A    Yes, ma'am.

21        Q    All right.  Thank you.  Why did you say that?

22        A    The child was very hysterical, very upset.

23    And at this time, you know, once we had the suspect in

24    handcuffs, we wanted to separate all parties so that we

25    can do our investigation.
```

```
 1        Q    Great.  Thank you.  I'll play more.

 2        (Video played.)

 3   BY MS. GERRICK:

 4        Q    All right.  Can you describe what's happening

 5   at this point in the video?  We're at minute 4:10 -- or

 6   no, 4:09 at the video.

 7        A    I don't remember, but it -- it looks like the

 8   child and her mother are here going to talk to -- to me,

 9   and there's another officer next to me as well.

10        Q    Great.  So, and did you hear the little girl

11   saying, "He hasn't done anything.  It was my fault"?

12        A    I don't remember based off this video.  Yeah.

13        Q    Do you want me to rewind and play that part

14   again?

15        A    If you could.

16        Q    Great.  Sure.  And yeah, if at any point you

17   want me to rewind and look again, I'm happy to do that.

18   Give me one moment.

19        A    Okay.

20             MS. MULLEN:  All right.  And Sergeant

21   Todaro, do you want me to put on the record what we

22   discussed yesterday?

23             THE WITNESS:  Yes, please.  Actually, I

24   was going to bring that up.

25             MS. MULLEN:  Okay.  Officer Todaro
```

```
 1   suffered a concussion, and he's been on medical leave

 2   for four weeks.  And he remains on medical leave as this

 3   deposition is being taken.

 4              It was a serious injury.  It was in the

 5   line of duty, but he's still recovering.  And it's my

 6   understanding that the concussion may very well have

 7   affected his memory to a certain extent.

 8              And if you want to ask him to what extent

 9   it has affected his memory, you are certainly free to do

10   so.

11              MS. GERRICK:  Sure.

12              Well, first, let me just say I'm terribly

13   sorry, and I hope that you recover soon.

14              THE WITNESS:  Thank you for that.

15   BY MS. GERRICK:

16      Q    Are you able to you tell me how this might

17   affect your memory and how it might affect things for

18   the purposes of this deposition?

19      A    I've noticed since the -- my fall and my

20   concussion, my -- my long-term and short-term memory,

21   things have been -- I've been forgetting things, very

22   important life things in my life, and of course, little

23   things as well.  So, it's -- it's definitely affected my

24   -- my day-to-day, and -- and for situations at work

25   even, as I'm finding out.
```

```
 1      Q    I'm terribly sorry about that.  Do you feel

 2   okay to still be doing this deposition right now, or is

 3   it your preference to reschedule?  Do you feel able to

 4   do this right now, or how are you feeling about it?

 5      A    I feel I can do it.  I just might have to take

 6   some breaks when I start developing some symptoms of

 7   migraines and nausea.  My doctors have instructed me to

 8   kind of take a break from what I'm doing.

 9           Too much screen time especially can trigger

10   things.  Being in the car triggers things.  So, I just

11   kind of have to -- to take a break, and I might ask for

12   a break here.

13      Q    Yeah.  Absolutely.  Did you say a break right

14   now?

15      A    If you don't mind.  I'm feeling some symptoms.

16   I would -- I would like to kind of just get off the

17   screen and just get back to neutral, so to speak.

18      Q    Absolutely.  Yes.  And yeah, at any point, if

19   you need to take a break, just let me know.  We can

20   start the first one now.

21      A    All right.  Thank you.  I appreciate it.

22              MS. MULLEN:  I'm sorry Sergeant.

23              THE WITNESS:  Yes, ma'am.

24              THE REPORTER:  Wait one second.  Let me

25   take us off the record.  We are temporarily off the
```

1    record at 12:07 p.m., Eastern Time.

2        (Off the record.)

3                THE REPORTER:  The time is 12:24 p.m.,

4    Eastern Time.  We're back on the record.

5    BY MS. GERRICK:

6        Q    Great.  All right.  Well, thank you for, yeah,

7    being willing to do this.  Like I said, if you want to

8    reschedule or take any breaks or anything, just let us

9    know.

10              I'm going to go ahead -- we had last talked

11    about rewinding the video to relisten because for -- say

12    -- the record will show I heard the younger girl saying,

13    "He hasn't done anything.  It was my fault," or

14    something to that.

15              So, I'm going to rewind to that part, and then

16    ask you a couple of questions about that.  So, give me a

17    moment to find it.  I think I'm actually here.  So, I'm

18    going to start at minute 4:00 and see if it's in this

19    little snip.

20        A    Okay.

21        (Video played.)

22                MS. MULLEN:  And I just -- and I know you

23    understand this.  But there's a difference between what

24    the officer may remember, and then what he's seeing and

25    hearing on the body cam footage, so --

```
 1                    MS. GERRICK:  Yes.  I understand.

 2                    MS. MULLEN:  Okay.

 3    BY MS. GERRICK:

 4         Q    So what I -- what I want to know is what you

 5    thought at this point in the video.  If you've watched

 6    this and think, "Oh, I probably didn't hear that at any

 7    point," then you can say that.  If instead it's pretty

 8    clear what she's saying and you say, "Yeah.  I think I

 9    heard that, and here's what I thought about it," then

10    you can answer that way, but yeah.

11                    MS. GERRICK:  Any -- anything else before

12    we proceed?

13                    MS. MULLEN:  No.  No.

14    BY MS. GERRICK:

15         Q    Great.  And, yeah, I do think I just want to

16    play this and see what is clearly awful.  Okay.  Let's

17    go ahead.

18         (Video played.)

19    BY MS. GERRICK:

20         Q    So I'm stopping at 4:10.  Can you describe

21    what's happening here and what you hear?

22         A    From watching the video, the -- the little

23    girl is very hysterical and -- and yelling.  And then

24    the older sister comes up to the right here, and she's

25    more calm, and you're able to understand her better.
```

```
 1      Q    And at this point, do you hear the younger

 2   girl saying something along the lines of, "He hasn't

 3   done anything.  It was my fault."

 4      A    I heard from -- after watching the video, she

 5   did say he didn't do anything.  I didn't hear her say it

 6   was her fault, though.  I did not hear that.

 7      Q    Okay.  Great.  So, at this point, what did you

 8   think was going on.

 9      A    At -- at this point, still with the initial

10   call that possible kidnapping, or --

11      Q    Great.  And what was your -- what did you

12   think the relationship between the girl and the woman

13   picking her up was?

14      A    I assumed it was her mother.

15      Q    Great.  Thank you.  And what did you think her

16   relationship was to the man?

17      A    To the man, I -- I didn't even think about it,

18   to be honest.

19      Q    Okay.  Thank you.  And did it seem to you like

20   the little girl was distressed the man was being taken

21   away and handcuffed?

22            MS. MULLEN:  Well, objection as to what

23   he -- you're asking him to speculate what the little

24   girl was reacting to?

25            MS. GERRICK:  Yes.
```

1    BY MS. GERRICK:

2        Q    What was your -- what was your impression of

3    what was -- what she was reacting to?

4        A    I'm not sure what the little girl was -- why

5    she was acting the way she was, but she was visibly

6    upset about what was happening.

7        Q    Great.  Thank you.  And at this point, what

8    crime or crimes did you have reasonable suspicion of?

9        A    At this point, reasonable suspicion that a

10   kidnapping potentially occurred.

11       Q    Great.  Thank you.  All right.  So that was

12   minute 4:10.  I'm going to keep playing for about seven

13   more seconds.

14       (Video played.)

15   BY MS. GERRICK:

16       Q    Great.  And so I'm stopping at minute 4:17.

17   Can you describe what's happening here?

18       A    Still the little child -- little girl is very

19   hysterical as well.  Then I was pretty shocked at this

20   point because the older daughter came up and started

21   saying things that, you know, we didn't even talk to her

22   about.  So, she was talking about an incident that

23   happened that, you know, we didn't even talk about yet.

24   So, I was a little shocked and kind of overwhelmed at

25   this point.

```
 1       Q    Can you explain more why you were shocked?

 2       A    Usually, you know, when people come to the

 3  door, they'll ask us why we're there.  But this little

 4  girl knew exactly why we were there.  She had a reason

 5  for some sort of -- something that had happened before.

 6       Q    And what was her explanation?  Do you remember

 7  what it was just now, or should I replay it?

 8       A    Could you replay it?

 9       Q    Sure thing.  One second.  Go to 4:10.  I'm at

10  minute 4:07.  So let me --

11       (Video played.)

12  BY MS. GERRICK:

13       Q    All right.

14       A    So the older -- oh, I'm sorry.  Go ahead.

15       Q    Sorry.  Yeah.  I'm at minute 4:16, just for

16  the record.  Okay.  Go ahead.

17       A    So the older sister states that he did not

18  take her sister, to something to that effect.

19       Q    Great.  Thank you.  Did you hear her saying

20  that she was misbehaving and so he put her in the car.

21       A    After watching the video, yes.  I -- I heard

22  her say that.

23       Q    Great.  Thank you.  And is that explanation,

24  was it consistent with what you knew from the 9-1-1

25  call?
```

```
 1                    MS. MULLEN:  Well, objection as to the

 2     form.  You've not --

 3     BY MS. GERRICK:

 4          Q    I believe you described that you were walking

 5     -- when you were coming towards the house, what you had

 6     been told about the 9-1-1 call was that a man put a --

 7     threw a child into a car; is that correct?  That's what

 8     you testified earlier.

 9          A    That is correct.

10          Q    Great.  And so is the older girl's explanation

11     here consistent with what you'd been told?

12          A    Well, she gave some -- some background to what

13     possibly happened.  Yes.

14          Q    Great.  Thank you.  Did you have any reason to

15     believe that the girls were lying about what had

16     happened?

17          A    At this point, no.

18          Q    Great.  Thank you.  And is the behavior that

19     you're seeing here from the girls, the woman, is this

20     the sort of behavior that you would expect to see in a

21     kidnapping case?

22                    MS. MULLEN:  Well, objection as to the

23     form of a question.  And it's an improper hypothetical.

24     BY MS. GERRICK:

25          Q    You may answer.
```

```
 1        A    I ---- I don't know.

 2        Q    So none of this was at all inconsistent with

 3   what you would expect to see in a kidnapping case?

 4                MS. MULLEN:  Well, objection.  He told

 5   you this was his first kidnapping case.

 6                MS. GERRICK:  I mean, he's --

 7                MS. MULLEN:  So, he has nothing to

 8   compare it to.

 9                MS. GERRICK:  He's been trained on

10   kidnapping cases.  He testified.

11                MS. MULLEN:  Right.  But you're asking

12   him to talk to a particular situation that he's

13   experiencing for the first time, and compare it to what?

14   BY MS. GERRICK:

15        Q    Based on your training and expertise as a

16   police officer, was anything that you're seeing here

17   inconsistent with what you would expect to see in a

18   kidnapping case?

19        A    I -- I can't say.  You know, every -- every

20   situation is different.  Every investigation case is

21   different.  People act differently.  So, I -- I can't

22   say that it's consistent --

23        Q    All right.

24        A    -- or not.

25        Q    Thank you.  And so at this point -- I'm going
```

```
 1   to be asking this question a lot, and it's --

 2        A    Okay.

 3        Q    -- all right if your answer is the same.  But

 4   at this point, what crime or crimes did you believe you

 5   had reasonable suspicion of?

 6        A    A potential kidnapping.

 7        Q    Okay.  Thank you.  All right.  We're at minute

 8   4:16.  I'm going to press play again.

 9        (Video played.)

10   BY MS. GERRICK:

11        Q    All right.  So, is that you providing an

12   explanation of the call here?  Is that -- is that you?

13        A    Yes.  That is me.  Yes.

14        Q    Perfect.  Thank you.  And were you accurately

15   describing what you knew about the call to the woman?

16        A    To my best -- to the best of my ability, yes.

17        Q    Perfect.  Thank you.  Were you leaving out any

18   important details in the explanation to your knowledge?

19             MS. MULLEN:  Well, objection as to the

20   form of the question.

21   BY MS. GERRICK:

22        Q    Had you been told any details that were -- you

23   were -- have been thinking of, or were purposely leaving

24   out when you were talking to her?

25        A    I did not purposely leave out anything.  I
```

USCA Case #25-7050    Document #2131053       Filed: 08/20/2025     Page 142 of 426
Case 1:21-cv-01847-RJL   Document 47-5    Filed 11/20/23    Page 36 of 116

36

1    told her what I remembered off the top of my head from

2    the call.

3         Q    Perfect.  Thank you.  And again, same question

4    again.  At this point, what crime or crimes did you have

5    reasonable suspicion of?

6         A    A potential kidnapping.

7         Q    Great.  Thank you.  All right.  I'll play

8    again.  We're at 4:31.

9         (Video played.)

10   BY MS. GERRICK:

11        Q    Great.  So, we're at 4:53.  Can you describe

12   what's happening here?

13        A    The older daughter is telling me what

14   transpired before we -- we got to the house.

15        Q    Okay.  Thank you.  And does this explanation

16   seem plausible to you?

17        A    I don't understand the question.

18        Q    Sorry.  So does her explanation, does it seem

19   weird to you, or does it raise any red flags, or does it

20   seem like perfectly plausible and that makes sense?

21        A    Her explanation makes sense, but definitely

22   it's one side of the story.  So, we still have to

23   continue investigating.

24        Q    Okay.  Thank you.  And is her explanation here

25   consistent with what you know about what the 9-1-1

```
 1   caller said?

 2        A    Yes.

 3        Q    Thank you.  At this point, what do you think

 4   the relationship is between the girls and the man?

 5        A    That's their father and he -- and they're the

 6   daughter.

 7        Q    Great.  And do you still believe that the

 8   woman is their mother at this point?

 9        A    Yes.

10        Q    Great.  Thank you.  And so the older girl,

11   she's telling you all this, do you at any point relay

12   the information that she's telling you to your

13   colleagues down the street corner with Mr. Fishman?

14        A    I don't remember.

15        Q    And we can watch the video if you don't

16   remember, but --

17        A    Yeah.  I don't remember.

18        Q    And again, same question again.  At this

19   point, what crime or crimes did you have reasonable

20   suspicion of?

21        A    A potential kidnapping.

22        Q    Okay.  Thank you.  All right.  That was minute

23   4:53.  I'm going to keep playing.

24        (Video played.)

25   BY MS. GERRICK:
```

```
 1        Q    All right.  We're at minute 5:40.  Can you
 2   describe what's happening here?
 3        A    The little -- we -- we -- the little girl --
 4   the daughter was so visibly upset and thought we were
 5   going to take her -- her father away.  And myself and
 6   the other officer told her that we're -- nobody's going
 7   anywhere right now.  We're all staying here as we
 8   continue our investigation.  And then the mother is
 9   explaining to the younger daughter what -- what happened
10   -- what's -- what's going on.
11        Q    Great.  Thank you.  And did you hear her sort
12   of explaining the situation as, oh, they didn't know
13   that it was your daddy, and that's why they called?  Did
14   you hear something along those lines.
15        A    After watching the video, yes.  I -- I heard
16   that.  I don't remember that, though.
17        Q    Great.  Thank you.  And so if you -- if you
18   did hear -- so let's see.  So, at this point, are you
19   more certain that the man down the corner is her father?
20             MS. MULLEN:  Well, objection as to the
21   form of the question.
22             You can answer, Sergeant.
23             THE WITNESS:  At this point, I definitely
24   know that the -- it is her father.
25   BY MS. GERRICK:
```

```
 1        Q    Okay.  Thank you.  All right, that was minute

 2    5:40.  I'm going to keep playing.

 3        (Video played.)

 4    BY MS. GERRICK:

 5        Q    Okay.  So here was that you saying,

 6    "Everything here is safe"?

 7        A    Yes, me.  And I think I heard the other

 8    officer, Brady, up top say the same thing.

 9        Q    Okay.  And what is that referring to?

10        A    I don't --  I --

11                MS. MULLEN:  Well, he can testify as to

12    what he's referring to, not what --

13                MS. GERRICK:  Yes.

14                MS. MULLEN:  -- Officer Brady's referring

15    to.

16    BY MS. GERRICK:

17        Q    Yes.  I'm talking about what you're referring

18    to.

19        A    I don't remember exactly.  I can't hear what

20    the little girl was saying or the -- the mother or who

21    exactly is speaking inside the house.  So, I -- I don't

22    know exactly what they're referring to, but I --

23        Q    Oh, sorry.  I -- I'll just clarify.  I just

24    wanted to clarify that you're saying that as a -- to

25    reassure the family not -- you're not talking to other
```

```
 1   officers telling them it's safe?

 2       A    Oh, okay.  Yes, yes.  I was --

 3       Q    Okay.

 4       A    -- reassuring the family that he's safe right

 5   -- right down the street there on the sidewalk.

 6       Q    Great.  Thank you.  Yeah.  That wasn't like a

 7   trick question or anything.  I'm just trying to --

 8       A    Okay.

 9       Q    -- figure out what --

10       A    Got you.

11       Q    Thank you.  So that was --

12       A    Okay.

13       Q    I'm sorry?  That was 6:06.  I'm going to keep

14   playing.

15       (Video played.)

16   BY MS. GERRICK:

17       Q    All right.  Can you tell me why you decide at

18   this point to walk over to the corner where Mr. Fishman

19   is, and sorry I'm at minute -- sorry.

20       A    No, no.  You're fine.  Sorry.  It's all right.

21   The officer -- well, Almanzar (phonetic) right there, he

22   was my partner for that day.  We were assigned to -- to

23   ride together.  So, we're trained, you know, you're

24   never supposed to leave your partner, but there's, you

25   know, you're always supposed to stay with your partner.
```

USCA Case #25-7050   Document #2131053      Filed: 08/20/2025   Page 147 of 426
Case 1:21-cv-01847-RJL   Document 47-5   Filed 11/20/23   Page 41 of 116

41

1    So I wanted to come and check on his well-being, and --

2        Q    Great.  Thank you.  And is that the officer on

3    the left or the right?

4        A    On the left, who has his hand on the suspect's

5    arm?

6        Q    Great.  Okay.  Thank you.  Were you also

7    hoping to listen to the interview of Mr. Fishman and see

8    if it was consistent with what the girls were saying, or

9    were you just checking on your partner?

10       A    At this point, I was just coming to check on

11   my partner and make sure everything was -- was good at

12   their corner.

13       Q    Great.  Thank you.

14       (Video played.)

15   BY MS. GERRICK:

16       Q    All right.  I'm stopping at 8:44.  Can you

17   tell me why you decided to turn back around at this

18   point?

19       A    I don't know.

20       Q    Okay.  No worries.  And did it seem like

21   anything was happening on that corner, or they're just

22   kind of standing around?

23       A    Just standing around.

24       Q    Were you at all surprised that they weren't

25   asking him any questions or anything like that at this

```
 1   point?

 2        A    I thought they were.

 3        Q    Oh, okay.  I didn't see that just there.

 4   Maybe -- yeah.  I can rewind here.

 5        A    Yeah.  Yeah, if you could rewind.  I thought

 6   they were.

 7        Q    Okay.  I'm going to go here, I think 8:22, as

 8   you're walking towards them.

 9        (Video played.)

10             THE WITNESS:  Yeah.  There's an officer

11   in front of the suspect right now who's getting

12   information and talking to him.  You can't really see

13   him.  He's -- he's blocked by the suspect, but there's

14   three officers down the corner.

15   BY MS. GERRICK:

16        Q    Okay.  Great.  So that was on minute 8:43 here

17   that we're stopped at.  Thank you.

18        A    Okay.

19        Q    All right.  I'm going to keep playing.

20        (Video played.)

21   BY MS. GERRICK:

22        Q    All right.  We're at 9:03.  Can you tell me

23   why you decided to come back again after turning around?

24        A    Same thing.  I -- I didn't want to go too far

25   from my -- my partner.  I -- I know that he was still
```

1   here.

2       Q    Great.  Thank you.  All right.  I'm going to

3   keep playing.

4       (Video played.)

5   BY MS. GERRICK:

6       Q    All right.  I'm stopping at 9:21.  Can you

7   describe what's happening here?

8       A    Officer Tong was interviewing the suspect.

9       Q    Great.  Thank you.  And could you hear what --

10  could you hear the interview from that point?

11      A    I don't -- I don't remember hearing it that

12  day.  But from the video, I -- I can hear the officer

13  interviewing him.

14      Q    Great.  Thank you.  And were you -- so can you

15  tell me why you turned around again and started walking

16  away?

17      A    I don't know, to be honest.  I --

18      Q    Yeah.  No worries.

19      A    -- can't remember.

20      Q    Were you not interested in the interview that

21  was happening with Mr. Fishman?

22           MS. MULLEN:  Well, objection.  He just

23  told you he doesn't know.

24           THE WITNESS:  I -- I don't know why.

25  BY MS. GERRICK:

```
 1        Q    Okay.  Thank you.  All right.  I'm going to

 2   keep playing.

 3        (Video played.)

 4   BY MS. GERRICK:

 5        Q    Great.  And do you know if you could hear the

 6   interview from where you are here?  We're at 9:35.

 7        A    I couldn't hear anything on the day of.  I can

 8   hear they're talking now, but I can't make out any

 9   specific conversation.

10        Q    Okay.  So, to the best -- to the best of your

11   recollection, on the day of, you couldn't really hear

12   Mr. Fishman's account of events on the corner; is that

13   correct?

14        A    Correct.  Correct.

15        Q    Great.  Thank you.  All right.  That was

16   minute 9:35.  I'm going to keep playing.

17        (Video played.)

18   BY MS. GERRICK:

19        Q    I'm at 10:06.  So same thing.  You're a little

20   bit closer now.  You still don't remember actually

21   hearing any of the interview; is that correct?

22        A    This, I do.  He was giving his -- his personal

23   information to Officer Tong there.  Like, his name.

24        Q    Great.  Right.  It's 10:06 playing.

25        (Video played.)
```

1    BY MS. GERRICK:

2        Q    All right.  So here it seems like you're

3    passing a phone around; is that correct?  11:11?

4        A    Correct.  I was handed the suspect's phone.

5        Q    Got it.  Okay.  Thank you.  I'll continue

6    playing.

7                    (Video played.)  MS. MULLEN:  Can we go

8    off the record for just a minute?

9                    MS. GERRICK:  Sure.  We're pausing the

10   video at 12:24.

11                   THE REPORTER:  We're temporarily off the

12   record at 12:53 p.m., Eastern Time.

13       (Off the record.)

14                   THE REPORTER:  The time is 1:09 p.m.,

15   Eastern Time, we are back on the record.  1:09 p.m.,

16   Eastern Time.

17                   MS. GERRICK:  Thank you.  And Ms. Mullen,

18   do you want to go ahead and talk about what we are

19   stipulating to?

20                   MS. MULLEN:  Yes, and thank you.  During

21   the course of this deposition, it became apparent that

22   the body worn camera footage that we have provided to

23   the plaintiff for Sergeant Todaro's camera at the scene

24   of the incident did not redact pedestrians walking by.

25   It should have been redacted.  It wasn't redacted.

```
 1                    And so the parties have agreed, and I'll
 2    ask Ms. Gerrick if she will stipulate, that if this
 3    deposition footage, the body cam footage that is being
 4    used today, needs to be used for any other purpose but
 5    this deposition, they will only -- "they" meaning the
 6    plaintiff -- will only use a redacted version which will
 7    be identical to this.  It will simply blur the
 8    pedestrians that you see walking by who have nothing to
 9    do with this case or this litigation.
10                    MS. GERRICK:  Yes.  And Plaintiff so
11    stipulates.  Thank you.
12                    MS. MULLEN:  Thank you.
13    BY MS. GERRICK:
14        Q    Great.  All right.  So we are at minute 12:24
15    of the video, and -- let's see.  Let me -- it's ready.
16    And we had previously paused and talked at around minute
17    11:11.
18                    And, Sergeant Todaro, is it -- would you agree
19    that so far in the video, since we paused with the phone
20    exchange at around a minute 11:11, that not much has
21    happened?  It's just been sort of standing around?
22        A    Yes.  That's correct.
23        Q    Great.  Thank you.  All right.  I'm going to
24    continue to play from 12:24.
25                    (Video played.)
```

```
 1    BY MS. GERRICK:

 2        Q    I'm going to go ahead and pause at 13:05.  So,

 3    you'd agree there's just more standing around at this

 4    point?

 5        A    Yes.

 6        Q    At this point, are you -- are you waiting for

 7    something?  Why are the officers just standing around?

 8        Q    At this point -- so other officers have taken

 9    over the -- the lead on the investigation.  They're --

10    they're interviewing the suspect here, Mr. Fishman, and

11    there was another officer talking to the children up

12    there.

13             So right now, myself and the other officer are

14    just standing by with the suspect, making sure everybody

15    is safe, and -- and waiting for the investigation to

16    continue.

17        Q    Great.  And when you say "waiting for the

18    investigation to continue", do you mean waiting to hear

19    back about what's happening at the house and what the

20    witnesses are saying at the house?

21        A    Correct.

22        Q    Okay.  So not much can happen until you hear

23    back from those officers about what's happening at the

24    house; is that correct?

25        A    That, and we also -- there's a supervisor that
```

1    was enroute to the -- the location, and we were waiting

2    for the -- the supervisor to come and conduct their

3    investigation themselves to give us some guidance on

4    what's going on.

5        Q    Great.  And at this point, do you assume that

6    you have everything you need from Mr. Fishman, as in

7    that you don't need any more interview questions from

8    him?

9        A    At this point, I did not interview him

10   directly.  So, I did not need to ask him any questions.

11       Q    Great.  Thank you.  All right.  That is minute

12   13:05.  I'm going to play again.

13       (Video played.)

14   BY MS. GERRICK:

15       Q    For some reason it's not playing.  Okay.  I'm

16   getting an unexpected error message.  I'm going to go

17   ahead and close it and try reopening it.  Give me a

18   moment.

19       A    Okay.

20            THE REPORTER:  That was going to be my

21   suggestion.  Try to refresh or close and open it.

22   BY MS. GERRICK:

23       Q    All right.  I'm going to fast forward to 13:11

24   here.  All right.  It's letting me go to 13:12.  I think

25   it's close enough.

```
 1        (Video played.)

 2   BY MS. GERRICK:

 3        Q    I'm pausing at 14:28.  Can you describe what's

 4   happening here?

 5        A    The -- Officer Welch (phonetic) had handed a

 6   phone to Officer Almanzar, and then Officer Welch took

 7   the phone back.

 8        Q    Great.  You might not know, but do you know

 9   why they would be doing this?

10        A    At the moment, I did not know.  But after

11   reviewing the body worn camera footage, Officer Welch

12   was using Officer Almanzar's phone because he had locked

13   his phone and keys in his vehicle.

14        Q    Great.  Thank you.  All right.  That was

15   14:28.  I'm going to go ahead and press play.

16        (Video played.)

17             MS. MULLEN:  Oh.  I'm smiling because I

18   think everyone saw what I saw, and that is there is a

19   pedestrian whose image has been redacted.

20             THE WITNESS:  Yes.

21   BY MS. GERRICK:

22        Q    Great.  That was 15:07.  I'm going to continue

23   to play.

24        (Video played.)

25   BY MS. GERRICK:
```

```
 1        Q    All right.  I'm going to go ahead and pause at

 2   18:26 here.  I just wanted to confirm.  At this point,

 3   you haven't heard anything from the officers at the

 4   house; is that correct?

 5        A    That is correct.

 6        Q    Okay.  Thank you.  I'm going to go ahead and

 7   play.

 8        (Video played.)

 9   BY MS. GERRICK:

10        Q    All right.  This is 18:40.  Can you describe

11   what's happening here?

12        A    I was informing the suspect that our

13   supervisor had just arrived on scene, and as I always

14   try and do is keep things calm.  So, I wanted to thank

15   him for, you know, being cooperative and -- and patient

16   with the investigation.

17        Q    Great.  Thank you.  And can you tell me why it

18   was important that the sergeant had arrived on the

19   scene?

20        A    When we're dealing with a serious incident

21   like this --

22        Q    I think we lost you.

23             MS. MULLEN:  Sergeant Todaro, it looks as

24   though -- well, you're frozen on the screen. I don't

25   know what we need to do.
```

1    BY MS. GERRICK:

2        Q    Can you get it working again?  Can you try

3    saying something?

4        A    Oh, I apologize.  So, when the supervisor

5    arrived on scene, you know, with our -- with our general

6    orders, with a serious incident like this, a supervisor

7    has to respond to the scene and conduct their

8    investigation to, you know, give the best direction on

9    what we should do -- to the officers.

10       Q    Thank you.  So, is it the case then that Mr.

11   Fishman couldn't get out of the handcuffs until a

12   sergeant had arrived?

13       A    Not necessarily, no.  The reason he stayed in

14   handcuffs was due to the fact that he tried to flee when

15   we first arrived on scene.  So whenever that happens,

16   you -- we tend to, as officers, try and eliminate any

17   other, you know, incidents, whether it's fleeing, or,

18   you know, fighting, or anything like that by keeping the

19   suspect in handcuffs.

20       Q    Great.  Thank you.  And would you have been

21   able to finish the investigation or stop detaining him

22   regardless of the handcuffs without a sergeant there, or

23   does a sergeant have to come and make the determination?

24       A    He could --

25            MS. MULLEN:  Objection to the form of the

 1    question.

 2              But you can answer.

 3              THE WITNESS:  He could have been removed

 4    from the handcuffs by an officer.  Didn't have to wait

 5    for a sergeant.

 6    BY MS. GERRICK:

 7        Q    Great.  Thank you.  All right.  I'm going to

 8    go ahead -- oh, wait.  Where did the video go?  So there

 9    we go.  Okay.  That is minute 18:40.  I'm going to go

10    ahead and play.

11        (Video played.)

12    BY MS. GERRICK:

13        Q    I'm going to stop at 19:09.  Do you know why

14    your partner moved Mr. Fishman at this point?

15        A    I do not know.

16        Q    Thank you.  I'm going to press play.

17        (Video played.)

18    BY MS. GERRICK:

19        Q    I'm stopping at 19:56.  Can you describe

20    what's happening here?

21        A    My partner heard him say that he had turned

22    the suspect away because someone was trying to take a

23    picture of him.  And then the suspect begins telling

24    that we unlawfully entered his house, and this is an

25    unlawful stop.  And that -- something along the lines of

1    we're going to, you know, find out about it later.

2        Q    Great.  And do you hear him saying that he'd

3    rather not be shown off to his neighbors like this?

4        A    I don't remember on scene, but I -- I do hear

5    that on the video today.  Yes.

6        Q    Great.  Thank you.  Does this concern seem

7    reasonable to you to not want to be handcuffed in front

8    of your neighbors?

9                MS. MULLEN:  Well, objection as to the

10    form of the question.

11                You can answer, Sergeant Todaro.

12                THE WITNESS:  Yes.  I would not want to

13    be handcuffed in front of my neighbors.

14    BY MS. GERRICK:

15        Q    Okay.  Thank you.  Great.  I'm going to go

16    ahead and press play.  That was 19:56.

17        (Video played.)

18                MS. MULLEN:  Would it be possible for you

19    to fast forward this until you have another question?

20                MS. GERRICK:  Sure.

21    BY MS. GERRICK:

22        Q    Yeah.  So we're at 21:53.  I don't know

23    exactly when this thing starts, but I imagine it's a

24    couple of minutes further.  Let's see.

25                All right.  I'm going to go to 23:16, and for

1   purposes since we're skipping ahead, I'm just going to

2   say that you start walking down towards the house again,

3   if that's all right, and then I'll press play.

4        A    Okay.

5        (Video played.)

6   BY MS. GERRICK:

7        Q    All right.  So, at 23:17, can you tell me why

8   you were asking about Sergeant Brady?

9        A    So at -- at the time, Sergeant Brady was the

10  highest-ranking officer on -- on the scene.  So, he --

11  he basically was the commanding officer.  So, I was

12  curious when -- if he was going to come down and speak

13  to the suspect.  And I found out that there was a

14  lieutenant on-scene who outranked him now and will be

15  the, you know, commanding official, so to speak.

16       Q    Great.  Thank you.  All right.  I'm going to -

17  - if it's preferable, I can try skipping ahead again.  I

18  might have to go back a little bit.  Let's see.  I'm

19  going to go to 23:48 here.

20       (Video played.)

21            MS. GERRICK:  I've actually gone too far.

22  Sorry.  I maybe shouldn't be skipping ahead too much

23  here.  Let's see,  23:44.

24       (Video played.)

25            MS. GERRICK:  23:21, let's go back.

```
 1        (Video played.)

 2   BY MS. GERRICK:

 3        Q    All right.  So I'm pausing at 23:25.  Who is

 4   the officer you're talking to here?

 5        A    Officer Welch.

 6        Q    Great.  And so can you describe what he said

 7   just now?

 8        A    It -- it -- it's hard to make out some of it,

 9   but I heard him say there was an argument of some sort.

10        Q    And I heard Cactus Cantina, again, too.  And

11   did you hear that as well?

12        A    I did not hear that.

13        Q    No worries.  And then I heard you, whatever

14   he's saying, you say, "Yeah."  Do you -- did you hear

15   that as well?

16        A    Honestly, can we rewind it?  I -- it's hard

17   with the -- the body cam made, like, the beeping noise

18   and the vibrating.  I couldn't hear much.  If you could

19   rewind it.

20        Q    Yeah.  I feel you.  Okay.  Let me go back.

21   23:20.

22        (Video played.)

23   BY MS. GERRICK:

24        Q    All right.  So, I'm at 23:36.  Yeah.  Go

25   ahead.
```

```
 1        A     Okay.  So, yes, I did hear.  He said they were

 2   at Cactus Cantina.  There was argument with the child.

 3   And then Lieutenant -- I heard that our Lieutenant

 4   Loftus was going to be speaking with the child to verify

 5   that's what happened?

 6        Q     Great.  Thank you.  And so Officer Welch here,

 7   is he telling you -- is your understanding that he's

 8   telling you what he heard at the house or what he heard

 9   Mr. Fishman say?

10        A     It's my understanding that's information from

11   up at the house.  I'm not sure who or if it was the

12   officer or if it was one of the children.

13        Q     Great.  Thank you.  And at this point, you had

14   already talked to the older girl back when you were at

15   the house, right?

16        A     Briefly, yes.

17        Q     Yeah.  And she had told you basically the same

18   thing; is that accurate?

19        A     Yes.

20        Q     Great.  Thank you.  Great.  I'm going to go --

21   so it's 23:36.  I'm going to go ahead and press play,

22   again.

23        (Video played.)

24   BY MS. GERRICK:

25        Q     All right.  I'm at 24:11, can you tell me what
```

```
 1    this is about?  I couldn't really hear it, but yeah.

 2         A    From watching the video, it seems like we're

 3    talking about how Officer Welch locked his notebook and

 4    his keys in his car.  The phone and everything.  And I

 5    was trying to think of somebody who had a lockout kit to

 6    unlock his car.  A lot of our officers carry a tool so

 7    we can get into locked cars for citizens, ourselves.

 8         Q    Great.  Thank you.  Yeah.  I just literally

 9    couldn't hear and didn't know the background of the

10    phone.  That makes sense.  Okay.

11         A    Uh-huh.

12         Q    All right.  This is 24:11, I'm going to go

13    ahead and press play, again.

14         (Video played.)

15    BY MS. GERRICK:

16         Q    Great.  24:17.  The thing about Brady is just

17    him maybe having a lockout kit.  Am I understanding that

18    correctly?

19         A    That is correct.  Yes.  Officer Brady usually

20    carries the tool I was speaking of to get people who

21    lock their keys in their car.

22         Q    Got it.  Okay.  Thank you.

23         A    Uh-huh.

24         (Video played.)

25    BY MS. GERRICK:
```

1     Q    All right.  So, I'm stopping at 25:12.  Do you

2   know why Sergeant Brady is asking for ID here?

3     A    I don't know why.  I -- I would think to

4   verify, you know, who he is from what the people at the

5   house are saying, and/or maybe to know who he's talking

6   to.

7     Q    Thank you.  And it's been, I think, over 20

8   minutes at this point.  Is it surprising to you that no

9   one's asked him for the ID yet?

10     A    Officer Tong had gotten his information prior

11   when he was interviewing the suspect.  So, I'm not sure

12   why exactly Sergeant Brady is asking for the ID now.

13     Q    Great.  Thank you.  I'm going to go ahead and

14   press play.

15     (Video played.)

16   BY MS. GERRICK:

17     Q    So I'm stopping at minute 26.  Can you

18   describe what's happening here?

19     A    Sergeant Brady is conducting his own

20   investigation since he just, you know, you may have seen

21   not that long ago talking to all parties.  And he's

22   explaining to the suspect here, you know, why exactly

23   we're here and why he's in handcuffs.  And then the

24   suspect thought it was pretty humorous that we -- we

25   were investigating the kidnapping.

```
 1        Q    Okay.  And did you have any guesses for why he
 2   might be laughing?
 3                MS. MULLEN:  Well, objection as to the
 4   form of the question.  How -- he -- you're asking him to
 5   speculate as to why the suspect, you know, laughs after
 6   he hears they're inspecting -- investigating kidnapping.
 7                THE WITNESS:  I don't know --
 8                MS. GERRICK:  Yes.
 9                THE WITNESS:  -- why he would find humor
10   in -- in this and laugh.
11   BY MS. GERRICK:
12        Q    As far as you know, is this the first time
13   that anybody has told Mr. Fishman what's being
14   investigated?
15                MS. MULLEN:  Objection as to form.
16                If you know the answer, you can answer.
17                THE WITNESS:  I don't know if he's been
18   told before.
19   BY MS. GERRICK:
20        Q    Okay.  Great.  Thank you.  Is this how you
21   might expect a kidnapper to react to --
22                MS. MULLEN:  Objection as to the form of
23   the question.  This is his first kidnapping, which he
24   put on the record over an hour ago.
25                MS. GERRICK:  Yes.  And as -- and as
```

1    before, he is an experienced police officer who has been

2    trained on kidnappings.  You don't have to have been in

3    a kidnapping to have natural instincts on how someone

4    might react.  And I would assume that someone who's a

5    police officer would be more informed than the general

6    public.

7    BY MS. GERRICK:

8        Q    But anyhow, you may answer.

9        A    Well, can you repeat the question, please?

10       Q    Yeah.  Is this how you would expect a

11   kidnapper to react being told that they're investigating

12   a kidnapping.

13            MS. MULLEN:   And we object to the form

14   of the question.

15            You can go ahead and try and answer, sir.

16            THE WITNESS:  I don't even know how to

17   answer that.  You know, every person and situation,

18   there's different reactions and emotions.  So, I -- I

19   don't know.

20   BY MS. GERRICK:

21       Q    Okay.  And at this point, what crime or crimes

22   do you have reasonable suspicion of?

23       A    A possible kidnapping?

24       Q    Great.  Thank you.  All right.  We're at

25   minute 26:00.  I'm going to go ahead and press play.

```
 1        (Video played.)

 2   BY MS. GERRICK:

 3        Q    All right.  So, I'm stopping at 26:12.  Can

 4   you describe what's happening here?

 5        A    The suspect is talking to the sergeant telling

 6   him that those are his kids, and --

 7        Q    Great.

 8        A    -- the sergeant is still interviewing him,

 9   doing his own investigation.

10        Q    Great.  And I heard Sergeant Brady saying that

11   they haven't actually talked to anybody yet.  Did you

12   hear that as well?

13        A    I thought I heard him say that he himself

14   hasn't talked to the kids.

15        Q    All right.  Let me rewind it.

16        A    Yeah.  Let's rewind it.

17        Q    26:12.  I'm going to rewind to let's say --

18   I'm going to go 25:57.  It's close.

19        (Video played.)

20   BY MS. GERRICK:

21        Q    All right.  What do you hear Sergeant Brady

22   say here?

23        A    He said, "We haven't spoken to anybody".  Any

24   of the children.

25        Q    Great.  He said "...to anybody."  Is that
```

1    correct, or do you hear him say --

2        A    He said, "We haven't spoken to anybody".  I --

3    I believe.

4        Q    Okay.  And you had spoken to the older

5    daughter, correct?

6        A    Correct.

7        Q    Great.  And you already knew that these were

8    his children, correct?

9            MS. MULLEN:  Well, objection as to the

10   form of the question.  It's so obvious what you're

11   trying to get this witness to say, but --

12   BY MS. GERRICK:

13       Q    How about this?  Is there a reason that you

14   don't correct sergeant Brady here?

15       A    Well, I didn't want to interrupt him speaking

16   with the suspect in his investigation.  I -- I waited

17   till after to go -- to speak with him about some of the

18   specifics while he was heading up to the house, as

19   you'll see in the video a little bit later here.

20       Q    Great.  Thank you.  All right.  This is 26:11.

21   I'm going to go ahead and press play.

22       (Video played.)

23   BY MS. GERRICK:

24       Q    All right.  I'm stopping at 26:41.  Can you

25   describe what's happening here?

```
 1      A    The suspect just told the sergeant his

 2  profession and why that his family does not trust the

 3  police, and that's probably why that they're not

 4  talking.

 5      Q    Great.  Thank you.  All right.  I'm going to -

 6  - that's 26:41, I'm going to go ahead and press play.

 7      (Video played.)

 8  BY MS. GERRICK:

 9      Q    Okay.  And -- let's see.  So, I'm stopping at

10  27:29.  Can you describe the last thing Sergeant Brady

11  says here?

12          MS. MULLEN:  Well, objection to this line

13  of questioning.  This video speaks for itself.  We've

14  all just heard this, and now you're asking this officer

15  to repeat what we just heard.

16          MS. GERRICK:  So, Ms. Mullen, I'm happy

17  to not do that.  The last time that I summarized to ask

18  a question in the prior depo, you objected to that as

19  well.  But I'm more than happy to go back to doing it

20  that way where I say what I heard them say and then ask

21  --

22          MS. MULLEN:  No.  It's -- it --

23          MS. GERRICK:  -- the question.

24          MS. MULLEN:  But the -- it's -- did you

25  hear him say this that day?  Because we're hearing it
```

1    now on the body cam footage.  That's what I'm talking

2    about.  So --

3                    MS. GERRICK:  I think what's happening

4    here, and I've already said at the beginning of this,

5    that what I'm referring to for all these questions is

6    what you believed at the time.  I think he's been

7    answering that way.  I think it's been okay.  But, yeah,

8    I can rephrase the question, but yeah.

9                    MS. MULLEN:  All right.  I understand

10   your point of view.  Just carry on.

11                   And answer to the best of your ability,

12   Sergeant Todaro.

13                   THE WITNESS:  So, from watching the

14   video, it shows Sergeant Brady said we need to make sure

15   that the kids are -- are his, the suspect's.

16   BY MS. GERRICK:

17       Q    Great.  So, I can replay it, but what I heard

18   was him say "The only thing that we need to do is make

19   sure the child is okay and is yours."

20       A    So --

21       Q    Do you want me to replay it or --

22       A    That -- that is correct.  I'm sorry.  I -- I

23   thought you meant just like the last little excerpt.  So

24   that is correct.

25       Q    It's confusing.  Sorry.  I just wanted to --

1    yeah.  It's all -- all I was getting at here -- okay.

2              So, do you agree with -- did you agree with

3    Sergeant Brady's assessment here that the only thing you

4    need to do is make sure that the kid was okay and is

5    his?

6        A    From the information that I know, from my

7    sergeant telling me, yes.

8        Q    Great.  Thank you.  And you had already seen

9    the children at the beginning at the house, correct?

10       A    Correct.

11       Q    Besides the distress that the younger girl

12   seemed to be in at the scene, did they seem okay to you?

13       A    Besides the distress, yeah, they -- they

14   seemed in good health.

15       Q    Great.  Great.  That's 27:29.  I'm going to go

16   ahead and press play.

17       (Video played.)

18   BY MS. GERRICK:

19       Q    All right.  I'm stopping at 27:43.  And did

20   you hear Mr. Fishman saying -- requesting that the cuffs

21   be removed here?

22       A    I -- I don't remember on that day.  But from

23   watching the video, yes, he's -- he's asking the cuffs

24   be removed, and he can prove that it's his daughter.

25       Q    Great.  Thank you.  And do you know -- do you

1    remember if he had already expressed that he would like

2    the cuffs be removed before this point?

3        A    I don't remember.

4        Q    Okay.  Do you remember so when he said that he

5    -- let me go back -- that he would appreciate not being

6    put on display or something like that in front of his

7    neighbors?  Do you remember him saying something like

8    that?

9        A    Yes.

10       Q    Great.  And you had -- you and other officers

11   had refused to take the cuffs off at that point,

12   correct?  I think we had a line of questioning about

13   this.

14       A    I don't -- I don't recall him ever making a

15   statement during that time to remove the cuffs.

16       Q    Great.

17       A    And we won't have -- we won't have anyways for

18   the safety of -- of him and -- and ourselves.

19       Q    Great.  Thank you.  And so at this point, do

20   you expect Sergeant Brady to refuse to take the cuffs

21   off as well?

22                MS. MULLEN:  Objection as to --

23                THE WITNESS:  I don't know.

24                MS. MULLEN:  -- the form of the question.

25                But yes, go ahead and answer, Sergeant

1    Todaro.

2                    THE WITNESS:  At this point, I don't know

3    what Sergeant Brady is thinking or what -- what he would

4    want to happen.

5    BY MS. GERRICK:

6         Q    Great.  Thank you.  But you wouldn't have

7    taken the cuffs off at this point; is that correct?

8         A    At this point, no.

9         Q    Great.  Thank you.  All right.  We're at

10   27:43.  I'm going to press play.

11        (Video played.)

12   BY MS. GERRICK:

13        Q    All right.  I'm stopping at 28:28.  Are you

14   surprised here that Sergeant Brady said to take him out

15   of the cuffs?

16        A    I don't remember on scene how -- how I felt,

17   to be honest.

18        Q    Okay.  Did he seem to know -- yeah.  Okay.

19   It's fine.  Great.  We're at 28:28.  I'm going to press

20   play.

21             And I just want to do a quick check in.  Are

22   you doing okay?  Do you need a break?  Anything like

23   that?  I think we've been going for a while.

24        A    I was going to ask if we could take a -- a

25   five-minute break.

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 174 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 68 of 116

68

```
 1      Q     Sure.  Yeah.

 2      A     Thank --

 3      Q     Absolutely.

 4      A     -- thank you so much.

 5            THE REPORTER:  All right.  The time is

 6   1:53 p.m., Eastern Time.  We are temporarily off the

 7   record.

 8      (Off the record.)

 9            THE REPORTER:  The time is 1:58 p.m.,

10   Eastern Time.  We're back on the record.

11            MS. GERRICK:  Great.  Thank you.

12   BY MS. GERRICK:

13      Q    All right.  We're at 28:28 on the video.  I am

14   going to press play.

15      (Video played.)

16            THE WITNESS:  I'm having some sound

17   difficulties.  I can't hear the audio from anybody.

18      (Video played.)

19   BY MS. GERRICK:

20      Q    All right.  So, I'm pausing.  Oh.  Are you

21   still there, Sergeant Todaro?  Shoot.

22            THE REPORTER:  Mr. Todaro, can you hear

23   us?  I think he may have been receiving a call.  I

24   understand he's on a cellular device, and sometimes if a

25   call --
```

```
 1                    MS. MULLEN:  Oh.

 2                    THE REPORTER:  -- is coming in, it might

 3     yeah.

 4                    MS. GERRICK:  Oh, there you go.

 5                    THE REPORTER:  But it looks like he's

 6     back.

 7                    THE WITNESS:  Okay.  I apologize.  I was

 8     having some technical difficulties, but I'm back.  Audio

 9     is good.

10     BY MS. GERRICK:

11          Q     Yeah.  No worries.  Okay.  Let's see.  I think

12     we can go ahead and skip this.  I'm going to just keep

13     playing from 28:48 here.

14          A     Okay.

15          (Video played.)

16     BY MS. GERRICK:

17          Q     All right.  I am stopping at 29:41.  Tell me,

18     who's saying to do a check on the welfare of a juvenile?

19          A     That's Lieutenant Loftus.

20          Q     Great.  And do you know why this would be

21     reported as check as a welfare of a juvenile?

22          A     Anytime that there's a child involved and an

23     incident, so with their well-being or welfare, so to

24     speak, as the name says, we -- we want to document that

25     and make sure that the notifications are made to the
```

1    Youth and Family Services Division, Child and Family

2    Services, to just ensure that, you know, there's proper

3    care and treatment of the child by the parents.

4         Q    And is this a -- so we've talked about this as

5    a kidnapping call.  Is there a reason that it's being

6    reported as check on welfare of a juvenile instead of a

7    kidnapping investigation?

8         A    So the --

9              MS. MULLEN:  Objection as to the form of

10   the question.  I'm not certain what you're actually

11   asking.

12   BY MS. GERRICK:

13        Q    So it could be that I don't understand police

14   procedures, and how things are reported.  But yeah, do

15   you understand my question?  Are you able to answer it?

16        A    I -- so what I -- I take from it is -- you

17   know, in our profession, everything is kind of fluid.

18   So, the call came out as a kidnapping.  We investigated

19   the kidnapping to the furthest extent to make sure that,

20   you know, we had all the information.

21             And then here, it is determined that there was

22   no kidnapping, and to document the incident with the --

23   the child and the father, we're going to still take a

24   report.  So, it wouldn't be a kidnapping report because

25   we deemed that, after the investigation now, that he's -

1    - did not do a kidnapping, it's his daughter.  So, we do

2    the check on welfare report just to document our

3    interaction with all parties.

4        Q    Okay.  So, I want to make sure that I'm

5    understanding it.  So, you wouldn't file a report that

6    says there's a kidnapping investigation and there was no

7    kidnapping.  Do I have that part right?  That's not a

8    thing that would happen.

9        A    So when we were getting -- go ahead.

10            MS. MULLEN:  I'm going to -- objection to

11    the form of the question, and you haven't laid a

12    foundation as to whether Sergeant Todaro authored any of

13    the documents in this case.

14    BY MS. GERRICK:

15        Q    I -- I'm right now trying to just understand,

16    and it -- if you're able to explain it to me.  Like, I

17    legitimately don't understand how this would be

18    reported.  And your -- the explanation you gave, it

19    seems like that was what you were saying; is that

20    incorrect, or?

21        A    So -- could -- could you repeat the question

22    again?  I'm sorry.

23        Q    Right.  So, the procedure then would be, and

24    I'm -- I guess I'm speaking in general terms now.  So

25    the procedure would be, if you investigate a kidnapping,

1   find out that it's not a kidnapping after the close of

2   the investigation, you wouldn't then file a report that

3   said, like, we did an investigation of a kidnapping,

4   it's not a kidnapping.

5           And to have it be titled like kidnapping, you

6   would instead, because it involved a child, make it a

7   check on welfare of a child, and then put everything in

8   that.

9           Is that -- am I understanding there correct?

10      A    So it's not procedure per se.  But if I was

11  the author of the report, I can't speak on what other

12  people would write, I, myself, would put that in the

13  report, you know.  "On this time, date, and location, we

14  got a call for a kidnapping.  And after the

15  investigation, we determined there was, you know,

16  insufficient facts and it was the father," and go on to

17  it.

18          So, I, myself, as an author, would put it into

19  the report somehow, whether it's in the public narrative

20  or possibly in the internal narrative, which is not

21  available to the public.  But I can't speak on what

22  other -- there's not like a procedure saying you have to

23  put that in there.

24      Q    Right.  Okay.  So actually, I think -- I think

25  I see where the -- okay.  So putting aside the check on

```
 1   welfare of a juvenile for a second, if it's possible --
 2       A    Okay.
 3       Q    -- can you -- like, let's say you're doing the
 4   investigation for a kidnapping, or like really any other
 5   crime, do you then file a report that says this was a
 6   kidnapping investigation/any crime investigation, but we
 7   determined insufficient facts and then file that?
 8       A    That's -- so it's all grouped into -- I hate
 9   to go back to it, but you -- you only take one -- one --
10   you -- you just -- it's called control -- control
11   numbers for the CCN numbers for the event.
12            So, you -- you have to get it -- you wouldn't
13   get it for kidnapping, and then say this was not a
14   kidnapping and list all the people.  You would get the -
15   - the report numbers for check on the welfare, and then
16   add that information in that report, that narrative.
17       Q    Okay.  Is there --
18       A    If you want -- yeah.  Go ahead.
19       Q    Is there a reason to be titled under check for
20   welfare instead of kidnapping.
21       A    Yeah.  The only way you would put the
22   kidnapping is if it actually -- if -- if it was a
23   confirmed kidnapping, and we are -- you know, we have
24   the suspect, we have the -- the, now, defendant
25   arrested, or we're still looking for the suspect, and
```

1    this is the description of the suspect, or where they're

2    driving, or where they were last seen, all that.

3        Q    Okay.  So, when you do respond to a call and

4    you determine that there's no grounds -- like you do the

5    investigation, you determine that there's nothing there,

6    you wouldn't file a report about it?

7            MS. MULLEN:  Well, I'm going to object to

8    this line of questioning to the extent you're -- you're

9    now asking this officer, who's a fact witness, to

10   testify as a Rule 30(b)(6) witness who can address

11   generalized policies.  And he's already explained he's

12   not the author of the documents.  You've showed him no

13   document.  You're asking him, once again, a

14   hypothetical, and I object to this line of questioning

15   on those grounds.

16           MS. GERRICK:  Okay.  I mean, surely I'm

17   allowed to ask him what his understanding is, and I feel

18   like I need to have better clarification for me to ask

19   questions about this event.

20           MS. MULLEN:  Right.  It -- it's

21   understood that you're --

22           MS. GERRICK:  Yeah.  And your objection

23   is noted.

24   BY MS. GERRICK:

25       Q    But can you please answer if you can?

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 181 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 75 of 116

75

```
 1                    THE WITNESS:  Can you repeat --

 2                    MS. MULLEN:  I think he has --

 3                    THE WITNESS:  -- the question?

 4                    MS. MULLEN:  -- twice now?

 5  BY MS. GERRICK:

 6     Q    I'm honestly still not understanding.  So, I

 7  would like to ask the question.

 8          So let me just clarify then what you've

 9  already told me, and this might just be a clarification

10  that you have already answered.  I'm not sure, but -- so

11  you don't file -- is it -- is it true that you then

12  don't file a report for an investigation of a crime if

13  you determine that there's no actual crime?

14                    MS. MULLEN:  Objection --

15                    THE WITNESS:  Yes, to an extent.

16                    MS. MULLEN:  -- to the form of the

17  question.

18                    THE WITNESS:  To an -- to an extent.

19  Every situation is different.  So just because we're not

20  taking a report documenting the crime of a kidnapping,

21  we still will take a report for something else which

22  will mention the reason why we were initially there in

23  the first place.

24  BY MS. GERRICK:

25     Q    Right.  Okay.  But I want to give a
```

1    hypothetical here.  Let's say you're not investigating a

2    kidnapping, you're investigating -- you're investigating

3    a murder.  You arrive, it turns out there's no murder,

4    right?

5         A    Okay.  Okay.

6         Q    The alleged victim is like, "Oh, sorry, I know

7    you thought I died.  It was a Halloween costume," or

8    something.  "I'm right here."  Right?

9         A    Okay.

10         Q    Do you file a report that says we're

11    investigating a murder, but there's no murder, or do you

12    file something else?  What do you file?

13         A    Well, there's a lot of missing pieces to the

14    hypothetical question here.  But if we show up and

15    there's just somebody saying that there is a murder,

16    there's no suspects, there's nothing on scene, and the

17    person is just there saying, "No, it's nothing."  Then

18    there's no report taken.

19         Q    Okay.

20         A    But if there's a, you know, if there's a

21    person on scene that we have in handcuffs, that has to

22    be documented, at least, in a stop report that the

23    person was stopped and placed in handcuffs, and the

24    reason for that.

25         Q    Okay.  Let me amend the hypothetical then

```
 1    because I think I see where this is -- okay.  So let's

 2    say same thing.  It's like a -- there's some actors

 3    filming, like, a movie or something.

 4         A    Uh-huh.

 5         Q    And some passersby think it's real, and they

 6    see someone get stabbed, and they call the police.  And

 7    then you show up, and then everyone's like, "No, no,

 8    no."  And you show up and you put someone in handcuffs

 9    because at first -- and I know this probably wouldn't

10    really happen, but like let's say for this purpose, you

11    put them in handcuffs because you think they're a

12    suspect.  And then --

13         A    Okay.

14         Q    -- you realize, "Oh, no, it's a movie.  This

15    is all a big misunderstanding.  There's nothing here."

16    How would you document that?

17         A    So me, personally, there's -- so there's no

18    one way to do it.  There's multiple ways you can go

19    about it.  Me, personally, I would document it as a

20    miscellaneous report we have and a stop report, because

21    I placed somebody in handcuffs.  That's -- that's

22    mandatory.  Once somebody's in handcuffs, there has to

23    be a stop report done.

24              So, it wouldn't -- there wouldn't be like a --

25    a report for stabbing.  It would be a report for a
```

1    miscellaneous and described, you know, it's a

2    misunderstanding.  They're actors doing movie scene and

3    then explain to the person who called exactly what

4    happened.

5         Q    Great.  Thank you so much.  I understand now.

6    Okay.

7         A    Okay.

8         Q    OPkay.  Got it.  Okay.  So, we're at 29:41.

9    All right.  I'm just going to say, at this point in the

10   video, same questions that you've been answering.

11            At this point, what crime of crimes, if any,

12   did you have reasonable suspicion of?

13        A    At this point, nothing.  No crimes.

14        Q    Great.  Thank you.  Okay.  And then the rest

15   of the video, it's talking about the Youth Division and

16   Child and Family Services following up.  And I think

17   you've already talked about that.  So, unless there's --

18   yeah.  I think that's good.

19            Let me go ahead and close this exhibit then.

20   And I think we're almost done.  I just want to pull up

21   the exhibit for a welfare check.  And this might --

22   Okay.

23            I'm closing up Exhibit B.  I'm going to open a

24   new exhibit.  Okay.  Great.

25            (Exhibit C marked for identification.)

```
 1   BY MS. GERRICK:

 2        Q    Do you see, "General Order".  "Welfare

 3   Checks"?

 4        A    Yes, ma'am.

 5        Q    Great.  Thank you.  Okay.  I'm going to go to

 6   page 2.

 7                 MS. MULLEN:  Is this Exhibit C?

 8                 MS. GERRICK:  Yes.  Exhibit C.

 9                 MS. MULLEN:  Thank you.

10   BY MS. GERRICK:

11        Q    I'm going to go to page 2.  Do you see

12   something that says, "Regulations" at the top?

13        A    Yes.

14        Q    Great.  Okay.  I'm going to read the two

15   examples that are under point B here.  So, "Example 1: A

16   son has been unable to reach his elderly mother for two

17   days, but she has not answered the phone or responded to

18   knocks at the door.  The son calls MPD to perform a

19   welfare check at his mother's residence.  This is an

20   example of a 'Check on Welfare of Adult' incident."

21                 All right.  And then, "Example 2: A call is

22   received from a concerned member of the community

23   regarding a homeless person who appears to be in

24   distress.  A member is dispatched to respond to that

25   location and determines the need for an ambulance from
```

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 186 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 80 of 116

80

1    District of Columbia Fire and Emergency Medical

2    Services.  This is not an example of 'Check on Welfare

3    of Adult' incident."

4            Can you explain the difference between these

5    two, and why one is versus is not check on welfare?

6                MS. MULLEN:  You're asking him to explain

7    to you the policy example?

8    BY MS. GERRICK:

9        Q    What is your understanding of what the

10   difference is between these two examples and why one

11   would or would not be a welfare check?

12       A    Let me see here.  One second.

13               MS. MULLEN:  I'll object to the form.

14               But you can certainly answer, Sergeant

15   Todaro.

16               THE WITNESS:  So, the first example is --

17   is the most common example we get all the time where,

18   you know, people call concerned about an elderly person,

19   a son, daughter that's not answering the phone.  So, we

20   try and go check on the welfare.  They might be, you

21   know, no one's able to reach them.  So, we go and do

22   that.

23               And the second one, "A call is received

24   from a concerned member of the community regarding a

25   homeless person who appears to be in distress..."

1   (reading to self).

2              So, this example, the second one, the --

3   with the homeless person being described as in distress,

4   it sounds like a -- a mental health call for service

5   where we need to get them some sort of help through --

6   whether it's, you know, the ambulance or take them to a

7   psychologic -- psychiatrist.

8              Yeah.  I mean, one example we can't make,

9   you know, contact with somebody.  The other one, we have

10  the person there, and they're in need of medical

11  assistance right then and there, so --

12  BY MS. GERRICK:

13     Q    Okay.  I can say that my understanding of a

14  previous answer to this question was that in one of the

15  situations, the person who was in distress, the first

16  one, the person who was in distress, the elderly mother,

17  knew the person who was making the call because it was

18  their son.

19         The second one, the caller was not known to

20  the homeless individual.  And that was the difference.

21  Is that -- that's not your understanding of what the

22  difference is between these two?

23              MS. MULLEN:  Well, you're comparing his

24  testimony to, what, another officer's testimony?

25              MS. GERRICK:  Yes.

```
 1                    THE WITNESS:  Personally --

 2                    MS. MULLEN:  Okay.  I object -- I object

 3    to the form of the question.

 4                    But you can go ahead and try and answer.

 5                    THE WITNESS:  So, these are just, you

 6    know, examples.  Of course, you know, we can take a

 7    report for check on the welfare -- in different

 8    circumstances, obviously, if we feel it's necessary to

 9    document the encounter, especially when dealing with a

10    juvenile.

11                    So, the fact that the caller in the

12    second example is not known, as long as there's a -- a

13    callback number that can be documented in the report, we

14    can still take a report for a check on the welfare.

15    Just because, you know, the caller is not known doesn't

16    mean that it can't be done.  I've done that many times.

17    BY MS. GERRICK:

18      Q    Got it.  Okay.  So what -- what is -- I -- I'm

19    -- can you explain, again, because I don't think I

20    understood what -- why is example 2 not an example of

21    Check on welfare of adults?

22                    MS. MULLEN:  Well, objection.  You've

23    asked the question; he's answered it twice now.

24                    MS. GERRICK:  I don't know if he's

25    answered yet.
```

```
 1              MS. MULLEN:  If you could, go ahead and
 2     answer it again.
 3     BY MS. GERRICK:
 4        Q   So he's described what example 2 is talking
 5     about.  I don't think he said why it's not a check on a
 6     welfare call?
 7        A   I'll be honest, I -- I'm -- I -- I don't know.
 8     To be honest with you.
 9        Q   That's great.  Thanks.  I just wanted to --
10        A   Yeah.
11        Q   -- find out.
12        A   Okay.
13        Q   Okay.  Great.  Let me -- can we take just a
14     five-minute or less break?  I'm going to confer with my
15     colleague and see if there's anything else we need.  But
16     we should be almost done.
17              MS. GERRICK:  Is that all right with
18     everybody?
19              THE REPORTER:  Sure.
20              MS. GERRICK:  Great.
21              THE WITNESS:  Yeah.
22              MS. MULLEN:  Yes.  Of course.
23              THE REPORTER:  The time is 2:17 p.m.,
24     Eastern Time.  We're temporarily off the record.
25        (Off the record.)
```

```
1                    THE REPORTER:  The time is 2:18 p.m.,
2    Eastern Time.  We're back on the record.
3                    MS. GERRICK:  Great.  Thank you.  Those
4    are all the questions that I have.  Thank you so much.
5    I will pass the witness.
6                    MS. MULLEN:  Thank you.  We don't have
7    any questions for Sergeant Todaro, and I know all the
8    parties.  Thank you, sir, for being here, and wishing --
9    we wish you a quick recovery.
10                   THE WITNESS:  Thank you.  I really
11   appreciate everything from everybody.  Thank you.
12                   THE REPORTER:  Thank you, all.  Will
13   counsel state for the record whether they intend to
14   purchase a copy of the transcript, and if they'd like
15   for the witness to read and sign?
16                   MS. MULLEN:   The witness will waive.
17   But we do request a copy.  But we need -- and I always
18   have to put this on the record.
19                   THE REPORTER:  Yeah.
20                   MS. MULLEN:  That, because we're the
21   government, we can't order goods and services until such
22   time we have an approved purchase order.
23                   So, if you sent me notice of the cost of
24   the transcript and video, or the options for the
25   purchase, we can get an approved purchase order.  So
```

USCA Case #25-7050    Document #2131053        Filed: 08/20/2025    Page 191 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 85 of 116

85

1    yes, we want the transcript, but no, I'm not ordering it

2    today.

3              THE REPORTER:  Understood.

4              MS. MULLEN:  Thank you.

5              THE REPORTER:  You're welcome.

6              And Ms. Gerrick, I understand you

7    noticed.  Would you like a copy of the transcript to

8    purchase it?

9              MS. GERRICK:  Yes.  Thank you.

10             THE REPORTER:  Yes.  All right.  The time

11   is 2:19 p.m., Eastern Time.  We are officially off the

12   record.

13             (Proceedings concluded at 2:19 p.m.)

14               (Read and Sign waived.)

15                    * * * * *

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Shenay Crawford, hereby certify:

 4            That the foregoing proceedings were taken

 5  before me at the time and place therein set forth;

 6            That the proceedings were recorded by me and

 7  thereafter formatted into a full, true, and correct

 8  transcript of same;

 9            I further certify that I am neither counsel

10  for nor related to any parties to said action, nor in

11  any way interested in the outcome thereof.

12

13            DATED, this 11th day of September 2023.

14

15

16            _____

17            Shenay Crawford, CDR-1966

18            Certified Reporter

19

20

21

22

23

24

25
```

**WORD**
**INDEX**

**< 1 >**
**1**    18:*8,*
*22*
*79:15*
**1:09**
*45:14,*
*15*
**1:21-cv-**
**01847-**
**RJL**
*1:7*
*5:13*
**1:53**
*68:6*
**1:58**
*68:9*
**10:06**
*44:19,*
*24*
**11:11**
*45:3*
*46:17,*
*20*
**11:34**
*1:18*
*5:4*
**11:35**
*6:19*
**11:38**
*6:23*
**11th**
*86:13*
**12:07**
*28:1*
**12:24**
*28:3*
*45:10*
*46:14,*
*24*

**12:53**
*45:12*
**13:05**
*47:2*
*48:12*
**13:11**
*48:23*
**13:12**
*48:24*
**14:28**
*49:3, 15*
**15:07**
*49:22*
**17th**
*8:17*
*14:10,*
*16*
*17:24*
*20:15*
*21:22*
**18:26**
*50:2*
**18:40**
*50:10*
*52:9*
**19**    *4:5*
**19:09**
*52:13*
**19:56**
*52:19*
*53:16*
**19062**
*1:22*

**< 2 >**
**2**    19:*5,*
*23, 24*
*79:6,*
*11, 21*
*82:20*
*83:4*
**2:17**
*83:23*

**2:18**
*84:1*
**2:19**
*1:19*
*85:11,*
*13*
**20**    *58:7*
**20001**
*2:15*
**20002**
*2:5*
**2020**
*8:17*
*14:11,*
*17*
*17:25*
*20:15*
*21:22*
**2023**
*1:17*
*5:3*
*86:13*
**21:53**
*53:22*
**23**    *4:7*
**23:16**
*53:25*
**23:17**
*54:7*
**23:20**
*55:21*
**23:21**
*54:25*
**23:25**
*55:3*
**23:36**
*55:24*
**23:44**
*54:23*
**23:48**
*54:19*
**24**    *1:17*

**24:11**
*56:25*
*57:12*
**24:17**
*57:16*
**24th**
*5:3*
**25:12**
*58:1*
**25:57**
*61:18*
**26**
*58:17*
**26:00**
*60:25*
**26:11**
*62:20*
**26:12**
*61:3, 17*
**26:41**
*62:24*
*63:6*
**27:29**
*63:10*
*65:15*
**27:43**
*65:19*
*67:10*
**28:28**
*67:13,*
*19*
*68:13*
**28:48**
*69:13*
**29:41**
*69:17*
*78:8*

**< 3 >**
**3:53**
*24:17*
**30(b)(6**

**74:10**
**301**    *2:4*
**381**    *5:6*

**< 4 >**
**4:00**
*28:18*
**4:07**
*32:10*
**4:09**
*25:6*
**4:10**
*25:5*
*29:20*
*31:12*
*32:9*
**4:16**
*32:15*
*35:8*
**4:17**
*31:16*
**4:31**
*36:8*
**4:53**
*36:11*
*37:23*
**400**
*2:14*

**< 5 >**
**5:40**
*38:1*
*39:2*

**< 6 >**
**6:06**
*40:13*

**< 7 >**
**7**    *3:4*
**70**    *9:2*
**79**    *4:8*

| | | | | |
|---|---|---|---|---|
| **7the** | 71:*16* | 79:*20* | 56:*21* | *18* |
| 2:*4* | 80:*21* | 80:*3* | 57:*13* | 15:*3* |
| | **Absolutel** | **adults** | 58:*13* | 29:*10* |
| **< 8 >** | **y** | 82:*21* | 60:*15,* | 33:*25* |
| **8:22** | 27:*13,* | | *25* | 35:*3* |
| 42:*7* | *18*  68:*3* | **advisable** | 62:*21* | 38:*22* |
| **8:43** | **AC** | 15:*1* | 63:*6* | 52:*2* |
| 42:*16* | 12:*23* | **affect** | 65:*16* | 53:*11* |
| **8:44** | **academy** | 26:*17* | 66:*25* | 59:*16* |
| 41:*16* | 14:*19* | **affirm** | 69:*12* | 60:*8,* |
| **810**  2:*4* | **account** | 7:*4* | 71:*9* | *15, 17* |
| | 44:*12* | **ago** | 73:*18* | 64:*11* |
| **< 9 >** | **accurate** | 58:*21* | 78:*19* | 66:*25* |
| **9:03** | 56:*18* | 59:*24* | 82:*4* | 70:*15* |
| 42:*22* | **accuratel** | **agree** | 83:*1* | 74:*25* |
| **9:21** | **y**  35:*14* | 6:*5, 7* | **alleged** | 80:*14* |
| 43:*6* | **act** | 46:*18* | 76:*6* | 81:*14* |
| **9:35** | 34:*21* | 47:*3* | **allowed** | 82:*4* |
| 44:*6, 16* | **acting** | 65:*2* | 74:*17* | 83:*2* |
| **9-1-1** | 31:*5* | **Agreed** | **allows** | **answered** |
| 21:*4* | **action** | 20:*20* | 9:*21* | 22:*6* |
| 32:*24* | 86:*10* | 46:*1* | **Almanzar** | 75:*10* |
| 33:*6* | **activity** | **ahead** | 40:*21* | 79:*17* |
| 36:*25* | 9:*21,* | 10:*15* | 49:*6* | 82:*23,* |
| | *22* | 13:*18* | **Almanzar'** | *25* |
| **< A >** | 10:*23* | 15:*16* | **s**  49:*12* | |
| **A.1** | 14:*4* | 23:*8,* | | **answering** |
| 20:*3, 6* | **actors** | *11* | **ambulance** | 64:*7* |
| **a.m** | 77:*2* | 28:*10* | 79:*25* | 78:*10* |
| 1:*18* | 78:*2* | 29:*17* | 81:*6* | 80:*19* |
| 5:*4* | **actual** | 32:*14,* | **amend** | **anybody** |
| 6:*19, 23* | 14:*4* | *16* | 76:*25* | 11:*5, 6* |
| **ability** | 75:*13* | 45:*18* | **and/or** | 59:*13* |
| 35:*16* | **add** | 47:*2* | 6:*7* | 61:*11,* |
| 64:*11* | 73:*16* | 48:*17* | 58:*5* | *23, 25* |
| **able** | **address** | 49:*15* | **answer** | 62:*2* |
| 10:*8* | 74:*10* | 50:*1, 6* | 8:*11* | 68:*17* |
| 26:*16* | | 52:*8,* | 10:*9,* | **anything'** |
| 27:*3* | **admission** | *10* | *16* | **s**  14:*3* |
| 29:*25* | 6:*8* | 53:*16* | 11:*3,* | **Anytime** |
| 51:*21* | **adult** | 54:*1,* | *16* | 69:*22* |
| 70:*15* | 22:*17* | *17, 22* | 12:*13* | **anyways** |
| | 23:*3* | 55:*25* | 13:*5,* | 66:*17* |

apologize
  51:*4*
  69:*7*
apparent
  45:*21*

Appearing
  2:*10, 18*
appears
  79:*23*
  80:*25*
appreciat
e
  12:*14*
  22:*12*
  27:*21*
  66:*5*
  84:*11*
approache
d    22:*3,
9*
approachi
ng
  22:*15*
approval
  11:*13*
approved
  84:*22,
25*
approxima
tely
  5:*4*
area
  21:*7*
arguing
  12:*24*
argument
  55:*9*
  56:*2*
arm
  41:*5*

arrested
  17:*3*
  73:*25*
arrive
  76:*3*
arrived
  50:*13,
18*
  51:*5,
12, 15*
aside
  72:*25*
asked
  22:*7*
  58:*9*
  82:*23*
asking
  8:*23*
  10:*13*
  30:*23*
  34:*11*
  35:*1*
  41:*25*
  54:*8*
  58:*2,
12*
  59:*4*
  63:*14*
  65:*23*
  70:*11*
  74:*9,
13    80:6*
assessmen
t    65:*3*
assigned
  40:*22*
assistanc
e    81:*11*
assume
  48:*5*
  60:*4*
assumed
  30:*14*

ATTORNEY
  2:*12*
  5:*17,
22    8:11*
Audi
  22:*20*
audio
  6:*7*
  68:*17*
  69:*8*
audiovisu
al    6:*7*
August
  1:*17*
  5:*3*
author
  72:*11,
18*
  74:*12*
authored
  71:*12*

available
  4:*2*
  72:*21*
Avenue
  5:*6*
awful
  29:*16*

< B >
back
  6:*22*
  16:*2,
13, 19*
  24:*18*
  27:*17*
  28:*4*
  41:*17*
  42:*23*
  45:*15*
  47:*19,
23*

49:*7*
  54:*18,
25*
  55:*20*
  56:*14*
  63:*19*
  66:*5*
  68:*10*
  69:*6, 8*
  73:*9*
  84:*2*
backgroun
d    8:*25*
  19:*11*
  33:*12*
  57:*9*
based
  10:*12*
  21:*12*
  25:*12*
  34:*15*

basically
  54:*11*
  56:*17*
basis
  6:*8*
beeping
  55:*17*

beginning
  64:*4*
  65:*9*
begins
  52:*23*
behalf
  6:*2*
behavior
  33:*18,
20*
believe
  21:*23*
  22:*2, 8*

23:*24*
  33:*4,
15*
  35:*4*
  37:*7*
  62:*3*
believed
  64:*6*
best
  20:*13*
  35:*16*
  44:*10*
  51:*8*
  64:*11*
better
  29:*25*
  74:*18*
big
  77:*15*
bit
  24:*12*
  44:*20*
  54:*18*
  62:*19*
block
  15:*22*
  17:*5*
  22:*25*
blocked
  42:*13*
blur
  46:*7*
Body
  4:*7*
  8:*3, 5,
8    23:9,
20, 25*
  24:*6*
  28:*25*
  45:*22*
  46:*3*
  49:*11*

55:*17*
64:*1*
**BRADY**
1:*9*
5:*12*
39:*8*
54:*8, 9*
57:*16,*
*19*
58:*2,*
*12, 19*
61:*10,*
*21*
62:*14*
63:*10*
64:*14*
66:*20*
67:*3, 14*
**Brady's**
39:*14*
65:*3*
**break**
27:*8,*
*11, 12,*
*13, 19*
67:*22,*
*25*
83:*14*
**breaks**
19:*10*
27:*6*
28:*8*
**Briefly**
56:*16*
**Bring**
19:*14*
25:*24*
**Broadcast**
20:*24*
**broadcast**
**ed**    21:*1*

**broadly**
21:*22*
**bunch**
12:*22*

**< C >**
**Cactus**
55:*10*
56:*2*
**cage**
17:*1, 5*
**cages**
17:*4*
**call**
12:*17*
13:*14*
14:*2*
30:*10*
32:*25*
33:*6*
35:*12,*
*15*
36:*2*
68:*23,*
*25*
70:*5,*
*18*
72:*14*
74:*3*
77:*6*
79:*21*
80:*18,*
*23*
81:*4,*
*17*    83:*6*
**callback**
82:*13*
**called**
7:*11*
12:*21*
13:*9*
19:*6*
21:*4, 9*

38:*13*
73:*10*
78:*3*
**caller**
37:*1*
81:*19*
82:*11,*
*15*
**calls**
12:*3*
13:*23,*
*24*
79:*18*
**calm**
29:*25*
50:*14*
**cam**
23:*9,*
*25*
24:*6*
28:*25*
46:*3*
55:*17*
64:*1*
**Camera**
4:*7*
8:*3, 5,*
*8*
23:*20*
45:*22,*
*23*
49:*11*
**Cantina**
55:*10*
56:*2*
**capabilit**
**y**    19:*22*
**captured**
6:*10*

**capturing**
6:*6*

**car**
16:*3,*
*13, 19*
27:*10*
32:*20*
33:*7*
57:*4, 6,*
*21*
**care**
18:*12*
70:*3*
**Carolina**
9:*6*
**carries**
57:*20*
**carry**
57:*6*
64:*10*
**cars**
11:*6*
57:*7*
**Case**
1:*6*
5:*12*
33:*21*
34:*3, 5,*
*18, 20*
46:*9*
51:*10*
71:*13*
**Cases**
4:*6*
14:*22*
17:*20*
18:*5*
34:*10*
**CCN**
73:*11*
**CDR-1966**
1:*21*
86:*17*
**cellular**
68:*24*

**certain**
11:*10,*
*13*
23:*15*
26:*7*
38:*19*
70:*10*

**certainly**
10:*8*
26:*9*
80:*14*
**CERTIFICA**
**TE**    86:*1*

**Certified**
86:*18*
**certify**
86:*3, 9*
**check**
41:*1,*
*10*
67:*21*
69:*18,*
*21*
70:*6*
71:*2*
72:*7,*
*25*
73:*15,*
*19*
78:*21*
79:*19,*
*20*
80:*2, 5,*
*11, 20*
82:*7,*
*14, 21*
83:*5*
**checking**
41:*9*

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 197 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 91 of 116

5

| | | | | |
|---|---|---|---|---|
| **Checks** | **clear** | 41:*10* | **confer** | **copy** |
| 4:*8* | 18:*16* | 69:*2* | 83:*14* | 84:*14*, |
| 79:*3* | 29:*8* | **commanding** | **confirm** | *17*  85:*7* |
| **child** | **clearly** | 54:*11*, | 50:*2* | **corner** |
| 22:*19*, | 29:*16* | *15* | | 37:*13* |
| *20* | **close** | **common** | **confirmed** | 38:*19* |
| 24:*22* | 21:*19* | 80:*17* | 73:*23* | 40:*18* |
| 25:*8* | 48:*17*, | | | 41:*12*, |
| 31:*18* | *21, 25* | **community** | **confusing** | *21* |
| 33:*7* | 61:*18* | 79:*22* | 64:*25* | 42:*14* |
| 56:*2, 4* | 72:*1* | 80:*24* | **considera** | 44:*12* |
| 64:*19* | 78:*19* | **compare** | **tion** | **correct** |
| 69:*22* | **closer** | 34:*8, 13* | 17:*12* | 8:*17*, |
| 70:*1, 3,* | 44:*20* | | **consisten** | *18* |
| *23* | **closing** | **comparing** | **t** | 11:*23*, |
| 72:*6, 7* | 78:*23* | 81:*23* | 32:*24* | *24* |
| 78:*16* | **Coastal** | **complain** | 33:*11* | 12:*1* |
| **children** | 9:*6* | 13:*15* | 34:*22* | 18:*1, 2* |
| 47:*11* | | | 36:*25* | 24:*4, 7* |
| 56:*12* | **colleague** | **completed** | 41:*8* | 33:*7, 9* |
| 61:*24* | 23:*2* | 9:*2* | **contact** | 44:*13*, |
| 62:*8* | 83:*15* | **concern** | 81:*9* | *14, 21* |
| 65:*9* | **colleagues**  37:*13* | 53:*6* | **continue** | 45:*3, 4* |
| **CHRISTOPH** | **college** | | 36:*23* | 46:*22* |
| **ER** | 9:*3, 6* | **concerned** | 38:*8* | 47:*21*, |
| 1:*10,* | **COLUMBIA** | 79:*22* | 45:*5* | *24* |
| *16*  3:*3* | 1:*2, 7* | 80:*18*, | 46:*24* | 50:*4, 5* |
| 5:*9, 12* | 2:*5, 13,* | *24* | 47:*16*, | 57:*19* |
| 7:*1* | *15* | | *18* | 62:*1, 5,* |
| **circumsta** | 5:*11,* | **concluded** | 49:*22* | *6, 8, 14* |
| **nces** | *14*  80:*1* | 85:*13* | **control** | 64:*22*, |
| 82:*8* | **come** | **concussio** | 73:*10* | *24* |
| **citizens** | 32:*2* | **n**  26:*1,* | **conversat** | 65:*9*, |
| 57:*7* | 41:*1* | *6, 20* | **ion** | *10* |
| **clarifica** | 42:*23* | **conduct** | 44:*9* | 66:*12* |
| **tion** | 48:*2* | 48:*2* | | 67:*7* |
| 74:*18* | 51:*23* | 51:*7* | **conveying** | 72:*9* |
| 75:*9* | 54:*12* | | 14:*7* | 86:*7* |
| **clarify** | **comes** | **conducted** | **cooperati** | |
| 39:*23*, | 29:*24* | 6:*2* | **ve** | **correctly** |
| *24*  75:*8* | **coming** | **conducting**  58:*19* | 50:*15* | 7:*20* |
| | 33:*5* | | | 57:*18* |

cost
    84:23
costume
    76:7
counsel
    5:15
    7:15
    23:10
    84:13
    86:9
couple
    28:16
    53:24
course
    26:22
    45:21
    82:6
    83:22
COURT
    1:1
    5:14
Crawford
    1:21
    5:5
    86:3, 17
credits
    9:2
crime
    11:22
    12:4
    13:3,
    15, 25
    14:1
    17:13
    21:22
    31:8
    35:4
    36:4
    37:19
    60:21
    73:5, 6
    75:12,

13, 20
    78:11
crimes
    11:10,
13
    12:18
    21:22
    31:8
    35:4
    36:4
    37:19
    60:21
    78:11,
13
criminal
    9:21,
22
    10:23
    14:4
cuffs
    65:20,
23
    66:2,
11, 15,
20
    67:7, 15
curious
    54:12
current
    7:20, 21

< D >
D.C
    22:21
daddy
    38:13
DATE
    1:17
    5:3
    14:16
    72:13
DATED
    86:13

daughter
    31:20
    36:13
    37:6
    38:4, 9
    62:5
    65:24
    71:1
    80:19
day
    22:10,
19
    40:22
    43:12
    44:7,
11
    63:25
    65:22
    86:13
days
    79:17
day-to-
day
    26:24
dealing
    50:20
    82:9
decide
    40:17
decided
    41:17
    42:23
deemed
    70:25

defendant
    73:24
Defendant
s    1:11
    2:18
    5:23
defense
    6:13

definitel
y
    26:23
    36:21
    38:23
Departmen
t    7:22
    17:23
depo
    63:18
deponent
    5:24
DEPOSITIO
N    1:13
    5:9
    6:1
    8:2, 10
    26:3,
18
    27:2
    45:21
    46:3, 5
describe
    25:4
    29:20
    31:17
    36:11
    38:2
    43:7
    49:3
    50:10
    52:19
    55:6
    58:18
    61:4
    62:25
    63:10

described
    33:4
    78:1
    81:3
    83:4

describes
    12:3
describin
g    35:15
DESCRIPTI
ON    4:4
    22:18
    74:1
designate
d    5:6
details
    35:18,
22
detain
    9:24
detained
    14:25
    15:7

detaining
    51:21

detention
    9:20
determina
tion
    51:23

determine
    74:4, 5
    75:13
determine
d
    10:22
    70:21
    72:15
    73:7
determine
s    79:25
developin
g    27:6

device
68:24
died
76:7
differenc
e
28:23
80:4,
10
81:20,
22
different
11:20
15:22
20:17,
18
34:20,
21
60:18
75:19
82:7
different
ly
8:20
34:21
difficult
ies
68:17
69:8

direction
51:8
directly
48:10

discovery
23:11

discussed
25:22
dispatche
d    79:24

display
66:6
distress
65:11,
13
79:24
80:25
81:3,
15, 16
distresse
d    30:20
DISTRICT
1:2, 7
2:5, 13,
15
5:11,
14    80:1

DISTWRICT
1:1
Division
70:1
78:15
doctors
27:7
document
17:18
18:3,
17
19:5,
10, 12,
17, 25
69:24
70:22
71:2
74:13
77:16,
19    82:9
documente
d
76:22
82:13

documenti
ng
75:20

documents
8:10,
11, 12
71:13
74:12
doing
20:18
27:2, 8
49:9
61:9
63:19
67:22
73:3
78:2
door
16:20,
21, 22
17:5
32:3
79:18
doors
16:24
download
4:2
driving
23:1
24:13
74:2
due
51:14
duly
7:11
duty
26:5

< E >
earlier
33:8

easier
14:9
easily
16:14
East
2:4
Eastern
5:4
6:19,
23
28:1, 4
45:12,
15, 16
68:6,
10
83:24
84:2
85:11

education
9:1
effect
32:18
either
18:23
elderly
79:16
80:18
81:16

eliminate
16:16
51:16

Emergency
80:1
EMILY
2:6
5:18
emily@ger
stein-
harrow.co
m    2:7

emotions
60:18
encounter
82:9
enforceme
nt    9:14
enroute
48:1
ensure
70:2
entered
52:24
error
48:16
especiall
y    27:9
82:9
ESQUIRE
2:6, 8,
16
EST
1:18, 19
event
73:11
74:19
events
44:12
everybody
47:14
83:18
84:11
everyone'
s    77:7
evidence
11:22
12:4
exact
23:1
exactly
8:7
32:4

39:19,
21, 22
53:23
58:12,
22   78:3
EXAMINATI
ON    3:3
7:17
Example
79:15,
20, 21
80:2, 7,
16, 17
81:2, 8
82:12,
20   83:4
examples
12:20,
25
79:15
80:10
82:6
excerpt
64:23
exchange
46:20
EXHIBIT
4:4
17:17
18:8,
10, 20,
22, 24
19:1
21:19
23:12
78:19,
21, 23,
24, 25
79:7, 8
exhibits
18:14
expect
33:20

34:3,
17
59:21
60:10
66:20
experienc
e   8:24
12:17
14:22
16:4
experienc
ed    60:1
experienc
ing
34:13

expertise
34:15
explain
32:1
71:16
78:3
80:4, 6
82:19

explained
74:11
explainin
g   38:9,
12
58:22
explanati
on
32:6,
23
33:10
35:12,
18
36:15,
18, 21,
24
71:18

expressed
66:1
extent
26:7, 8
70:19
74:8
75:15,
18
eyes
11:23
12:7, 15
eyesight
15:23

< F >
fact
51:14
74:9
82:11
facts
10:6
72:16
73:7
fall
26:19
familiar
18:3
family
39:25
40:4
63:2
70:1
78:16
far
21:10
42:24
46:19
54:21
59:12
fast
24:12

48:23
53:19
father
37:5
38:5,
19, 24
70:23
72:16
fault
25:11
28:13
30:3, 6
February
8:17
14:10,
16
17:24
20:15
21:22
feel
27:1, 3,
5
55:20
74:17
82:8
feeling
27:4, 15
felt
67:16
fighting
51:18
figure
40:9
file
71:5
72:2
73:5, 7
74:6
75:11,
12
76:10,
12

filed
5:13
filming
77:3
find
28:17
53:1
59:9
72:1
83:11
finding
26:25
fine
18:11,
23
40:20
67:19
finish
51:21
Fire
80:1
firm
5:19
first
19:10
26:12
27:20
34:5,
13
51:15
59:12,
23
75:23
77:9
80:16
81:15
FISHMAN
1:4
5:10
8:16
21:24
37:13
40:18

41:*7*
43:*21*
47:*10*
48:*6*
51:*11*
52:*14*
56:*9*
59:*13*
65:*20*

**Fishman's**
22:*10*
44:*12*
**five-
minute**
67:*25*
83:*14*
**flags**
36:*19*
**flash**
20:*24*
21:*1, 2,*
*5*
**flee**
51:*14*
**fleeing**
51:*17*
**fluid**
70:*17*
**followed**
20:*14*

**following**
78:*16*
**follows**
7:*12*
**footage**
8:*3, 6,*
*8*
23:*20,*
*25*
24:*6*
28:*25*

45:*22*
46:*3*
49:*11*
64:*1*

**foregoing**
86:*4*
**forgettin
g** 26:*21*
**form**
10:*5*
11:*2,*
*15*
12:*9*
13:*4,*
*17*
15:*2,*
*15*
20:*16*
33:*2,*
*23*
35:*20*
38:*21*
51:*25*
53:*10*
59:*4,*
*15, 22*
60:*13*
62:*10*
66:*24*
70:*9*
71:*11*
75:*16*
80:*13*
82:*3*

**formatted**
86:*7*
**forth**
86:*5*
**forward**
24:*12*

48:*23*
53:*19*
**found**
16:*7*
54:*13*
**foundatio
n** 71:*12*
**four**
26:*2*
**free**
26:*9*
**front**
13:*10*
42:*11*
53:*7,*
*13* 66:*6*
**frozen**
50:*24*
**full**
6:*24*
86:*7*
**further**
13:*2, 6,*
*11*
14:*1*
53:*24*
86:*9*
**furthest**
70:*19*

**< G >**
**GENERAL**
2:*12*
4:*5, 8*
5:*23*
8:*13*
14:*20*
17:*19*
18:*4*
51:*5*
60:*5*
71:*24*
79:*2*

**generaliz
ed**
74:*11*

**generally**
12:*6*
14:*24*
15:*10,*
*21* 16:*9*
**Georgetow
n** 22:*24*
**GERRICK**
2:*6*
3:*4*
5:*18,*
*19*
6:*12*
7:*16,*
*18*
10:*8,*
*12, 19*
11:*8,*
*18*
12:*11*
13:*8,*
*19, 21*
14:*15*
15:*6,*
*14, 24*
18:*9,*
*13, 23*
19:*3, 4,*
*13, 16,*
*20, 23,*
*25*
20:*1, 8,*
*12, 23*
22:*7,*
*13, 14*
23:*13*
24:*1, 4,*
*7, 8, 11,*
*16*

25:*3*
26:*11,*
*15*
28:*5*
29:*1, 3,*
*11, 14,*
*19*
30:*25*
31:*1,*
*15*
32:*12*
33:*3,*
*24*
34:*6, 9,*
*14*
35:*10,*
*21*
36:*10*
37:*25*
38:*25*
39:*4,*
*13, 16*
40:*16*
41:*15*
42:*15,*
*21*
43:*5,*
*25*
44:*4,*
*18*
45:*1, 9,*
*17*
46:*2,*
*10, 13*
47:*1*
48:*14,*
*22*
49:*2,*
*21, 25*
50:*9*
51:*1*
52:*6,*
*12, 18*

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 202 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 96 of 116

10

53:14,
20, 21
54:6,
21, 25
55:2,
23
56:24
57:15,
25
58:16
59:8,
11, 19,
25
60:7,
20
61:2,
20
62:12,
23
63:8,
16, 23
64:3,
16
65:18
67:5,
12
68:11,
12, 19
69:4,
10, 16
70:12
71:14
74:16,
22, 24
75:5,
24
79:1, 8,
10
80:8
81:12,
25
82:17,
24

83:3,
17, 20
84:3
85:6, 9
GERSTEIN
2:3
5:19
getting
42:11
48:16
65:1
71:9
girl
25:10
28:12
29:23
30:2,
12, 20,
24
31:4,
18
32:4
37:10
38:3
39:20
56:14
65:11
girls
33:15,
19
37:4
41:8
girl's
33:10
give
7:5
12:20
20:2
25:18
28:16
48:3,
17

51:8
75:25
given
22:18
giving
44:22
go
6:19
10:15
11:6
13:2, 6,
10, 18
14:1
15:16,
22
23:8,
11
28:10
29:17
32:9,
14, 16
42:7,
24
45:7,
18
47:2
48:16,
24
49:15
50:1, 6
52:8, 9
53:15,
25
54:18,
19, 25
55:20,
24
56:20,
21
57:12
58:13
60:15,
25

61:18
62:17,
21
63:6,
19
65:15
66:5,
25
69:4,
12
71:9
72:16
73:9,
18
77:18
78:19
79:5,
11
80:20,
21
82:4
83:1
goal
15:23
going
8:23
11:9
15:21
17:2, 3,
16
18:7,
19
20:2
23:5, 8,
9, 14
24:9,
12
25:8,
24
28:10,
15, 18
30:8
31:12

34:25
35:8
37:23
38:5, 6,
10
39:2
40:13
42:7,
19
43:2
44:1,
16
46:23
47:2
48:4,
12, 16,
20, 23
49:15,
22
50:1, 6
52:7, 9,
13, 16
53:1,
15, 25
54:1,
12, 16,
19
56:4,
20, 21
57:12
58:13
60:25
61:17,
18
62:21
63:5, 6
65:15
67:10,
19, 23,
24
68:14
69:12
70:23

71:*10*
74:*7*
78:*9,
23*
79:*5,
11, 14*
83:*14*
**Good**
5:*2, 21*
21:*9*
41:*11*
65:*14*
69:*9*
78:*18*
**goods**
84:*21*
**gotten**
58:*10*
**governmen
t**   84:*21*
**governs**
6:*4*
**Great**
9:*4, 8,
13*
10:*2,
24*
12:*16,
25*
14:*6,
10, 21*
18:*6,
13*
20:*13*
21:*10,
15, 18*
22:*1*
23:*4, 8,
21*
25:*1,
10, 16*
28:*6*
29:*15*

30:*7,
11, 15*
31:*7,
11, 16*
32:*19,
23*
33:*10,
14, 18*
36:*7,
11*
37:*7,
10*
38:*11,
17*
40:*6*
41:*2, 6,
13*
42:*16*
43:*2, 9,
14*
44:*5,
15, 24*
46:*14,
23*
47:*17*
48:*5,
11*
49:*8,
14, 22*
50:*17*
51:*20*
52:*7*
53:*2, 6,
15*
54:*16*
55:*6*
56:*6,
13, 20*
57:*8,
16*
58:*13*
59:*20*
60:*24*

61:*7,
10, 25*
62:*7,
20*
63:*5*
64:*17*
65:*8,
15, 25*
66:*10,
16, 19*
67:*6, 9,
19*
68:*11*
69:*20*
78:*5,
14, 24*
79:*5,
14*
83:*9,
13, 20*
84:*3*
**green**
22:*20*
**grounds**
74:*4, 15*
**grouped**
73:*8*
**guess**
71:*24*
**guesses**
59:*1*
**guidance**
48:*3*
**Guideline
s**   19:*6*

**< H >**
**half**
19:*10*

**Halloween**
76:*7*

**hand**
7:*3, 13*
41:*4*
**handcuffe
d**   17:*7*
30:*21*
53:*7, 13*

**handcuffs**
11:*1, 7*
16:*12*
24:*24*
51:*11,
14, 19,
22*
52:*4*
58:*23*
76:*21,
23*
77:*8,
11, 21,
22*
**handed**
45:*4*
49:*5*
**Handling**
4:*5*
14:*11,
17*
17:*19*
18:*4*
**happen**
16:*3*
47:*22*
67:*4*
71:*8*
77:*10*
**happened**
14:*5*
16:*22*
31:*23*
32:*5*
33:*13,

*16*
38:*9*
46:*21*
56:*5*
78:*4*

**happening**
25:*4*
29:*21*
31:*6,
17*
36:*12*
38:*2*
41:*21*
43:*7,
21*
47:*19,
23*
49:*4*
50:*11*
52:*20*
58:*18*
61:*4*
62:*25*
64:*3*
**happens**
51:*15*
**happy**
25:*17*
63:*16,
19*
**hard**
55:*8, 16*
**HARROW**
2:*3*
5:*20*
**hate**
73:*8*
**head**
36:*1*
**heading**
62:*18*

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 204 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 98 of 116

12

**health**
  65:*14*
  81:*4*
**hear**
  14:*13*
  15:*18*
  22:5
  25:*10*
  29:*6,
21*
  30:*1, 5,
6*
  32:*19*
  38:*11,
14, 18*
  39:*19*
  43:*9,
10, 12*
  44:*5, 7,
8, 11*
  47:*18,
22*
  53:*2, 4*
  55:*11,
12, 14,
18*
  56:*1*
  57:*1, 9*
  61:*12,
21*
  62:*1*
  63:*20*
  65:*20*
  68:*17,
22*
**heard**
  15:*25*
  28:*12*
  29:*9*
  30:*4*
  32:*21*
  38:*15*
  39:*7*

50:*3*
52:*21*
55:*9,
10, 13*
56:*3, 8*
61:*10,
13*
63:*14,
15, 20*
64:*17*
**hearing**
  28:*25*
  43:*11*
  44:*21*
  63:*25*
**hears**
  59:*6*
**he'd**
  53:*2*
**help**
  81:*5*
**highest**
  9:*1*
**highest-
ranking**
  54:*10*
**home**
  16:*11,
12*   17:*8*
**homeless**
  79:*23*
  80:*25*
  81:*3, 20*
**honest**
  22:*19*
  30:*18*
  43:*17*
  67:*17*
  83:*7, 8*
**Honestly**
  55:*16*
  75:*6*

**hope**
  26:*13*
**hoping**
  41:*7*
**hour**
  59:*24*
**house**
  22:*3,
10, 15*
  24:*18*
  33:*5*
  36:*14*
  39:*21*
  47:*19,
20, 24*
  50:*4*
  52:*24*
  54:*2*
  56:*8,
11, 15*
  58:*5*
  62:*18*
  65:*9*
**humor**
  59:*9*
**humorous**
  58:*24*
**hypotheti
cal**
  10:*6*
  33:*23*
  74:*14*
  76:*1,
14, 25*
**hysterica
l**
  24:*22*
  29:*23*
  31:*19*

**< I >**

**ID**
  58:*2, 9,
12*

**identical**
  46:*7*
**identific
ation**
  19:*1*
  23:*12*
  78:*25*
**identify**
  5:*15*
**image**
  49:*19*
**imagine**
  53:*23*

**important**
  26:*22*
  35:*18*
  50:*18*
**impressio
n**   31:*2*
**improper**
  33:*23*
**incident**
  8:*16,
21*
  14:*16*
  31:*22*
  45:*24*
  50:*20*
  51:*6*
  69:*23*
  70:*22*
  79:*20*
  80:*3*

**incidents**
  51:*17*
**include**
  6:*6*

**including**
  5:*24*
**inconsist
ent**
  34:*2, 17*

**incorrect**
  71:*20*
**individua
l**    81:*20*
**individua
lly**
  15:*19*

**influence**
  15:*20*
**informati
on**
  21:*8*
  37:*12*
  42:*12*
  44:*23*
  56:*10*
  58:*10*
  65:*6*
  70:*20*
  73:*16*
**informed**
  60:*5*

**informing**
  50:*12*
**initial**
  30:*9*

**initially**
  75:*22*
**injure**
  16:*23*
**injury**
  26:*4*

| | | | | |
|---|---|---|---|---|
| inside 39:21 | 9:22 13:2, 6, 10 | investigation/any 73:6 | 70:6 73:1 82:10 | 35:6 36:6 37:21 |
| inspecting 59:6 | 14:1 17:13 | investigations 14:12, 18 | < K > keep 31:12 | 58:25 59:6, 23 |
| instincts 60:3 | 71:25 investigated | involuntary 9:20 | 37:23 39:2 | 60:3, 12, 23 |
| instructed 27:7 | 59:14 70:18 | involved 9:21 | 40:13 42:19 | 70:5, 7, 18, 19, |
| insufficient 72:16 73:7 | investigating 17:24, 25 | 69:22 72:6 | 43:3 44:2, 16 | 22, 24 71:1, 6, 7, 25 |
| intend 84:13 | 36:23 58:25 | involving 8:16 | 50:14 69:12 | 72:1, 3, 4, 5, 14 |
| interaction 71:3 | 59:6 60:11 | It'll 9:10 | keeping 51:18 | 73:4, 6, 13, 14, |
| interested 43:20 | 76:1, 2, 11 | < J > | key 10:1 | 20, 22, 23 |
| 86:11 | investigation | JAEGER 1:8 | keys 49:13 | 75:20 76:2 |
| internal 72:20 | 10:22 24:25 | 5:11 23:2 | 57:4, 21 kick | Kidnapping/Extortion 4:6 |
| interrupt 62:15 | 34:20 38:8 | JARED 1:4 | 16:22 kid | 17:19 18:5 |
| interview 41:7 | 47:9, 15, 18 | 5:10 8:16 | 65:4 | Kidnapping/Extortions |
| 43:10, 20 | 48:3 50:16 | JEREMY 1:9 | kidnapper 59:21 | 20:4 |
| 44:6, 21 | 51:8, 21 | 5:12 JOB | 60:11 kidnapping | kidnappings 60:2 |
| 48:7, 9 | 58:20 61:9 | 1:22 JOHN | 14:12, 18, 22 | kids 61:6, 14 |
| interviewing 43:8, 13 | 62:16 70:7, 25 | 1:16 3:3 | 17:25 21:25 | 64:15 kind |
| 47:10 58:11 | 71:6 72:2, 3, 15 | 7:1 justification | 22:2, 8 30:10 | 27:8, 11, 16 |
| 61:8 investigate | 73:4, 6 74:5 | 10:25 juvenile | 31:10 33:21 | 31:24 41:22 |
| | 75:12 | 69:18, 21 | 34:3, 5, 10, 18 | 70:17 |

**kit**
 57:*5, 17*
**knew**
 23:*5*
 32:*4,*
*24*
 35:*15*
 62:*7*
 81:*17*
**knocks**
 79:*18*
**know**
 12:*12*
 13:*15,*
*25*
 16:*7*
 17:*2*
 19:*18,*
*21*
 20:*5,*
*14, 17,*
*21*
 21:*11*
 22:*6*
 23:*20*
 24:*23*
 27:*19*
 28:*9,*
*22*
 29:*4*
 31:*21,*
*23*
 32:*2*
 34:*1,*
*19*
 36:*25*
 38:*12,*
*24*
 39:*22*
 40:*23,*
*25*
 41:*19*
 42:*25*

 43:*17,*
*23, 24*
 44:*5*
 49:*8,*
*10*
 50:*15,*
*25*
 51:*5, 8,*
*17, 18*
 52:*13,*
*15*
 53:*1,*
*22*
 54:*15*
 57:*9*
 58:*2, 3,*
*4, 5, 20,*
*22*
 59:*5, 7,*
*12, 16,*
*17*
 60:*16,*
*17, 19*
 65:*6,*
*25*
 66:*23*
 67:*2,*
*18*
 69:*20*
 70:*2,*
*17, 20*
 72:*13,*
*15*
 73:*23*
 76:*6,*
*20*
 77:*9*
 78:*1*
 80:*18,*
*21*
 81:*6, 9*
 82:*6,*
*15, 24*

 83:*7*
 84:*7*

**knowledge**
 20:*14,*
*25*
 35:*18*
**known**
 81:*19*
 82:*12,*
*15*

**< L >**
**laid**
 71:*11*
**laugh**
 59:*10*
**laughing**
 59:*2*
**laughs**
 59:*5*
**law**
 5:*19*
 9:*13, 14*
**lawn**
 13:*10*
**laws**
 6:*3*
**lawyer**
 10:*10,*
*11*
**lead**
 47:*9*
**leave**
 26:*1, 2*
 35:*25*
 40:*24*
**leaves**
 12:*22*
 13:*10*
**leaving**
 35:*17,*
*23*

**left**
 41:*3, 4*
**Legal**
 1:*20*
 5:*6*
**legitimat**
**ely**
 71:*17*
**letting**
 48:*24*
**level**
 9:*1, 24*
**leverage**
 16:*17*
**license**
 22:*21*
**lieutenan**
**t**
 54:*14*
 56:*3*
 69:*19*
**life**
 17:*15*
 26:*22*
**line**
 26:*5*
 63:*12*
 66:*12*
 74:*8, 14*
**lines**
 30:*2*
 38:*14*
 52:*25*
**list**
 73:*14*
**listen**
 41:*7*
**literally**
 57:*8*
**litigatio**
**n**    5:*24*
 46:*9*

**little**
 24:*12*
 25:*10*
 26:*22*
 28:*19*
 29:*22*
 30:*20,*
*23*
 31:*4,*
*18, 24*
 32:*3*
 38:*3*
 39:*20*
 44:*19*
 54:*18*
 62:*19*
 64:*23*
**lived**
 22:*24*
**LLP**    2:*3*
**LOCATION**
 1:*20*
 22:*24*
 48:*1*
 72:*13*
 79:*25*
**lock**
 16:*24*
 57:*21*
**locked**
 49:*12*
 57:*3, 7*
**lockout**
 57:*5, 17*
**LOFTUS**
 1:*8*
 5:*11*
 56:*4*
 69:*19*
**long**
 9:*8*
 58:*21*
 82:*12*

longer
  6:17
long-
term
  26:20
look
  6:17
  20:24
  25:17
looking
  21:8
  73:25
lookout
  21:3
look-out
  21:1, 2,
5
looks
  23:19
  25:7
  50:23
  69:5
lost
  6:18
  50:22
lot
  35:1
  57:6
  76:13
lying
  33:15

< M >
ma'am
  7:25
  9:12
  15:17
  17:21
  24:20
  27:23
  79:4
making
  12:23

47:14
66:14
81:17
male
  22:18
  23:3
man
  30:16,
17, 20
  33:6
  37:4
  38:19

mandatory
  77:22
MARCK
  1:8
  5:11
marked
  18:7,
20
  19:1
  21:19
  23:12
  78:25
marking
  18:14
MARTHA
  2:16
  5:22
martha.mu
llen@dc.g
ov    2:17
matching
  22:18
matter
  5:10
  6:4
mean
  34:6
  47:18
  74:16

81:8
82:16
meaning
  46:5
means
  6:5, 7
meant
  64:23
medical
  26:1, 2
  80:1
  81:10
member
  79:22,
24
  80:24
memory
  26:7, 9,
17, 20
mental
  81:4
mention
  75:22
message
  48:16
method
  6:9
Metropoli
tan
  7:22
  17:22
MICHAEL
  1:9
  5:12

migraines
  27:7
mind
  27:15
minute
  24:17
  25:5
  28:18

31:12,
16
32:10,
15
35:7
37:22
38:1
39:1
40:19
42:16
44:16
45:8
46:14,
16, 20
48:11
52:9
58:17
60:25
minutes
  53:24
  58:8
misbehavi
ng
  32:20
miscellan
eous
  77:20
  78:1
missing
  10:6
  76:13
misunders
tanding
  77:15
  78:2
moment
  17:17
  20:2
  25:18
  28:17
  48:18
  49:10

Montgomer
y    9:6
morning
  5:2, 21
mother
  25:8
  30:14
  37:8
  38:8
  39:20
  79:16
  81:16
mother's
  79:19
moved
  52:14
movie
  77:3,
14    78:2
MPD
  9:11
  11:6
  79:18
MULLEN
  2:16
  5:21,
22
  6:13
  10:5,
10, 15
  11:2,
15
  12:9
  13:4,
16
  14:13
  15:2,
13, 15
  18:7,
11, 15,
19
  19:7, 9,
15, 18,

21, 24
20:6,
10, 16
22:5,
11
23:24
24:2, 5
25:20,
25
27:22
28:22
29:2,
13
30:22
33:1,
22
34:4, 7,
11
35:19
38:20
39:11,
14
43:22
45:7,
17, 20
46:12
49:17
50:23
51:25
53:9,
18
59:3,
15, 22
60:13
62:9
63:12,
16, 22,
24
64:9
66:22,
24
69:1
70:9

71:10
74:7,
20
75:2, 4,
14, 16
79:7, 9
80:6,
13
81:23
82:2,
22
83:1,
22
84:6,
16, 20
85:4
multiple
9:5
77:18
murder
76:3,
11, 15

< N >
name
5:5, 21
6:25
44:23
69:24

narrative
72:19,
20
73:16
natural
60:3
nausea
27:7
near
16:12
necessari
ly
51:13

necessary
16:7
21:3
82:8
need
9:24
10:3,
21, 25
11:10,
12
27:19
48:6, 7,
10
50:25
64:14,
18
65:4
67:22
74:18
79:25
81:5,
10
83:15
84:17
needs
18:20
46:4

neighbors
17:9
53:3, 8,
13    66:7
neighbor'
s    12:22
neither
86:9
neutral
27:17
never
16:5
40:24

New
5:7
78:24
nobody's
38:6
noise
12:23
55:17
North
2:4

Northwest
2:14
notary
7:12
notebook
57:3
noted
10:14
74:23
notice
84:23
noticed
26:19
85:7
noticing
5:16
notificat
ions
69:25
November
9:10
Number
5:13
18:8
82:13
numbers
73:11,
15

< O >
object
60:13

74:7,
14
80:13
82:2
objected
63:18

objecting
15:15

Objection
10:5,
14
11:2,
15
12:9,
12
13:4,
16
15:2
20:16
30:22
33:1,
22
34:4
35:19
38:20
43:22
51:25
53:9
59:3,
15, 22
62:9
63:12
66:22
70:9
71:10
74:22
75:14
82:22
objects
16:16,
18

obscure
  14:3
obvious
  62:10

obviously
  82:8
occurred
  11:22
  21:23
  22:2, 9
  31:10
OFFICE
  2:12
  5:22
officer
  5:6
  9:9
  10:15
  11:12
  23:2
  25:9,
25
  28:24
  34:16
  38:6
  39:8,
14
  40:21
  41:2
  42:10
  43:8,
12
  44:23
  47:11,
13
  49:5, 6,
11, 12
  52:4
  54:10,
11
  55:4, 5
  56:6,

12
  57:3,
19
  58:10
  60:1, 5
  63:14
  74:9
officers
  8:6
  16:1
  20:17
  21:7
  40:1
  42:14
  47:7, 8,
23
  50:3
  51:9,
16
  57:6
  66:10

officer's
  81:24
official
  6:6
  21:12,
13
  54:15
officiall
y    85:11
Oh
  15:12
  17:23
  29:6
  32:14
  38:12
  39:23
  40:2
  42:3
  49:17
  51:4
  52:8

68:20
  69:1, 4
  76:6
  77:14
Okay
  8:1, 19
  12:14
  13:9,
13
  19:2,
20
  20:10,
11
  21:18
  23:17,
22, 23
  24:14
  25:19,
25
  27:2
  28:20
  29:2,
16
  30:7,
19
  32:16
  35:2, 7
  36:15,
24
  37:22
  39:1, 5,
9    40:2,
3, 8, 12
  41:6,
20
  42:3, 7,
16, 18
  44:1,
10
  45:5
  47:22
  48:15,
19

50:6
  52:9
  53:15
  54:4
  55:20
  56:1
  57:10,
22
  59:1,
20
  60:21
  62:4
  63:9
  64:7,
19
  65:1, 4,
12
  66:4
  67:18,
22
  69:7,
11, 14
  71:4
  72:24,
25
  73:2,
17
  74:3,
16
  75:25
  76:5, 9,
19, 25
  77:1,
13
  78:6, 7,
8, 14,
22, 24
  79:5,
14
  81:13
  82:2,
18

83:12,
13
older
  29:24
  31:20
  32:14,
17
  33:10
  36:13
  37:10
  56:14
  62:4
Once
  10:22
  24:23
  74:13
  77:22
one's
  58:9
  80:21
on-scene
  54:14
open
  16:20,
21
  48:21
  78:23
operation
s    20:4
OPkay
  78:8
oppose
  6:8
opposed
  17:14
options
  84:24
Order
  4:5, 8
  9:24
  14:20
  17:19
  18:4

79:*2*
84:*21,*
*22, 25*
ordering
85:*1*
orders
8:*13*
51:*6*
original
8:*12*
outcome
86:*11*
outranked
54:*14*
outside
16:*10*
17:*7*
overwhelm
ed
31:*24*
owner
22:*24*

< P >
p.m
1:*19*
28:*1, 3*
45:*12,*
*14, 15*
68:*6, 9*
83:*23*
84:*1*
85:*11,*
*13*
PAGE
3:*3*
4:*4*
19:*5,*
*23, 24*
20:*9*
79:*6, 11*

paragraph
s    20:*7*
parents
70:*3*
Park
5:*6*
part
14:*14*
20:*3,*
*24*
21:*16*
25:*13*
28:*15*
71:*7*
particula
r    34:*12*
parties
6:*5, 11*
15:*18*
24:*24*
46:*1*
58:*21*
71:*3*
84:*8*
86:*10*
partner
40:*22,*
*24, 25*
41:*9,*
*11*
42:*25*
52:*14,*
*21*
pass
84:*5*

passersby
17:*10*
77:*5*
passing
45:*3*
patient
50:*15*

PATRICK
1:*8*
5:*11*
pause
47:*2*
50:*1*
paused
46:*16,*
*19*
pausing
45:*9*
49:*3*
55:*3*
68:*20*
pedestria
n    49:*19*
pedestria
ns
45:*24*
46:*8*
people
12:*16,*
*24*
14:*7*
16:*2*
17:*4*
20:*22*
32:*2*
34:*21*
57:*20*
58:*4*
72:*12*
73:*14*
80:*18*
Perfect
35:*14,*
*17*    36:*3*
perfectly
36:*20*
perform
79:*18*

person
9:*20*
11:*5*
14:*8*
16:*2,*
*22*
17:*1*
18:*14*
60:*17*
76:*17,*
*21, 23*
78:*3*
79:*23*
80:*18,*
*25*
81:*3,*
*10, 15,*
*16, 17*
personal
17:*15*
44:*22*
personall
y
77:*17,*
*19*    82:*1*

personnel
6:*9*
person's
15:*20*
17:*14*
phone
14:*8*
45:*3, 4*
46:*19*
49:*6, 7,*
*12, 13*
57:*4,*
*10*
79:*17*
80:*19*

phonetic
40:*21*
49:*5*
picking
30:*13*
picture
52:*23*
pieces
76:*13*
pile
12:*22*
piled
13:*9*
place
75:*23*
86:*5*
placed
76:*23*
77:*21*
places
15:*10*

Plaintiff
1:*5*
2:*10*
5:*19*
6:*2*
45:*23*
46:*6, 10*
plate
22:*21*
platform
1:*20*

plausible
36:*16,*
*20*
play
25:*1,*
*13*
29:*16*
35:*8*
36:*7*

46:*24*
48:*12*
49:*15,*
*23*
50:*7*
52:*10,*
*16*
53:*16*
54:*3*
56:*21*
57:*13*
58:*14*
60:*25*
62:*21*
63:*6*
65:*16*
67:*10,*
*20*
68:*14*
**played**
  24:*10,*
*15*
  25:*2*
  28:*21*
  29:*18*
  31:*14*
  32:*11*
  35:*9*
  36:*9*
  37:*24*
  39:*3*
  40:*15*
  41:*14*
  42:*9,*
*20*
  43:*4*
  44:*3,*
*17, 25*
  45:*7*
  46:*25*
  48:*13*
  49:*1,*
*16, 24*

50:*8*
52:*11,*
*17*
53:*17*
54:*5,*
*20, 24*
55:*1,*
*22*
56:*23*
57:*14,*
*24*
58:*15*
61:*1,*
*19*
62:*22*
63:*7*
65:*17*
67:*11*
68:*15,*
*18*
69:*15*
**playing**
  23:*15*
  24:*2, 9*
  31:*12*
  37:*23*
  39:*2*
  40:*14*
  42:*19*
  43:*3*
  44:*2,*
*16, 24*
  45:*6*
  48:*15*
  69:*13*
**please**
  5:*15*
  6:*24*
  7:*2*
  10:*16*
  25:*23*
  60:*9*
  74:*25*

**point**
  10:*3,*
*20*
  23:*18,*
*19*
  25:*5,*
*16*
  27:*18*
  29:*5, 7*
  30:*1, 7,*
*9*   31:*7,*
*9, 20,*
*25*
  33:*17*
  34:*25*
  35:*4*
  36:*4*
  37:*3, 8,*
*11, 19*
  38:*18,*
*23*
  40:*18*
  41:*10,*
*18*
  42:*1*
  43:*10*
  47:*4, 6,*
*8*   48:*5,*
*9*   50:*2*
  52:*14*
  56:*13*
  58:*8*
  60:*21*
  64:*10*
  66:*2,*
*11, 19*
  67:*2, 7,*
*8*   78:*9,*
*11, 13*
  79:*15*
**points**
  23:*15*

**Police**
  7:*22*
  9:*9, 21*
  11:*11*
  12:*3,*
*17, 21*
  13:*24*
  16:*3,*
*13, 19*
  17:*22*
  21:*7, 9*
  34:*16*
  60:*1, 5*
  63:*3*
  70:*13*
  77:*6*
**policies**
  74:*11*
**policy**
  80:*7*
**possible**
  30:*10*
  53:*18*
  60:*23*
  73:*1*
**possibly**
  33:*13*
  72:*20*

**potential**
  9:*22*
  17:*25*
  35:*6*
  36:*6*
  37:*21*
**potential
ly**
  9:*20*
  31:*10*
**prefer**
  16:*11,*
*12*

**preferabl
e**   16:*9*
  54:*17*
**Preferabl
y**   16:*15*
**preferenc
e**
  18:*12*
  27:*3*
**preparati
on**   8:*1,*
*9*
**prepared**
  8:*11*
**present**
  7:*12*
**press**
  35:*8*
  49:*15*
  52:*16*
  53:*16*
  54:*3*
  56:*21*
  57:*13*
  58:*14*
  60:*25*
  62:*21*
  63:*6*
  65:*16*
  67:*10,*
*19*
  68:*14*
**pretty**
  29:*7*
  31:*19*
  58:*24*
**previous**
  81:*14*
**previousl
y**   46:*16*
**prior**
  58:*10*
  63:*18*

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 212 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 106 of 116

20

probably
  29:6
  63:3
  77:9
problem
  22:13
  23:7
procedural  6:3
  19:6
  20:3

procedure
  71:23,
25
  72:10,
22
Procedures  20:4,
14
  70:14
proceed
  7:15
  10:14
  29:12
proceeding  5:8
  6:8, 10
  7:5
Proceedings
  85:13
  86:4, 6
produced
  23:25
  24:3
profession  63:2
  70:17
promoted
  11:12
proper
  70:2

prove
  65:24
provided
  45:22

providing
  35:11
psychiatrist
  81:7
psychologic  81:7
public
  7:12
  60:6
  72:19,
21
pull
  17:16
  23:9
  78:20
pulled
  22:25
purchase
  84:14,
22, 25
  85:8
purpose
  46:4
  77:10

purposely
  35:23,
25
purposes
  26:18
  54:1
pursuant
  6:3
  9:25
  15:8
put
  10:25

11:7
  15:1,
11
  16:1, 2
  25:21
  32:20
  33:6
  59:24
  66:6
  72:7,
12, 18,
23
  73:21
  77:8,
11
  84:18
putting
  72:25

< Q >
question
  10:6, 9,
16, 17
  11:3
  12:10
  13:20
  14:14
  15:5
  16:11,
13
  22:6
  23:1
  33:23
  35:1,
20
  36:3,
17
  37:18
  38:21
  40:7
  52:1
  53:10,
19

59:4,
23
  60:9,
14
  62:10
  63:18,
23
  64:8
  66:24
  70:10,
15
  71:11,
21
  75:3, 7,
17
  76:14
  81:14
  82:3, 23
questioning
  14:25
  15:8,
14
  16:2, 3,
5  17:8
  63:13
  66:12
  74:8, 14

questions
  8:24
  13:17
  23:16
  28:16
  41:25
  48:7,
10
  64:5
  74:19
  78:10
  84:4, 7
quick
  24:19

67:21
  84:9

< R >
raise
  7:2
  36:19
rank
  7:20, 21
reach
  79:16
  80:21
react
  59:21
  60:4, 11
reacting
  30:24
  31:3

reactions
  60:18
read
  20:3,
11
  79:14
  84:15
  85:14
reading
  14:19
  20:6
  81:1
ready
  46:15
real
  24:18
  77:5
realize
  77:14
really
  42:12
  44:11
  57:1
  73:4

USCA Case #25-7050    Document #2131053    Filed: 08/20/2025    Page 213 of 426
Case 1:21-cv-01847-RJL    Document 47-5    Filed 11/20/23    Page 107 of 116

21

77:10
84:10
**reason**
32:4
33:14
48:15
51:13
62:13
70:5
73:19
75:22
76:24
**Reasonabl
e**    10:1
11:20,
21
12:2
21:21,
23
22:1, 8
31:8, 9
35:5
36:5
37:19
53:7
60:22
78:12
**reassure**
39:25
**reassurin
g**    40:4
**recall**
66:14
**received**
79:22
80:23

**receiving**
68:23
**recollect
ion**
44:11

**record**
5:3, 7,
16    6:6,
19, 21,
22, 25
18:16
25:21
27:25
28:1, 2,
4, 12
32:16
45:8,
12, 13,
15
59:24
68:7, 8,
10
83:24,
25
84:2,
13, 18
85:12
**recorded**
86:6

**Recording**
4:7
6:7
**recover**
26:13
**recoverin
g**    26:5
**recovery**
84:9
**red**
36:19
**redact**
45:24
**redacted**
45:25
46:6
49:19

**referring**
7:20
39:9,
12, 14,
17, 22
64:5
**refresh**
48:21
**refuse**
66:20
**refused**
66:11
**regard**
17:15

**regarding**
79:23
80:24
**regardles
s**    51:22
**regards**
21:2
**registere
d**    22:23
**registrat
ion**
22:23
**Regulatio
ns**
79:12
**related**
8:16
21:24
86:10
**relating**
8:20
14:11,
17
**relations
hip**
30:12,
16    37:4

**relay**
37:11
**release**
10:3, 21

**releasing**
11:13
**reliable**
12:7
**relisten**
28:11
**remains**
26:2
**remember**
21:17
22:18
25:7,
12
28:24
32:6
37:14,
16, 17
38:16
39:19
43:11,
19
44:20
53:4
65:22
66:1, 3,
4, 7
67:16
**remembere
d**    36:1
**REMOTE**
1:20
5:6
**remotely**
6:1
**remove**
15:22
66:15

**removed**
52:3
65:21,
24    66:2

**reopening**
48:17
**repeat**
13:20
60:9
63:15
71:21
75:1

**repeating**
22:11
**rephrase**
64:8
**replay**
32:7, 8
64:17,
21
**report**
70:24
71:2, 5
72:2,
11, 13,
19
73:5,
15, 16
74:6
75:12,
20, 21
76:10,
18, 22
77:20,
23, 25
82:7,
13, 14
**reported**
12:8
69:21
70:6,

| | | | | |
|---|---|---|---|---|
| *14* | *17* | *50:1,* | **Rule** |
| 71:*18* | **residence** | 18:*15,* | 10 | 74:*10* |
| **REPORTER** | 79:*19* | *18, 21* | 52:*7* | **rules** |
| 1:*21* | **respond** | 19:*5,* | 53:*25* | 6:*3* |
| 5:*2, 25* | 21:*12,* | *13* | 54:*3, 7,* | **run** |
| 6:*15,* | *14* | 21:*18,* | *16* | 22:*22* |
| *22*    7:*2,* | 51:*7* | *20* | 55:*3,* | |
| *13* | 74:*3* | 23:*8* | *24* | **< S >** |
| 18:*18,* | 79:*24* | 24:*9,* | 56:*15,* | **safe** |
| *21* | | *21* | *25* | 39:*6* |
| 19:*2* | **responded** | 25:*4,* | 57:*12* | 40:*1, 4* |
| 27:*24* | 79:*17* | *20* | 58:*1* | 47:*15* |
| 28:*3* | **rest** | 27:*2, 4,* | 60:*24* | **safety** |
| 45:*11,* | 7:*13* | *13, 21* | 61:*3,* | 11:*4, 5* |
| *14* | 78:*14* | 28:*6* | *15, 21* | 66:*18* |
| 48:*20* | **review** | 29:*24* | 62:*20,* | **sam@gerst** |
| 68:*5, 9,* | 8:*10* | 31:*11* | *24* | **ein-** |
| *22* | **reviewed** | 32:*13* | 63:*5* | **harrow.co** |
| 69:*2, 5* | 8:*15* | 34:*11,* | 64:*9* | **m**    2:*9* |
| 83:*19,* | | *23* | 65:*19* | **samaritan** |
| *23* | **reviewing** | 35:*3, 7,* | 67:*9,* | **s**    21:*9* |
| 84:*1,* | 49:*11* | *11* | *13* | **SAMUEL** |
| *12, 19* | **rewind** | 36:*7* | 68:*5,* | 2:*8* |
| 85:*3, 5,* | 25:*13,* | 37:*22* | *13, 20* | 5:*20* |
| *10* | *17* | 38:*1, 7* | 69:*17* | **saw** |
| 86:*1, 18* | 28:*15* | 39:*1* | 71:*7,* | 22:*17,* |
| **reports** | 42:*4, 5* | 40:*4, 5,* | *15, 23* | *25* |
| 8:*12* | 55:*16,* | *17, 20,* | 72:*24* | 23:*2* |
| | *19* | *21* | 74:*20* | 49:*18* |
| **represent** | 61:*15,* | 41:*3,* | 75:*25* | **saying** |
| 5:*23* | *16, 17* | *16* | 76:*4, 8* | 24:*18* |
| 23:*9* | | 42:*11,* | 78:*9* | 25:*11* |
| **request** | **rewinding** | *19, 22* | 79:*21* | 28:*12* |
| 21:*11,* | 28:*11* | 43:*2, 6* | 81:*11* | 29:*8* |
| *13* | **ride** | 44:*1,* | 83:*17* | 30:*2* |
| 84:*17* | 40:*23* | *15, 24* | 85:*10* | 31:*21* |
| **requestin** | **right** | 45:*2* | **road** | 32:*19* |
| **g**    65:*20* | 7:*3, 23,* | 46:*14,* | 12:*22* | 39:*5,* |
| **reschedul** | *24*    8:*1* | *23* | **room** | *20, 24* |
| **e**    27:*3* | 11:*9,* | 47:*13* | 15:*22* | 41:*8* |
| 28:*8* | *19* | 48:*11,* | **ROSEN** | 47:*20* |
| | 15:*25* | *23, 24* | 2:*8* | 51:*3* |
| | 17:*16,* | 49:*14* | 5:*20* | 53:*2* |

| | | | | |
|---|---|---|---|---|
| 55:*14* | **SDD** | 77:*1*, *6* | 50:*18*, | **share** |
| 58:*5* | 21:*15* | 79:*2*, | *23* | 23:*11* |
| 61:*10* | **se** | *11* | 51:*12*, | **shared** |
| 65:*20* | 72:*10* | 80:*12* | *22*, *23* | 23:*10* |
| 66:*7* | **second** | 83:*15* | 52:*5* | **Shenay** |
| 69:*18* | 17:*23* | **seeing** | 53:*11* | 1:*21* |
| 71:*19* | 27:*24* | 12:*7* | 54:*8*, *9* | 5:*5* |
| 72:*22* | 32:*9* | 28:*24* | 58:*2*, | 86:*3*, *17* |
| 76:*15*, | 73:*1* | 33:*19* | *12*, *19* | **shocked** |
| *17* | 80:*12*, | 34:*16* | 61:*5*, *8*, | 31:*19*, |
| **says** | *23* | **seen** | *10*, *21* | *24*   32:*1* |
| 17:*19* | 81:*2*, | 22:*22* | 62:*14* | **Shoot** |
| 20:*3* | *19* | 58:*20* | 63:*1*, | 68:*21* |
| 63:*11* | 82:*12* | 65:*8* | *10* | **short-** |
| 69:*24* | **seconds** | 74:*2* | 64:*12*, | **term** |
| 71:*6* | 31:*13* | **self** | *14* | 26:*20* |
| 73:*5* | **see** | 81:*1* | 65:*3*, *7* | **show** |
| 76:*10* | 11:*10*, | **sense** | 66:*20*, | 28:*12* |
| 79:*12* | *22* | 23:*5* | *25* | 76:*14* |
| **scene** | 12:*23* | 36:*20*, | 67:*3*, | 77:*7*, *8* |
| 8:*6* | 14:*8* | *21* | *14* | **showed** |
| 21:*6*, | 16:*14* | 57:*10* | 68:*21* | 22:*23* |
| *12*, *14* | 17:*18* | **sent** | 71:*12* | 74:*12* |
| 23:*5* | 19:*6*, *9*, | 84:*23* | 80:*14* | **shown** |
| 45:*23* | *12* | **separate** | 84:*7* | 53:*3* |
| 50:*13*, | 28:*18* | 14:*25* | **serious** | **shows** |
| *19* | 29:*16* | 15:*9*, | 26:*4* | 64:*14* |
| 51:*5*, *7*, | 33:*20* | *18*, *21* | 50:*20* | **side** |
| *15* | 34:*3*, | 16:*1* | 51:*6* | 36:*22* |
| 53:*4* | *17* | 24:*24* | **service** | **sidewalk** |
| 54:*10* | 38:*18* | | 81:*4* | 40:*5* |
| 65:*12* | 41:*7* | **September** | **Services** | **sign** |
| 67:*16* | 42:*3*, | 86:*13* | 70:*1*, *2* | 84:*15* |
| 76:*16*, | *12* | **sergeant** | 78:*16* | 85:*14* |
| *21*   78:*2* | 46:*8*, | 7:*21*, | 80:*2* | **silent** |
| **screen** | *15* | *23* | 84:*21* | 24:*13* |
| 17:*18* | 53:*24* | 15:*16* | **set** | **simply** |
| 27:*9*, | 54:*18*, | 24:*5* | 86:*5* | 46:*7* |
| *17* | *23* | 25:*20* | **seven** | **Sir** |
| 50:*24* | 62:*19* | 27:*22* | 9:*10* | 7:*4* |
| **scroll** | 63:*9* | 38:*22* | 16:*8* | 8:*16* |
| 19:*16*, | 69:*11* | 45:*23* | 31:*12* | 60:*15* |
| *19* | 72:*25* | 46:*18* | | 84:*8* |

sister
 29:24
 32:17,
 18
sitting
 8:19

situation
 22:16
 34:12,
 20
 38:12
 60:17
 75:19
situations
 26:24
 81:15
Sixth
 2:14
skip
 69:12
skipping
 54:1,
 17, 22
small
 22:20
smiling
 49:17
snip
 28:19
solemnly
 7:4
somebody
 10:4,
 21
 11:1,
 14
 13:14,
 23
 14:24
 17:7
 57:5

76:15
77:21
81:9
somebody's    77:22
son
 79:16,
 18
 80:19
 81:18
soon
 26:13
Sorry
 13:3
 14:13
 17:23
 22:5
 26:13
 27:1,
 22
 32:14,
 15
 36:18
 39:23
 40:13,
 19, 20
 54:22
 64:22,
 25
 71:22
 76:6
sort
 32:5
 33:20
 38:11
 46:21
 55:9
 81:5
sound
 68:16
sounds
 81:4

South
 5:7
speak
 27:17
 54:12,
 15
 62:17
 69:24
 72:11,
 21
speaking
 23:2
 39:21
 56:4
 57:20
 62:15
 71:24
speaks
 63:13
specific
 44:9

specifics
 62:18

spectacle
 17:9

speculate
 30:23
 59:5
spoke
 21:6
spoken
 61:23
 62:2, 4
stabbed
 77:6
stabbing
 77:25
standing
 41:22,
 23

46:21
 47:3, 7,
 14
stands
 21:15
START
 1:18
 7:19
 8:23
 24:9
 27:6,
 20
 28:18
 54:2
started
 31:20
 43:15
starting
 5:16
starts
 53:23
State
 6:3, 24
 84:13

statement
 66:15
STATES
 1:1
 5:13
 32:17
stay
 40:25
stayed
 51:13
staying
 38:7
stick
 18:25

stipulate
 6:11
 46:2

stipulates    6:14
 46:11
stipulating
 45:19
stop
 9:18,
 19, 23,
 25
 10:4,
 13, 21
 11:14
 15:8
 23:15
 51:21
 52:13,
 25
 76:22
 77:20,
 23
stopped
 42:17
 76:23
stopping
 24:17
 29:20
 31:16
 41:16
 43:6
 52:19
 58:1,
 17
 61:3
 62:24
 63:9
 65:19
 67:13
 69:17
story
 15:18,
 20
 36:22

| | | | | |
|---|---|---|---|---|
| **Street** | 68:*1* | 41:*4* | *24* | *25* |
| 2:*4, 14* | 69:*25* | 45:*4* | 70:*16,* | 42:*12* |
| 16:*12,* | 70:*19* | 64:*15* | *23* | 44:*8* |
| *15* | 71:*4* | | 73:*9* | 47:*11* |
| 22:*24* | 75:*10* | **suspicion** | 75:*21* | 55:*4* |
| 37:*13* | 83:*19* | 9:*24* | 81:*6* | 57:*3* |
| 40:*5* | **surely** | 10:*1* | 82:*6,* | 58:*5,* |
| **suffered** | 74:*16* | 11:*20,* | *14* | *21* |
| 26:*1* | | *21* | 83:*13* | 61:*5* |
| **suggestio** | **surprised** | 12:*3* | **taken** | 63:*4* |
| **n**  48:*21* | 41:*24* | 21:*21,* | 5:*10* | 64:*1* |
| **Suite** | 67:*14* | *23* | 6:*1* | 78:*15* |
| 2:*4* | **surprisin** | 22:*1, 8* | 26:*3* | 83:*4* |
| **summarize** | **g**  58:*8* | 31:*8, 9* | 30:*20* | |
| **d**  63:*17* | **suspect** | 35:*5* | 47:*8* | **technical** |
| **superviso** | 11:*5* | 36:*5* | 67:*7* | 69:*8* |
| **r** | 16:*23* | 37:*20* | 76:*18* | **tell** |
| 47:*25* | 23:*1* | 60:*22* | 86:*4* | 7:*19* |
| 48:*2* | 24:*23* | 78:*12* | **talk** | 8:*6* |
| 50:*13* | 42:*11,* | **SUV** | 11:*19* | 9:*1, 17* |
| 51:*4, 6* | *13* | 22:*20* | 17:*4* | 21:*15* |
| **superviso** | 43:*8* | **swear** | 25:*8* | 26:*16* |
| **r's** | 47:*10,* | 7:*4* | 31:*21,* | 40:*17* |
| 11:*11,* | *14* | **sworn** | *23* | 41:*17* |
| *13* | 50:*12* | 7:*11, 14* | 34:*12* | 42:*22* |
| **supposed** | 51:*19* | **symptoms** | 45:*18* | 43:*15* |
| 40:*24,* | 52:*22,* | 27:*6, 15* | **talked** | 50:*17* |
| *25* | *23* | **system** | 21:*21* | 54:*7* |
| **Sure** | 54:*13* | 22:*23* | 28:*10* | 56:*25* |
| 18:*9* | 58:*11,* | | 46:*16* | 69:*17* |
| 25:*16* | *22, 24* | **< T >** | 56:*14* | **telling** |
| 26:*11* | 59:*5* | **take** | 61:*11,* | 36:*13* |
| 31:*4* | 61:*5* | 5:*7* | *14* | 37:*11,* |
| 32:*9* | 62:*16* | 27:*5, 8,* | 70:*4* | *12* |
| 41:*11* | 63:*1* | *11, 19,* | 78:*17* | 40:*1* |
| 45:*9* | 73:*24,* | *25* | **talking** | 52:*23* |
| 47:*14* | *25* | 28:*8* | 8:*12* | 56:*7, 8* |
| 53:*20* | 74:*1* | 32:*18* | 13:*22* | 61:*5* |
| 56:*11* | 77:*12* | 38:*5* | 16:*25* | 65:*7* |
| 58:*11* | **suspects** | 52:*22* | 18:*16* | **tells** |
| 64:*14,* | 76:*16* | 66:*11,* | 31:*22* | 13:*1,* |
| *19* | | *20* | 35:*24* | *23, 24* |
| 65:*4* | **suspect's** | 67:*14,* | 39:*17,* | |

**temporarily**
  6:*19*
  27:*25*
  45:*11*
  68:*6*
  83:*24*
**tend**
  51:*16*
**terms**
  71:*24*
**terribly**
  26:*12*
  27:*1*
**Terry**
  9:*18,*
  *19, 23,*
  *25*
  10:*4,*
  *13, 21*
  11:*14*
  15:*8*
**testified**
  7:*12*
  33:*8*
  34:*10*
**testify**
  20:*18,*
  *21*
  39:*11*
  74:*10*
**testimony**
  6:*9*
  7:*5*
  81:*24*
**Thank**
  5:*18,*
  *25*
  6:*15*
  7:*16,*
  *23*    8:*1,*

*9, 15,*
*23*    9:*8*
  10:*2,*
  *24*
  11:*9,*
  *19*
  12:*14,*
  *16, 25*
  13:*13*
  14:*10,*
  *21, 24*
  15:*25*
  17:*22*
  18:*6*
  19:*3,*
  *15*
  20:*10,*
  *13*
  21:*10*
  22:*11*
  23:*4, 6*
  24:*21*
  25:*1*
  26:*14*
  27:*21*
  28:*6*
  30:*15,*
  *19*
  31:*7,*
  *11*
  32:*19,*
  *23*
  33:*14,*
  *18*
  34:*25*
  35:*7,*
  *14, 17*
  36:*3, 7,*
  *15, 24*
  37:*3,*
  *10, 22*
  38:*11,*
  *17*

  39:*1*
  40:*6,*
  *11*
  41:*2, 6,*
  *13*
  42:*17*
  43:*2, 9,*
  *14*
  44:*1,*
  *15*
  45:*5,*
  *17, 20*
  46:*11,*
  *12, 23*
  48:*11*
  49:*14*
  50:*6,*
  *14, 17*
  51:*10,*
  *20*
  52:*7,*
  *16*
  53:*6,*
  *15*
  54:*16*
  56:*6,*
  *13, 20*
  57:*8,*
  *22*
  58:*7,*
  *13*
  59:*20*
  60:*24*
  62:*20*
  63:*5*
  65:*8,*
  *25*
  66:*19*
  67:*6, 9*
  68:*2, 4,*
  *11*
  78:*5,*
  *14*

  79:*5, 9*
  84:*3, 4,*
  *6, 8, 10,*
  *11, 12*
  85:*4, 9*
**Thanks**
  83:*9*
**thereof**
  86:*11*
**thing**
  17:*3*
  32:*9*
  39:*8*
  42:*24*
  44:*19*
  53:*23*
  56:*18*
  57:*16*
  63:*10*
  64:*18*
  65:*3*
  71:*8*
  77:*2*
**things**
  12:*17*
  13:*22*
  20:*18*
  26:*17,*
  *21, 22,*
  *23*
  27:*10*
  31:*21*
  50:*14*
  70:*14*
**think**
  12:*18*
  13:*25*
  18:*9,*
  *24*
  21:*18*
  28:*17*
  29:*6, 8,*
  *15*

  30:*8,*
  *12, 15,*
  *17*
  37:*3*
  39:*7*
  42:*7*
  48:*24*
  49:*18*
  50:*22*
  57:*5*
  58:*3, 7*
  64:*3, 6,*
  *7*
  66:*12*
  67:*23*
  68:*23*
  69:*11*
  72:*24*
  75:*2*
  77:*1, 5,*
  *11*
  78:*16,*
  *18, 20*
  82:*19*
  83:*5*
**thinking**
  35:*23*
  67:*3*
**thought**
  29:*5, 9*
  38:*4*
  42:*2, 5*
  58:*24*
  61:*13*
  64:*23*
  76:*7*
**three**
  9:*2*
  42:*14*
**threw**
  33:*7*
**thrown**
  22:*20*

**Thursday**
1:*17*
**till**
62:*17*
**TIME**
1:*18*,
*19*    5:*4*
6:*20*,
*23*
18:*24*
24:*23*
27:*9*
28:*1, 3,*
*4*
34:*13*
45:*12,*
*14, 15,*
*16*
54:*9*
59:*12*
63:*17*
64:*6*
66:*15*
68:*5, 6,*
*9, 10*
72:*13*
80:*17*
83:*23,*
*24*
84:*1, 2,*
*22*
85:*10,*
*11*    86:*5*
**times**
14:*2*
16:*23*
82:*16*
**titled**
72:*5*
73:*19*
**TODARO**
1:*10,*
*16*    3:*3*

5:*10,*
*12*
6:*16*
7:*1, 2,*
*8, 23*
25:*21,*
*25*
46:*18*
50:*23*
53:*11*
64:*12*
67:*1*
68:*21,*
*22*
71:*12*
80:*15*
84:*7*
**Todaro's**
24:*6*
45:*23*
**today**
5:*24*
7:*5*
8:*19*
46:*4*
53:*5*
85:*2*
**Today's**
5:*3*
8:*2*
**told**
21:*6*
22:*16*
33:*6,*
*11*
34:*4*
35:*22*
36:*1*
38:*6*
43:*23*
56:*17*
59:*13,*
*18*

60:*11*
63:*1*
75:*9*
**TONG**
1:*9*
5:*12*
43:*8*
44:*23*
58:*10*
**tool**
57:*6, 20*
**top**
36:*1*
39:*8*
79:*12*
**trained**
34:*9*
40:*23*
60:*2*
**training**
8:*24*
14:*11,*
*17, 19*
34:*15*
**transcript**
84:*14,*
*24*
85:*1, 7*
86:*8*
**transpired**    36:*14*
**transport**
11:*6*
**treatment**
70:*3*
**trick**
40:*7*
**tried**
51:*14*

**trigger**
27:*9*
**triggers**
27:*10*
**trouble**
14:*7*
**true**
13:*13*
75:*11*
86:*7*
**trust**
63:*2*
**truth**
7:*6, 7*
**try**
19:*13*
48:*17,*
*21*
50:*14*
51:*2,*
*16*
54:*17*
60:*15*
80:*20*
82:*4*
**trying**
23:*4*
40:*7*
52:*22*
57:*5*
62:*11*
71:*15*
**turn**
41:*17*
**turned**
43:*15*
52:*21*
**turning**
42:*23*
**turns**
76:*3*

**twice**
75:*4*
82:*23*
**two**
12:*23*
21:*3*
79:*14,*
*16*
80:*5,*
*10*
81:*22*

**< U >**
**Uh-huh**
57:*11,*
*23*    77:*4*
**unable**
79:*16*
**understand**    9:*19*
13:*19*
15:*4*
28:*23*
29:*1,*
*25*
36:*17*
64:*9*
68:*24*
70:*13,*
*15*
71:*15,*
*17*
78:*5*
85:*6*
**understanding**
9:*17,*
*23*
10:*3,*
*13, 20,*
*25*
26:*6*
56:*7,*

10
  57:17
  71:5
  72:9
  74:17
  75:6
  80:9
  81:13,
  21
Understoo
d    17:7,
16
  74:21
  82:20
  85:3
unexpecte
d    48:16
unit
  12:23
UNITED
  1:1
  5:13
universit
ies    9:5
Universit
y    9:6,
7
unknown
  10:7
unlawful
  52:25
unlawfull
y    52:24
unlock
  57:6
upset
  24:22
  31:6
  38:4
use
  46:6

Usually
  32:2
  57:19

< V >
vehicle
  23:1
  49:13
verify
  56:4
  58:4
version
  46:6
versus
  5:10
  80:5

vibrating
  55:18
victim
  76:6
Video
  4:7
  6:17
  8:15
  23:9,
  15
  24:10,
  15, 17
  25:2, 5,
  6, 12
  28:11,
  21
  29:5,
  18, 22
  30:4
  31:14
  32:11,
  21
  35:9
  36:9
  37:15,
  24

38:15
39:3
40:15
41:14
42:9,
20
43:4,
12
44:3,
17, 25
45:7,
10
46:15,
19, 25
48:13
49:1,
16, 24
50:8
52:8,
11, 17
53:5,
17
54:5,
20, 24
55:1,
22
56:23
57:2,
14, 24
58:15
61:1,
19
62:19,
22
63:7,
13
64:14
65:17,
23
67:11
68:13,
15, 18
69:15

78:10,
15
84:24
videos
  8:2
VIDEOTAPE
D    1:13
view
  64:10
Virginia
  9:5
visibly
  31:5
  38:4

< W >
Wait
  27:24
  52:4, 8
waited
  62:16
waiting
  47:6,
  15, 17,
  18    48:1
waive
  84:16
waived
  85:14
walk
  40:18
walking
  33:4
  42:8
  43:15
  45:24
  46:8
  54:2
want
  7:19
  11:19
  14:25
  15:9,

17
  16:1
  19:22
  25:13,
  17, 21
  26:8
  28:7
  29:4,
15
  42:24
  45:18
  53:7,
12
  62:15
  64:21
  67:4,
21
  69:24
  71:4
  73:18
  75:25
  78:20
  85:1
wanted
  24:24
  39:24
  41:1
  50:2,
14
  64:25
  83:9
Washingto
n    2:5,
15
watch
  8:2, 5
  37:15
watched
  8:7, 8
  29:5
watching
  29:22
  30:4

32:21
38:15
57:2
64:13
65:23
**way**
11:23
18:23
29:10
31:5
63:20
64:7
73:21
77:18
86:11
**ways**
11:20
77:18
**weapon**
16:17
**weeks**
26:2
**weird**
36:19
**Welch**
49:5, 6,
11
55:5
56:6
57:3
**welcome**
85:5
**Welfare**
4:8
69:18,
21, 23
70:6
71:2
72:7
73:1,
15, 20
78:21
79:2,

19, 20
80:2, 5,
11, 20
82:7,
14, 21
83:6
**well**
11:7,
15
13:4,
16
20:16
25:9
26:6,
12, 23
28:6
30:22
31:19
33:1,
12, 22
34:4
35:19
38:20
39:11
40:21
43:22
50:24
53:9
55:11,
15
59:3
60:9
61:12
62:9,
15
63:12,
19
66:21
74:7
76:13
81:23
82:22

**well-
being**
41:1
69:23
**we're**
18:16
20:6
21:8
25:5
28:4
32:3
35:7
36:8,
11
38:1, 6,
7
40:23
42:17,
22
44:6
45:9,
11
50:20
53:1,
22
54:1
57:2
58:23
60:24
63:25
67:9,
19
68:10,
13
70:23
73:25
75:19
76:10
78:8,
20
83:24
84:2, 20

**West**
9:5
**we've**
21:21
63:13
67:23
70:4
**willing**
28:7
**window**
17:5
**wish**
84:9
**wishing**
84:8
**WITNESS**
1:16
6:18,
24
7:11,
14
10:17
11:4,
17
12:3, 8,
15
13:6
15:4,
11, 17
19:8
20:11,
20
22:17,
22
25:23
26:14
27:23
38:23
42:10
43:24
49:20
52:3
53:12

59:7, 9,
17
60:16
62:11
64:13
66:23
67:2
68:16
69:7
74:9,
10
75:1, 3,
15, 18
80:16
82:1, 5
83:21
84:5,
10, 15,
16

**witnesses**
15:1, 9
21:4, 6
47:20
**woman**
30:12
33:19
35:15
37:8
**work**
26:24
**worked**
9:14
**working**
51:2
**worn**
8:3, 5,
8
45:22
49:11
**worried**
17:8

**worries**
 41:*20*
 43:*18*
 55:*13*
 69:*11*
**write**
 72:*12*
**wrong**
 23:*19*

**< Y >**
**yeah**
 11:*10*
 12:*23*
 20:*8*
 23:*4,*
*18, 19*
 25:*12,*
*16*
 27:*13,*
*18*
 28:*6*
 29:*8,*
*10, 15*
 32:*15*
 37:*17*
 40:*6*
 42:*4, 5,*
*10*
 43:*18*
 53:*22*
 55:*14,*
*20, 24*
 56:*17*
 57:*1, 8*
 60:*10*
 61:*16*
 64:*7, 8*
 65:*1,*
*13*
 67:*18*
 68:*1*
 69:*3,*

*11*
 70:*14*
 73:*18,*
*21*
 74:*22*
 78:*18*
 81:*8*
 83:*10,*
*21*
 84:*19*
**years**
 9:*2, 10*
 16:*8*
**yelling**
 29:*23*

**yesterday**
 25:*22*
**York**
 5:*7*
**younger**
 28:*12*
 30:*1*
 38:*9*
 65:*11*
**Youth**
 70:*1*
 78:*15*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,

     *Plaintiff*,

    v.

DISTRICT OF COLUMBIA,
PATRICK LOFTUS, MARCK JAEGER,
JEREMY BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

     *Defendants.*

1:21-cv-01847-RJL

## DEFENDANT OFFICER CHRISTOPHER TODARO'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Defendant Officer Christopher Todaro (Officer Todaro) submits his opposition to

Plaintiff's Motion for Partial Summary Judgment [47] (Motion).

In his Motion and throughout this litigation, Plaintiff posits that parents cannot harm their

own children and that once even a hint of a parental relationship is recognized, suspicion of a

crime should dissipate. Plaintiff's theory is largely based on the Court's denial of Defendants'

Motion to Dismiss, but that is misguided.[1]

---

[1]    Relying on the Court's February 2, 2023 Memorandum Opinion [31], in which the Court held that "the interview of Fishman's younger daughter, conducted by Officer Brady in which she stated unequivocally that she had not been kidnapped . . . dispelled any remaining reasonable suspicion underlying the stop," Plaintiff argues that the realization of a parental relationship immediately dispels any suspicion of a crime. But, as discussed below, the Court's assessment at the summary judgment stage is under a different standard. Because there are factual issues in dispute, summary judgment is inappropriate and a jury will need to consider (1) the nature of police work; (2) the intricacies of police investigations; and (3) law enforcement training for child-involved crimes. Indeed, according to DOJ's Office of Juvenile Justice and Delinquency Prevention's Law Enforcement Response to Child Abuse Manual, officers investigating crimes against children, should not "rule out the possibility of child abuse with a domestic dispute

In the District of Columbia, kidnapping is a serious felony. *See* D.C. Code § 22-2001. It is a crime for a custodial parent to kidnap a child, and this may occur in cases of intentional concealment from the other parent. D.C. Code § 16-1022. The District of Columbia also recognizes child abuse and neglect, D.C. Code § 4-1301.02, and cruelty to children, D.C. Code § 22-1101. Tragically, in 2021, an estimated 1,820 children died from abuse and neglect nationally, and five children die every day from child abuse.[2] In 2017, in the District of Columbia alone, there were between 64 and 78 *new* victims among children aged 10 to 16.[3]

Here, equipped with training, experience, and basic common sense, officers on scene recognized that the Fishman familial relationship was only one factor in their investigation.[4] The facts in this case support Officer Todaro's continued reasonable suspicion of a crime: kidnapping. In his Motion, Plaintiff omits the testimony of Officers Brady, Welsh, Tong, and Jaeger, Sgt. Bray and Lt. Loftus. Each witness, including Officer Todaro, testified that their reasonable suspicion did not dissipate simply because the alleged kidnapping victim was Plaintiff's daughter. *See* Def.'s Exs. A-F. Applying Plaintiff's theory to criminal investigations would mean that officers would not have to investigate further once a familial relationship has

---

complaint." *See* U.S. Department of Justice Office of Justice Programs, *Law Enforcement Response to Child Abuse*, 8 (2001), https://www.ojp.gov/pdffiles/162425.pdf.

[2]     American Society for the Positive Care of Children, *Child Maltreatment Statistics*, https://americanspcc.org/child-maltreatment-statistics/#:~:text=Highest%20rate%20of%20child%20abuse,younger%20than%203%20years%20old (last visited Dec. 13, 2023).

[3]     Family & Youth Initiative, *Findings from Recent Report on Child Abuse and Neglect*, (Mar. 3, 2023), https://www.dcfyi.org/findings-recent-report-child-abuse-and-neglect#:~:text=In%20DC%20there%20were%20between,were%20for%20neglect%20(85.7%25).

[4]     MPD Officers are trained in the skills necessary for effectively interviewing child victims.

**JA 220**

been established, even if a crime *already* occurred, and officers would not be able to draw

inferences or reach conclusions throughout those investigations.

Plaintiff also contends that Officer Todaro had a legal duty to cease an active and

ongoing investigation under these circumstances. Not so. Plaintiff was a suspect in an ongoing

investigation, and discovery revealed that Officer Todaro remained with Plaintiff to maintain on-

scene safety. The collective knowledge doctrine supports Officer Todaro's well-founded

suspicion and that of his fellow officers, thus precluding an award of summary judgment in

Plaintiff's favor. For these reasons, the Court should deny Plaintiff's motion.

## STANDARD OF REVIEW

Summary judgment should be granted if "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under Rule 56, summary judgment is appropriate if the "pleadings, depositions, answers to

interrogatories, admissions on file, and affidavits show that there is no genuine issue of material

fact." *Cater v. Greenspan*, 304 F.Supp.2d 13, 20 (D.D.C. 2004).

Indeed, "[a] moving party is 'entitled to judgment as a matter of law' against 'a party

who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.'" *Waterhouse v.*

*District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 332 (1986)). "If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50

(1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Id.* at 242, 247–248 (emphasis original).

3

**JA 221**

## ARGUMENT

**I.**  **Officer Todaro Kept Plaintiff—a Fleeing Suspect—in Handcuffs for On-Scene Safety, and Throughout the Entirety of the Investigation Officer Todaro Had Reasonable Suspicion That a Kidnapping Occurred.**

In his Motion, Plaintiff argues that within the first few minutes of arriving on scene, Officer Todaro no longer had reasonable suspicion of a kidnapping and thus had the duty to end the *Terry* stop.  Pl.'s Mot. for Partial Summary Judgment (Pl.'s Mot.) at 3-4 [47-1].  Plaintiff ignores the evidence in this case and the basic investigatory measures law enforcement officers are trained and mandated to perform.[5]

Officer Todaro testified in his deposition that Plaintiff remained in handcuffs because he "tried to flee when we first arrived on scene," and to eliminate the likelihood of further fleeing or fighting, Plaintiff was kept in handcuffs.  Pl.'s Mot. Ex. B at 51:14-19.  Officer Todaro, an officer with MPD for seven years, was trained in police interactions with the community, including complainants, witnesses, and subjects.[6]  He focused his "attention on not only what is being said, but also nonverbal signs as well."[7]  Officers are trained that "making conscious

---

[5]     *See, e.g.*, Metropolitan Police Department General Order 304.01, Operation and Management of Criminal Investigations, 1 ("The initial investigation begins when the first police officer arrives on the scene, and shall continue until all necessary activities have been performed at the crime scene . . ."), https://go.mpdconline.com/GO/GO_304_01.pdf.

[6]     *See generally* Metropolitan Police Academy Curriculum, https://mpdc.dc.gov/page/mpd-academy-curriculum ("MPD recruit officers complete a full program of classroom, scenario, physical, and tactical training to prepare them for the challenges of being a police officer. The subjects covered include laws of arrest, search and seizure, criminal law, traffic regulations, human relations, community policing, and ethics.") (last visited Dec. 13, 2023).

[7]     Metropolitan Police Academy 2.3 Situational Awareness, *2.3.3 Detect the behavioral warning signs of potential flight or assault*, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2.3%20Situational%20Awareness.pdf.

4

## JA 222

observations about a person's body language is crucial in helping to determine whether he or she is contemplating an escape or assault or experience a mental health crisis or trauma."[8]

Plaintiff argues that Officer Todaro gained all the information necessary to dispel any reasonable suspicion. Pl.'s Mot. at 3-9. But Officer Todaro testified that although Plaintiff's spouse's explanation made "sense" it was only "one side of the story" and that officers had to "continue investigating." Pl.'s Mot. Ex. B at 36:21-23. At approximately 23 minutes into his body-worn camera video, Officer Todaro obtained information from Officer Welsh about the status of the investigation, learning that their Sergeant was on the way and would need to speak with the child. *See* Pl.'s Mot. Ex. B. at 23:00. Officer Todaro testified that Sergeant Brady was continuing to conduct his own investigation and that officers were continuing to investigate a kidnapping. Pl.'s Mot. Ex. B at 58:19-25.

The evidence in discovery shows that Officer Todaro had reasonable suspicion of a kidnapping until superior officers arrived on scene and conducted their own investigation. Pl.'s Mot. Ex. B at 21:21-25-22:1-4; 30:7-10; 31:7-10; 35:3-6; 36:3-6; 37:18-21; 58:19-25; 60:21-23. Officer Todaro also testified that officers were gathering information from Plaintiff, and Officer Todaro stood with Plaintiff to make "sure everything [was] safe" and waited "for the investigation to continue." Pl.'s Mot. Ex. B at 42:10-14; 43:8; 44:22-23: 47:8-16.

It was not unreasonable that the officers detained (and remained with) Plaintiff until all facts came to light, and all suspicion of any crime was dispelled. Indeed, the officers in this case, including Officer Todaro, did what they were trained to do. "Upon arrival at the scene of an

---

[8]    *Id*.

intrafamily related call for service, members shall conduct an initial investigation."[9]
"Understanding the warning signs of danger, the potential for flight or assault, and gauging the
seriousness and level of danger in any given situation produces a more prepared officer in on and
off-duty situations."[10]

And although Plaintiff was not ultimately charged with kidnapping, Lieutenant Loftus
directed Officer Welsh to author a report for "check on the welfare of a juvenile."  Def.'s Ex. F
at 74:3-8.  Officers are trained to "complete an Incident Report in response to every call for
service for Check on Welfare" and all reports must contain "related facts and circumstances, the
identities of the person(s) from whom information was obtained, and how the welfare of the
person(s) was verified."[11]  Officers are trained to know that incident reports "are just as critical
as those taken for an offense and must be given the same due diligence and care during a
preliminary investigation."[12].  Officers must not "be lulled into a false sense of security simply
because they have been dispatched to a scene of an incident and not an offense."[13]  Thus, the

---

[9]    Metropolitan Police Academy 9.1 Domestic Violence Offenses, *9.1.7 Describe a
Domestic Violence Investigation*,
https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/9.1%20Domestic%
20Violence%20Offenses.pdf.

[10]   Metropolitan Police Academy 2.3 Situational Awareness, *Introduction*,
https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2.3%20Situational
%20Awareness.pdf.

[11]   Metropolitan Police Academy 8.1 Juvenile Interactions, 8.1.4 *Describe the patrol
officer's role in Child Abuse/Neglect investigations*, Checks on Welfare of Children,
https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/8.1%20Juvenile%2
0Offenses%20-%20IA.pdf.

[12]   Metropolitan Police Academy 3.2 Basic Investigative Incident Reports, *Introduction*,
https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/3.2%20Basic%20In
vestigative%20Incident%20Reports.pdf.

[13]   *Id.*

**JA 224**

officers' duty to further investigate the potential kidnapping did not cease within the first three minutes of the interaction and Officer Todaro's role in this investigation was to maintain on-scene safety by remaining with Plaintiff, who was a fleeing suspect to a suspected kidnapping. Pl.'s Mot. Ex. B at 66:14-18.  In light of the deposition testimony cited above and the other evidence revealed in discovery, it is apparent that there are material facts in dispute, and the Court should deny summary judgment.  *Waterhouse*, 298 F.3d at 992.

## II.    In the Alternative, Officer Todaro Relied on the Knowledge of His Fellow Officers Who Had a Well-Founded Reasonable Suspicion of a Possible Kidnapping.

Even if the Court finds that Officer Todaro's reasonable suspicion ceased at any point during Plaintiff's stop, the Court should find that Officer Todaro reasonably relied on the well-founded reasonable suspicion of fellow officers, and thus Plaintiff's detention was based on the collective knowledge of Officer Todaro's fellow officers.  *See, e.g.*, *United States v. Robinson*, 2021 WL 2778556, at *3 (D.D.C. July 1, 2021) ("Probable cause may be based on the 'collective knowledge of the police'" and does not require one officer to individually have firsthand knowledge of all the facts amounting to the probable cause) (citing *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016)).  Members of the Court have acknowledged the vertical collective knowledge doctrine.  For example, in *United States v. Gorham*, 317 F. Supp. 459, 472 (D.D.C. 2018), Judge Randolph Moss reasoned that under the doctrine, "law enforcement efficiency and responsiveness is increased, and individual officers are allowed to rely on the implicit representation from their colleagues that sufficient grounds exist for [a] search and seizure." (internal citations omitted).  Judge Moss declined to embrace the horizontal collective knowledge doctrine because it may permit circumstances "in which no actual communication or direction occurs between the officer conducting the search or seizure and the officer in

**JA 225**

possession of the information giving rise to the required reasonable suspicion and where the relevant facts are merely aggregated after the fact." *Id*. at 473.

Here, unlike *Gorham*, the circumstances fall under the well-accepted vertical collective knowledge doctrine. Officer Todaro had actual communication with and direction from officers "in possession of the information giving rise to the required reasonable suspicion" as shown in his body-worn camera and confirmed by deposition testimony. *See generally* Pl.'s Mot. Exs. A-B; *see also* Def.'s Exs. A-F. As Officer Todaro approached Plaintiff's house, he knew that a witness saw an adult male, with a particular description, placing a small child into a green Audi SUV. Pl.'s Mot. Ex. B at 22:15-20. The license plate was seen by the witness, verified in the Metropolitan Police Department's (MPD) system, and the registered owner's address was located on O Street in Georgetown. Pl.'s Mot. Ex. B. at 22:21-24. Officer Todaro saw the "exact vehicle in question that the suspect was driving and saw [his] other colleague, Officer Jaeger, speaking to an adult male" at the scene. *Id*. Officer Todaro described a hysterical and upset child. Pl.'s Mot. Ex. B at 24:22-25. Officer Todaro separated the parties so that officers could conduct their investigation. *Id.* Officer Welsh communicated information regarding the status of the officers' supervisors, Sergeant Bray, and the steps he would take upon arrival. Pl.'s Mot. Ex. A. at 23:25.

It would have been wholly inappropriate and contrary to Officer Todaro's duties and training as an officer, to unilaterally release Plaintiff from handcuffs during an ongoing investigation, when the officers on scene had reasonable suspicion of a possible kidnapping throughout the entirety of their on-scene investigation. As a result, because a jury will need to resolve questions of fact, Plaintiff's motion for partial summary judgment should be denied.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for partial summary judgment as to Officer Christopher Todaro.

Date: December 13, 2023                    Respectfully submitted,

                                           BRIAN L. SCHWALB
                                           Attorney General for the District of Columbia

                                           STEPHANIE E. LITOS
                                           Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Chad Copeland*
                                           CHAD COPELAND [982119]
                                           Assistant Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Fernando Amarillas*
                                           FERNANDO AMARILLAS [974858]
                                           Assistant Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Martha J. Mullen*
                                           MARTHA J. MULLEN [419036]
                                           Senior Assistant Attorney General
                                           AMANDA L. TORRES [1562702]
                                           Assistant Attorney General
                                           400 Sixth Street, NW
                                           Washington, D.C. 20001
                                           202-724-6612
                                           202-735-7390
                                           martha.mullen@dc.gov
                                           amanda.torres@dc.gov

                                           *Counsel for Defendant Officer Christopher Todaro*

9

**JA 227**

## CERTIFICATE OF SERVICE

This certifies that on December 13, 2023, Defendant Officer Christopher Todaro's

Opposition to Plaintiff's Motion for Partial Summary Judgment was filed using *CM/ECF*, which

will send electronic notice to all counsel of record.

> */s/ Amanda L. Torres*
> AMANDA L. TORRES
> Assistant Attorney General

**JA 228**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JARED FISHMAN,

       *Plaintiff*,

   v.

DISTRICT OF COLUMBIA,
PATRICK LOFTUS, MARCK JAEGER,
JEREMY BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

       *Defendants.*

1:21-cv-01847-RJL

**DEFENDANT OFFICER CHRISTOPHER TODARO'S RESPONSE**
**TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

    Defendant Officer Christopher Todaro (Officer Todaro) responds to Plaintiff's Statement

of Undisputed Material Facts.

1. On February 17, 2020, Officer Christopher Todaro of the Metropolitan Police Department (MPD) was dispatched to the home of Plaintiff Jared Fishman to investigate the kidnapping of a young girl. (Exhibit A, Unredacted Body-Worn Camera Footage of Officer Christopher Todaro, at 4:18–4:23.)

   **RESPONSE**:  It is undisputed that Officer Christopher Todaro learned the location of a

   suspect to a kidnapping of a child and responded to Plaintiff's home after Plaintiff's

   registered Audi was traced to Plaintiff's home on O Street N.W.  Todaro Tr. 22:17-20.

2. As Officer Todaro approached the home, he believed he had reasonable suspicion to believe a kidnapping had occurred because he had been told that a 9-1-1 caller had described a man matching Fishman's description throwing a small child into a car registered to Fishman's address. (Exhibit B, Transcript of Deposition of Officer Christopher Todaro, at 22/1–23/3.)

   **RESPONSE**:  This fact is undisputed.

3. The alleged kidnapping was the only crime that Officer Todaro was investigating at Fishman's home. (Id. at 21/21-25.)

**RESPONSE**:  This is disputed.  Officer Todaro was present to investigate any crime, including the alleged kidnapping, and he had reasonable suspicion of a kidnapping until the investigation concluded.  Def.'s Opp'n at 5-8.

4.  Todaro was the second MPD officer to arrive at the scene. (Ex. A at 3:29-3:33)

**RESPONSE**:  This fact is undisputed, but it is immaterial whether Officer Todaro was the second officer to arrive on scene because the assertions of this paragraph cannot "affect the outcome of [this] suit under the governing law and, thus, "do not affect the summary judgment determination." *Lindell v. Landis Construction Co.*, 714 F. Supp. 2d 103, 105 (D.D.C. 2010) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).

5.  Seconds into his arrival, Todaro helped another officer grab Fishman and place him in handcuffs. (Id. at 3:32-3:44.).

**RESPONSE**:  It is undisputed that Officer Todaro assisted Officer Jaeger detain Plaintiff, who was a fleeing kidnapping suspect. Def.'s Opp'n at 4.

6.  Moments later, a group of MPD officers walked Fishman to the corner of his street. (*Id.* at 7:50-8:03.)

**RESPONSE**:  It is undisputed that after Plaintiff was detained and separated from any possible victims, which is common police practice in scene management, officers walked Fishman to the corner of his street.  Pl.'s Mot. Ex. B at 15:17-23.

7.  Todaro remained on the front steps and spoke with Fishman's wife, Fiona, and two daughters, Arabella and Juliet, all of whom had witnessed Fishman being handcuffed. (Ex. A at 3:53.)

**RESPONSE**:  It is undisputed that Officer Todaro briefly spoke with Plaintiff's wife, but the assertion in this paragraph is not material.  *Lindell*, 714 F. Supp. 2d at 105.

8. Fishman's younger daughter, Juliet, pleaded with Todaro and his colleagues to not arrest Fishman. (Id. at 3:53–4:06)

   **RESPONSE**:  It is undisputed that Officer Todaro and others detained Plaintiff and that Juliet cried when officers detained Plaintiff.  It is disputed whether Juliet understood, comprehended, or recognized that officers were detaining her father.  *See generally* Pl.'s Mot. Ex. A.  This fact is immaterial to whether she had been harmed.

9. Todaro asked all three people to move away from the house's front stairs, where Fishman sat handcuffed, and to "come back in the house." (*Id.*)

   **RESPONSE**:  It is undisputed that Officer Todaro asked all potential victims to move away from the house to separate all parties and allow officers to conduct their investigation.  Pl.'s Mot. Ex. B at 24:22-25.

10. All three complied; Juliet sat on the floor, crying and pleading with officers, "please don't arrest him, please—he hasn't done anything wrong," (*id.* at 4:08), before Fiona picked her up and consoled her. (*Id.* at 4:12).

    **RESPONSE**:  This fact is undisputed.

11. At this point, less than two minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro believed that Fiona was Juliet's mother. (Ex. B at 30/11-18.)

    **RESPONSE**:  It is undisputed that Officer Todaro had information that Fiona was Juliet's mother.  That fact standing alone, did not mean the investigation was concluded.  Indeed, Officer Todaro was duty bound to fully investigate.  Def.'s Opp'n at 6.

12. Fishman's elder daughter, Arabella, then said "He did not take my sister. My sister was misbehaving, so he brought her into the car." (Ex. A at 4:18.)

    **RESPONSE**:  This fact is undisputed.

13. Todaro then told Arabella: "We got a call that there was a male who picked up a child, put her over his shoulder, and took her into the car—abducted her. Of course we take that very seriously." (Id. at 4:25.)

    **RESPONSE**:  This fact is undisputed, but the assertion in this paragraph is not material.

*Lindell*, 714 F. Supp. 2d at 105.

14. When Todaro finished speaking, Fiona took Juliet into the house and said, to Todaro, "please don't leave, stay right there." (Id. at 4:30.)

**RESPONSE**:  This fact is undisputed, but the assertion in this paragraph is not material.

*Lindell*, 714 F. Supp. 2d at 105.

15. Todaro then asked Arabella whether she had been with Fishman and Juliet the whole time. (*Id.* at 4:33.) In response, Arabella said, "I was in the car in the front seat. My sister was misbehaving, and she wouldn't get into the car and come home. We didn't want her to get taken or anything, and she was not listening, so my dad had to put her over his shoulder and bring her into the car. He did nothing wrong." (*Id.* at 4:35.)

**RESPONSE**:  This is disputed to the extent Plaintiff's assertion attempts to support his

argument that reasonable suspicion was dispelled during the interaction.  Def.'s Opp'n at

1.

16. At this point in the investigation, less than two minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro did not believe he had any reason to think the girls were lying, and he believed that their explanation of the events was consistent with the allegations of the 9-1-1 caller. (Ex. B at 33/14-17.)

**RESPONSE**:  This is disputed to the extent Plaintiff's assertion attempts to support his

argument that reasonable suspicion was dispelled during the interaction.  Def.'s Opp'n at

1.  Officer Todaro and other officers had to continue their investigation, and the

statements of the children were but one factor in the investigation.  Pl.'s Mot. Ex. B at

36:21-23.

17. At this point, less than three minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro believed that Fishman was the "father" of both girls. (Id. at 37/5-6)

**RESPONSE**:  This is disputed to the extent Plaintiff's assertion attempts to support his

argument that reasonable suspicion was dispelled during the interaction.  Def.'s Opp'n

at 1.  Although Officer Todaro believed that Plaintiff was the girls' father, the

investigation had not concluded. *Id*. at 6-8.

18. Todaro remained on the front steps while Fishman's wife, Fiona, consoled a still-crying Juliet in the doorway. (Ex. A at 5:20.) "You know what happened, sweetie?" said Fiona. "Somebody misunderstood. Somebody saw Daddy pick you up and they didn't know he was Daddy. They didn't know he was Daddy, so they thought, 'maybe this is just, like, a man who's taking a child.'" (Id. at 5:39.)

   **RESPONSE**:  This fact is undisputed, but the assertion in this paragraph is not material.

   *Lindell*, 714 F. Supp. 2d at 105.

19. At this, Juliet screamed "No!" Fiona then turned and pointed towards Todaro. "But these officers know," she reassured Juliet. "They know the situation. They know the situation, and everything is ok. Somebody misunderstood." (Id. at 5:40.)

   **RESPONSE**:  This fact is undisputed but the assertion in this paragraph is not material.

   *Lindell*, 714 F. Supp. 2d at 105.

20. At this point in the investigation, less than three minutes after Fishman was grabbed by Todaro and placed into handcuffs, Todaro "definitely kn[ew]" that Fishman was Juliet's father. Ex. B at 38/23–24.

   **RESPONSE**:  This is disputed to the extent Plaintiff's assertion attempts to support his

   argument that reasonable suspicion was dispelled during the interaction.  Def.'s Opp'n at

   1. Regardless of whether Officer Todaro believed Plaintiff to be the child's father,

   officers were still conducting their investigation. Def's Opp'n at 5-8.

21. After speaking with Fiona, Juliet, and Arabella, Todaro remained on the steps of the house for roughly one minute. (Ex. A at 5:47-6:46.) He then left the house, moved an MPD cruiser that was parked in the middle of the street, and walked to the corner where Fishman was being held. (*Id.* at 6:46-7:42.) Roughly four minutes had passed since Todaro's exchange with Arabella. (*Id.*)

   **RESPONSE**:  This fact is undisputed, but the assertion in this paragraph is not material.

   *Lindell*, 714 F. Supp. 2d at 105.

22. Todaro stood on the corner and watched as Fishman spoke with another MPD officer. During this exchange, Fishman shared the names and dates of birth of his wife and daughters. (Id. at 8:32-10:45.)

5

**RESPONSE**:  This is disputed.  Plaintiff was uncooperative during the investigation and officers took the investigation seriously, while Plaintiff did not.  Todaro Tr. 58:19-25.

23. During this time, Todaro watched as Fishman asked those officers to remove his handcuffs and the officers declined. (Id. at 10: 50).

   **RESPONSE**:  This fact is undisputed.

24. Two of the three officers that had been detaining Fishman then left the corner, and Todaro stayed behind near Fishman. (Id. at 11:00).

   **RESPONSE**:  This fact is undisputed.

25. Todaro and a colleague then stood next to a handcuffed Fishman in near total silence for almost eight minutes. (Id. at 11:00-18:34.) Todaro briefly broke this silence to thank Fishman for his "patience" and to tell him that an MPD sergeant was on his way to the scene. (Id. at 18:34.)

   **RESPONSE**:  This fact is undisputed.

26. Todaro believed that he was "waiting for" a "supervisor to come and conduct their investigation themselves to give us some guidance on what's going on." (Ex. B at 47-48/22-4.) Todaro was aware that the approval of a supervisor is not required to release someone from a *Terry* stop. (*Id.* at 11/17.).

   **RESPONSE**:  This is disputed to the extent Plaintiff is asserting that reasonable

   suspicion had dispelled, and the investigation had concluded.  Def.'s Opp'n at 1.

   Officer Todaro and other officers were waiting for their superior, Sgt. Bray, to arrive to

   the scene.  Officers had to wait for the completion of a superior officer's investigation

   before Plaintiff was free to leave and any assertion to the contrary is disputed.  *Id*. at 5.

27. After roughly five more minutes of Fishman standing next to Todaro, handcuffed and in silence on the corner of his street, Todaro asked a colleague about the location of the sergeant. (Ex. A at 23:16.) Around two minutes after that, the sergeant, Adam Bray, appeared. (*Id.* at 25:05.)

   **RESPONSE**:  This fact is not in dispute.  The timing of Officer Todaro's questions

   posed to fellow officers is immaterial to the outcome of the case.  *Lindell*, 714 F. Supp. 2d

at 105.

28. As Todaro watched, Sergeant Bray told Fishman that the only thing that officers needed to confirm before Fishman could be uncuffed was that "the child [meaning Juliet] is OK, and is yours." (*Id.* at 27:25.) Bray continued, "I see you standing there in your socks, I understand that you were sitting on your own steps, and I want this all to be worked out as quick as we can." (*Id.*)

   **RESPONSE**: This fact is not in dispute.

29. Todaro already knew that Fishman was the girl's father (Ex. B at 37/5– 6, 38/23–24) and had already seen the girl and determined that she "seemed in good health" and was fine apart from the distress of seeing her father arrested in front of her. *Id*. at 65/8–14. However, he did not tell Sergeant Bray either of these things. Ex. A at 27:25–28:37.

   **RESPONSE**: This is disputed to the extent Plaintiff is asserting that reasonable

   suspicion had dispelled and the investigation had concluded.  Def.'s Opp'n at 1.

   Officers had to wait for the completion of a superior officer's investigation before Plaintiff was free to leave and any assertion to the contrary is disputed.  *Id*. at 5.

30. One minute later, after a brief exchange between Bray and Fishman that uncovered no new information about this mistaken kidnapping, Bray instructed the officers to uncuff Fishman and Fishman walked back to his house. (*Id.* at 28:37.)

   **RESPONSE**: It is disputed that Sgt. Bray did not learn new information for the first time

   on the scene.  He learned several facts, including Plaintiff's position at U.S. Department

   of Justice. *See* Pl.'s Mot. Ex. A; *see also* Def's Mot. Ex. E at 77:4-10.

31. After he was uncuffed, Fishman walked back to his house, followed by Todaro and other officers, and sat on his front stoop with his wife. *Id*. at 28:38-29:41.

   **RESPONSE**: This fact is undisputed, but the assertion in this paragraph is not material.

   *Lindell*, 714 F. Supp. 2d at 105.

32. The officers then explained to the couple what had initiated the call, answered some questions, and left. *Id*. at 29:41-32:46.

   **RESPONSE**: It is undisputed that officers and supervisors remained on the scene to

   calmly explain all the facts that led to Plaintiff's detention.

7

**JA 235**

33. At all points during Fishman's detention, the only crime Todaro was investigating and believed he had reasonable suspicion of was a potential kidnapping. (Ex. B at 31/7–10, 35/3–6, 36/3–6, 37/18–21, 60/21–23)

**RESPONSE**:  This is disputed.  Officer Todaro was present to investigate any crime, including the alleged kidnapping, and he had reasonable suspicion of a kidnapping until the investigation concluded.  Def.'s Opp'n at 5-8.

34. Fishman was detained and in handcuffs for approximately 25 minutes. Ex. A at 3:32-28:38.

**RESPONSE**:  This fact is undisputed.

Date: December 13, 2023                    Respectfully submitted,

                                           BRIAN L. SCHWALB
                                           Attorney General for the District of Columbia

                                           STEPHANIE E. LITOS
                                           Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Chad Copeland*
                                           CHAD COPELAND [982119]
                                           Assistant Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Fernando Amarillas*
                                           FERNANDO AMARILLAS [974858]
                                           Assistant Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Martha J. Mullen*
                                           MARTHA J. MULLEN [419036]
                                           Senior Assistant Attorney General
                                           AMANDA L. TORRES [1562702]
                                           Assistant Attorney General
                                           400 Sixth Street, NW
                                           Washington, D.C. 20001
                                           202-724-6612
                                           202-735-7390
                                           martha.mullen@dc.gov
                                           amanda.torres@dc.gov

                                           *Counsel for Defendant Officer Christopher Todaro*

**Exhibit A**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**

```
 1                 UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3  _____

 4  JARED FISHMAN,

 5          Plaintiff,

 6      v.                          Case No:

 7  DISTRICT OF COLUMBIA,           1:21-cv-01847-RJL

 8  PATRICK LOFTUS, MARCK JAEGER,

 9  JEREMY BRADY, MICHAEL TONG, &

10  CHRISTOPHER TODARO,

11          Defendants.

12  _____

13                 VIDEOTAPED DEPOSITION

14  _____

15

16  WITNESS:          MICHAEL TONG

17  DATE:             Wednesday, August 16, 2023

18  START TIME:       11:31 a.m., ET

19  END TIME:         2:33 p.m., ET

20  REMOTE LOCATION:  Remote Legal platform

21  REPORTER:         Shenay Crawford, CDR-1966

22  JOB NO.:          18111

23

24

25
```

```
1                    CERTIFICATE OF REPORTER

2

3            I, Shenay Crawford, hereby certify:

4            That the foregoing proceedings were taken

5    before me at the time and place therein set forth;

6            That the proceedings were recorded by me and

7    thereafter formatted into a full, true, and correct

8    transcript of same;

9            I further certify that I am neither counsel

10   for nor related to any parties to said action, nor in

11   any way interested in the outcome thereof.

12

13           DATED, this 1st day of September 2023.

14

15

16           _____

17           Shenay Crawford, CDR-1966

18           Court Reporter

19

20

21

22

23

24

25
```

1      Q    Yeah.  So at this moment, when I stopped the

2    video at minute 5 and second 26, when you arrived at the

3    front door of Mr. Fishman's house, what crimes, if any,

4    did you believe you had reasonable suspicion of at that

5    moment?

6      A    So at that moment, Officer -- it should be --

7    it's helpful to -- to note that Officer Jaeger went over

8    the air prior to that, and this is captured on body-worn

9    camera, as well, that he had the vehicle and the suspect

10   did match the lookout from the suspected kidnapping.

11     Q    So you had reasonable suspicion of kidnapping

12   at that point?

13     A    So that -- correct.  That -- that is the crime

14   at hand -- suspected kidnapping of juvenile, and Mr.

15   Jared Fishman was the, in this case, apparent suspect in

16   that -- in that crime.

17     Q    So just -- so just apply -- clarify your

18   earlier answer where you said primarily.

19         I think the correct testimony -- and please

20   correct me if this is not right, is that the crime of --

21   kidnapping was the exclusive crime that you were

22   investigating at that point?

23     A    I don't know.  I don't understand the question

24   that it was the only crime being investigated.  The call

25   for service was for a suspected kidnapping of juvenile

1    go back.

2              Where is the notebook now?

3      A    The -- the notebook is preserved.  It's --

4    it's not going anywhere.

5      Q    Do you know where it is?

6      A    Yes, I do know where it is.

7              MR. GERSTEIN:  Okay.  Okay.  I am going

8    to play the tape for, I believe, about one minute.

9      (Video playback.)

10             MR. GERSTEIN:  Let me just play a little

11   bit more, excuse me.  Okay.  I've stopped at minute 11,

12   second 10.

13   BY MR. GERSTEIN:

14     Q    Mr. Fishman has just explained what happened

15   that morning in response to your question, "What

16   happened in the last hour or so."

17             At this point, what crimes, if any, did you

18   believe you had reasonable suspicion of?

19     A    Again, Mr. Fishman is still being investigated

20   for the suspected kidnapping of juvenile.

21     Q    And you believed at this point that you had

22   reasonable suspicion of suspected kidnapping of

23   juvenile?

24     A    Yes.  Even though Jared Fishman provided his

25   account, we're still investigating it and had not

1   conferred with any other officer

2       Q    At that point, whose kids do you think those

3   two children in the doorway were?

4       A    At that point?  I don't know.

5       Q    You did not think they were Jared Fishman's

6   kids?

7       A    I have no idea to -- so I couldn't -- could

8   not -- could not confirm or deny whether they were --

9   those were his kids.

10      Q    It's your testimony today that you had no idea

11  whose children those were?

12      A    Correct.  I had no idea who -- whose kids they

13  were.  I cannot confirm or deny whether they were his

14  kids or not, based on this point in time in the video.

15           MR. GERSTEIN:  I am going to play a

16  little less than two more minutes.  Although -- just so

17  we can save time, so I don't have to go back.  Let's --

18  it's 12:35.

19           Just for everyone's information, we

20  probably don't have very much to go.  So unless anyone's

21  particularly hungry, I was hoping we could just power

22  through what otherwise probably would be a lunch break.

23  But I'm perfectly happy to take a lunch break, if you'd

24  prefer -- if either Counsel or Officer Tong would

25  prefer.

**Exhibit B**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**

```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLUMBIA

 3   _____

 4   JARED FISHMAN,

 5           Plaintiff,

 6       v.                          Case No:

 7   DISTRICT OF COLUMBIA,           1:21-cv-01847-RJL

 8   PATRICK LOFTUS, MARCK JAEGER,

 9   JEREMY BRADY, MICHAEL TONG, &

10   CHRISTOPHER TODARO,

11           Defendants.

12   _____

13                  VIDEOTAPED DEPOSITION

14   _____

15

16   WITNESS:            JEREMY BRADY

17   DATE:               Thursday, August 17th, 2023

18   START TIME:         12:05 p.m., ET

19   END TIME:           2:55 p.m., ET

20   REMOTE LOCATION:    Remote Legal platform

21   REPORTER:           Shenay Crawford, CDR-1966

22   JOB NO.:            18141

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Shenay Crawford, hereby certify:

 4            That the foregoing proceedings were taken

 5   before me at the time and place therein set forth;

 6            That the proceedings were recorded by me and

 7   thereafter formatted into a full, true, and correct

 8   transcript of same;

 9            I further certify that I am neither counsel

10   for nor related to any parties to said action, nor in

11   any way interested in the outcome thereof.

12

13            DATED, this 5th day of September, 2023.

14

15

16            _____

17            Shenay Crawford, CER-1966

18            Certified Electronic Reporter

19

20

21

22

23

24

25
```

1  allegations, he has to be kept in cuffs at that point?

2      A    Because of the allegations and also he did try

3  to flee from the officers when they tried to stop him.

4      Q    Okay.  But you don't say that in the videos?

5      A    I don't say that in the videos, and there was

6  no reason for me to make more of an accusation, it'd

7  seem, to his wife at the moment.  See, we're starting to

8  -- to be able to communicate.

9      Q    Right.  Okay.  At this point, you still -- do

10  you still have reasonable suspicion for both kidnapping

11  and child abuse?

12      A    Yes.

13      Q    All right.  And at this point, do you believe

14  that she is the children's mother and he is their

15  father?

16      A    Yes.

17      Q    Okay.  And that they're both the biological

18  parents?

19      A    They're both the likely custodial parents.

20  Yes.

21      Q    Okay.  Great.  Okay.  And in your view, when

22  can he be taken out of the handcuffs?

23      A    Once we have determined that no crime has

24  occurred and there's no risk of somebody getting harmed

25  or -- or a flight.  Until that's happened.

**Exhibit C**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**

```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3   _____

 4   JARED FISHMAN,

 5           Plaintiff,

 6      v.                              Case No:

 7   DISTRICT OF COLUMBIA,             1:21-cv-01847-RJL

 8   PATRICK LOFTUS, MARCK JAEGER,

 9   JEREMY BRADY, MICHAEL TONG, &

10   CHRISTOPHER TODARO,

11           Defendants.

12   _____

13                VIDEOTAPED DEPOSITION

14   _____

15

16   WITNESS:           MARCK JAEGER

17   DATE:              Monday, August 28th, 2023

18   START TIME:        1:44 p.m., ET

19   END TIME:          4:21 p.m., ET

20   REMOTE LOCATION:   Remote Legal platform

21   REPORTER:          Shenay Crawford, CDR-1966

22   JOB NO.:           18135

23

24

25
```

```
 1                CERTIFICATE OF REPORTER

 2

 3           I, Shenay Crawford, hereby certify:

 4           That the foregoing proceedings were taken

 5     before me at the time and place therein set forth;

 6           That the proceedings were recorded by me and

 7     thereafter formatted into a full, true, and correct

 8     transcript of same;

 9           I further certify that I am neither counsel

10     for nor related to any parties to said action, nor in

11     any way interested in the outcome thereof.

12

13           DATED this 13th day of September, 2023.

14

15

16           _____

17           Shenay Crawford, CDR-1966

18           Court Reporter

19

20

21

22

23

24

25
```

1    where they go over general orders and standard practices

2    for calls.

3         Q    Thank you.  And on February 17th, 2020, what

4    crime did you have reasonable suspicion to believe had

5    occurred as it related to Mr. Fishman?

6         A    We received -- received the call for

7    kidnapping.

8         Q    Right.  Thank you.  So the crime that you were

9    investigating was -- what kind of crimes were you

10   investigating on that day?

11        A    The radio sign was for kidnapping; so we're

12   investigating a kidnapping.

13        Q    Thank you.  Right.  And on February 17th,

14   2020, what experience had you had with kidnapping cases?

15        A    I'd been assigned to a -- the Georgetown area

16   at that point for a few -- for a few years, at that

17   point.  It's not a frequent call I would say, but it --

18   it happens more frequently than, I guess, someone would

19   like to think.

20        Q    So you had had experience with kidnapping

21   calls at that point?

22        A    Yes.

23        Q    Can you tell me about those experiences?

24        A    I had a person try to kidnap a little girl;

25   she was able to fight them off.  And we interviewed her,

1            MS. MULLEN:  Well, the first question

2    should be, did you hear what the older girl is saying?

3    BY MS. GERRICK:

4        Q    Can you describe what you hear, what the older

5    girl is saying at this point?

6        A    At the time when -- during this -- all I heard

7    was kind of yelling.  I couldn't say.

8        Q    Okay.  You didn't hear anything that she said?

9        A    Yeah.  If you replay the video, I'll tell you

10    exactly what she says, but.

11        Q    But at the time you didn't hear her say

12    anything?

13        A    I heard -- I heard yelling.

14        Q    Great.  And did you, at this point, have any

15    belief as to what the girls -- why the girls were

16    yelling?

17        A    No.

18        Q    Okay.  Thank you.  And at this point, what

19    relation did you think that the girls had to the man, if

20    any?

21        A    At this point, I wasn't sure.

22        Q    Thank you.  And at this point, what crime or

23    crimes did you have reasonable suspicion of?

24        A    We were still investigating a kidnapping.  And

25    if nothing else, this -- there's a lot of yelling.

1    There's -- there's people there.  We knew it would lead

2    to a family disturbance, possible domestic violence

3    situation going on.  We still have other officers that

4    are interviewing -- the actual callers at this time.  So

5    it -- so there's a lot going on.

6        Q    Can you say more about the domestic violence,

7    what would -- what gave you reasonable suspicion of

8    domestic violence, if anything?

9        A    Well, even if it is a possible parental

10   kidnapping, there's -- there's -- there's a lot of

11   evidence that abusers will lie for their -- people who

12   are abused will lie to keep their abusers out of

13   trouble.  So we still need to -- we're still doing an

14   investigation at this point.

15       Q    Okay.  And so did you have reasonable

16   suspicion of kidnapping and another crime or just of

17   kidnapping at this point?

18              MS. MULLEN:  Well, objection.

19              Asked and answered.

20              MS. GERRICK:  I'm not sure what you --

21              THE WITNESS:  I mean, at this point,

22   we're investigating multiple things.

23   BY MS. GERRICK:

24       Q    Okay.  And that would include domestic

25   violence and child abuse in addition to kidnapping?

**Exhibit D**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3   _____

 4   JARED FISHMAN,

 5        Plaintiff,

 6     v.                           Case No:

 7   DISTRICT OF COLUMBIA,          1:21-cv-01847-RJL

 8   PATRICK LOFTUS, MARCK

 9   JAEGER, JEREMY BRADY,

10   MICHAEL TONG,

11   & CHRISTOPHER TODARO,

12        Defendants.

13   _____

14              VIDEOTAPED DEPOSITION

15   _____

16

17   WITNESS:          JABARI WELCH

18   DATE:             Wednesday, September 20, 2023

19   START TIME:       10:07 a.m., ET

20   END TIME:         2:14 p.m., ET

21   REMOTE LOCATION:  Remote Legal platform

22   REPORTER:         Kimberly Costanza, CDR-1835

23   JOB NO.:          19548

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, Kimberly Costanza, hereby certify:

 4              That the foregoing proceedings were taken

 5    before me at the time and place therein set forth;

 6              That the proceedings were recorded by me and

 7    thereafter formatted into a full, true, and correct

 8    transcript of same;

 9              I further certify that I am neither counsel

10    for nor related to any parties to said action, nor in

11    any way interested in the outcome thereof.

12

13              DATED, this 10th day of September, 2023.

14

15

16              _____

17              Kimberly Costanza, CDR-1835

18              Court Reporter

19

20

21

22

23

24

25
```

1   order.

2        Q    Okay.  I have one more question about Terry

3   stops and reasonable suspicion.  We've talked about

4   these principles, sort of, generally.  At any point on

5   February 17th, 2020, what crime or crimes did you have

6   reasonable suspicion to believe had occurred?  So in

7   other words, you know, for the -- for the entirety of

8   the -- of the incident, what are -- could you -- could

9   you list the crime or crimes that you believed you had

10  reasonable suspicion of?

11       A    A kidnapping of a juvenile.

12       Q    Okay.  A kidnapping, that's the -- that's the

13  list for the -- for the entirety of the incident?

14       A    That was -- the call for service was a

15  kidnapping.

16       Q    Okay.  Thank you.

17            MR. ROSEN:  I would like to introduce

18  Exhibit A.  Let's see if I can do this properly.  Okay.

19  Can everyone see the exhibit I just shared?

20            MS. TORRES:  Yes.

21            THE WITNESS:  Yes.

22            MR. ROSEN:  Okay.  Great.

23            If this could be marked as Exhibit A,

24  please?

25            THE REPORTER:  Okay.  Exhibit has been

```
 1                    MR. ROSEN:  Okay.  So I am going to go

 2    back.  I believe we were at 00:08:42.  Can everyone now

 3    see the same exhibit?  Okay.  Great.  I'm going to keep

 4    playing.  We're at 00:08:42.

 5         (Video played.)

 6    BY MR. ROSEN:

 7         Q    Sergeant Welch, at this point, having just had

 8    this exchange with Officer Tong, what crime or crimes do

 9    you have reasonable suspicion of?

10         A    The crime that we -- that we responded to or

11    with the information that was provided?

12         Q    I guess I mean, at this point, Mr. Fishman is

13    still stopped.  He's in -- he's in handcuffs.  You and

14    your colleagues are conducting a Terry stop.  What is

15    the crime or crime that you have reasonable suspicion of

16    that justifies the continuation of this stop at this

17    moment?

18         A    So we were still actively investigating.  And

19    now we also know that we have a domestic situation here.

20    And here in the District, we take domestics very

21    seriously.  So we were still actively investigating.

22         Q    And can you say what you mean by a domestic

23    situation?

24         A    So -- or an intra-family -- an intra-family

25    incident or offense.  This would be considered an intra-
```

1  family offense, where you have family members that are

2  related to each other.  So we were still actively

3  investigating, as we typically do with intra-family

4  offenses.

5      Q    Okay.  That's helpful.  Thank you.  What --

6  what is the -- what is the possible intra-family offense

7  --

8      A    Yes.

9      Q    -- that you're investigating?

10     A    Right.  Well, this is intra-family, so we were

11  still investigating a kidnapping.  But just -- just

12  because -- we were -- we were still investigating a

13  kidnapping that was reported to us.

14          Mr. Fishman, he advised the events that

15  occurred.  I mean, we were just still actively

16  investigating.  We were able to ascertain what happened

17  from him.  Officer Brady was interviewing -- or was

18  speaking to the -- the mom, but we were still actively

19  investigating at this time.

20     Q    So your -- is it fair to say that your

21  characterization of this as intra-family means that

22  everyone who's possibly involved in the offense is in

23  the same family?  Everyone is part of one family?

24     A    I wouldn't say a part of one family, but if

25  they are related, as -- as Mr. Fishman advised, we have

**Exhibit E**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3  _____

 4  JARED FISHMAN,

 5          Plaintiff,

 6      v.                          Case No:

 7  DISTRICT OF COLUMBIA, PATRICK      1:21-cv-01847-RJL

 8  LOFTUS, MARCK JAEGER, JEREMY

 9  BRADY, MICHAEL TONG, &

10  CHRISTOPHER TODARO,

11          Defendants.

12  _____

13              VIDEOTAPED DEPOSITION

14  _____

15

16  WITNESS:          SERGEANT ADAM BRAY

17  DATE:             Thursday, September 7th, 2023

18  START TIME:       10:00 a.m., EST

19  END TIME:         1:35 p.m., EST

20  REMOTE LOCATION:  Remote Legal platform

21  REPORTER:         Evie Heffner, CER-2084

22  JOB NO.:          19224

23

24

25
```

1        (Video playback.)

2    BY MR. ROSEN:

3        Q    Okay.  So can you, Sergeant, just start by

4    identifying the person you're speaking with here?

5        A    That sounds like Officer Jaeger.  That sounds

6    like his voice.

7        Q    Okay.  And I realize there's some sort of --

8    kind of crosstalk with the radio here in what I just

9    played.

10            But Officer Jaeger is sort of essentially, I

11   believe, recounting to you the -- sort of part of the

12   initial encounter that he had with Mr. Fishman on Mr.

13   Fishman's front steps; does that -- does that sound

14   accurate to you?

15       A    Yes.  Yes.

16       Q    Okay.  And at this point, what crime or crimes

17   do you have reasonable suspicion of?

18       A    The same.  There's -- nothing has changed.

19       Q    Okay.  Great.  Okay.

20            MR. ROSEN:  I'm going to keep playing.

21       (Video playback.)

22   BY MR. ROSEN:

23       Q    Okay.  So I hear you ask Officer Jaeger,

24   "What's the issue?"  Can you explain just what you

25   meant, specifically by that question?

1        A    That he said that there's -- I -- the -- I --

2    when he's talking about, he had to step back and people

3    are mad, who's mad; why -- why is someone mad?

4        Q    Okay.

5        A    Is it -- is it the -- the -- the suspect who's

6    upset?  Is it the victim who's upset; that -- that what

7    are we -- what are we dealing with?

8        Q    Okay.  And again, I know there's some --

9    there's some fuzziness on the audio that we have, but

10   can you tell me the gist of what you heard Officer

11   Jaeger say in response to your question of what's the

12   issue?

13       A    The -- something about the -- the wife is

14   upset the -- he wasn't talking.  But you -- you -- you

15   can play it again.

16            I mean to the -- the effect that she's not

17   talking or he's not talking, or -- I'm just trying to

18   figure out what is going on.  I mean, I'm -- I can't

19   really see from where I'm at what -- what has -- what am

20   I looking into?  What am I walking into, in essence?

21       Q    Okay.  Great.  And then for what it's worth,

22   I'm going to be asking this next question a couple of

23   times, and I know you just answered it.

24            But if you'll indulge me at this point, what

25   crime or crimes do you have reasonable suspicion of?

```
 1      A    The same.  I mean, kidnapping.

 2      Q    Okay.  Great.  Okay.

 3           MR. ROSEN:  So I'm going to play just for

 4   a couple more seconds here.

 5      (Video playback.)

 6   BY MR. ROSEN:

 7      Q    Okay.  I hear you ask where the kid is.

 8      A    Mm-hmm.

 9      Q    I presume that here you mean the child who

10   would have been the victim of the -- of the alleged

11   kidnapping; is that correct?

12      A    Yes.

13      Q    Okay.  And what did you, in the moment, hear

14   Officer Jaeger say in response to that?

15      A    Well, when he said the kid was inside or that

16   -- he says he definitely thinks that it could be the kid

17   of the man that -- or the father or the person, the

18   suspect.

19      Q    Yeah, I guess --

20      A    Yeah, that -- that's what he said.

21      Q    That he -- yeah.  Yeah.

22      A    I definitely -- yeah, I think it could be the

23   kid of the -- of the father or something like that.

24      Q    Okay.  Okay.  So at this point, is it -- is it

25   accurate to say that what you've heard from Jaeger is
```

1  scene than what she seems right there.

2       Q    Okay.  That's helpful.  Thank you.

3            MR. ROSEN:  I'm going to play the footage

4  for about 40 seconds now.

5       (Video playback.)

6  BY MR. ROSEN:

7       Q    Okay.  Okay.  Sergeant, can you summarize for

8  me the relevant information that you were just -- that

9  Officer Jaeger just shared with you?

10      A    It kind of made the situation a little more

11 serious, I guess, up until that point, I didn't realize

12 that he tried to run -- like, he tried to get away.

13           But from saying that he's the biological

14 father and then that's the mother, but then saying that

15 he won't talk and then saying he tried to go into the

16 house, that -- that kind of escalates the -- the

17 severity, you know, during our little -- our preliminary

18 investigation here.

19           We have somebody who doesn't want to cooperate

20 with the police, someone who, when approached by the

21 police, tried to run inside.  We -- that -- that's

22 concerning.  So I need to determine what -- why would he

23 do that, and I believe I said that the lieutenant was

24 here, so I'm going to be telling him that.

25           But also, you hear me say that I wanted to

1  kind of verify with the people up at the top.  It's just

2  probably because the initial scene was north of that, so

3  I was -- I meant up the -- it's up a hill, so I was

4  saying up the top where Officer Vasquez and whoever else

5  was up on scene with him.  So we can try and figure out,

6  okay, what exactly is the witness up there alleging and

7  why do we have someone here who's refusing to speak to

8  the police, you know, at this point, nothing has really

9  been deescalated.

10      Q    I see.  And you -- a moment ago, you said that

11  your understanding from Officer Jaeger's description was

12  that Mr. Fishman ran into the house or attempted to run

13  into the house.

14          To the extent that you can recall this, what

15  specifically were you -- what specifically were you

16  imagining when Officer Jaeger told you that Mr. Fishman

17  tried to run into the house?

18      A    He said that he's not talking and that he

19  tried to leave, and he's definitely not free to leave.

20  I mean, we're investigating a kidnapping.

21          We have the person who matches the description

22  who won't talk to the police, he won't help us

23  understand why he might be matching the lookout of a --

24  of a kidnapping, he won't tell us anything, and when

25  approached by the police, his inclination was to not

1    cooperate and to leave and to go into his house.  That

2    ends up becoming a serious situation.

3        Q    And this -- the answer to this next question

4    may be sort of obvious to you, but what in -- what in

5    particular would you be concerned about as a member of

6    law enforcement if you heard that someone in, you know,

7    in a -- in a situation like the one that Officer Jaeger

8    encountered initially.  What would you be concerned

9    about specifically if you heard that a potential suspect

10   tried to run into the house that he had been sitting in

11   front of?

12       A    Like any situation, we have something which

13   has one level of safety.  Where we're approaching

14   someone, we see that they're there, but when you go into

15   another -- a building and you close a door, anything can

16   be in that building, including the victim of a

17   kidnapping.  Weapons could be in that building.  Other

18   people could be in that building.

19            We no longer have access to investigate.  If

20   you go into a building and you close the door and lock

21   it, that just adds one more layer or obstacle to us and

22   obstructs our ability to finish our investigation or to

23   do anything in that matter.

24            In a situation like this, when we have

25   reasonable suspicion to stop somebody, you're not free

1  to leave, and going into a house and closing the door is

2  definitely leaving.

3       Q    Okay.  So based on what Officer Jaeger shared

4  with you, you understood the situation to be that Mr.

5  Fishman attempted to enter his house and close the door

6  on Officer Jaeger?

7       A    Based on what, yeah, Officer Jaeger said.

8       Q    Okay.  Okay.  Thank you.

9            MR. ROSEN:  I am going to play the video

10  now for about 20 seconds.

11       (Video playback.)

12  BY MR. ROSEN:

13       Q    Okay.  This is -- this is sort of a more

14  technical question, but I hear you say into your radio

15  that you're switching?

16       A    Mm-hmm.

17       Q    Correct me if I'm wrong, but if -- but if

18  that's correct, can you just explain what that means,

19  what you're doing, and who you're talking to there?

20       A    In general, we have three radio channels on

21  each -- well, we have channels, but each channel is

22  divided up into three bands.  Usually, we have a -- the

23  main air, if you will, the main channel, we have a

24  tactical channel and a surveillance channel.

25       Most of the police dispatching and calls for

1    stopped by the police, and, you know, he knows what

2    potentially led up to this.  The disconnect is -- is why

3    do we have the confusion between either there was a -- a

4    kidnapping or there was not.

5                    MR. ROSEN:  Okay.  Thank you.  I'm going

6    to keep playing the video.

7        (Video playback.)

8    BY MR. ROSEN:

9        Q    So did anything that you just heard from Mr.

10   Fishman change the reasonable suspicion analysis for you

11   as to what crime or crimes you might have reasonable

12   suspicion of?

13       A    No, but he is working towards it.  He's --

14   he's talking and he's corroborating what the other

15   officer said, which is positive.  That's a good move --

16   that's moving in the right direction, and he's calm and

17   we're -- we're having an exchange trying to determine

18   what's going on.

19                    MR. ROSEN:  Great.  Okay.  I'm actually

20   just going to go back sort of a couple seconds and then

21   I'll hit play again.

22                    THE WITNESS:  Sure.

23       (Video playback.)

24   BY MR. ROSEN:

25       Q    So in what we just watched you tell Mr.

1  in front of us?

2      Q    At the -- at the point that we just stopped

3  all in, you still have reasonable suspicion of a -- of a

4  possible kidnapping?

5      A    There's still reasonable suspicion of a -- of

6  a kidnapping.

7      Q    Okay.  And reasonable suspicion for any other

8  crimes?

9      A    I mean, like I said before, I -- I don't know

10  if on my -- if -- if the -- the potential for an abuse

11  is on my mind at this point.

12      Q    Okay.  Understood.

13      A    I just know for certain that my mind right now

14  is on the kidnapping.

15          MR. ROSEN:  Okay.  Great.  Thank you.

16  I'm just going to play for about 10 seconds here.

17      (Video playback.)

18  BY MR. ROSEN:

19      Q    Okay.  I mean, so I hear Mr. Fishman say to

20  you that the children in question are his, and then I

21  hear him say, "They've probably told you that."  Does

22  that -- does that match with what you heard in the

23  moment?

24      A    Yes.

25      Q    I'm happy to read --

1          (Video playback.)

2     BY MR. ROSEN:

3          Q     What do you make of this?

4          A     Again, it -- when you're talking about like

5     moving a needle to -- to -- I mean, again, he's -- he

6     hasn't provided any ID, not necessarily that an ID would

7     determine where he worked, but he's now felt that it was

8     for some reason important to say what his job was and

9     that he investigated the police and he's a Department of

10    Justice attorney.

11          As a Department of Justice attorney, it even

12    becomes more alarming that he wouldn't sort of

13    understand how a situation like this would unfold and

14    how to keep it -- I don't know what word to use.

15          It has escalated to a certain level, I believe

16    because of -- of his unwillingness to cooperate with the

17    police as a Department of Justice attorney, and he's

18    saying this, and in real-time, I know, I'm thinking,

19    wait, well, if you're a Department of Justice attorney,

20    then you know what this is, you know, that we're just

21    trying to determine what happened in this event.  We're

22    -- that we're trying to -- you know, we're concerned

23    with the welfare of a child who's alleged to be the

24    victim of a kidnapping and all this stuff.

25          So we go from, it's -- it kind of just

**Exhibit F**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





(800) 528-3335
NAEGELIUSA.COM

JARED FISHMAN,

      Plaintiff,

-v-                     1:21-cv-01847-RJL

DISTRICT OF COLUMBIA,
PATRICK LOFTUS, MARCK JAEGER,
JEREMY BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

      Defendants.

_____


                         **DEPOSITION OF**

                        **PATRICK LOFTUS**


                           **TAKEN ON**
        **THURSDAY, SEPTEMBER 28, 2023**
                     **11:38 A.M.**


             **ATTORNEY GENERAL OFFICE**
           **400 SIXTH STREET NORTHWEST**
    **WASHINGTON, DISTRICT OF COLUMBIA, 20001**

50

1    And did you think that was important at
2  the time?
3    A.  Well, he didn't say it might be an
4  aftercare situation.  I think he said so it's not an
5  after -- since there is no school, it's likely not
6  an aftercare situation.  Like an after school -- I
7  think that's what -- I think that's what I heard.
8    Q.  That was your understanding?
9    A.  Right.  Just now, I think that's what he
10  just said.  I don't know if you want to rewind it
11  again.
12    Q.  Sure.  Yeah, yeah.  Let's watch it again.
13    A.  Just to make sure.
14    Q.  Absolutely.
15    I'm going to go back ten seconds.
16    (Video plays)
17    A.  So it's not -- so it wouldn't be an
18  aftercare situation.
19  BY MR. GERSTEIN:
20    Q.  Did that lead you to believe that the
21  incident was not a kidnapping?
22    MS. MULLEN:  Objection as to the form of
23  the question.
24    You can answer.
25    THE WITNESS:  No, I don't think so.

51

1  BY MR. GERSTEIN:
2    Q.  Okay.
3    Did you think it was an important
4  observation?
5    MS. MULLEN:  Objection as to form.
6    You can answer.
7    THE WITNESS:  I'm just thinking back to
8  that day.  Not really.
9  BY MR. GERSTEIN:
10    Q.  Okay.
11    I'm going to play it for seven more
12  seconds.
13    (Video plays)
14    I'm going to go back.  I didn't need to
15  stop there.  Forgive me.
16    MR. GERSTEIN:  For the record, I'm
17  rewinding to minute five, second 50 and I'm going to
18  play again.
19    (Video plays)
20  BY MR. GERSTEIN:
21    Q.  I'm just going to keep playing.  I
22  actually didn't need to ask you a question there.
23  This is -- I'm at minute six, second 19 and I'm
24  going to keep playing until minute six, second 41.
25    (Video plays)

52

1  BY MR. GERSTEIN:
2    Q.  Okay.  In the video we just watched you
3  answered a call on a cellular telephone.  Do you
4  remember who called you?
5    A.  It sounds like -- well, he's now a
6  sergeant, but Officer Welch, at the time.
7    Q.  I'm having trouble reading my notes here.
8    Okay.
9    I'm going to play a little bit more of
10  your conversation with Welch, but I'm going to go
11  back ten seconds, just so we don't lose anything.
12    MS. MULLEN:  I don't see any Officer
13  Welch.
14    MR. GERSTEIN:  I'm sorry, what?
15    MS. MULLEN:  Go ahead.
16    MR. GERSTEIN:  I believe he's speaking to
17  now sergeant, then Officer Welch.  Dubary Welch.
18    MS. MULLEN:  Okay.  I thought you meant
19  you can hear it.
20    MR. GERSTEIN:  Yeah, you can -- well, if
21  you can hear it, you can hear it, but --
22    (Video plays)
23    MR. GERSTEIN:  I have stopped the video at
24  minute seven, second 11.
25  BY MR. GERSTEIN:

53

1    Q.  At this point, do you think that the
2  person being detained is the father of the girl?
3    A.  Potentially.  But that still doesn't
4  negate parental kidnapping or child abuse.
5    Q.  At this point, what crime or crimes did
6  you believe you had reasonable suspicion of?
7    MS. MULLEN:  Objection as to form.
8    You can answer.
9    THE WITNESS:  If it is the father, then
10  we're dealing with parental kidnapping or child
11  abuse. If it's not the father, then just a standard
12  kidnapping.
13  BY MR. GERSTEIN:
14    Q.  Okay.
15    I'm going to play to the end of the video.
16    (Video plays)
17    MR. GERSTEIN:  I'm stopping at minute
18  seven, second 30.
19  BY MR. GERSTEIN:
20    Q.  And in this video, I believe Loveday asked
21  you whether the mother might be separated and then
22  suggested that as a result, this might be a youth
23  division case.  Could you help me understand what
24  that means?
25    A.  So the youth and family services division



NAEGELI
DEPOSITION & TRIAL     (800)528-3335
NAEGELIUSA.COM

58

1    Q.  I need to go back further.  My apologies.
2  I'm going back to minute three, second 25.
3        (Video plays)
4  BY MR. GERSTEIN:
5    Q.  Okay.
6        What, in your understanding, were you
7  saying in this portion of the video we just watched?
8    A.  Essentially, if this had been a
9  misunderstanding where it was a father and a
10  daughter, that the parents would be appreciative
11  that the police actually, you know -- had this been
12  a legitimate kidnapping, found the people involved
13  -- had this been a kidnapping by a stranger and
14  found the little girl, and it raises suspicions that
15  there could be more going on, especially in the
16  realms of child abuse and perhaps something inside
17  that home, that they aren't being forthcoming and
18  cooperative.
19    Q.  Thank you.
20        I'll play for about 30 more seconds
21  starting at minute three, seconds 43.
22        (Video plays.)
23        MR. GERSTEIN:  Back on the record. I
24  stopped, for the record, at minute four, second 15
25  where I believe you say that it was weird that Mr.

59

1  Fishman was playing guitar on his porch.
2        MS. MULLEN:  Objection as to misstating
3  what we just heard.
4        MR. GERSTEIN:  I'm going back --
5        MS. MULLEN:  Thank you.
6        MR. GERSTEIN:  -- to make sure we're
7  getting this right.  I'm starting at minute four,
8  second eight.
9  BY MR. GERSTEIN:
10    Q.  Lieutenant Loftus, what, in your
11  understanding, were you saying was "very weird" in
12  the video we just saw?
13    A.  I think it was about him being outside
14  playing his guitar given -- in light of all the
15  facts and circumstances.
16    Q.  Could you explain why that seemed weird?
17    A.  Just unexpected.
18    Q.  Would you say it was suspicious?
19    A.  Potentially.
20    Q.  I'm going to play until 4:38.
21        (Video plays)
22        MR. GERSTEIN:  For the record, I stopped
23  at minute four, second 39.
24  BY MR. GERSTEIN:
25    Q.  What did you just instruct someone on the

60

1  radio to do in this video?
2    A.  I instructed them to make a notification
3  to the youth division.
4    Q.  Okay.
5        Why did you instruct them to do that?
6    A.  Based on the information we had at the
7  time, that it looks like it's parental involvement.
8  We had information provided to us by that 911
9  caller, who we interviewed on the scene and in
10  person, where she used -- described the conduct as
11  child abuse.  Based on, you know, everything that we
12  had at that time, we needed to make sure that the
13  parties that investigate child abuse and neglect and
14  potentially parental kidnapping are notified.
15    Q.  I'm just going to play a little bit more.
16        (Video plays)
17        MR. GERSTEIN:  I've stopped at minute
18  five, second seven.
19  BY MR. GERSTEIN:
20    Q.  Do you remember who you were talking to on
21  your cell phone in this video?
22    A.  At that point in time, I have no clue.
23    Q.  Okay.
24        In the video you said you still think
25  there's something weird.  Why did you still think

61

1  there was something weird?
2    A.  I don't remember exactly, but just given
3  all the information that, you know, was previously
4  provided, what we've seen in these videos, that
5  something still wasn't lining up.  Like I said, you
6  know, a normal -- if I had a kid and whatever
7  situation happened, I would be grateful the police
8  came and everything was safe.  Show them my child,
9  be cooperative.  You know, there's still the
10  uncooperative element that we had earlier.  So it
11  still needed more investigation.  Weird could be a
12  synonym for suspicious, strange, not right.
13    Q.  Okay.
14        And at this point, what crime or crimes
15  did you believe you had reasonable suspicion of?
16    A.  The two I told you about before, parental
17  kidnapping and/or child abuse.
18    Q.  Okay.  Thank you.
19    A.  If it is the biological father at that
20  time.  For the parental kidnapping.
21    Q.  Okay.
22        I'm going to play about nine more seconds.
23        (Video plays)
24  BY MR. GERSTEIN:
25    Q.  Let me just play that one more time, just



74

1      Thank you.
2      Back to the video for a second.
3      In the portion of the video we just
4   watched -- and for the record, again, I've stopped
5   at minute nine, second 28 -- you asked that a report
6   be written describing the incident that day as a
7   check on the welfare of a juvenile?
8      A.   Yes.
9      Q.   Okay.
10     And why did you direct that the report be
11  written that way?
12     A.   We originally got the call for a
13  kidnapping. An on-scene investigation ultimately
14  determined that a kidnapping would not be the
15  appropriate classification.
16     Q.   Why did you not characterize this as an
17  investigation into child abuse?
18     A.   Because we didn't see any injuries.  If we
19  had seen injuries, if the little girl had made
20  statements that would suggest, you know, that had
21  occurred, but like I said before, you know, our
22  ultimate goal is making sure that little girl is
23  safe and okay, and the suspect's actions on his
24  stairs and with our officers and really, frankly,
25  with his daughter were concerning.

75

1      Q.   Okay.
2      But did you believe that you had
3   investigated the crime of child abuse during your
4   investigation on February 17, 2020?
5      A.   Absolutely.  We had that 911 caller who
6   said -- who we interviewed in person said it's not
7   an abduction or kidnapping, it's child abuse.  We
8   absolutely were investigating that.
9      Q.   And so I'm just trying to understand how
10  you classified the reports.
11     When you -- and trying to understand how
12  this ended up as a check on the welfare of a
13  juvenile despite your statement that you were
14  investigating child abuse.
15     Do you sometimes characterize an
16  investigation as a check on the welfare of a
17  juvenile because it did not result in an arrest for
18  a crime, is that the distinction?
19     A.   That's likely.  If we had had probable
20  cause to make an arrest for child abuse, we would
21  have done it right then and there, and it would have
22  been classified differently.  But this one still
23  needed, you know, additional investigative efforts.
24     Q.   And it needed additional investigative
25  efforts for the reasons you just said, is that

76

1   correct, the behavior that you just described?
2      A.   Exactly, what was described by the 911
3   caller, the suspect's actions with his daughter and
4   the suspects actions with our officers.
5      Q.   Okay.
6      I'll play just a little bit more and then
7   --
8      MR. GERSTEIN:  Martha, I know you need to
9   go at 2:00.  I think we should be safely done by
10  2:00.
11     MS. MULLEN:  Well, don't rush.
12     MR. GERSTEIN:  Okay.  Thank you.
13     (Video plays)
14     MR. GERSTEIN:  I'm sorry, I just paused
15  for a second to check my notes at 9:56, but I'm
16  going to keep playing.
17     (Video plays)
18     MR. GERSTEIN:  So I'm stopping at minute
19  ten, second 18 --
20  BY MR. GERSTEIN:
21     Q.   -- where you just described this incident
22  as a misunderstanding rather than a legitimate
23  kidnapping.
24     At this point in the video, did you
25  believe this was a misunderstanding?

77

1      A.   That's what I just said in the video.  The
2   misunderstanding as far as kidnapping versus father
3   who had custody of the daughter.
4      Q.   Correct.
5      Well, let me actually just ask a more
6   general question.
7      Did you believe that the incident giving
8   rise to your investigation that day was a
9   misunderstanding?
10     A.   Components of it.
11     Q.   Which components?
12     A.   The fact that it was not a stranger
13  kidnapping.
14     Q.   Okay.
15     And at this point, did you think it might
16  still have been a parental kidnapping?
17     A.   No, I think parental kidnapping could
18  likely be ruled out at this point.  We're still
19  dealing with the witness's statement about child
20  abuse.  While we did not see any visible injuries,
21  as the officer noted, she is wearing long sleeves
22  and legs and torso were completely covered.  Given
23  the suspect's actions and behavior, it warranted
24  additional follow-up.
25     Q.   Thank you.



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Patrick Loftus    September 28, 2023    NDT Assgn # 68847    Page 21

---

78

1    I'm going to play until 11:05.
2    (Video plays)
3    MR. GERSTEIN: For the record and because
4  of an agreement we've had, we're not going to ask
5  questions after this point. I'm pointing to
6  opposing counsel.
7    Martha Mullen, you and I agreed by e-mail
8  because of the existence of the qualified immunity
9  dispute that we're not going to ask certain
10 questions on this deposition, so we're going to stop
11 at this point. That's 11:05.
12    I do have just one or two more questions
13 and then I can let you go.
14 BY MR. GERSTEIN:
15    Q. So having watched the videos we watched
16 today and referred to the documents that we referred
17 to today, would you do anything differently in this
18 investigation than you did on the day itself?
19    MS. MULLEN: Objection; asked and
20 answered, but you can answer again.
21    THE WITNESS: No.
22    MR. GERSTEIN: I'll pass the witness if
23 you have any questions.
24    MS. MULLEN: No.
25    Actually, I do have one question.

---

79

1 EXAMINATION:
2 BY MS. MULLEN:
3    Q. While you were at the scene as depicted in
4  the video, did you see that the front door to the
5  suspect's house had been, as he described, broken in
6  any fashion?
7    A. No, it appeared to be operational and
8  intact.
9    MS. MULLEN: Thanks.
10    MR. GERSTEIN: I also have no further
11 questions.
12    MS. MULLEN: He's going to waive reading.
13 Copy. Send an e-mail to the address I provided with
14 the cost.
15    (The deposition concluded at 1:39 p.m.)
16
17
18
19
20
21
22
23
24
25

---

80

1    CERTIFICATE
2
3    I, Kenneth Norris, do hereby certify that I reported
4  all proceedings adduced in the foregoing matter and that
5  the foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9    I further certify that I am neither related to
10 counsel or any part to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13    IN WITNESS HEREOF, I have hereunto set my hand this
14 16th day of October, 2023.
15
16
17
18
19
20 /S/ Kenneth Norris
21
22
23
24
25

---

81

1    CORRECTION SHEET
2  Deposition of: Patrick Loftus  Date: 09/28/23
3  Regarding:    Fishman vs District of Columbia
4  Reporter:    Norris
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number. If there are no changes, write "none" across
9  the page. Sign this sheet on the line provided.
10 Page  Line  Reason for Change
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24    Signature_____
25    Patrick Loftus

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

JA 276

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,                        )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )
                                       )
THE DISTRICT OF COLUMBIA; and          )        Case No. 21-cv-1847
LIETENANT PATRICK LOFTUS,              )        Jury Trial Demanded
OFFICER MARCK JAEGER, OFFICER          )
JEREMY BRADY, OFFICER                  )
MICHAEL TONG, and OFFICER              )
CHRISTOPHER TODARO, all of the         )
Metropolitan Police Department of the  )
District of Columbia, all in his       )
individual capacity,                   )
                                       )
          Defendants.                  )
                                       )

## PLAINTIFF'S REPLY IN SUPPORT OF SUMMARY JUDGMENT

## I.    PRELIMINARY STATEMENT

In his motion for summary judgment against Defendant Officer Christopher Todaro, Plaintiff Jared Fishman argued that the undisputed material facts uncovered in discovery confirmed the allegations in his complaint: that Todaro knew minutes into his investigation that Fishman had not kidnapped anyone; that Todaro was not investigating any crime besides kidnapping; and that Todaro nevertheless continued to detain Fishman for over twenty more minutes, during which time he undertook no additional investigation. (*See* Doc. 47 at 3.) These facts are identical to those that this Court already deemed sufficient to defeat Defendants' motion to dismiss Fishman's Fourth Amendment claim. (*See* Doc. 31 at 13.) Todaro offers *no* evidence to dispute *any* of these facts. And Todaro's opposition to this motion for summary judgment does not respond to Fishman's legal claim either. Neither of Todaro's theories in support of his prolonged detention of Fishman have merit, and Fishman is therefore entitled to judgment as a matter of law.

## II.    ARGUMENT

### A.    There Are No Disputes of Fact Whatsoever

Fishman's motion for summary judgment involves no disputes of material fact because Todaro has failed to properly address Fishman's assertion of each of the three key facts on which this Court based its denial of Defendants' motion to dismiss. A "non-moving party may oppose summary judgment using 'any of the kinds of evidentiary materials listed in Rule 56(c).' This evidence includes materials found in the record, such as 'depositions, documents, electronically stored information . . . or other materials.'" *Cauthen v. D.C.*, 459 F. Supp. 3d 134, 140 (D.D.C. 2020) (cleaned

up). "If a party. . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.' Fed. R. Civ. P. 56(e). 'Mere unsupported allegations or denials,' alone, are insufficient to defeat summary judgment." *Id.* (cleaned up).

Here, Todaro has failed to properly address any key assertion of fact. First, Todaro provides no evidence to dispute that he knew minutes into his investigation that Fishman had not kidnapped anyone. Instead, Todaro largely references two impermissible sources: his own opposition to Fishman's motion for summary judgment and his position, discussed in more detail *infra*, that Todaro could not conclude the *Terry* stop until his superiors had arrived and conducted a separate investigation. (*See, e.g.,* Doc. 50-1 at 7.) These are both legal arguments, not assertions of countervailing factual evidence. Tellingly, Todaro asserts six different times in his response to Fishman's Statement of Undisputed Material Facts that a fact is "disputed to the extent that Plaintiff is asserting that reasonable suspicion had dispelled." (*See, e.g.,* Doc. 50-1 at 6.) This objection clearly goes to the question of whether Fishman is entitled to judgment as a matter of *law*, not whether a given *fact* is legitimately in dispute. Todaro has thus failed to adequately dispute that he knew minutes into his investigation that Fishman had not kidnapped anyone.

Second, Todaro provides no evidence to dispute that kidnapping was the only crime that Todaro was ever investigating. Todaro claims that this statement is "disputed" because "Todaro was present to investigate *any* crime, *including* the alleged kidnapping." (*See* Doc. 50-1 at 2 (emphasis added).) But the only evidence

Todaro offers in support of this statement is a citation to his own opposition motion. (*See* Doc. 50-1 at 2.) And, in fact, the evidence cited in this portion of Todaro's opposition directly contradicts his assertion that Todaro was ever investigating a crime besides kidnapping. At nine distinct points in his deposition, Todaro testified that he was investigating a kidnapping; at no point in his deposition did he mention investigating or having reasonable suspicion for any other crime. (*See* Doc. 50 at 5 (citing these nine portions of Todaro's deposition).) Six of these nine instances came when counsel for Fishman paused her review of Todaro's body-worn camera footage to specifically ask Todaro to state the "crime or crimes" for which he felt he had "reasonable suspicion" at that particular moment in the investigation. (*See* Doc. 47, Ex. B at 21:21-25; 31:7-10; 35:3-6; 36:3-6; 37:18-21; 60:21-23.) At each opportunity, Todaro answered that he felt he had reasonable suspicion for a kidnapping; not once did he mention any other crime. (*Id.*) Todaro has thus failed to adequately dispute that he was ever investigating any crime besides kidnapping.

Finally, Todaro provides no evidence to dispute that he continued to detain Fishman for another 20 minutes after the point at which he lacked reasonable suspicion that Fishman had committed a crime. Todaro concedes that it is "undisputed" that "Fishman was detained and in handcuffs for approximately 25 minutes." (Doc. 50-1 at 8.) As discussed *supra*, Todaro has not adequately denied that he lacked reasonable suspicion for the only crime he was ever investigating within roughly two minutes of his arrival on scene. As such, his concession that Fishman was detained for roughly twenty five minutes amounts to a concession that for over

twenty of those minutes Fishman was detained in the absence of reasonable suspicion. Nowhere else in his response to Fishman's Statement of Undisputed Material facts has Todaro adequately made any assertion to the contrary. There are, therefore, no disputes of material fact before this Court.

### B.   Todaro Lacked Reasonable Suspicion During All But Roughly Two Minutes of His Investigation

Todaro first argues that he did not violate Fishman's Fourth Amendment rights because he "had reasonable suspicion of a kidnapping until superior officers arrived on scene and conducted their own investigation."[1] (Doc. 50 at 5.) Later in his opposition, Todaro claims that reasonable suspicion existed "throughout the entirety of the[ ] on-scene investigation." (*Id.* at 8.) This is so, Todaro claims, because "[o]fficers had to wait for the completion of a superior officer's investigation before Plaintiff was free to leave." (Doc. 50-1 at 6.)

Taken together, these statements amount to a novel and indefensible theory of the Fourth Amendment: that police can create reasonable suspicion for the continued detention of a suspect simply by continuing their investigation. Indeed, Todaro does not reference any new information that came to light once his superiors arrived (and

---

[1] Todaro devotes a significant portion of his opposition to justifying his use of handcuffs in detaining Fishman. (*See* Doc. 50 at 4.) Todaro also cites numerous pieces of federal and District of Columbia law-enforcement guidance, but offers no evidence that he *followed* or even considered them during his investigation of Fishman. (*See Id.* at 2, 4.) Neither Todaro's use of handcuffs nor any of this general guidance is relevant to Fishman's motion for summary judgment, and this Court need not consider the portions of Todaro's opposition that address these issues.

there is none),[2] or explain how "reasonable suspicion of a possible kidnapping" could have persisted given the information that Todaro himself uncovered on Fishman's front steps. Nor does Todaro acknowledge his own deposition testimony, in which he testified that officers *do not* need approval from a superior to end a *Terry* stop. (*See* Doc. 47, Ex. B at 11: 9-17.) Instead, Todaro simply asserts that the investigation could not end until his superiors arrived, and claims that this alone gave him continued reasonable suspicion.

This argument completely inverts the actual causal relationship between the existence of reasonable suspicion and the permissibility of extending a *Terry* stop: the presence of reasonable suspicion *is what makes a continued stop permissible*, not the other way around. *See, e.g., United States v. Devaugh*, 422 F. Supp. 3d 104, 114 (D.D.C. 2019) (describing limits on duration and intrusiveness). An investigation is not magically imbued with reasonable suspicion simply because officers continue to investigate. And an officer may not prolong a *Terry* stop because he would prefer that someone else be the one to release the suspect.

To accept Todaro's first argument, then, would be to neutralize the Fourth Amendment as a constraint on police behavior. In Todaro's telling, all that officers need to continue a *Terry* stop indefinitely is their own subjective belief—regardless of

---

[2] Todaro notes that during his continued detention of Fishman another officer told Todaro that Sergeant Adam Bray was headed to the scene and, in Todaro's words, "would need to speak with the child" (meaning Fishman's younger daughter). (Doc. 50 at 5.) Sergeant Bray, however, released Fishman from handcuffs without ever speaking to any other member of Fishman's family, and never spoke to either of Fishman's daughters. (*See* Doc. 47 at 4.)

any objective evidence to the contrary—that further investigation is required. By Todaro's logic, he could have detained Fishman for another three hours if a traffic jam delayed Todaro's superiors' arrival for that amount of time. This is the opposite of what the Fourth Amendment commands. *See United States v. Castle*, 825 F.3d 625, 635 (D.C. Cir. 2016) (reasonable suspicion assessed "within an objective framework").

**C.    Todaro May Not—and Did Not—Rely on Knowledge Possessed Only by Other Officers.**

Todaro's second and final argument is that his prolonged detention of Fishman was permissible in light of knowledge held by other officers on scene. It is an attempt to infuse other defendants, other possible crimes, and other officers' knowledge into the question of when *Todaro* lacked reasonable suspicion that Fishman had committed a kidnapping. This attempt, however, is both unsupported by the record and prohibited by the law of this Circuit, and Todaro's invocation of the vertical collective knowledge doctrine does nothing to change that.

Todaro relies, for this argument, on two inaccurate factual assertions. Specifically, he brazenly claims that Fishman, in his motion for summary judgment, "posits" both "that parents cannot harm their own children" and that "once even a hint of a parental relationship is recognized, suspicion of a crime should dissipate." (Doc. 50 at 1.) Neither claim is accurate. The first simply appears nowhere in the record of this case; the second stretches one of Fishman's straightforward legal claims almost beyond recognition. In his motion for summary judgment, Fishman referenced a principle of black-letter District of Columbia law: that custodial parents cannot kidnap their children except for instances in which one parent "intentionally coneal[s]

a child from the child's other parent.[3] (*See* Doc. 47 at 7, citing D.C. Code §§ 22-2001 and 16-1022.) Fishman then applied this principle to undisputed material evidence showing that Todaro knew both that Fishman was the father of the alleged kidnapping victim and that Fishman had not concealed the alleged victim from the girl's mother. (*See* Doc. 47 at 7-9.) Fishman has made no other claim about the way a suspect's parental status shapes officers' "[reasonable] suspicion of a crime."

Todaro's misstatements about what Fishman has "posit[ed]," however, are not the product of a genuine misunderstanding or disagreement. They are instead an attempt to retroactively broaden the scope of Todaro's investigation by twisting Fishman's words. This strategy runs headlong into three inconvenient facts: first, that Fishman has moved for summary judgment against only Todaro, leaving the question of damages and the other Defendants' liability for trial (*see* Doc. 47 at 12);[4] second, that Todaro repeatedly testified that he was never investigating any crime besides kidnapping, (*see id.* at 6); and third, that, in this Circuit, courts undertaking reasonable suspicion analysis "cannot take into account" any facts that "were not known to the investigating officer[ ] at the time of the search." *See United States v.*

---

[3] Todaro states that "[i]t is a crime for a custodial parent to kidnap a child, and this *may* occur in cases of intentional concealment from the other parent." (Doc. 50 at 2 (emphasis added).) That statement is incorrect. Under District of Columbia law, the *only* way in which a custodial parent can kidnap his child is to intentionally conceal the child from the other parent; it is not one of multiple ways in which a parental kidnapping may occur.

[4] Unique among Defendants, Todaro has admitted that he knew that Fishman and his wife were the girls' parents within roughly two minutes of his arrival on the scene, making it unnecessary to present to a jury any question about his liability.

*Brown*, 334 F.3d 1161, 1166 & n2 (D.C. Cir. 2003).

Todaro attempts to broaden the aperture by way of the "vertical collective knowledge doctrine." (Doc. 50 at 8.) Here, though, this doctrine is a red herring. The vertical collective knowledge doctrine allows an officer to act on an order from a colleague even if that officer himself lacks sufficient information for a valid arrest or detention. *See United States v. Gorham*, 317 F. Supp. 3d 459, 472-73 (D.D.C. 2018) (explaining the doctrine). "In this sense, the executing officers are acting as the agents or proxies of, or are relying on information provided by, the officers who possess probable cause or reasonable suspicion." *Id*. at 473.

Here, Todaro did not act as anyone's proxy or agent; he conducted his own investigation and detained Fishman of his own accord; while Todaro asserts that he took "direction from officers 'in possession of the information giving rise to the required reasonable suspicion,'" he supports this claim with nothing but a cursory citation to "his body-worn camera" and "deposition testimony." (Doc. 50 at 8.) In fact, Todaro's appeal to these sources of evidence upends his invocation of vertical knowledge: that doctrine allows officers to act on information that they themselves *do not possess* by empowering courts to "substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*." *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (emphasis in original). Todaro's body-worn camera footage and deposition testimony, by contrast, speak only to what Todaro actually

saw, heard, and knew at the time of the investigation.[5] As such, the vertical collective knowledge doctrine has no relevance to this case.

What Todaro appears to actually seek is the application of the *horizontal* collective knowledge doctrine. This theory is much broader than its vertical counterpart: it allows the post-hoc aggregation of information held—but not actually communicated—by "a number of individual law enforcement officers [who] have pieces of the probable cause [or reasonable suspicion] puzzle." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008); *See also Massenburg,* 654 F.3d at 493-95 (describing differences between horizontal and collective knowledge). In his opposition motion, Todaro criticizes Fishman's omission of the deposition testimony of other MPD members who were at the scene, implying that everything each officer, sergeant, and lieutenant knew is relevant here, even if it was not actually communicated to Todaro. (*See* Doc. 50 at 2.) Such aggregation without communication is the very essence of horizontal knowledge. But crucially—and as Todaro himself points out in his opposition—this Court, in an opinion by Judge Moss, has "declined to embrace the horizontal collective knowledge doctrine." (Doc. 50 at 7 (citing

---

[5] Even if Todaro *had* been acting on a directive from a colleague, no officer involved in the investigation possessed—or could have possessed—knowledge suggesting that Fishman had committed a parental kidnapping. Because Todaro quickly ascertained that Fishman was the father of the alleged victim, parental kidnapping was the only possible crime for which Todaro could have even theoretically possessed reasonable suspicion. Nothing that any of Todaro's colleagues knew, saw, or heard, therefore, could have possibly contributed to Todaro's reasonable suspicion that Fishman had kidnapped anyone.

*Gorham*, 317 F. Supp. 3d at 473).) Neither version of the collective knowledge doctrine, therefore, applies to this case nor changes the reasonable suspicion analysis in any way.

## III.    CONCLUSION

At the beginning of last year, in February 2023, this Court agreed with Fishman that a Fourth Amendment violation had been plausibly pleaded when it held that "the Complaint alleges sufficient facts to establish that Officer[ ] . . . Todaro . . . reached the conclusion that no crime had been committed well before the *Terry* stop was terminated." (Doc. 31 at 13.) Since then much has happened but little has changed: discovery confirmed the facts that Fishman initially alleged; Fishman presented those facts in his motion for summary judgment, and Todaro has now opposed that motion in ways that barely address, let alone counter, Fishman's argument. This Court should therefore affirm the principles it set out in its denial of Defendants' motion to dismiss, and grant Fishman's motion for summary judgment against Todaro.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
(D.C. Bar No. 1033346)
Emily Gerrick
(D.C. Bar No. 90010592)
Samuel Rosen
(D.C. Bar No. 90012245)
GERSTEIN HARROW LLP
810 7th St. NE, Ste. 301
Washington, DC 20002
charlie@gerstein-harrow.com

(202) 670-4809

_/s/ Jason Harrow_
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste 800
Los Angeles, CA 90025
jason@gerstein-harrow.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,

        *Plaintiff*,

  v.

DISTRICT OF COLUMBIA, PATRICK
LOFTUS, MARCK JAEGER, JEREMY
BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

     *Defendants*.

1:21-cv-01847-RJL

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff sued the District of Columbia (the District), Lt. Patrick Loftus, Officer Marck Jaeger, Officer Jeremy Brady, Officer Michael Tong, and Officer Christopher Todaro (Defendants, unless otherwise identified) claiming under 42 U.S.C. § 1983 that Defendants violated his Fourth Amendment Rights on February 17, 2020, when they investigated a reported child kidnapping outside the Cactus Cantina restaurant on Wisconsin Avenue in Northwest Washington, D.C.  Plaintiff also sought damages for common law trespass (Count V), false imprisonment (Count VI), negligence (Count VII), and a First Amendment violation under Section 1983 (Count VIII).

Upon consideration of Defendants' Rule 12(b)(6) motion to dismiss [22], the Court dismissed Counts I, II, V, VII, and VIII of the Amended Complaint.  *See* Memorandum Opinion (Mem. Op.) [31].  Thus, the only inquiry before the Court is whether the record presents a genuine issue for trial on Count III (Arrest without Reasonable Suspicion), Count IV (Arrest without Probable Cause), and Count VI (False Imprisonment).  As set forth in the accompanying

Memorandum of Points and Authorities, Counts III-IV and VI should be dismissed as a matter of law.  The grounds for this motion are more fully set forth in the accompanying Statement of Undisputed Facts and Memorandum of Points and Authorities.  Defendants also attach a proposed order.

January 10, 2024                          Respectfully submitted,

                                          BRIAN L. SCHWALB
                                          Attorney General for the District of Columbia

                                          STEPHANIE E. LITOS
                                          Deputy Attorney General
                                          Civil Litigation Division

                                          */s/ Chad Copeland*
                                          CHAD COPELAND [982119]
                                          Assistant Deputy Attorney General
                                          Civil Litigation Division

                                          */s/ Fernando Amarillas*
                                          FERNANDO AMARILLAS [974858]
                                          Assistant Deputy Attorney General
                                          Civil Litigation Division

                                          */s/ Martha J. Mullen*
                                          MARTHA J. MULLEN [419036]
                                          Senior Assistant Attorney General
                                          AMANDA L. TORRES [1562702]
                                          Assistant Attorney General
                                          400 Sixth Street, NW
                                          Washington, DC 20001
                                          202-724-6612
                                          202-735-7390
                                          martha.mullen@dc.gov
                                          amanda.torres@dc.gov

                                          *Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JARED FISHMAN,

        *Plaintiff*,

   v.                                  1:21-cv-01847-RJL

DISTRICT OF COLUMBIA, PATRICK
LOFTUS, MARCK JAEGER, JEREMY
BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

        *Defendants.*

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

1. On February 17, 2020, Plaintiff Jared Fishman took his two daughters to the Cactus Cantina restaurant on Wisconsin Avenue, Northwest Washington, D.C.  Defs.' Ex. 3, Tong Body Worn Camera Video at 10:34-50.

2. At some point, Plaintiff's younger daughter misbehaved, and Plaintiff and his children left the restaurant, but the commotion continued outside.  Plaintiff picked up the child and put her in his car.  *Id.* at 10:34-11:11.

3. Moments after Plaintiff secured his younger daughter and got into the driver's seat, a car stopped in front of Plaintiff's car and asked if "there was a problem." Plaintiff told the man that his "kid was being a little shit."  Plaintiff took his children home.  *Id.* 10:50-11:06.

4. A civilian 9-1-1 caller reported the possible "abduction" of a child.  Defs.' Ex. 6, 9-1-1 recording.  The witness told emergency services, "I don't know if it was an abduction, or a father manhandling his child in a really bad way […]  I saw this little girl walking

**JA 291**

by herself, she was probably six or seven, so I pulled over to see if she was by herself or with an adult.  Then I saw this guy pull up, and he tried to talk to her, then he started screaming at her, and she pushed him, and he just grabbed her, threw her over his shoulder, and just threw her into the car […] Then this other guy pulled over and tried to help, and he said, 'it's my daughter,' but the other guy wasn't convinced." *Id.*

5.  Surveillance video shows a male witness pull up in a black Chevrolet SUV in front of Plaintiff's Green Audi and approach Plaintiff's Green Audi. Within seconds, Plaintiff turns and speeds away. *See* Defs.' Ex. 17 at 2:30-2:45.

6.  The 9-1-1 caller gave a description of the vehicle, a Green Audi, license plate number, and physical description of the suspect, a white balding male in his forties. Defs.' Ex. 6.

7.  Officer Jaeger heard the call with Plaintiff's address while he was parked in front of the 7-Eleven on 27th and P Street Northwest, and saw Plaintiff's home address registered to the license plate.  *See* Defs.' Ex. 2, Jaeger Body Worn Camera Video; *see also* Defs.' Ex. 12, Jaeger Depo. Tr. at 22:6-12.

8.  As Jaeger approaches the home, a helicopter circled above and indicated over the radio that "they're watching the situation because the call is for a kidnapping. It's a very serious crime." Defs.' Ex. 12 at 26:20-23.

9.  When Officer Jaeger reached the home, Plaintiff, sitting on the front steps, confirmed that he had just arrived home in the automobile identified by its license plate by the 9-1-1 caller, an Audi.  *See* Def. Ex. 2.  Plaintiff then *self-identified* as the kidnapping suspect. *Id.*

10.  Plaintiff now realized that someone near Cactus Cantina must have called the police, and he figured it must have been the man he spoke to.  Defs.' Ex. 18, Fishman Depo.

2

**JA 292**

Tr. 40:1-21. Plaintiff told Officer Jaeger that the "guy who called in has no idea what's going on." Defs.' Ex. 2 at 3:50.

11.   Instead of answering Jaeger's request for more information, Plaintiff told him to "hold on," and stood up to enter his home. *Id.* But before Plaintiff stepped over the threshold of his doorway, Officer Jaeger told Plaintiff not to go inside. *Id.* at 4:01.

12.   Plaintiff disregarded Officer Jaeger and entered the house. *Id.* at 4:02. Officer Jaeger immediately followed him inside, seized Plaintiff, and handcuffed him. *Id.* at 4:03-4:07. Three other MPD officers—Jeremy Brady, Michael Tong, and Christopher Todaro—arrived while Officer Jaeger was handcuffing Plaintiff. *Id.*

13.   While Officer Jaeger was handcuffing Plaintiff, Plaintiff's two daughters appeared in the doorway of the home. *Id.* at 4:17.

14.   Her older sister told the officers that Plaintiff had done nothing wrong and that "it is my sister, she was misbehaving." Defs.' Ex. 5, Brady Body Worn Camera Video at 4:09; *see also* Defs.' Ex. 7, Todaro Body Worn Camera Video at 4:14.

15.   Officers escorted Plaintiff around the corner for scene safety and to hear each person's story individually. Defs.' Ex. 9, Tong Depo. Tr. at 38:22-25; *see also* Defs.' Ex. 11, Todaro Depo. Tr. at 15:17-23.

16.   While Officer Tong steered Plaintiff away from the home, Officers Brady and Todaro stayed at the Plaintiff's front steps and spoke with Plaintiff's wife and children. *See generally* Defs.' Ex. 5; *see also* Defs.' Ex. 7.

17.   Plaintiff was handcuffed because he was a fleeing suspect to a felony and a flight risk. *See* Def. Ex. 11 at 51:14-19.

3

**JA 293**

18.  Both Plaintiff's wife and his older daughter explained to the officers that the girl whom the witness had observed being placed in the car was Plaintiff's younger daughter. *See generally* Defs.' Ex. 5; *see also* Defs.' Ex. 7.

19.  Determining the relationship of the parties involved was but one aspect of the inquiry and the investigation did not cease when officers learned that the alleged victim was the Plaintiff's daughter. Defs.' Ex. 11, Todaro Depo. Tr. at 36:21-23.

20.  The officers insisted that they needed to speak with the alleged kidnapping victim herself. Defs.' Ex. 5 at 20:00. After expressing reservations about her daughter being interviewed by police and after explaining to her daughter that "part of the police officer's job is to keep everybody safe," Plaintiff's wife agreed to let Officer Brady interview her younger daughter. *Id.* at 21:20-24:40.

21.  The girl told Officer Brady that she had fought with her older sister, ran from the car, and was picked up by her father. *Id.* at 25:00- 27:37. She stated that she was not hurt and that her father had picked her up gently. *Id.*

22.  Officer Brady did not begin his interview of Plaintiff's daughter until approximately 20 minutes into Plaintiff's detention. *Id.* at 24:20.

23.  Sergeant Adam Bray arrived on the scene with knowledge that officers were investigating a kidnapping, there was a helicopter in the air, the suspect's tag was run and returned an address. Bray had reasonable suspicion of a kidnapping and obtained information from the officers already on scene. Defs.' Ex. 13, Bray Depo. Tr. at 19-25.

24.  Lieutenant Loftus then arrived on scene and conferred with Sergeant Bray. *Id.* at 41.

4

**JA 294**

25.   After briefly conferring with Lieutenant Loftus, Sergeant Bray walked over to where Plaintiff was being held and began speaking with him.  Defs.' Ex. 4, Bray Body Worn Camera Video at 9:00.

26.   Plaintiff scoffed and laughed when Bray told him officers were investigating a kidnapping. *Id*. at 9:57.

27.   Plaintiff was the only person laughing.  *Id*.

28.   Without prompting, Plaintiff stated that his family was likely reluctant to speak with officers because Plaintiff is a United States Department of Justice (DOJ) civil rights attorney and "I prosecute police officers who violate the Constitution as a job.  My family doesn't trust police and so that is probably why she doesn't want to speak.  I did not kidnap anyone.  The girl I put in my car is my child." *Id.* at 10:25.

29.   Sergeant Bray explained the nature of the 9-1-1 call and ordered another unidentified officer to remove Plaintiff's handcuffs.  *Id*. at 10:48-11:23.

30.   Bray ordered the removal of handcuffs because he felt that Plaintiff was starting to be cooperative and was no longer a flight risk.  Defs.' Ex. 13, Bray Depo. Tr. at 84:8-85:8; Id. at 88:3-17.

31.   Nevertheless, Bray continued with the investigation until he and Lieutenant Loftus were satisfied their investigation was complete and that MPD's Youth Division would have to be notified. *Id*. at 89:11-13; 51-54.

32.   Fishman was detained for approximately 25 minutes while officers investigated a dangerous felony involving a child.  *See generally* Defs.' Exs. 2-5, 7-8; *see also* Defs.' Ex. 15, Loftus Depo. Tr. at 33:8-18; Defs.' Ex. 13 at 62:22-23.

5

**JA 295**

33.     Officers maintained reasonable suspicion of a kidnapping throughout the entirety of the

investigation until its conclusion.  *See* Defs.' Ex. 9 at 19:5-15, 36:3-6; Defs.' Ex. 10 at

44:21-24; Defs.' Ex. 11 at 22:1-4, 31:9-10; Defs.' Ex. 12 at 17:3-7; Defs.' Ex. 13 at

23:24-24:1, 43:5-9; Defs.' Ex. 14 at 12:9-11, 64:17-23; Defs.' Ex. 15 at 23:18-22, 57:1-

5.

January 10, 2024                                       Respectfully submitted,

                                                       BRIAN L. SCHWALB
                                                       Attorney General for the District of Columbia

                                                       STEPHANIE E. LITOS
                                                       Deputy Attorney General
                                                       Civil Litigation Division

                                                       */s/ Chad Copeland*
                                                       CHAD COPELAND [982119]
                                                       Assistant Deputy Attorney General
                                                       Civil Litigation Division

                                                       */s/ Fernando Amarillas*
                                                       FERNANDO AMARILLAS [974858]
                                                       Assistant Deputy Attorney General
                                                       Civil Litigation Division

                                                       */s/ Martha J. Mullen*
                                                       MARTHA J. MULLEN [419036]
                                                       Senior Assistant Attorney General
                                                       AMANDA L. TORRES [1562702]
                                                       Assistant Attorney General
                                                       400 Sixth Street, NW
                                                       Washington, DC 20001
                                                       202-724-6612
                                                       202-735-7390
                                                       martha.mullen@dc.gov
                                                       amanda.torres@dc.gov

                                                       *Counsel for Defendants*

6

**JA 296**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,

       *Plaintiff*,

  v.

DISTRICT OF COLUMBIA, PATRICK
LOFTUS, MARCK JAEGER, JEREMY
BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

      *Defendants.*

1:21-cv-01847-RJL

## DEFENDANTS' MEMORANDUM OF POINTS AND
## AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Court should grant summary judgment in favor of the District of Columbia, Lt. Patrick Loftus, Officer Marck Jaeger, Officer Jeremy Brady, Officer Michael Tong, and Officer Christopher Todaro (Defendants, unless otherwise identified) on Count III (Arrest without Reasonable Suspicion), Count IV (Arrest without Probable Cause), and Count VI (False Imprisonment).  Because Defendants were investigating a credible report of a child kidnapping, they had reasonable suspicion to justify the *Terry* stop resulting in Plaintiff's short, continuous detention.  No probable cause was required, and Plaintiff's claims fail as a matter of law.

### FACTS

On February 17, 2020, Plaintiff Jared Fishman took his two daughters to the Cactus Cantina restaurant on Wisconsin Avenue, Northwest Washington, D.C.  Def.'s Ex. 3, Tong Body Worn Camera Video at 10:34-50. SUMF No.1.   At some point, Plaintiff's younger daughter

misbehaved, and Plaintiff and his children left the restaurant, but the commotion continued outside.  Plaintiff picked up the child and put her in his car.  *Id.* at 10:34-11:11. SUMF No.2.  Moments after Plaintiff secured his younger daughter and got into the driver's seat, a car stopped in front of Plaintiff's car and asked if "there was a problem."  Plaintiff told the man that his "kid was being a little shit."  Plaintiff took his children home.  SUMF No. 3.  Surveillance video shows a male witness pull up in a black Chevrolet SUV in front of Plaintiff's Green Audi and approach Plaintiff's Green Audi.  Within seconds, Plaintiff turns and speeds away. *See* Def.'s Ex. 17 at 2:30-2:45.  SUMF No. 5.

A civilian 9-1-1 caller reported the possible "abduction" of a child.  Def.'s Ex. 6, 9-1-1 recording.  The witness told emergency services, "I don't know if it was an abduction, or a father manhandling his child in a really bad way […]  I saw this little girl walking by herself, she was probably six or seven, so I pulled over to see if she was by herself or with an adult.  Then I saw this guy pull up, and he tried to talk to her, then he started screaming at her, and she pushed him, and he just grabbed her, threw her over his shoulder, and just threw her into the car […] Then this other guy pulled over and tried to help, and he said, 'it's my daughter,' but the other guy wasn't convinced."  *Id.*  SUMF No. 4.   The 9-1-1 caller gave a description of the vehicle, a Green Audi, license plate number, and physical description of the suspect, a white balding male in his forties.  SUMF No 6.

Officer Jaeger heard the call with Fishman's address while he was parked in front of the 7-Eleven on 27th and P St, Northwest and saw Plaintiff's home linked registered to the license plate.  *See* Def.'s Ex. 2, Jaeger Body Worn Camera Video; *see also* Def.'s Ex. 12, Jaeger Depo. Tr. At 22:6-12. SUMF No. 7.   As Jaeger approaches the home, a helicopter circles above and indicates over the radio that "they're watching the situation because the call is for a kidnapping"

which is a serious crime.  SUMF No. 8.  When Officer Jaeger reached the home, Plaintiff, sitting

on the front steps, confirmed that he had just arrived home in the automobile identified by its

license plate by the 9-1-1 caller, an Audi.  *See* Def. Ex. 2.  Plaintiff then *self-identified* as the

kidnapping suspect.  *Id*. SUMF No. 9.

Plaintiff realized that someone near Cactus Cantina must have called the police, and he

figured it must have been the man he spoke to.  SUMF No. 10.  Plaintiff told Officer Jaeger that

the "guy who called in has no idea what's going on."  *Id*.  Instead of answering Jaeger's request

for more information, Plaintiff told him to "hold on," and stood up to enter his home.  *Id*.  But

before Plaintiff stepped over the threshold of his doorway, Officer Jaeger told Plaintiff not to go

inside.  SUMF No. 11.  Plaintiff disregarded Officer Jaeger and entered the house.  *Id*.  Officer

Jaeger immediately followed him inside, seized Plaintiff, and handcuffed him.  *Id.* Three other

MPD officers—Jeremy Brady, Michael Tong, and Christopher Todaro—arrived while Officer

Jaeger was handcuffing Plaintiff.  SUMF No. 12.

While Officer Jaeger was handcuffing Plaintiff, Plaintiff's two daughters appeared in the

doorway of the home.  SUMF No. 13.  Her older sister told the officers that Plaintiff had done

nothing wrong and that "it is my sister, she was misbehaving."  SUMF No. 14.  Officers

escorted Plaintiff around the corner for scene safety and to hear each person's story individually.

SUMF No. 15.

While Officer Tong steered Plaintiff away from the home, Officers Brady and Todaro

stayed at the Plaintiff's front steps and spoke with Plaintiff's wife and children.  SUMF No. 16.

Plaintiff was handcuffed because he was a flight risk.  SUMF No. 17.  Both Plaintiff's wife and

his older daughter explained to the officers that the girl whom the witness had observed being

placed in the car was Plaintiff's younger daughter.  SUMF No. 17.  Determining the relationship

of the parties involved was but one aspect of the inquiry and the investigation did not cease when officers learned that the alleged victim was the Plaintiff's daughter. SUMF No. 18. The officers insisted that they needed to speak with the alleged kidnapping victim herself. SUMF No. 20. After expressing reservations about her daughter being interviewed by police and after explaining to her daughter that "part of the police officer's job is to keep everybody safe," Plaintiff's wife agreed to let Officer Brady interview her younger daughter. SUMF No. 20.

The girl told Officer Brady that she had fought with her older sister, ran from the car, and was picked up by her father. SUMF No. 21. She stated that she was not hurt and that her father had picked her up gently. *Id.* Officer Brady did not begin his interview of Plaintiff's daughter until approximately 20 minutes into Plaintiff's detention. SUMF No. 21. Sergeant Adam Bray arrived on the scene with knowledge that officers were investigating a kidnapping, there was a helicopter in the air, the suspect's tag was run and returned an address. Bray had reasonable suspicion of a kidnapping and obtained information from the officers already on scene. SUMF No. 23. Lieutenant Loftus arrived on scene and conferred with Sergeant Bray. SUMF No. 24.

After briefly conferring with Lieutenant Loftus, Sergeant Bray walked over to where Plaintiff was being held and began speaking with him. SUMF No. 25. Plaintiff scoffed and laughed when Bray told him officers were investigating a kidnapping. SUMF No. 26. Plaintiff was the only person laughing. SUMF No. 27. Without prompting, Plaintiff stated that his family was likely reluctant to speak with officers because Plaintiff is United States Department of Justice (DOJ) civil rights attorney and "I prosecute police officers who violate the Constitution as a job. My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child." SUMF No. 28. Sergeant Bray explained the nature of the 9-1-1 call and ordered another unidentified officer to

remove Plaintiff's handcuffs.  SUMF No. 29.  Bray ordered the removal of cuffs because he felt

that Plaintiff was starting to be cooperative and was no longer a flight risk.  SUMF No. 30.

Nevertheless, Bray continued with the investigation until he and Lieutenant Loftus were satisfied

their investigation was complete and that Youth Division would have to be notified.  SUMF No.

31.  Fishman was detained for approximately 25 minutes while officers investigated a dangerous

felony involving a child.  SUMF No. 32.

Officers maintained reasonable suspicion of a kidnapping throughout the entirety of the

investigation until its conclusion.  SUMF No. 33.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) "must be construed with due regard not only for

the rights of the non-movant . . . but also for the rights of the moving party to demonstrate in the

manner provided by the Rule, prior to trial, that the claims . . . have no factual basis." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  By the very nature of the language of Rule 56(c),

"the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  Thus, a court should grant summary judgment if the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  Indeed, "[a] moving party is 'entitled to judgment as a matter of

law' against 'a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial.'" *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex*

*Corp.*, 477 U.S. at 332). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby, Inc.*, 477 U.S. 249-50.

Applying these standards to this case, the Court should grant summary judgment in Defendants' favor on Counts III-IV and VI of the Amended Complaint.

**ARGUMENT**

I.     **Defendants' Reasonable Suspicion Justifying the *Terry* Stop Supported the Plaintiff's Temporary Detention.**

The bedrock of the Fourth Amendment is reasonableness. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." (emphasis in original)). "[C]onsistent with the Fourth Amendment, the police may briefly detain an individual for investigative purposes, even if they lack the probable cause to arrest, so long as the officers have a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

The Supreme Court has made it clear that "an investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The Court has stressed that brevity is an important aspect of *Terry* stops and that "in assessing the effect of the length of the detention we take into account whether the police diligently pursue their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983). "[I]f an investigatory stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe*, 470 U.S. at 685 (1985).

6

**JA 302**

When evaluating whether Defendants' conduct comports with the Fourth Amendment, the Court must consider the totality of the circumstances and various factors, including time of day, flight, and any informant's tip.  *See, e.g.*, *Miles v. United States*, 181 A.3d 633, 637-638 (D.C. 2018) (*citing Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011)).  "Although each factor is useful in determining whether there were articulable facts justifying the stop, these factors 'are not elements of a conjunctive test,' and no one factor is 'outcome determinative.'" *Miles*, 181 A.3d at 638 (citing *Umanzor v. United States*, 803 A.2d 983, 993 (D.C. 2002) (quoting *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C. 2000)).

Here, the record shows that Defendants' reasonable suspicion justifying the *Terry* stop supported the Plaintiff's temporary detention.  *First*, a civilian 9-1-1 caller reported the possible "abduction" of a child.  SUMF No. 4.  The caller stated, "I don't know if it was an abduction, or a father manhandling his child . . ..  I saw this little girl walking by herself, she was probably six or seven, so I pulled over to see if she was by herself or with an adult.  Then I saw this guy pull up, and he tried to talk to her, then he started screaming at her, and she pushed him, and he just threw her into the car . . ..  Then this other guy pulled over and tried to help, and he said, 'it's my daughter,' but the other guy wasn't convinced."  SUMF No. 4.  Surveillance video shows a male witness pull up in a black Chevrolet SUV in front of Plaintiff's green Audi and approach Plaintiff's car.  Within seconds, Plaintiff turns and speeds away.  SUMF No. 5.  The 9-1-1 caller gave a description of Plaintiff's vehicle, a green Audi, license number, and physical description of the suspect, a white balding male. SUMF No. 6.

*Second*, Officer Jaeger heard the call with Plaintiff's address while he was parked in a police car in front of the 7-Eleven on 27th and P Street, Northwest, which is a block away from Plaintiff's house.  SUMF No. 7.  As Jaeger approaches the home, a helicopter circled above and

indicated over the radio that they were observing "the situation" due to the nature of the kidnapping call.  SUMF No. 8.

When Officer Jaeger reached the home, Plaintiff, sitting on the front steps, confirmed that he had just arrived home in the automobile identified by its license plate by the 9-1-1 caller, an Audi.  SUMF No. 9.  Plaintiff self-identified as the kidnapping suspect.  SUMF No. 9.  Plaintiff told Officer Jaeger: "And that guy who called in has no idea what's going on."  SUMF No. 10.  Plaintiff then sighed, told Jaeger to "hold on one sec," muttered under his breath, and stood up to enter his home.  But before he stepped over the threshold of his doorway, Officer Jaeger told Plaintiff, "Hang tight for a second, don't go inside."  SUMF No. 11.

*Third*, instead of cooperating with Officer Jaeger, Plaintiff fled into his house after being ordered by the first officer on the scene not to do so.  SUMF No. 12.  As the Court found, "once initiated, a suspect cannot terminate a valid *Terry* stop by retreating into his home."  Mem. Op. at 2 (quoting *United States v. Santana*, 427 U.S. 38, 42-43 (1976)).  The Court also found the force used by Officer Jaeger was reasonable, "including the use of handcuffs, to prevent a suspect's flight during an investigative stop."  *Id.*  (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Here, Plaintiff's temporary detention on less than probable cause satisfied the reasonable test under *Terry*.  Reasonable suspicion is a less demanding standard than probable cause and can be established with "less quantity or content or information that is less reliable" than that needed to establish probable cause.  *Alabama v. White*, 496 U.S. 325, 330 (1990).  But the "scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances."  *Sharpe*, 470 U.S. at 682.  Here, handcuffing Plaintiff "was reasonable, as a corollary of the lawful '[*Terry* stop]' . . . to maintain the status quo while the officer sought more information."  *United States v. Purry*, 545 F.2d 217, 220

(D.C. Cir. 1976).  Indeed, Plaintiff was handcuffed because he was a fleeing suspect to a felony and a flight risk.  SUMF No. 17.

Under these facts and circumstances, it was entirely reasonable for Defendants to detain and remain with Plaintiff until all facts came to light, and all suspicion of any crime was dispelled.  Indeed, the officers in this case did what they were trained to do.  "Upon arrival at the scene of an intrafamily related call for service, members shall conduct an initial investigation."[1] "Understanding the warning signs of danger, the potential for flight or assault, and gauging the seriousness and level of danger in any given situation produces a more prepared officer in on and off-duty situations."[2]  This directive comports with Defendants' conduct here as they continued to gather information about a potential kidnapping or child abuse.

## II.     Reasonable Suspicion Supported Defendants' Actions And Justified Plaintiff's Continued Detention, Which Did Not Require Probable Cause.

Generally, an arrest is effected "when the police have [decided] to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court. *In re M.E.B.* 638 A.2d 1123, 1126 (1993) (*citing generally Hayes v. Florida,* 470 U.S. 811 (1985); *Taylor v. Alabama,* 457 U.S. 687, (1982). A *Terry* seizure, on the other hand, involves a more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect. 638 A.2d at

---

[1]     Metropolitan Police Academy 9.1 Domestic Violence Offenses, p. 13, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/9.1%20Domestic%20Violence%20Offenses.pdf (last visited Dec. 13, 2023).

[2]     Metropolitan Police Academy 2.3 Situational Awareness, p. 1, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2.3%20Situational%20Awareness.pdf (last visited Dec. 13, 2023)

1126 (citing *United States v. Purry,* 545 F.2d 217 (1976)).  Here, in fact, although not

controlling, there is no evidence that Defendants in this case intended to formally charge

Plaintiff, and after a reasonable time, he was released.  *See e.g., In re M.E.D.,* 638 A.2d at 1126

(*citing United States v. Gayden*, 492 A.2d 868 (D.C. 1985), *cert denied*, 502 U.S. 843 (1991)

"There is no evidence that the officers meant to formally charge A. and appellant when they put

them into the police vehicle., A. and appellant were specifically told they were not under

arrest"). The two detainees in *M.E.D.* "were only wanted for 'questioning,' a phrase

incompatible with an intent to arrest."  638 A.2d at 1127.  Likewise, even though Plaintiff was

restrained, his continued detention never converted to an arrest, and was justified under the

reasonable suspicion standard articulated in *Terry*, 392 U.S. at 21–22.  It is well established that

the "reasonable, articulable suspicion" standard "requires substantially less than probable cause

and considerably less than proof of wrongdoing by a preponderance of the evidence."  *See*

*Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) (citing *Henson v. United States*, 55

A.3d 859, 867 (D.C. 2012)).

     Importantly, three other MPD officers—Jeremy Brady, Michael Tong, and Christopher

Todaro—arrived while Jaeger was handcuffing Plaintiff.  SUMF No. 9.  Thus, these four

Defendants witnessed an uncooperative and combative suspect, which further heightened their

suspicion.  See generally Def.'s Exs. 2-8.  Officer Todaro testified that Plaintiff remained in

handcuffs because he "tried to flee when we first arrived on scene," and to eliminate the

likelihood of further fleeing or fighting, Plaintiff was kept in handcuffs.  Def. Ex. 11 at 51:14-19.

A seven-year veteran, Officer Todaro was trained in police interactions with the community,

including complainants, witnesses, and subjects.[3]  He focused his "attention on not only what is being said, but also nonverbal signs as well."[4]  Officers are trained that "making conscious observations about a person's body language is crucial in helping to determine whether he or she is contemplating an escape or assault or experienc[ing] a mental health crisis or trauma."[5]

Plaintiff argues that any reasonable suspicion to hold him dissipated when Officer Todaro learned that Plaintiff was the minor child's parent and heard his daughters' protestations that their father had done nothing wrong.  Plaintiff faults Officers Brady (who is thanked by Plaintiff's spouse for his handling of the matter), *see* Def. Ex. 5, and Todaro for not informing Officer Tong what they learned while on the Plaintiff's stoop while first on the scene and then later interviewing Plaintiff's family.  But Plaintiff is wrong.  Officers must not "be lulled into a false sense of security simply because they have been dispatched to a scene of an incident and not an offense."[6]  As Lt. Loftus testified after looking at BWC footage:

> A. Based on my experience in policing, sometimes things are different than they appear, really in life, but it is something we want to factor in during our preliminary investigation.
> Q.  After what you just watched, what did you think happened at the incident that was reported?

---

[3]    *See generally* Metropolitan Police Academy Curriculum, https://mpdc.dc.gov/page/mpd-academy-curriculum ("MPD recruit officers complete a full program of classroom, scenario, physical, and tactical training to prepare them for the challenges of being a police officer. The subjects covered include laws of arrest, search and seizure, criminal law, traffic regulations, human relations, community policing, and ethics.") (last visited Dec. 13, 2023).

[4]    Metropolitan Police Academy 2.3 Situational Awareness, *2.3.3 Detect the behavioral warning signs of potential flight or assault*, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2.3%20Situational%20Awareness.pdf.

[5]    *Id.*

[6]    Metropolitan Police Academy 3.2 Basic Investigative Incident Reports, p.2, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/3.2%20Basic%20Investigative%20Incident%20Reports.pdf (last visited Dec. 13, 2023).

> A: We have one of two situations . . . a couple of possible situations. We have a kidnapping; we have a parental kidnapping or we have child abuse.

Defs.' Ex. 3, Loftus Depo. Tr. 25:1-22; 26:1-16.

Lt. Loftus was the officer in charge that day, making his own observations and remaining in radio contact until he arrived at the scene where the officers had lawfully detained Plaintiff. *See generally* Def.'s Exs. 1, 4, 7-8. But Plaintiff veers off course when making his case that kidnapping is the only relevant crime separate and apart from child abuse. *See generally* Pl.'s Partial MSJ [47-1]. Police investigations are fluid, and although officers may respond to a call for a suspected crime, information may come to light that changes the circumstances of the officers' investigation, particularly serious ones where children are potential victims. Plaintiff's case rests on the faulty premise that being a parent is exculpatory, that a parent cannot kidnap or abuse his own child, and that once a parental relationship is established, all reasonable suspicion dissipates. But knowledge of a parental or custodial relationship with the minor child did not mean that the officers were violating Plaintiff's constitutional rights when they continued their investigation about whether a crime had been committed, whether it be parental kidnapping or child abuse. Nor did the minor daughters' protestations that their father had done nothing wrong signal that the investigation should come to an end. Children may lie to protect a parent, particularly if the child believes she has put her parent in harm's way.[7] Mental health professionals and law enforcement agencies know that the home is not always

---

[7]    It is common knowledge among mental health professionals and the legal justice system, that such phenomenon does occur and that a child's version of what may have happened is the starting point, not the end point of an investigation. *See* Regina Sullivan & Elizabeth Norton Lasley, *Fear in Love: Attachment, Abuse, and the Developing Brain*;2010 Cerebrum 17 (2010).

safe and have developed networks to protect children from abuse and trauma whether inflicted by a parent, relative, friend, or stranger.

These concerns are codified in the District of Columbia Code.  Kidnapping in the District of Columbia is a felony.  *See* D.C. Code § 22-2001.  It is a crime for a custodial parent to kidnap a child.  D.C. Code § 16-1022.  The District of Columbia also recognizes child abuse and neglect, D.C. Code § 4-1301.02, and cruelty to children, D.C. Code § 22-1101.  "Tragically, in 2021, an estimated 1,820 children died from abuse and neglect nationally, and five children die every day from child abuse."[8]  In 2017, in the District of Columbia alone, there were between 64 and 78 *new* victims among children aged 10 to 16.[9]  Here, "equipped with training, experience, and basic common sense, officers on the scene recognized that the Fishman familial relationship was only one factor in their investigation."  *See* Todaro Opp'n [48-2].

Officer Todaro thought Plaintiff's spouse's explanation made "sense," but it was only "one side of the story" and officers had to "continue investigating."  Def.'s Ex. 11 at 36:21-23. He obtained information from Officer Welsh about the status of the investigation, learning that Sergeant Bray was on the way and would need to speak with the child, and that Sergeant Brady was continuing to conduct his own investigation and officers were continuing to investigate a kidnapping.  Def. Ex. 11 at 58:19-25.  Thus, Officer Todaro had reasonable suspicion of a

---

[8]    American Society for the Positive Care of Children, *Child Maltreatment Statistics*, https://americanspcc.org/child-maltreatment-statistics/#:~:text=Highest%20rate%20of%20child%20abuse,younger%20than%203%20years%20old (last visited Dec. 13, 2023).

[9]    Family & Youth Initiative, *Findings from Recent Report on Child Abuse and Neglect*, (Mar. 3, 2023), https://www.dcfyi.org/findings-recent-report-child-abuse-and-neglect#:~:text=In%20DC%20there%20were%20between,were%20for%20neglect%20(85.7%25) (last visited Dec. 13, 2023).

kidnapping until superior officers arrived on scene and conducted their own investigation.  Pl.'s

Mem. Supp. Summ. J. Ex. B (citing Todaro Depo. at 21:21-25-22:1-4; 30:7-10; 31:7-10; 35:3-6;

36:3-6; 37:18-21; 58:19-25; 60:21-23).   Officer Todaro stood with Plaintiff to make "sure

everything [was] safe" and waited "for the investigation to continue." *Id*. at 42:10-14; 43:8;

44:22-23; 47:8.

Approximately 15 minutes after Plaintiff's daughter told Officers Brady and Todaro what

had happened, Sergeant Adam Bray arrived on the scene.  Bray first spoke with Officer Jaeger,

learning that "it definitely sounds like [the alleged victim] was his daughter."  SUMF No. 17.

Bray then waited "a couple minutes" until the arrival of Lieutenant Patrick Loftus.  SUMF No.

18.  After briefly conferring with Loftus, Bray walked over to where Plaintiff was being held and

began speaking with him.  When Bray asked Plaintiff why his family would be reluctant to speak

with them, he responded that he was a United States Department of Justice (DOJ) civil rights

attorney and "I prosecute police officers who violate the Constitution as a job.  My family

doesn't trust police and so that is probably why she doesn't want to speak.  I did not kidnap

anyone.  The girl I put in my car is my child."  SUMF No. 19.  Bray explained the nature of the

9-1-1 call and ordered another unidentified officer to remove Plaintiff's handcuffs.  SUMF No.

20.  Plaintiff and Bray returned to Plaintiff's house.  SUMF No. 21.  Plaintiff was detained for

approximately 25 minutes.  SUMF No. 22.

As seen on BWC footage, *see* Def.'s Exs. 1-8, all events on the family stoop begin

benignly but quickly escalate because Plaintiff starts to flee into his house only to be captured

and cuffed by Officer Jaeger.  Almost immediately thereafter a woman and two young girls

emerge from the house.  The woman leaves the front door open and travels back and forth from

the stoop and goes inside as do the young girls.  Dialogue ensues that reaches a feverish pitch

with the youngest girl appearing hysterical until she later calms down.  To the layman these events might have satisfactorily explained the situation, but MPD officers investigating the possible abduction of a minor child must exercise caution when interacting with family members.[10]

Had Plaintiff been cooperative when questioned by the police instead of fleeing into his house during a lawful *Terry* stop, the encounter might have ended sooner, with the situation resolved to everyone's satisfaction.  Indeed, the Department of Justice—Plaintiff's former employer—admonished Plaintiff for the very conduct he maintains was appropriate during Defendants' investigation of a reported kidnapping of a minor:

> The OIG investigation substantiated the allegation that the Trial Attorney engaged in conduct prejudicial to the government in violation of federal ethics regulations and DOJ policy when the Trial Attorney ignored the instructions of a local police officer. The OIG investigation also found that the Trial Attorney misused the Trial Attorney's position as a DOJ attorney in an attempt to influence the police investigation when the Trial Attorney made reference to being a DOJ attorney while being questioned in handcuffs by police, in violation of federal ethics regulations.

> The Trial Attorney resigned while the OIG's investigation was ongoing.  The OIG has completed its investigation and provided its report to the Trial Attorney's employing division for its information and to DOJ's Professional Misconduct Review Unit for appropriate action.

*See* Def.'s Ex. 16.

Under the totality of the circumstances, no reasonable juror could find in Plaintiff's favor, and summary judgment should be granted to Defendants on Count III (Arrest without

---

[10] Metropolitan Police Academy 9.1 Domestic Violence Offenses, p. 13, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/9.1%20Domestic%20Violence%20Offenses.pdf (last visited Dec. 13, 2023); see also Metropolitan Police Academy 2.3 Situational Awareness, p. 1, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/2.3%20Situational%20Awareness.pdf (last visited Dec. 13, 2023)

Reasonable Suspicion), Count IV (Arrest without Probable Cause), and Count VI (False

Imprisonment).

## CONCLUSION

For these reasons, Defendants ask the Court to grant them summary judgment and dismiss

this case with prejudice.

January 10, 2024                              Respectfully submitted,

                                             BRIAN L. SCHWALB
                                             Attorney General for the District of Columbia

                                             STEPHANIE E. LITOS
                                             Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Chad Copeland*
                                             CHAD COPELAND [982119]
                                             Assistant Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Fernando Amarillas*
                                             FERNANDO AMARILLAS [974858]
                                             Assistant Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Martha J. Mullen*
                                             MARTHA J. MULLEN [419036]
                                             Senior Assistant Attorney General
                                             AMANDA L. TORRES [1562702]
                                             Assistant Attorney General
                                             400 Sixth Street, NW
                                             Washington, D.C. 20001
                                             202-724-6612
                                             202-735-7390
                                             martha.mullen@dc.gov
                                             amanda.torres@dc.gov

                                             *Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,

      *Plaintiff,*

   v.

DISTRICT OF COLUMBIA, PATRICK
LOFTUS, MARCK JAEGER, JEREMY
BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

      *Defendants.*

1:21-cv-01847-RJL

## NOTICE OF FILING OF EXHIBIT

Pursuant to Local Civil Rule 5.4(e), I hereby notice the Court that Exhibits 1-8 and 17 to

Defendants' Motion for Summary Judgment, which are body-worn camera videos, 9-1-1 call

recording, and surveillance video, exist in formats incompatible with filing through the Court's

ECF filing The exhibits will be hand-delivered to the Court on January 11, 2024.  Because these

media files contain the images and identities of minor children and other personally identifying

information, Defendants request that these exhibits remain out of the public record.

January 10, 2024

      Respectfully submitted,

      BRIAN L. SCHWALB
      Attorney General for the District of Columbia

      STEPHANIE E. LITOS
      Deputy Attorney General
      Civil Litigation Division

      */s/ Chad Copeland*
      CHAD COPELAND [982119]
      Assistant Deputy Attorney General
      Civil Litigation Division

**JA 313**

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Assistant Deputy Attorney General
Civil Litigation Division

*/s/ Martha J. Mullen*
MARTHA J. MULLEN [419036]
Senior Assistant Attorney General
AMANDA L. TORRES [1562702]
Assistant Attorney General
400 Sixth Street, NW
Washington, DC 20001
202-724-6612
202-735-7390
martha.mullen@dc.gov
amanda.torres@dc.gov

*Counsel for Defendants*

2

**JA 314**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 9**

Page 1

```
 1       UNITED STATES DISTRICT COURT
 2       FOR THE DISTRICT OF COLUMBIA
 3    _____
 4   JARED FISHMAN,
 5        Plaintiff,
 6     v.          Case No:
 7   DISTRICT OF COLUMBIA,      1:21-cv-01847-RJL
 8   PATRICK LOFTUS, MARCK JAEGER,
 9   JEREMY BRADY, MICHAEL TONG, &
10   CHRISTOPHER TODARO,
11        Defendants.
12    _____
13        VIDEOTAPED DEPOSITION
14    _____
15
16   WITNESS:     MICHAEL TONG
17   DATE:        Wednesday, August 16, 2023
18   START TIME:  11:31 a.m., ET
19   END TIME:    2:33 p.m., ET
20   REMOTE LOCATION:  Remote Legal platform
21   REPORTER:    Shenay Crawford, CDR-1966
22   JOB NO.:     18111
23
24
25
```

Page 2

```
 1      A P P E A R A N C E S
 2
 3   GERSTEIN HARROW, LLP
 4   810 7th Street Northeast
 5   Suite 301
 6   Washington, D.C. 20002
 7   By:  CHARLES GERSTEIN, ESQUIRE
 8        EMILY GERRICK, ESQUIRE
 9        SAMUEL ROSEN, ESQUIRE
10   charlie@gerstein-harrow.com
11   emily@gerstein-harrow.com
12   sam@gerstein-harrow.com
13   Appearing for Plaintiff
14
15   OFFICE OF THE ATTORNEY GENERAL
16   FOR THE DISTRICT OF COLUMBIA
17   400 6th Street NW
18   Washington, D.C. 20001
19   By:  AMANDA TORRES, ESQUIRE
20        MARTHA MULLEN, ESQUIRE
21   manda.torres@dc.gov
22   martha.mullen@dc.gov
23   Appearing for Defendants
24
25
```

Page 3

```
 1      APPEARANCES
 2      (CONT'D)
 3
 4   ALSO PRESENT:
 5     Amanda Ricker, Notary Public
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      I N D E X   O F   T E S T I M O N Y
 2
 3   EXAMINATION OF MICHAEL TONG:        PAGE
 4     By Mr. Gerstein           8
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 21

1  in accordance with general order SPT30202, request an
2  official to respond to the scene, notify SDD, and upon
3  approval of the SDD watch commander, obtains central
4  Complaint Numbers, prepare a PD form 251, and a PD form
5  252."
6        Let me just ask that a little bit more
7  clearly.
8        Do you believe you did all of those things,
9  you and the other officers who responded on February
10 17th, 2020?
11       MS. TORRES:  Objection as to his
12 knowledge of what the other officers did.
13       THE WITNESS:  So it should be noted that
14 I was an assisting officer.  I was not the primary unit
15 or first responding unit, which is what you're referring
16 to.
17       MR. GERSTEIN:  Okay.  Okay.  Moving on.
18 All right, and let me -- one moment, please.  Going to
19 my --
20 BY MR. GERSTEIN:
21    Q  Do you know what a welfare check is, Officer
22 Tong?
23    A  Do I know what a welfare check is?  Yes, in
24 the context of MPD.
25    Q  Okay.  And are you aware that there's a

Page 22

1  general order governing welfare checks?
2     A  Correct.  There's well -- there's a general
3  order regarding welfare checks of adults and juveniles.
4     Q  And did you review either of both of those
5  documents in preposit (sic) -- in preparation for your
6  deposition today?
7     A  It -- it's one document, but, yes, I -- I have
8  general knowledge of the general order and reviewed it
9  prior to today.
10       MR. GERSTEIN:  Okay.  I am going to --
11 hold, one moment -- going to share what, Ms. Court
12 Reporter, I'd like marked as Exhibit B, please.
13       Okay.  Counsel, can you see the document
14 on your screen?
15       MS. TORRES:  Yes.  Thank you.
16       MR. GERSTEIN:  Thank you.
17       Ms. Court Reporter, this is Exhibit B.
18       (Exhibit B marked for identification.)
19 BY MR. GERSTEIN:
20    Q  Officer Tong, have you ever seen this document
21 before?
22    A  Yes, I have.
23    Q  And this is the general order governing --
24 well, excuse me.
25       This is the general order governing welfare

Page 23

1  checks; is that correct?
2     A  Correct.
3     Q  Okay.  For a typical welfare check, do you
4  need to have people in handcuffs?
5     A  I think it's that circumstantial and I think
6  it depends on the -- and, therefore, I can't make a
7  general conclusion.
8     Q  So have you put people in handcuffs during a
9  welfare check before?
10    A  During a welfare check?  Wait a second, wait.
11       I can recall specific -- instances where I've
12 gone to -- excuse me.  Yes, I've gone to -- called for
13 service for a welfare check, and, yes, I've placed
14 people in handcuffs.
15 BY MR. GERSTEIN:
16    Q  I'm going to direct your attention to page 2
17 of this document where there are two examples.  Could
18 you take a moment to read Example 1 and Example 2?
19 Alternatively, I can read them out loud, if you'd
20 prefer.
21    A  You're talking about Regulations A and B?
22    Q  Correct.  So B, Example 1, and B, Example 2,
23 which are, "A son has been unable to reach his elderly
24 mother for two days, but she has not answered the phone
25 or responded to knocks at the door.  The son calls MPD

Page 24

1  to perform a welfare check at his mother's residence.
2  This is an example of a 'Check on Welfare of Adult'
3  incident."
4        "Example 2:  A call is received from a
5  concerned member of the community regarding the homeless
6  person who appears to be in distress.  A member is
7  dispatched to respond to that location and determines
8  the need for an ambulance from District of Columbia Fire
9  and Emergency Medical Services."  "This is not an
10 example of a 'Check on [the] Welfare of [an] Adult'
11 incident."
12       Why do you think, in your opinion, the second
13 example is not a welfare check?
14       MS. TORRES:  I'm going to object.  You're
15 asking him to analyze this and draw a legal conclusion
16 from it.
17       THE WITNESS:  Correct.  I don't think I
18 can answer that question in the context of someone who
19 doesn't -- doesn't write policy for the police
20 department.
21       MR. GERSTEIN:  Let me rephrase a little
22 bit.
23 BY MR. GERSTEIN:
24    Q  And this document is attempting to draw a
25 distinction between these two events so that officers

Page 29

1 reviewed in preparation for this deposition.

2          I'm clicking "Share." I would not be

3 surprised if this takes a little while. Okay.

4          Does everyone see a 34-minute and 25-

5 second video file on their screens?

6          (Exhibit C marked for identification.)

7          MS. TORRES: Yes.

8          MR. GERSTEIN: Officer Tong, do you see

9 the same?

10         THE WITNESS: I see a video, but can't

11 see duration.

12         MR. GERSTEIN: Okay. I see it marked

13 Exhibit C. Officer Tong, your video is frozen. I'm

14 okay continuing, but if there's anything we can do to

15 improve that connection.

16         Are you all -- is everyone else seeing

17 Officer Tong frozen?

18         MS. TORRES: Yes, I see him frozen.

19         MR. GERSTEIN: Let's hang tight for a

20 second because I think the system may be overwhelmed by

21 the size of this video, but --

22         THE WITNESS: I can actually still --

23         MS. TORRES: So enough --

24         THE WITNESS: I can actually still hear

25 everything that's going on. If my video -- if the video

Page 30

1 is paused, then I don't think there's anything wrong

2 with the connection.

3          MR. GERSTEIN: Okay. Great. Yeah, now I

4 can see you moving as well, so I think we're in good

5 shape.

6          THE WITNESS: Okay. Okay.

7          MR. GERSTEIN: So let me just ask you --

8 I'm going to play this video for you now and ask you

9 some questions as we go along, but before we start

10 -- let me move this video to -- I am moving the video to

11 the five minute mark, and then I'm going to play it

12 until the 5 minute and 26 second mark, starting a little

13 more early.

14          I'm sorry, Officer Tong, can you hear the

15 audio as well?

16          THE WITNESS: I hear that one second

17 snippet that -- when you -- when you play it. Yes, I

18 can hear.

19          MR. GERSTEIN: Great.

20          And Ms. Torres, can you hear that as

21 well?

22          MS. TORRES: Yes, I can. Thank you.

23          MR. GERSTEIN: Excellent.

24 (Video playback.)

25 BY MR. GERSTEIN:

Page 31

1   Q   Before you arrived at Mr. Fishman's front door

2 in this videotape, what crimes, if any, did you believe

3 you had reasonable suspicion of?

4   A   So like I said earlier, MPD was investigating

5 a possible kidnapping of a juvenile.

6   Q   Did you believe you had reasonable suspicion

7 of any other crimes at that time?

8   A   I believe, I have answered that question.

9   Q   I don't believe you did. But if you could

10 answer it again, the worst-case scenario, we have two

11 answers.

12   A   Are there any objections?

13         MS. TORRES: It's okay, Officer Tong.

14 You can -- I didn't make an objection, so you can go

15 ahead and answer.

16         THE WITNESS: Okay. At -- at the time,

17 MPD was only investigating, primarily, the suspected

18 kidnapping of a juvenile and no other crimes.

19 BY MR. GERSTEIN:

20   Q   I'm just going to focus for a moment to make

21 sure we're absolutely clear.

22         You said "primarily" in that sentence. Is it

23 your testimony that you did not have reasonable

24 suspicion of any other crime before you arrived at the

25 door of Mr. Fishman's house on February 17th, 2020?

Page 32

1   A   I can't testify to -- to that.

2   Q   Why not?

3   A   When I arrived to this scene, in particular

4 where you -- you're saying this video stopped, were

5 there any other crimes?

6   Q   Correct.

7   A   Right. I don't know how I can answer that

8 question. Without, you know -- I think that's a

9 question for the officers that actually stopped him,

10 whether there were more crimes committed in their

11 presence --

12   Q   Oh, let me make -- let me clarify that.

13         What I need to say is, did you believe at that

14 moment that you had reasonable suspicion in your own

15 mind of any other crimes, based on the state of the

16 evidence that you know?

17   A   Again, I don't understand the question.

18   Q   Okay. Let me make sure I'm clarifying this.

19         Your earlier testimony was that you understand

20 how a police officer forms reasonable suspicion when

21 investigating a crime; is that correct?

22   A   You mean how officers develop reasonable

23 suspicion and conduct a stop?

24   Q   Correct.

25   A   Yes. I believe I answered that earlier.

Page 37

1    Q   You said to Mr. Fishman, "If you want to speak
2  to a supervisor, we can speak to a supervisor later, but
3  not right now."
4        Do you recall why you said that?
5    A   If you look a couple seconds before he asked,
6  "Who's in charge here?" and that was my response to him,
7  that if he wanted to speak to a supervisor, he could.
8        MR. GERSTEIN:  I am going to continue
9  playing now.
10   (Video playback.)
11       MR. GERSTEIN:  I am stopping at 6:44.
12 BY MR. GERSTEIN:
13   Q   So in this video, you took Mr. Fishman to a
14 spot just around the corner from his house.  Why did you
15 choose that specific location?
16   A   Right.  So I walked Mr. Fishman to the corner
17 of 27th and O Street, which is, literally, like, one
18 door down.  And that just is easier to -- scene that's
19 easy to manage.  He can -- he can be attended to at the
20 corner; he can be offered medical attention, whatever
21 the need is.  And it's just easier to manage a scene
22 that way.
23   Q   Did you specifically want to separate him from
24 the other members of the people that you described -- I
25 understand -- I'm sorry.  Let me just ask this question

Page 38

1  again:  Did you specifically want to separate him from
2  other people involved in the incident that you were
3  investigating?
4    A   Such as?
5    Q   The two girls who appeared at the door of his
6  house and the woman who was with them.
7    A   Not necessarily, no.
8    Q   Okay.  So when you told Mr. Fishman that it
9  would -- that, "We're not going to do this in front of
10 your kids," why did you say that?
11   A   You -- what -- so -- I'm sorry.  Can you
12 rephrase the question, if I -- if -- about what I said?
13   Q   Sure.  So at -- I believe, it's at
14 approximately minute 5:39, you say, "No, we're not going
15 to do this in front of your kids," in response to Mr.
16 Fishman's request, "I want to do this in front of my
17 kids."
18       Why couldn't you investigate this incident in
19 front of his children?
20   A   So I -- at that time, you know, I did not know
21 whether it -- whether Mr. Fishman meant he wants to
22 argue, fight, you know, et cetera, in front of his kids.
23 I have no idea.  So the best practice is actually just
24 to move him to a separate location, and then interview
25 him there.  So he's removed from situation.

Page 39

1    Q   Okay.  So it's your testimony that you
2  interpreted this as potentially involving a fight or
3  dispute of some kind?
4    A   As I said earlier, I saw Mr. Fishman
5  struggling with MPD in front of -- on the front steps of
6  his home.
7    Q   And that's what you didn't want to happen in
8  front of his kids?
9    A   Correct.  So did -- to de-escalate the
10 situation, he was walked to the corner of the block,
11 which is literally one door down from his home.
12   Q   Okay.  And the purpose of moving him wasn't so
13 that other potential witnesses wouldn't hear what he had
14 to say.  It was instead to de-escalate the situation.
15   A   I think you're inferring that it was the only
16 -- it was the only reason that he was moved to the block
17 was to separate him.
18       And again, as a best practice, it's to de-
19 escalate the situation, to have him separated from the
20 scene, and manage it that way.
21       MR. GERSTEIN:  I am going to play the
22 tape for about another 20 seconds.  Thank you, Officer
23 Tong.
24   (Video playback.)
25 BY MR. GERSTEIN:

Page 40

1    Q   Between approximately seven minutes and eight
2  seconds into the video, and 7 minutes and 18 seconds
3  into the video, Mr. Fishman asks for explanation why
4  he's been detained in front of his house, and you
5  respond, "I don't have information to answer your
6  question."
7        Was that true?
8    A   So Mr. Fishman's question was why is he being
9  stopped?
10   Q   Correct.  I mean, to be clear, we all saw the
11 video, so let your own recollection control, but my
12 understanding is that he was asking why he was being
13 detained.  We can play it back, if that would be
14 helpful.
15   A   Yeah.  So it's MPD's policy to inform everyone
16 prior to their release.  At this point in time, the --
17 the investigation is still ongoing, so I don't know all
18 the information that has been collected on scene.
19   Q   Okay.  At this point during the videotape,
20 what kinds, if any, did you, yourself, believe you had
21 reasonable suspicion of?
22   A   So, again, Mr. -- Mr. Fishman was being
23 investigative in regards to the suspected kidnapping of
24 juvenile.
25       MR. GERSTEIN:  Okay. I'm going to

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 10**

Page 1

```
1         UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    _____

4  JARED FISHMAN,

5          Plaintiff,

6       v.          Case No:

7  DISTRICT OF COLUMBIA,        1:21-cv-01847-RJL

8  PATRICK LOFTUS, MARCK JAEGER,

9  JEREMY BRADY, MICHAEL TONG, &

10 CHRISTOPHER TODARO,

11         Defendants.

12  _____

13        VIDEOTAPED DEPOSITION

14  _____

15

16 WITNESS:      JEREMY BRADY

17 DATE:         Thursday, August 17th, 2023

18 START TIME:   12:05 p.m., ET

19 END TIME:     2:55 p.m., ET

20 REMOTE LOCATION:  Remote Legal platform

21 REPORTER:     Shenay Crawford, CDR-1966

22 JOB NO.:      18141

23

24

25
```

Page 2

```
1        A P P E A R A N C E S

2

3   GERSTEIN HARROW LLP

4   810 7th Street Northeast, Suite 301

5   Washington, District of Columbia 20002

6   By:  EMILY GERRICK, ESQUIRE

7        JASON HARROW, ESQUIRE

8        SAMUEL ROSEN, ESQUIRE

9        emily@gerstein-harrow.com

10       jason@gerstein-harrow.com

11       sam@gerstein-harrow.com

12  Appearing for Plaintiff

13

14  DISTRICT OF COLUMBIA ATTORNEY OFFICE

15  400 Sixth Street Northwest

16  Washington, District of Columbia 20001

17  By:  MARTHA J. MULLEN, ESQUIRE

18       martha.mullen@dc.gov

19  Appearing for Defendants

20

21  ALSO PRESENT:

22  KIMBERLY JONES, RON Notary Public

23  PRAE SUWANNIROJ, Paralegal, D.C. Attorney Office

24

25
```

Page 3

```
1      INDEX OF TESTIMONY

2

3  EXAMINATION OF JEREMY BRADY:          PAGE

4   By Ms. Gerrick            7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1      INDEX OF EXHIBITS

2        (available for download)

3

4  EXHIBIT  DESCRIPTION            PAGE

5  A    3/2/2007 General Order on Handling    22

6       Kidnapping/Extortion Cases

7  B    6/4/2018 General Order on Welfare Checks  23

8  C    11/18/2020 General Order on Child Abuse   29

9       and Neglect

10 D     Officer Brady's Body Worn Camera     36

11      Video Footage

12 E     03/19/2020 Final Investigative Report Memo  91

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 41

1    Q   Great.  And so then you tell the little girl
2    that it's going to be okay and you're going to explain
3    everything to her.  What were you planning to explain?
4    Right.  What would you say?
5         MS. MULLEN:  Are you moving on with the
6    video, or --
7         MS. GERRICK:  I think that -- I think
8    that he said it -- I think he's already said that at
9    this point in the video, but let's rewind a little bit
10   and --
11        (Video Exhibit Played.)
12   BY MS. GERRICK:
13        Q   Yeah.  Did you -- you -- that was you saying,
14   we're going to explain everything to you; is that
15   correct?
16        A   Yes.
17        Q   Okay.  What were you -- do you remember what
18   you were planning to say to her, what you were going to
19   explain?
20        A   So my goal at that moment was de-escalation,
21   trying to bring some more calm to somebody that was
22   extremely stressed.
23        Q   Uh-huh?
24        A   That's my answer.
25        Q   Okay.  Were you going to -- what were you --

Page 42

1    were you going to explain things to her, or were you
2    just saying that to deescalate the situation?
3         A   Sure.  I was definitely going to explain what
4    I was able to, but I needed -- I didn't have anything I
5    could explain right at that second.
6         Q   Right.
7         A   It takes a little bit of time to -- to
8    formulate that.
9         Q   Okay.  Thank you.
10        (Video Exhibit Played.)
11   BY MS. GERRICK:
12        Q   All right.  And so at this point in the video,
13   Mr. Fishman, does it look like -- does it look like he
14   is comforting the girl as he tells her to go back
15   inside?
16        MS. MULLEN:  Objection as to form.
17   You're asking him if -- looking at this image, whether
18   it looks like the father is comforting the little girl?
19        MS. GERRICK:  Yes.
20   BY MS. GERRICK:
21        Q   Did it appear to you like he was speaking in a
22   comforting tone, like he was trying to comfort her?  Was
23   that your impression?
24        A   If you're referring to the comment about,
25   please go back -- go back inside of the house reference,

Page 43

1    I believe it was Officer Todaro that said that.
2         Q   He said --
3         A   It sounded like it.
4         Q   Oh, I --
5         A   I could be wrong.  I'm just basing on what I
6    heard in the house.
7         Q   Okay.  I may be mistaken.  All right.  I
8    thought he was saying that.  It looks --
9         A   It's possible.  I have to hear it again, but
10   it sounded like Officer Todaro's voice that I heard say
11   that, just based on working with him in the past.
12        Q   Okay.  Why would Officer Todaro have told the
13   girls to go back inside the house?
14        A   Clearly we don't -- there's something dramatic
15   going on for this child, and our goal is not to have her
16   stare at this dramatic situation and make it worse for
17   them.
18        Q   Great.  Thank you.
19        (Video Exhibit Played.)
20   BY MS. GERRICK:
21        Q   All right.  So, at this point, did you hear
22   her say he had -- the little girl say she hasn't done
23   anything; it was my fault?
24        A   She said something that I -- I don't -- she
25   was screaming -- screaming and crying at the same time.

Page 44

1    Q   All right.  And at this point, it's like the
2    -- you see the woman picking the little girl up; is that
3    correct?
4         A   Yes, ma'am.
5         Q   And so what did you think that the girl's
6    relationship to the woman was?
7         A   I mean, I -- I assumed it was a mother or
8    caretaker.  Later in my discussion, I -- I confirmed it
9    that it was the mother.  But at that moment --
10        Q   Thank you.
11        A   -- it was a female inside the house that
12   seemed to be doing something to try to help comfort that
13   child that needed help.
14        Q   Great.  Thank you.  And did you have any
15   assumption about who the man was in relation to the
16   mother and the girl?
17        A   I think at that point I did not.  I can't
18   remember if she screamed dad or something.  I can't
19   remember when she had screamed it, but when I first
20   arrived, no, I -- I did not know.
21        Q   Okay.  So, you see the woman pick her up, you
22   assume that that's her mother.  At this point, what did
23   you believe you had reasonable suspicion of?
24        A   An alleged child abduction because that's what
25   was announced on the police radio.  And there was

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 11**

1             UNITED STATES DISTWRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    _____

4    JARED FISHMAN,

5             Plaintiff,

6        v.                          Case No:

7    DISTRICT OF COLUMBIA,           1:21-cv-01847-RJL

8    PATRICK LOFTUS, MARCK JAEGER,

9    JEREMY BRADY, MICHAEL TONG, &

10   CHRISTOPHER TODARO

11           Defendants.

12   _____

13             VIDEOTAPED DEPOSITION

14   _____

15

16   WITNESS:          CHRISTOPHER JOHN TODARO

17   DATE:             Thursday, August 24, 2023

18   START TIME:       11:34 a.m., EST

19   END TIME:          2:19 p.m., EST

20   REMOTE LOCATION:   Remote Legal platform

21   REPORTER:         Shenay Crawford, CDR-1966

22   JOB NO.:          19062

23

24

25

```
 1   from other witnesses, where is it advisable to put them?
 2              MS. MULLEN:  Objection as to form.
 3              You can answer.
 4              THE WITNESS:  I don't understand the
 5   question.
 6   BY MS. GERRICK:
 7       Q    So let's say that you have someone detained
 8   for questioning pursuant to a Terry stop, and there are
 9   other witnesses around, and you want to separate them.
10   Where would you generally -- what are places that you
11   could put the witness while you --
12       A    Oh.
13              MS. MULLEN:  I --
14              MS. GERRICK:  -- questioning them?
15              MS. MULLEN:  I'm objecting to the form.
16              But go ahead, Sergeant.
17              THE WITNESS:  Yes, ma'am.  You want to
18   separate all parties to -- to hear each story
19   individually so there's no -- how do I say it?  No
20   influence on one person's story or another.
21              So, we generally separate them, going
22   into a different room, go down the block.  Just remove
23   them from eyesight is the -- is the goal.
24   BY MS. GERRICK:
25       Q    All right.  Thank you.  And I've heard that
```

USCA Case #25-7050    Document #2131053       Filed: 08/20/2025    Page 330 of 426
Case 1:21-cv-01847-RJL   Document 45-5   Filed 01/02/2024   Page 22 of 18

22

```
1        Q    Great.  And did you have reasonable suspicion

2   to believe that a kidnapping had occurred as you

3   approached the house?

4        A    Yes.

5             MS. MULLEN:  I'm sorry.  I didn't hear

6   the question.  I know he's already answered.

7             MS. GERRICK:  I just asked if he had

8   reasonable suspicion to believe that a kidnapping has

9   occurred -- had occurred when he approached Mr.

10  Fishman's house on that day.

11            MS. MULLEN:  Thank you for repeating it.

12  I appreciate that.

13            MS. GERRICK:  No problem.

14  BY MS. GERRICK:

15       Q    And as you're approaching the house, what have

16  you been told about the situation?

17       A    There was a witness that saw a -- an adult

18  male matching description given, which I don't remember

19  from that day, to be honest.  And it was a child --

20  small child was thrown into a green Audi SUV.

21            The license plate, D.C. license plate, was

22  seen by the -- the witness and was run through our

23  system and showed the registration was registered to an

24  owner who lived at the O Street location in Georgetown.

25            So, when I pulled into the block and saw the
```

```
 1    BY MS. GERRICK:

 2        Q    What was your -- what was your impression of

 3    what was -- what she was reacting to?

 4        A    I'm not sure what the little girl was -- why

 5    she was acting the way she was, but she was visibly

 6    upset about what was happening.

 7        Q    Great.  Thank you.  And at this point, what

 8    crime or crimes did you have reasonable suspicion of?

 9        A    At this point, reasonable suspicion that a

10    kidnapping potentially occurred.

11        Q    Great.  Thank you.  All right.  So that was

12    minute 4:10.  I'm going to keep playing for about seven

13    more seconds.

14        (Video played.)

15    BY MS. GERRICK:

16        Q    Great.  And so I'm stopping at minute 4:17.

17    Can you describe what's happening here?

18        A    Still the little child -- little girl is very

19    hysterical as well.  Then I was pretty shocked at this

20    point because the older daughter came up and started

21    saying things that, you know, we didn't even talk to her

22    about.  So, she was talking about an incident that

23    happened that, you know, we didn't even talk about yet.

24    So, I was a little shocked and kind of overwhelmed at

25    this point.
```

```
 1    told her what I remembered off the top of my head from

 2    the call.

 3         Q    Perfect.  Thank you.  And again, same question

 4    again.  At this point, what crime or crimes did you have

 5    reasonable suspicion of?

 6         A    A potential kidnapping.

 7         Q    Great.  Thank you.  All right.  I'll play

 8    again.  We're at 4:31.

 9         (Video played.)

10    BY MS. GERRICK:

11         Q    Great.  So, we're at 4:53.  Can you describe

12    what's happening here?

13         A    The older daughter is telling me what

14    transpired before we -- we got to the house.

15         Q    Okay.  Thank you.  And does this explanation

16    seem plausible to you?

17         A    I don't understand the question.

18         Q    Sorry.  So does her explanation, does it seem

19    weird to you, or does it raise any red flags, or does it

20    seem like perfectly plausible and that makes sense?

21         A    Her explanation makes sense, but definitely

22    it's one side of the story.  So, we still have to

23    continue investigating.

24         Q    Okay.  Thank you.  And is her explanation here

25    consistent with what you know about what the 9-1-1
```

```
 1   BY MS. GERRICK:

 2       Q    Can you get it working again?  Can you try

 3   saying something?

 4       A    Oh, I apologize.  So, when the supervisor

 5   arrived on scene, you know, with our -- with our general

 6   orders, with a serious incident like this, a supervisor

 7   has to respond to the scene and conduct their

 8   investigation to, you know, give the best direction on

 9   what we should do -- to the officers.

10       Q    Thank you.  So, is it the case then that Mr.

11   Fishman couldn't get out of the handcuffs until a

12   sergeant had arrived?

13       A    Not necessarily, no.  The reason he stayed in

14   handcuffs was due to the fact that he tried to flee when

15   we first arrived on scene.  So whenever that happens,

16   you -- we tend to, as officers, try and eliminate any

17   other, you know, incidents, whether it's fleeing, or,

18   you know, fighting, or anything like that by keeping the

19   suspect in handcuffs.

20       Q    Great.  Thank you.  And would you have been

21   able to finish the investigation or stop detaining him

22   regardless of the handcuffs without a sergeant there, or

23   does a sergeant have to come and make the determination?

24       A    He could --

25                MS. MULLEN:  Objection to the form of the
```

1       Q    All right.  So, I'm stopping at 25:12.  Do you

2   know why Sergeant Brady is asking for ID here?

3       A    I don't know why.  I -- I would think to

4   verify, you know, who he is from what the people at the

5   house are saying, and/or maybe to know who he's talking

6   to.

7       Q    Thank you.  And it's been, I think, over 20

8   minutes at this point.  Is it surprising to you that no

9   one's asked him for the ID yet?

10      A    Officer Tong had gotten his information prior

11  when he was interviewing the suspect.  So, I'm not sure

12  why exactly Sergeant Brady is asking for the ID now.

13      Q    Great.  Thank you.  I'm going to go ahead and

14  press play.

15      (Video played.)

16  BY MS. GERRICK:

17      Q    So I'm stopping at minute 26.  Can you

18  describe what's happening here?

19      A    Sergeant Brady is conducting his own

20  investigation since he just, you know, you may have seen

21  not that long ago talking to all parties.  And he's

22  explaining to the suspect here, you know, why exactly

23  we're here and why he's in handcuffs.  And then the

24  suspect thought it was pretty humorous that we -- we

25  were investigating the kidnapping.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 12**

Page 1

```
1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    _____

4    JARED FISHMAN,

5          Plaintiff,

6      v.          Case No:

7    DISTRICT OF COLUMBIA,        1:21-cv-01847-RJL

8    PATRICK LOFTUS, MARCK JAEGER,

9    JEREMY BRADY, MICHAEL TONG, &

10   CHRISTOPHER TODARO,

11         Defendants.

12   _____

13         VIDEOTAPED DEPOSITION

14   _____

15

16   WITNESS:      MARCK JAEGER

17   DATE:         Monday, August 28th, 2023

18   START TIME:   1:44 p.m., ET

19   END TIME:     4:21 p.m., ET

20   REMOTE LOCATION:   Remote Legal platform

21   REPORTER:     Shenay Crawford, CDR-1966

22   JOB NO.:      18135

23

24

25
```

Page 2

```
1          A P P E A R A N C E S

2

3    GERSTEIN HARROW

4    810 7th Street Northeast

5    Suite 301

6    Washington, D.C. 20002

7    By: EMILY GERRICK, ESQUIRE

8       SAM ROSEN, ESQUIRE

9       emily@gerstein-harrow.com

10      sam@gerstein-harrow.com

11   Appearing for Plaintiff

12

13   OFFICE OF ATTORNEY GENERAL FOR THE

14   DISTRICT OF COLOMBIA

15   400 6th Street Northwest

16   Washington D.C. 20001

17   By: MARTHA MULLEN, ESQUIRE

18      martha.mullen@dc.gov

19   Appearing for Defendants

20

21

22

23

24

25
```

Page 3

```
1

2          I N D E X   O F   T E S T I M O N Y

3

4    EXAMINATION OF MARCK JAEGER:          PAGE

5      By Ms. Gerrick              7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1

2          I N D E X   O F   E X H I B I T S

3          (available for download)

4    EXHIBIT   DESCRIPTION          PAGE

5    A    Body cam video taken by Officer    22

6         Marck Jaeger of witness arrest

7    B    Child Abuse and Neglect General Order    84

8         of Mr. Fishman

9    C    Welfare Check General Order of        93

10        Mr. Fishman

11   D    Memo Investigative report of         97

12        Mr. Fishman

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 17

1  where they go over general orders and standard practices
2  for calls.
3      Q.  Thank you.  And on February 17th, 2020, what
4  crime did you have reasonable suspicion to believe had
5  occurred as it related to Mr. Fishman?
6      A.  We received -- received the call for
7  kidnapping.
8      Q.  Right.  Thank you.  So the crime that you were
9  investigating was -- what kind of crimes were you
10 investigating on that day?
11     A.  The radio sign was for kidnapping; so we're
12 investigating a kidnapping.
13     Q.  Thank you.  Right.  And on February 17th,
14 2020, what experience had you had with kidnapping cases?
15     A.  I'd been assigned to a -- the Georgetown area
16 at that point for a few -- for a few years, at that
17 point.  It's not a frequent call I would say, but it --
18 it happens more frequently than, I guess, someone would
19 like to think.
20     Q.  So you had had experience with kidnapping
21 calls at that point?
22     A.  Yes.
23     Q.  Can you tell me about those experiences?
24     A.  I had a person try to kidnap a little girl;
25 she was able to fight them off.  And we interviewed her,

Page 18

1  and ultimately, the person was arrested a day later, I
2  believe.
3      Q.  Thank you.  And were you there when the
4  suspect was arrested in that case?
5      A.  I was not.
6      Q.  And did you participate in the interview of
7  the little girl?
8      A.  Yes.
9      Q.  Thank you.  Were there any other kidnapping
10 cases that you had experience with?
11     A.  A couple calls for, like, parental kidnapping,
12 where one parent would -- would abscond with the child.
13 But there's a -- other than that, nothing.
14     Q.  In the first case that you described, what
15 kind of questions did you ask the little girl?
16         MS. MULLEN:  Well, objection to the form
17 of the question.  It's also irrelevant.
18         But you can go ahead and answer it.
19         THE WITNESS:  For her, I -- my main focus
20 was -- because she was -- believe, she was about five
21 years old.  So she was -- you know, my main focus was to
22 calm her down, make sure she was okay, and slowly talk
23 to her and see if -- if she can tell me what the person
24 looked like.  Most of the investigation with that went
25 back to reviewing -- not body cameras, excuse me,

Page 19

1  surveillance cameras from up the street.  And that's
2  ultimately how the person was located.
3  BY MS. GERRICK:
4      Q.  Thank you.  And was it fairly clear -- fairly
5  immediately in that case that she was not related to the
6  kidnapper?
7      A.  Yes.  She said she wasn't.
8      Q.  Thank you.  And in the family kidnapping
9  cases, is it fairly clear in those situations as well
10 that it's a family -- there was a family member
11 kidnapping them?
12         MS. MULLEN:  Well, objection as to -- to
13 form.
14         He said it was parental kidnapping.
15 BY MS. GERRICK:
16     Q.  Yes.  Was it immediately clear that it was a
17 parental kidnapping case in those cases, or did you have
18 to do investigation to find out?
19     A.  There was some investigation in those.
20     Q.  Can you tell me about that?
21         MS. MULLEN:  Objection as to form.
22         What do you want to know?
23         MS. GERRICK:  Know what did the
24 investigation look like.
25 BY MS. GERRICK:

Page 20

1      Q.  What did you do?
2      A.  Well, by separating all the parties and
3  talking to everybody individually until we can figure
4  out what is going on at that point.
5      Q.  And in those cases, is it -- what -- has it
6  been a custodial parent kidnapping the child and the --
7  and the parents are separated, or what was the -- what
8  was the relationship and family dynamics in those cases?
9      A.  It -- it was different each time.  Some were
10 still married.  Some were separated.  Some were all
11 stages in-between.
12     Q.  Yeah.  All right.  I am going to turn back to
13 the case on February 17th -- oh wait, I have one more
14 question.
15         Have you ever had a kidnapping case where both
16 parents were custodial parents and -- kidnapped the
17 child together?
18         MS. MULLEN:  Objection as to the form of
19 the question.
20         You can answer it.
21         THE WITNESS:  Yes.
22 BY MS. GERRICK:
23     Q.  Yes?  Who were they kidnapping the child from,
24 if they were both the custodial parents kidnapping it?
25     A.  I believe they were going through a process

Page 21

1  but they were -- they were still together.  They are
2  still married.  They both still had custody.
3      Q   And which parent kidnapped the child?
4      A   That was the father, I believe.
5      Q   And where did the father take the child?
6      A   Out of state, against the mother's wishes.
7      Q   Right.  So the mother wasn't involved in the
8  kidnapping in that case?
9      A   No.
10     Q   Have you ever had a case where both custodial
11 parents were involved in the kidnapping?
12     A   I --
13         MS. MULLEN:  Are you asking him if he had
14 --
15         THE WITNESS:  I don't --
16         MS. MULLEN:  -- two parents who kidnapped
17 their own child?
18         MS. GERRICK:  Asking a -- asking a -- as
19 a -- yeah.
20         THE WITNESS:  I don't think that's
21 possible.
22         MS. GERRICK:  Right.  Thank you.
23         Okay.  I'm going to play your body cam
24 footage in a moment, and I'll introduce it as an
25 exhibit.

Page 22

1      (Exhibit A marked for identification.)
2  BY MS. GERRICK:
3      Q   But let's see.  First, before I start playing
4  it, one question; as you were approaching Mr. Fishman's
5  house, what had you been told about the situation?
6      A   Just what I heard over the radio.  We -- there
7  was a call for a kidnapping.  Said, an older white male
8  who's balding had grabbed a girl, threw her over his
9  shoulder, and threw her into a car, and drove off.  The
10 caller gave the license plate.  When the dispatcher ran
11 the license plate through our NCIC system, it came back
12 to the address of the suspect.
13     Q   Thank you.  So you had all that information as
14 you were approaching the house; is that correct?
15     A   Yes.
16     Q   Thank you.
17         MS. GERRICK:  All right.  I'm going to
18 pull up the body cam footage.  Give me a moment to do
19 that.  Right.  Let's see.
20         Great.  Thank you.
21         And so I'm going to be playing this
22 footage, and at different points I'm going to pause and
23 ask questions.  Sometimes I'm going to let it play for a
24 while; sometimes it's going to be only a few seconds in
25 between pauses.

Page 23

1  BY MS. GERRICK:
2      Q   And I want to note -- just for clarification -
3  - that when I'm asking you these questions about the
4  video, I want you to answer about what you knew at the
5  time on February 17th, 2020, at the moment in the video;
6  does that make sense?
7      A   Yep.  Okay.
8      Q   Great.  Thank you.  All right.  And I'm going
9  to fast forward a little bit because the first two
10 minutes of the video are completely redacted.  There's
11 no sound or anything, and you're just driving; just FYI.
12     A   Okay.
13     Q   So I'll fast forward until the sound comes on,
14 which is at two minutes here.  All right.
15     (Video played.)
16 BY MS. GERRICK:
17     Q   All right.  So I'm pausing at minute 2:48 in
18 the video.  Can you explain -- so can you -- can you
19 talk about what's happening here?  And then I'll have a
20 few clarifying questions.
21         MS. MULLEN:  Okay.  And Ms. Gerrick, I'm
22 a little bit puzzled.  Counts I and II have already been
23 dismissed.  The Court has already found that Officer
24 Jaeger did not violate Mr. Fishman's Fourth Amendment
25 rights by entering his home or seizing him, and that

Page 24

1  included handcuffing him.  So this claim is no longer a
2  live claim in the case.
3         So my question to you is, why are you
4  going to take a step-by-step questioning of this officer
5  who's already been exonerated by the Court on his
6  conduct that day?
7         The Court had the video footage as well,
8  so if you wanted to ask him questions afterwards, that
9  would make sense.  But the video, everyone has it.
10 Everyone sees what's going on, and these claims -- these
11 counts have been dismissed.
12         So why are you questioning Officer Jaeger
13 on this because we are, of course, filing a motion to
14 dismiss him?
15         MS. GERRICK:  So I do have reasons.  I
16 want to know about his -- what he knew at certain times,
17 what he believed at certain times.  I don't -- if that's
18 an objection and it's noted, I'm going to proceed,
19 though.
20         MS. MULLEN:  Well, I think what you might
21 want to do is certify your questions.  If I make other
22 objections, just certify them to the court and Judge
23 Leon can rule as to whether it's appropriate to depose
24 Officer Jaeger on some of your questions.  So I will be
25 objecting if I think it's inappropriate.

Page 25

1    And I suggest, we're not going to --
2 you're not going to persuade me.  I'm not going to
3 persuade you.  So we can just certify the question to
4 Judge Leon.  If he rules in your favor, then we can have
5 the officer come back.
6    MS. GERRICK:  Okay.  So you're saying
7 that you want to not have any questions until after Mr.
8 Fishman has been pulled out of the house and put in
9 handcuffs, and we can come back to ask about his state
10 of mind on a different deposition date?
11    MS. MULLEN:  Well, I don't know.  I don't
12 know what questions you're going to ask.  I anticipate
13 that you're going through facts that are already known
14 and the Court's already ruled.  The Counts I and II, I
15 believe, were dismissed.  So that's why -- it depends on
16 what you ask.
17    MS. GERRICK:  Okay.  (Indiscernible -
18 simultaneous speech)
19    MS. MULLEN:  I'm just trying -- I'm just
20 trying to save us all time.  So if I tell him -- if I
21 object, you might want to certify the question for the
22 court because then the court can rule.  Because neither
23 you nor I can make a determination as to whether the
24 question is appropriate.  You, of course, will believe
25 that it is.  We, of course, will believe that it's not,

Page 26

1 given that the Court dismissed the claims against this
2 defendant.
3    MS. GERRICK:  All right.  Do you want to
4 just proceed and then if I ask a question, you can
5 object and instruct him not to answer?
6    MS. MULLEN:  Yes.
7    MS. GERRICK:  Great.  Okay.  So that was
8 minute 2:48, and he's not reached the house yet.  And I
9 believe -- so the reason I was asking, there were some
10 questions about -- I believe, I hear some other folks on
11 the radio saying they want to get a unit down there --
12 another unit down there and something about eyes on
13 something.  But we can rewind and replay that.  So let
14 me go ahead and do that.  I'm going to rewind to 2:28.
15 Let's see if --
16    (Video played.)
17 BY MS. GERRICK:
18    Q    All right.  Can you describe what's happening
19 at this point in the video?
20    A    So I'm walking up to the suspect's house.
21 Person on the radio, that is the helicopter saying that
22 they're watching the situation because the call is for a
23 kidnapping.  It's a very serious crime.  So we have a
24    Q    And --
25    A    -- we have a helicopter up looking at --

Page 27

1 looking for the location and the possible
2 (indiscernible).
3    Q    Okay.  Thank you.  And are you approaching
4 alone?
5    A    Yes.
6    Q    And is there a reason that you're approaching
7 alone versus waiting for another unit to get there?
8    A    I just saw what a -- who I believed to be a
9 kidnapping suspect at that time.  I would feel more
10 comfortable if I went up there and could possibly make
11 sure the situation doesn't escalate.  He doesn't flee.
12 He doesn't do anything.  And knowing where I'm at
13 downtown, an officer can get there with lights and
14 sirens in less than a minute.  So I felt it was -- it
15 was okay for me to go by myself.
16    Q    Thank you.  And so -- were you worried about
17 your safety approaching alone?
18    A    A little bit.  Yeah, if I'm going up to a
19 person who possibly just kidnapped a child.
20    Q    Thank you.  All right.  I'm going to go --
21 that was minute 2:48.  I'm going to go ahead and press
22 play.
23    (Video played.)
24 BY MS. GERRICK:
25    Q    All right.  So I'm pausing at minute 3:58

Page 28

1 here, and can you describe what's happening at this
2 point in the video?
3    MS. MULLEN:  Objection to the question.
4 Court's already ruled on this aspect of
5 what's going on.  And the -- it's very obvious by just
6 looking at the tape what's happening.  So I don't know
7 what purpose your questions serve.
8    MS. GERRICK:  Okay.
9    MS. MULLEN:  This claim has been
10 dismissed.
11    MS. GERRICK:  Okay.  Are you instructing
12 him not to answer this question?
13    MS. MULLEN:  Yeah.
14 BY MS. GERRICK:
15    Q    I would like to ask questions about your
16 conversation with him at this point.  Are you --
17    MS. MULLEN:  It's on the videotape --
18    MS. GERRICK:  Okay.  You're going to
19 object to --
20    MS. MULLEN:  -- which the Court has ruled
21 on this.  This conversation with Mr. Fishman is on
22 videotape, and the Court has already found that his
23 conduct did not violate your client's Fourth Amendment
24 rights.
25    So what probative value is there -- and

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 13**

Page 1

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLUMBIA

3    _____

4  JARED FISHMAN,

5         Plaintiff,

6      v.        Case No:

7  DISTRICT OF COLUMBIA, PATRICK    1:21-cv-01847-RJL

8  LOFTUS, MARCK JAEGER, JEREMY

9  BRADY, MICHAEL TONG, &

10  CHRISTOPHER TODARO,

11        Defendants.

12    _____

13        VIDEOTAPED DEPOSITION

14    _____

15

16  WITNESS:      SERGEANT ADAM BRAY

17  DATE:         Thursday, September 7th, 2023

18  START TIME:    10:00 a.m., EST

19  END TIME:      1:35 p.m., EST

20  REMOTE LOCATION:   Remote Legal platform

21  REPORTER:      Evie Heffner, CER-2084

22  JOB NO.:       19244

23

24

25

Page 2

1      A P P E A R A N C E S

2

3    GERSTEIN HARROW, LLP

4    810 7th Street Northeast

5    Suite 301

6    Washington, District of Columbia 20002

7    By: SAM ROSEN, ESQUIRE

8        EMILY GERRICK, ESQUIRE

9        sam@gerstein-harrow.com

10       emily@gerstein-harrow.com

11   Appearing for Plaintiff

12

13   OFFICE OF THE ATTORNEY GENERAL

14   400 6th Street Northwest

15   Washington, District of Columbia 20001

16   By: AMANDA TORRES, ESQUIRE

17       Amanda.torres@dc.gov

18   Appearing for Defendants

19

20

21

22

23

24

25

Page 3

1      I N D E X   O F   T E S T I M O N Y

2

3  EXAMINATION OF ADAM BRAY:            PAGE

4    By Mr. Rosen                  7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1      I N D E X   O F   E X H I B I T S

2        (available for download)

3

4  EXHIBIT  DESCRIPTION              PAGE

5  A     Sergeant Bray Video file      11

6  B     Memo Investigation Report     116

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 17

1  He was -- he was, like, very upset that we
2  would, you know, he kind of scoffed, or he was mad that
3  we would even insinuate that it was a kidnapping, but,
4  you know, that's what we got the call for.
5  At that point, I don't think -- I didn't
6  believe he was a -- a danger to flee anymore, so I asked
7  him -- I told the officers to take him out of handcuffs.
8  We made that -- the walk around the bush or the block,
9  went back to the house.  There was officers there at
10  that point talking to the wife and the -- either the
11  child or the children.  I don't remember how -- if both
12  kids were there.
13  The officer kind of gave me the signal, or I
14  asked him, or somebody asked him, are the kids okay?
15  The kids were okay, not injured.  They were kind of
16  corroborating his story that, yeah, they're my kids;
17  that's my wife, and he was let go at that point.
18  We collect -- made sure we had all the
19  information we needed for the report.  We determined
20  what the report would be at that point; obviously not a
21  kidnapping.  He was advised by my lieutenant, the -- I
22  believe he was the watch commander that day, what it
23  was.  He was told he'd be notified by different agencies
24  in reference to this at a later date, but that he was
25  free to go, and that was it.

Page 18

1  That was the end of the scene.  And we -- we
2  cleared it.  We left.
3  Q  Okay.  Great.
4  A  End of the session.
5  Q  Thank you so much.  So I guess with that was -
6  - that was really helpful.  Thank you.  I just have a
7  couple of other initial questions and then -- and then
8  essentially, we'll go through the -- the footage of the
9  -- of the events you just described and may be kind of
10  fill in a couple of details and I'll ask some follow-
11  ups.
12  So when your body worn starts, you're already
13  at the scene.  And so I'm wondering, when you first
14  learned about the situation with Mr. Fishman, you know,
15  that must have been before you started driving over
16  there, of course.  So I'm wondering what was -- what was
17  relayed to you either before you started driving over or
18  as you were driving over.
19  You know, when you get there, what do you --
20  what do you know about the situation?
21  A  I don't remember if somebody called me.  I
22  also did not look at my camera footage that is redacted.
23  So I -- basically in reviewing for this, I
24  looked at the camera footage that you're going to show
25  me.  So you --

Page 19

1  Q  Great.
2  A  -- prior to that, if you're saying that my
3  camera wasn't on and it doesn't record anything, I don't
4  remember if I got a phone call.  I don't think I did
5  because it was kind of a fast-moving scene.
6  So the information I would have would be the
7  information I pulled off the computer in my -- my
8  cruiser or my phone, which they both have access to the
9  dispatcher's notes that the call taker or the dispatcher
10  entering as the scene unfolds.
11  There's just a line-item issue where line by
12  line with a time stamp, it'll say, this person marked on
13  scene, or this particular important information was just
14  relayed.  That -- that would be on that record.
15  I believe that most of my information on the
16  scene was -- or about the scene was relayed to me by the
17  officer when I arrived, other than just --
18  Q  Okay.
19  A  -- we're investigating a kidnapping; there's a
20  helicopter in the air; we're looking for this tag; we
21  ran the tag; it returned this address; now I'm here.
22  Q  Great.  Thank you.  And so you sort of maybe
23  just answered this, but as you're driving over to the
24  scene, what crime or crimes do you have reasonable
25  suspicion of -- as having possibly been committed?

Page 20

1  A  Definitely the kidnapping.  The abuse portion
2  of this, which I read about in the report for sure, but
3  don't remember if that was necessarily communicated
4  initially.  I don't know if I found that out then or
5  later.  It's just the kidnapping of a child.
6  Q  Great.  Okay.  Thank you.  And then last
7  question before I start the body worn.  I'm just
8  genuinely wondering; do you know why your body worn
9  starts when you're at the scene as opposed to why you're
10  driving over?
11  I -- I'm -- I just -- I -- yeah, I don't know
12  why people's cameras click on when they click on as
13  opposed to sometime before or after the point at which
14  they click on.
15  A  A lot of different reasons.  One could be as
16  simple as there's a buffering moment, so the camera's
17  always capturing the last two minutes.
18  As soon as we turn the camera on when we get -
19  - when we turn it on, it will capture the prior two
20  minutes of no sound, leading up to the point where we
21  activate the camera to record -- to actively record.
22  So you'll hear sound, but then you will also
23  capture the -- you know, I don't know if you understand
24  that or if I'm -- if I'm being redundant and telling you
25  stuff you already know.

Page 21

1    Q   No.  No.  I mean, this is helpful.

2    A   The reasons why -- if you're telling me the

3    camera just turned on and there's sound at the same

4    time, there was no buffer two minutes; is that what

5    you're telling me?

6    Q   For the video that we have of you, yes, that's

7    -- it's sort of -- as the -- as the visuals click on, we

8    get the audio at the same time.

9    A   Okay.  Then at that point, maybe I was in the

10   bathroom, and I turned my camera off and then I didn't

11   turn it back on until I got back to the scene, or the

12   scene was unfolding really fast, and I didn't activate

13   it right away, or it was charging.  And there's a lot of

14   reasons.

15       Normally when we get a call, it would be

16   turned on as soon as we are responding over and then

17   maybe activated when we get on scene or activated as

18   soon as we are -- to answer your question, though, I

19   don't know why there's no camera footage prior to

20   arriving on scene.

21   Q   Sure.  Understood.  No, that's helpful.  Thank

22   you.

23       MR. ROSEN:  Okay.  I'm going to go

24   ahead and start the body worn, and I'm going to, yeah,

25   play it for about 20 seconds to start.

Page 22

1    (Video playback.)

2    BY MR. ROSEN:

3    Q   Okay.  So can you, Sergeant, just start by

4    identifying the person you're speaking with here?

5    A   That sounds like Officer Jaeger.  That sounds

6    like his voice.

7    Q   Okay.  And I realize there's some sort of --

8    kind of crosstalk with the radio here in what I just

9    played.

10       But Officer Jaeger is sort of essentially, I

11   believe, recounting to you the -- sort of part of the

12   initial encounter that he had with Mr. Fishman on Mr.

13   Fishman's front steps; does that -- does that sound

14   accurate to you?

15   A   Yes.  Yes.

16   Q   Okay.  And at this point, what crime or crimes

17   do you have reasonable suspicion of?

18   A   The same.  There's -- nothing has changed.

19   Q   Okay.  Great.  Okay.

20       MR. ROSEN:  I'm going to keep playing.

21   (Video playback.)

22   BY MR. ROSEN:

23   Q   Okay.  So I hear you ask Officer Jaeger,

24   "What's the issue?"  Can you explain just what you

25   meant, specifically by that question?

Page 23

1    A   That he said that there's -- I -- the -- I --

2    when he's talking about, he had to step back and people

3    are mad, who's mad; why -- why is someone mad?

4    Q   Okay.

5    A   Is it -- is it the -- the -- the suspect who's

6    upset?  Is it the victim who's upset; that -- that what

7    are we -- what are we dealing with?

8    Q   Okay.  And again, I know there's some --

9    there's some fuzziness on the audio that we have, but

10   can you tell me the gist of what you heard Officer

11   Jaeger say in response to your question of what's the

12   issue?

13   A   The -- something about the -- the wife is

14   upset the -- he wasn't talking.  But you -- you -- you

15   can play it again.

16       I mean to the -- the effect that she's not

17   talking or he's not talking, or -- I'm just trying to

18   figure out what is going on.  I mean, I'm -- I can't

19   really see from where I'm at what -- what has -- what am

20   I looking into?  What am I walking into, in essence?

21   Q   Okay.  Great.  And then for what it's worth,

22   I'm going to be asking this next question a couple of

23   times, and I know you just answered it.

24       But if you'll indulge me at this point, what

25   crime or crimes do you have reasonable suspicion of?

Page 24

1    A   The same.  I mean, kidnapping.

2    Q   Okay.  Great.  Okay.

3        MR. ROSEN:  So I'm going to play just for

4    a couple more seconds here.

5    (Video playback.)

6    BY MR. ROSEN:

7    Q   Okay.  I hear you ask where the kid is.

8    A   Mm-hmm.

9    Q   I presume that here you mean the child who

10   would have been the victim of the -- of the alleged

11   kidnapping; is that correct?

12   A   Yes.

13   Q   Okay.  And what did you, in the moment, hear

14   Officer Jaeger say in response to that?

15   A   Well, when he said the kid was inside or that

16   -- he says he definitely thinks that it could be the kid

17   of the man that -- or the father or the person, the

18   suspect.

19   Q   Yeah, I guess --

20   A   Yeah, that -- that's what he said.

21   Q   That he -- yeah.  Yeah.

22   A   I definitely -- yeah, I think it could be the

23   kid of the -- of the father or something like that.

24   Q   Okay.  Okay.  So at this point, is it -- is it

25   accurate to say that what you've heard from Jaeger is

Page 25

1  that Mr. Fishman is not cooperating; the child is in the
2  house, and the child appears to be Mr. Fishman's
3  daughter?
4          Is that -- is it -- is it accurate to say that
5  -- that you've now, at the point that we're watching,
6  you've -- Jaeger has relayed those three things to you?
7      A   Yeah.  That's what Jaeger believes is the --
8  is what's going on.  That's what his perception of the
9  scene as it's unfolding is, and he's telling me what he
10 believes had -- what he believes is -- he's witnessed.
11     Q   Okay.  And at this point, has your -- has your
12 assessment of the reasonable suspicion question changed?
13     A   That the individual should have --
14     Q   In other words --
15     A   -- stopped?
16     Q   Oh.
17     A   I'm sorry, go ahead.
18     Q   Yeah.  I'm -- no, I'm sorry to interrupt.
19         At the point that we just stopped the video
20 at, what crime or crimes do you have reasonable
21 suspicion of?
22     A   The -- nothing has changed.  Same.
23     Q   Okay.  Great.  Thank you.  All right.
24         MR. ROSEN:  I'm going to play for about
25 30 seconds here.

Page 26

1      (Video playback.)
2  BY MR. ROSEN:
3      Q   Okay.  I hear you ask what Vasquez is saying.
4  Can you tell me who Vasquez is?
5      A   Officer Robert Vasquez.
6      Q   And why are you asking about him and wanting
7  to know what he is saying?
8      A   I believe he's up at the original scene where
9  the caller -- the initial reporting person who called
10 911, I believe he's up there --
11     Q   Okay.
12     A   -- and I'm wanting to know what -- what a
13 little bit more specifically he now has.  I mean, he's
14 been up there for a minute.  I guess so.
15     Q   Sure.  Okay.  So does that mean that, I guess,
16 at some point as you're driving over or before your
17 video starts and you're speaking to Officer Jaeger, you
18 learned at least the identity of one of the officers who
19 was -- who was at the other scene with the person who
20 placed the 911 call?
21     A   That -- yeah, that's fair to -- to assess.
22 Yeah.  I -- I must have found that out somehow.
23     Q   Okay.  Okay.  Do you happen to remember
24 whether you knew who else was there from MPD, if anyone?
25     A   At this point in real-time, I don't know if I

Page 27

1  knew -- I know that eventually, because I've watched
2  this, you know --
3      Q   Sure.
4      A   -- in preparation for this, I do end up
5  speaking to a sergeant who has information about that up
6  there.
7      Q   Okay.
8      A   So I must have known eventually who that --
9  how I knew that he was up there.
10     Q   Great.  Okay.  Thank you.
11         MR. ROSEN:  I'm going to play for another
12 little bit here.
13     (Video playback.)
14 BY MR. ROSEN:
15     Q   Okay.  So I hear you say that this looks like
16 her mother.  Who are you -- who are you talking about
17 here?
18     A   There's a person over there that's not a
19 police officer next to the officer in a high visibility
20 vest.  She's wearing maybe purple or -- or red or
21 something like that.  My camera's pointing right at her.
22         So I'm assuming I'm looking at her and I'm
23 asking him who that is; is that -- and then I -- he's
24 answering that he thinks it's probably the mother.
25     Q   Okay.

Page 28

1          MR. ROSEN:  So let me just -- if it's all
2  right, I'm going to go back and replay just maybe the
3  last five or six seconds that we just watched if that's
4  all right.
5      (Video playback.)
6  BY MR. ROSEN:
7      Q   Okay.  So -- so you say this looks like her
8  mother.  What -- what informed your hunch or your
9  conclusion that the woman that you see in the -- in the
10 purple or the red at the top of the stairs is the
11 child's mother?
12     A   That was a question --
13     Q   Okay.
14     A   -- that I'm asking him, like, "This looks like
15 her mother?"  That -- that's a -- maybe my tone wasn't
16 correct, but --
17     Q   No.  No.  I see.
18     A   Because I'm seeing a person standing there and
19 I'm saying to him this looks like her mother; like, what
20 do you think?
21     Q   Okay.  Okay.
22     A   I think he might answer something there.  I'm
23 not --
24     Q   Yeah, I -- happy to -- happy to revisit that
25 if -- if he -- if he actually let's -- it's all

Page 41

1 please?

2    A  The driver is Lieutenant Loftus.

3    Q  Okay.

4    A  He used to be a lieutenant at the Second

5 District where I work.  The female, I have no idea who

6 that is.  Never --

7    Q  Okay.

8    A  -- met her.  I don't -- I don't know her at

9 all.

10    Q  No problem.  Okay.

11       MR. ROSEN:  I'm going to play for about

12 20 seconds.

13       (Video playback.)

14 BY MR. ROSEN:

15    Q  Okay.  This is not the most important question

16 in the world, but I'm wondering if you remember what you

17 grabbed from your car there.

18    A  You're reading my mind.  I don't know.

19    Q  Okay.

20    A  I was wondering what I went into the car for.

21 I may -- maybe my other -- I have two phones.  Maybe my

22 other phone, maybe my keys.  I heard keys jingling

23 there.  Maybe I jumped out of the car and forgot the

24 keys.

25       I don't think it was anything of consequence,

Page 42

1 to be honest.

2    Q  Okay.  Sounds good.

3       MR. ROSEN:  I'm going to play for about

4 30 seconds here.

5       (Video playback.)

6 BY MR. ROSEN:

7    Q  Okay.  It sounds like you laugh just a bit at

8 Lieutenant Loftus's description, and I'm wondering why

9 that is.

10    A  I don't know why I did that.  I'm wondering

11 too.  I don't know if it was just the totality of how

12 the scene is unfolding.

13       It just seems like it's getting -- I mean,

14 from getting there and being told that it's a mother

15 there and a father to then finding out that the person

16 didn't want to speak and he tried to leave, to then

17 being told that this person was picked up and thrown in

18 the car, it's a -- I don't know if it's just a police

19 response or me as a sergeant just dealing with another

20 potentially really bad scene.  I can't explain exactly

21 why -- why I did that.

22    Q  Understood.  Okay.

23       MR. ROSEN:  I'm going to play a little

24 bit of a longer stretch here, about under a minute.

25       (Video playback.)

Page 43

1 BY MR. ROSEN:

2    Q  Actually, I know I said I was going to play a

3 minute; there's one thing I'm going to ask here and then

4 I'll hit play again.

5       At this point, what crime or crimes do you

6 have reasonable suspicion of?

7    A  Nothing has -- nothing has changed.

8    Q  Okay.  So kidnapping?

9    A  Yes, sir.

10    Q  And no other crimes?

11    A  In -- I don't know.  In retrospect, I'm

12 hearing that this person was thrown into a car, but I

13 can't tell you for certain if it's because now,

14 understanding the totality of all the circumstances

15 after reading the report, which was completed

16 afterwards, and then I've read, or if it's this time

17 right now, but the throwing a kid in the car could

18 potentially be construed as a -- as a crime too

19 depending on the -- what the investigation, what to

20 tell.

21    Q  Okay.

22    A  But I can tell you for certain that I was

23 still operating under the suspicion that there could

24 potentially be a kidnapping.

25    Q  Okay.  And now with the added detail about the

Page 44

1 alleged throwing into the car, if I'm -- if I'm

2 understanding you correctly, you're saying that that

3 might be something additional, sort of distinct from the

4 kidnapping, but you're not sure yet; is that a -- is

5 that a fair description of what you sort of just said to

6 me?

7    A  What I'm saying -- well, what I'm saying is --

8 is that after reviewing the report as it's written now,

9 which it hadn't been written at that time --

10    Q  Sure.

11    A  -- it could be construed that that could

12 potentially be abuse of a child which would then require

13 further investigation.

14       I can't say specifically, or for certain what

15 was on my mind at that point, if I acknowledge what he

16 said, as you're telling me that this kid was abused, or

17 if that's me knowing now after reading the report, but

18 regardless, the throwing of a kid in the car would be an

19 element of a potential kidnapping, and that's what I'm

20 definitely still concerned with.

21    Q  Okay.  Great.

22       (Video playback.)

23    Q  So here it sounds like you and Lieutenant

24 Loftus are planning your next steps.  I'm --

25    A  Sure.

Page 61

1  that would just be one more level of -- of assurance
2  that, you know, you're saying your name is John -- John
3  Smith, and John Smith is a dad, John Smith is a picture
4  that's you -- it just helps.
5       MR. ROSEN:  Sure, totally.  Okay.  I'm
6  going to keep going here.
7       (Video Playback.)
8  BY MR. ROSEN:
9    Q    Okay.  So I hear Mr. Fishman telling you that
10  he does not give you authorization to go into his
11  pockets, and I'm wondering what you made of that
12  response by Mr. Fishman in the moment.
13    A    Again, it's just another situation where I'm
14  trying to determine who he is, and I'm trying to give
15  him the opportunity to, like, say who he is and if he
16  provides your ID, it makes it just easier, and I'm
17  asking him, and then he's saying, "Again, I don't give
18  you authorization."
19       It's just one more time that unfortunately, he's
20  just not cooperating and making it more difficult and
21  kind of, to be honest, like dragging the scene out a
22  little bit longer than it needs to be.
23    Q    And could you just expand maybe a bit on that
24  last thing you said about sort of dragging things out
25  longer than it needs to be?  Why was that your -- one of

Page 62

1  -- sort of one of your reactions, or one of your
2  thoughts in the moment?
3    A    Well, initially when we first started watching
4  the video, I got on scene, and then Officer Jaeger's
5  telling me that it looks like it's the dad, it looks
6  like it's the mom or, and I'm saying, is that the mom --
7  you know, all the stuff we've already established.
8       And we -- Officer Jaeger's already gone
9  through the motions of approaching him, and then he
10  doesn't want to be talked to.  He's not cooperative
11  there, and then that leads to him wanting to leave, but
12  he's not -- he stopped at that point.  We're
13  investigating.  He's not free to leave.  That made the
14  situation -- that escalated the situation further.
15       And then even now when I'm -- when he stopped and
16  I'm asking for his ID, and he -- he's saying where his
17  ID is, he's still not cooperating, and all this stuff
18  just keeps making -- I don't want to say with red flags
19  or situations where as an investigating officer, you're
20  trying to determine what exactly we have here and why do
21  we have somebody who's not wanting to cooperate,
22  especially in a sense where it's in reference to or
23  associated with a crime that serious.
24    Q    Okay.  And at this point, what crime or crimes
25  do you have reasonable suspicion of?

Page 63

1    A    The same.  It's -- it's a situation where
2  we're still trying to determine if there was a
3  kidnapping of some sort that was committed.
4       MR. ROSEN:  Okay.  Going to play again.
5       (Video playback.)
6  BY MR. ROSEN:
7    Q    Okay.  Before I hit play again.  I hear you
8  say to Mr. Fishman that there's some sort of disconnect.
9  Can you just expand on that a little bit and describe
10  what you meant specifically by the disconnect?
11    A    Sure.  Disconnect being -- there's developing
12  two sides of this here.  The side of a misunderstanding
13  of what somebody up at 36th Street said they saw and
14  what we determine -- what we may have now and what could
15  be potentially, you know, with the confusion in the side
16  -- and getting us to this point, being a -- it could be
17  a kidnapping or not.
18       The disconnect being, okay, I have somebody that
19  seems to be a parent.  All things are starting to point
20  to you are the parent, but for some reason, you're not
21  willing to cooperate and we can't determine what
22  happened and what's going on.  Even then I said, what is
23  your understanding?  What's happened?
24       And even then, it's like, what point?  And it's --
25  a reasonable person would expect a guy that is in -- is

Page 64

1  stopped by the police, and, you know, he knows what
2  potentially led up to this.  The disconnect is -- is why
3  do we have the confusion between either there was a -- a
4  kidnapping or there was not.
5       MR. ROSEN:  Okay.  Thank you.  I'm going
6  to keep playing the video.
7       (Video playback.)
8  BY MR. ROSEN:
9    Q    So did anything that you just heard from Mr.
10  Fishman change the reasonable suspicion analysis for you
11  as to what crime or crimes you might have reasonable
12  suspicion of?
13    A    No, but he is working towards it.  He's --
14  he's talking and he's corroborating what the other
15  officer said, which is positive.  That's a good move --
16  that's moving in the right direction, and he's calm and
17  we're -- we're having an exchange trying to determine
18  what's going on.
19       MR. ROSEN:  Great.  Okay.  I'm actually
20  just going to go back sort of a couple seconds and then
21  I'll hit play again.
22       THE WITNESS:  Sure.
23       (Video playback.)
24  BY MR. ROSEN:
25    Q    So in what we just watched you tell Mr.

Page 81

1 subject as he's -- as he's becoming. He's explaining

2 that he's -- and I said something there it's like an

3 intrafamilial, you know, inter-family incident, which is

4 what it's starting to seem at this point.

5      He's continuing to describe what happened,

6 he's continuing to provide details as to what transpired

7 before he grabbed his -- his, you know, alleged kid, all

8 that stuff. That's why I'm hearing him say this, a

9 little bit of frustrating because he is talking over me.

10 Not to the -- not to any extreme level.

11   Q   Okay. Just to follow up on something you

12 said, you just said something to the effect of there

13 being a kind of transition regarding Mr. Fishman from

14 suspect to subject. Could you -- could you expand on

15 that a bit?

16   A   That's what happens. I mean, that's what

17 we're going towards, that's the -- in an ideal situation

18 you know, when you're dealing with people and you're not

19 -- an ideal situation is that there's no crime that was

20 committed, there's no victim, there's no victimization,

21 there's no suspect, you know, you want there to be a

22 subject, not a suspect.

23      And so that's the transition. The transition

24 is when you finally cooperate and you finally provide

25 details and you finally answer the questions that are

Page 82

1 pertinent to that specific investigation, you can remain

2 a suspect at that point and then -- then we start to

3 enter into probable cause or we can have somebody become

4 a subject.

5      So what I'm saying is, is that, you know, I

6 know the ending of this, I mean, I know the ending of

7 this story. As we're doing this, I've seen it before so

8 I'm just kind of narrating it for you. You said as he's

9 talking and you know, I'm not specifically in my mind at

10 that point but as me looking at me, that's the direction

11 we're going, is to get him from being that suspect of a

12 kidnapping case to the subject of an unfortunate

13 misunderstanding.

14   Q   Sure, that's helpful, thank you. And then

15 this is my last follow-up here. You a moment ago,

16 mentioned the "pain in the ass" comment that I believe

17 Mr. Fishman makes twice. I'm wondering what you made of

18 that in the moment as far as your investigation is

19 concerned? If you made anything of it?

20   A   Yeah, it is strange -- it's not completely

21 unheard of but it is definitely not normal that when you

22 have a reasonable person who is -- in understanding the

23 gravity of the situation you're dealing with the police

24 they're trying to determine what -- what happened and to

25 refer to your child as a pain in the ass, to refer to

Page 83

1 one of them like my good kid, it does start to -- it

2 does make you wonder you know, well what is -- what is

3 this a little bit.

4      But I mean it's just a -- again with the

5 nature of police work is that you're always listening to

6 what people are saying and, in a situation, when you're

7 dealing with a reasonable adult, a reasonable father who

8 understands what the situation is. And is -- is

9 concurrently working towards a resolution with you, it

10 does seem strange that you would refer to your child as

11 a pain in the ass when it's been -- that's just, you

12 know, it is -- it was a little minor -- it was alarming,

13 but it wasn't anything that was trying to stop me from

14 thinking that it was a kidnapping.

15      I'm sorry, stop -- push me toward thinking it

16 was a kidnapping.

17   Q   Understood. Okay. And I know this is

18 probably the 15th time that I've asked this, at this

19 point, what crime or crimes did you have reasonable

20 suspicion of?

21   A   Sometime herein now, sometimes either in a few

22 seconds or in a minute or -- I'm making a determination

23 that though he's still not free to go, I don't -- I'm

24 not determining him to be a risk of being a fleeing

25 felon anymore. So I'm going to be determining it's time

Page 84

1 to take him out of handcuffs.

2   Q   Okay. And just -- that's helpful. And just

3 to make sure that I understand, is the distinction that

4 you're drawing that the decision to take him out of

5 handcuffs goes to the question of flight but that taking

6 him out of handcuffs doesn't necessarily conclude the

7 Terry stop, or am I misunderstanding --

8   A   The Terry stop -- the Terry stop means you're

9 not free to go. Just because you're not free to go

10 doesn't mean you're necessarily always placed in

11 handcuffs. Handcuffs can be used when there's a -- when

12 there's a situation where officers' safety or the safety

13 of the public is -- is a concern or the fact that you

14 have a potential for someone to flee is concerned.

15      There's like a totality of circumstances that

16 would lead to someone being placed in handcuffs. People

17 are stopped in reference to a Terry stop, in reference

18 to reasonable suspicion of a crime being committed,

19 they're not always put in handcuffs but what's -- what's

20 always certain is they're not free to leave. They're

21 stopped.

22   Q   Okay. So and I apologize for sort of drilling

23 down on this. Essentially, there are, as I -- as I take

24 you to be saying it now, there are kind of two distinct

25 moments in sort of what we're about to watch on the --

Page 85

1  on your body worn. The first is the moment at which you
2  determine that Mr. Fishman is no longer a flight risk
3  and so you have him removed from handcuffs. And then
4  there's a second distinct moment sometime after that
5  where the Terry stop concludes. And at that point, he's
6  free to go. But those are the two distinct moment that
7  happens sequentially.
8      A  I would agree.
9          MR. ROSEN: Okay. I am going to just go
10 back a bit and then -- and then I'll stop totally after
11 that. Sorry about this, okay. Got the error message,
12 sorry about this, let's do this again.
13         THE WITNESS: May I use the restroom for
14 just two minutes. I don't want to make it --
15         MR. ROSEN: Yeah, no let's -- I mean,
16 let's -- no --
17         THE WITNESS: -- to be a problem.
18         MR. ROSEN: That's totally fine with me.
19 Should we go off the record for maybe five minutes?
20         MS. TORRES: Sure, that works.
21         MR. ROSEN: Okay. Great.
22         THE REPORTER: Okay. The time is 12:18
23 p.m. Eastern Time, and we are off the record.
24     (Off the record.)
25         THE REPORTER: We're back on the record.

Page 86

1  The time is 12:24 p.m., Eastern Time.
2          MR. ROSEN: Okay. So I think we are at
3  11:38 in Sergeant Bray's body worn but I'm getting the
4  error message so I'm going to close out the exhibit and
5  then re-open it and it will be the same, the Exhibit A.
6  Okay. Does everyone see the body worn? Are we back?
7  Okay. Great.
8          So we stopped at 11:38 in the -- in the
9  video and I'm going to play -- I'm going to play it for
10 30 or 40 seconds.
11     (Video playback.)
12 BY MR. ROSEN:
13     Q  Does or did, in the moment, did Mr. Fishman's
14 explanation and version of events seem truthful to you?
15     A  Truthful?
16     Q  Yes.
17     A  Yeah, yes. His -- I don't remember thinking
18 that he was being untruthful.
19     Q  Okay. And at this point, what crime or crimes
20 did you have reasonable suspicion of?
21     A  At this point I -- I think, I mean -- I mean
22 without knowing how much time is about to transpire I
23 think I'm -- I'm believing that unless I hear something
24 different when we talk because I do need to talk to
25 them, I mean he's not free to leave but I'm moving

Page 87

1  towards thinking that this was a -- a misunderstanding,
2  but we need to go and determine that from the other
3  officers. I'm not the only one conducting the
4  investigation.
5          So eventually we're going to move over to talk
6  to them but he's -- he's, in your words "moving my
7  needle" towards the -- the good sign -- the positive
8  sign.
9          MR. ROSEN: I'm just going to play just
10 for a couple of seconds here.
11     (Video playback.)
12 BY MR. ROSEN:
13     Q  Can you just explain first, why you asked Mr.
14 Fishman if he had anything on him that could be, you
15 know, used as a weapon or that could hurt someone?
16     A  I don't -- I don't want him to use a weapon or
17 hurt somebody.
18     Q  Sure.
19     A  I mean he's wearing -- I mean he's wearing
20 like a decent amount of clothes there, he could hide all
21 kinds of crazy stuff in there, I guess if he really
22 wanted to.
23     Q  Sure. And did Mr. Fishman's answer seem
24 truthful to you?
25     A  Yes.

Page 88

1  (Video playback.)
2  MR. ROSEN:
3      Q  Okay. Could you explain or walk through why
4  you decided to uncuff or have one of the officers uncuff
5  Mr. Fishman at this point?
6      A  It's the same as what we discussed earlier.
7  So I -- I asked him if he was -- it's, you know, the
8  stop and frisk part of it, if I was being even more
9  cautious, I would have frisked him myself, but I didn't
10 but the question of do you have a weapon he said, "No."
11         I'm not in my mind at that moment but if I was
12 to try and understand or give you a reasonable idea, my
13 perception would be Officer Todaro and Almanzar, or
14 Officer Jaegar, or Officer Welch, or whoever is on the
15 scene or whoever actually placed in the handcuffs, which
16 I don't know, would have patted him down. Me asking
17 again is just another layer of security.
18         Sometimes people will admit to saying
19 something as crazy as, "Yeah I have a gun" or "Yeah, I
20 have a knife" that was missed by an officer and so that
21 was asked, he replied negative. I don't -- he was calm
22 at this point, he had given -- he had cooperated finely
23 at this point.
24         I told him that I was going to talk to the
25 kids or at least at that point, I think I thought I was

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 14**

Page 1

```
 1        UNITED STATES DISTRICT COURT

 2        FOR THE DISTRICT OF COLUMBIA

 3    _____

 4  JARED FISHMAN,

 5        Plaintiff,

 6    v.        Case No:

 7  DISTRICT OF COLUMBIA,    1:21-cv-01847-RJL

 8  PATRICK LOFTUS, MARCK

 9  JAEGER, JEREMY BRADY,

10  MICHAEL TONG,

11  & CHRISTOPHER TODARO,

12        Defendants.

13    _____

14        VIDEOTAPED DEPOSITION

15    _____

16

17  WITNESS:    JABARI WELCH

18  DATE:    Wednesday, September 20, 2023

19  START TIME:    10:07 a.m., ET

20  END TIME:    2:14 p.m., ET

21  REMOTE LOCATION:    Remote Legal platform

22  REPORTER:    Kimberly Costanza, CDR-1835

23  JOB NO.:    19548

24

25
```

Page 2

```
 1        A P P E A R A N C E S

 2

 3  GERSTEIN HARROW LLP

 4  810 7th Street Northeast

 5  Suite 301

 6  Washington, DC 20002

 7  By:  SAM ROSEN, ESQUIRE

 8      sam@gerstein-harrow.com

 9  By:  EMILY GERRICK, ESQUIRE

10      emily@gerstein-harrow.com

11  Appearing for Plaintiff

12

13  DEPARTMENT OF ATTORNEY GENERAL

14  Office of the Attorney General

15  for the District of Columbia

16  400 6th Street Northwest

17  Washington, DC 20001-0189

18  By:  AMANDA TORRES, ESQUIRE

19      amanda.torres@dc.gov

20  Appearing for Defendants

21

22

23

24

25
```

Page 3

```
 1      I N D E X   O F   T E S T I M O N Y

 2

 3  EXAMINATION OF JABARI WELCH:        PAGE

 4    By Mr. Rosen        7

 5    By Mr. Torres        120

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1      I N D E X   O F   E X H I B I T S

 2        (available for download)

 3

 4  EXHIBIT  DESCRIPTION        PAGE

 5  A      Sgt. Welch's body-worn camera footage    13

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 9

1  to college?

2      A   I attended the University of Texas at Austin.

3      Q   Okay.  How long have you been a police officer

4  -- or how long have you been in law enforcement?  Excuse

5  me.

6      A   I've been with the Metropolitan Police

7  Department for five years -- a little over five years.

8      Q   Okay.  And have you been in law enforcement

9  anywhere else or your whole law enforcement career has

10  been at MPD?

11      A   My law enforcement career has been at MPD, and

12  I also interned for a law enforcement agency in Austin

13  while I was in college.

14      Q   Okay.  And between college and your time at

15  MPD, did you -- did you work anywhere else or in any

16  other kind of job?

17      A   Yes.

18      Q   Okay.  And where was that?

19      A   Non-law enforcement related?

20      Q   Yes.

21      A   I worked for Travis County.

22      Q   Okay.  Great.  And as of February 17th, 2020,

23  what training did you have regarding kidnapping

24  investigations?

25      A   Training pursuant to our -- our policies and

Page 10

1  procedures at the Metropolitan Police Department.

2      Q   Okay.  So is it fair to characterize that as

3  your training being all of the training that someone at

4  MPD at your rank would receive?

5      A   Yes.

6      Q   And sort of, no more, no less,

7  essentially?

8      A   Yes, sir.

9      Q   Okay.  I have a few questions for you about

10  Terry stops.  First, what is your personal understanding

11  of the definition of a Terry stop?

12      A   When you have reasonable suspicion that a

13  crime has been committed, is being committed, or is

14  about to be committed.

15      Q   Okay.  So a stop -- a stop is made pursuant to

16  that reasonable suspicion?

17      A   Yes.

18      Q   Okay.  And what is your personal understanding

19  of the standard for when a Terry stop must be concluded?

20      A   It -- it depends on the scene.  It -- it would

21  depend.  But for a stop, you would need to have

22  reasonable suspicion and --

23      Q   And so --

24      A   -- it -- it would depend on the scene.

25      Q   Okay.  So totally, take the point that, you

Page 11

1  know, there are a lot of different sort of ways that

2  this could come up.  Is it -- I took you just to be

3  saying at the very end of your answer that continuing a

4  Terry stop requires reasonable suspicion that a crime is

5  -- has been committed or is about to be committed.  Is

6  that a fair, sort of, recap of what you were suggesting?

7      A   I'm sorry.  Can you repeat the question?

8      Q   Sure.  Sure.  My original question was what it

9  was -- what is your personal understanding of the

10  standard for when you need to release someone from a

11  Terry stop?  Yeah.  So that was -- that was the original

12  question.

13      A   Yes.  So it would be sort of scene-by-scene

14  and based on the investigation.  When a Terry stop would

15  be stopped is when the officers on the scene have all of

16  the information that they need for their investigation.

17      Q   Okay.  Are you aware of any MPD policy that

18  says that officers require approval of a superior in

19  order to release someone from a Terry stop?

20      A   Can -- can you repeat the question?

21      Q   Sure.  Is there -- is there or are you aware

22  of any policy at MPD that says that officers require the

23  approval or presence of a supervisor in order to

24  conclude a Terry stop?

25      A   I -- I would have to review the -- general

Page 12

1  order.

2      Q   Okay.  I have one more question about Terry

3  stops and reasonable suspicion.  We've talked about

4  these principles, sort of, generally.  At any point on

5  February 17th, 2020, what crime or crimes did you have

6  reasonable suspicion to believe had occurred?  So in

7  other words, you know, for the -- for the entirety of

8  the -- of the incident, what are -- could you -- could

9  you list the crime or crimes that you believed you had

10  reasonable suspicion of?

11      A   A kidnapping of a juvenile.

12      Q   Okay.  A kidnapping, that's the -- that's the

13  list for the -- for the entirety of the incident?

14      A   That was -- the call for service was a

15  kidnapping.

16      Q   Okay.  Thank you.

17          MR. ROSEN:  I would like to introduce

18  Exhibit A.  Let's see if I can do this properly.  Okay.

19  Can everyone see the exhibit I just shared?

20          MS. TORRES:  Yes.

21          THE WITNESS:  Yes.

22          MR. ROSEN:  Okay.  Great.

23  If this could be marked as Exhibit A,

24  please?

25          THE REPORTER:  Okay.  Exhibit has been

Page 61

1  scene, a check on welfare report was -- was taken.

2  Report numbers were generated for a check on welfare

3  after -- after our investigation to conclude that --

4  yeah.

5     Q    Okay.  Does MPD -- have you ever written a

6  report -- forget about MPD as a whole.  Just you

7  individually, have you ever written a report about an

8  investigation that concluded that the thing that was

9  being investigated didn't happen?

10    A    I -- I have taken a lot of reports --

11    Q    Fair enough.

12    A    -- over the years, so I wouldn't be able to

13  recall.

14    Q    In general, would it ever be the case that a

15  report would read, we got a call for x, we investigated,

16  and it turned out x hadn't happened?  Like for -- I

17  guess, I'm just purely trying to understand in -- as a -

18  - as a -- as kind of rule, I guess, as MPD policy, would

19  an MPD -- would a member of MPD ever take a report about

20  an investigation that concluded that there was no crime?

21         MS. TORRES:  Objection.

22         THE WITNESS:  And I wouldn't be able to

23  answer what -- what other members on the department

24  would do.

25  BY MR. ROSEN:

Page 62

1     Q    Okay.  Okay.  Why did you volunteer to write

2  the report in this instance?

3     A    So Georgetown, where the 2703 O Street --

4  Georgetown was my PSA -- PSA 206 -- at the time when I

5  was an officer in the Second District.  And so it was my

6  area -- my -- my beat, so I took the report because it

7  was my beat.

8     Q    And what -- and what does PSA stand for?  I'm

9  sorry.

10    A    Yes, sir.  A police service area.

11    Q    Okay.  And so just to make sure I've got this,

12  you were the -- were you the only officer on scene on

13  this day who's -- who had that PSA?  Like, is it as

14  simple as, like, you -- this was your -- this was your

15  area, you were the only one of the people here for whom

16  that was true, and so the report was yours to write?

17    A    So -- my memory serves me correctly because it

18  was in 2020 --

19    Q    Sure, sure, sure.

20    A    -- Officer Tong was not in PSA 206.  The

21  other officers -- I -- I cannot -- I cannot recall, but

22  I know it was my area of responsibility.  I was assigned

23  to PSA 206, and I decided to take the report.

24    Q    Okay.  So you decided to take the report.  Can

25  you explain why you volunteered or told Officer Tong

Page 63

1  that you were taking the report at this moment in the

2  action?

3     A    Because it was my area of responsibility, an

4  area where I proactively patrolled, answered calls for

5  service, attended community meetings, and I decided it

6  was my -- because it was in my area that I would take

7  the report.

8     Q    And I'm sorry, I actually -- I meant to ask,

9  like, why now?  Like, you're speaking -- you're speaking

10  to Tong.  He's giving you a rundown of events from his

11  perspective as he's hearing them from Mr. Fishman and

12  maybe getting information from other sources as well.

13  And then at that point, you say, okay, I'll write the

14  report.

15         So you've explained why you decided to write

16  it.  I'm also wondering if you can speak to why you told

17  Tong at this moment, I'm going to -- I'll write the

18  report?

19    A    I -- I can't remember in that time -- exactly

20  at that time period why I -- I told him.  But it was my

21  area that I was assigned to at the time when I was

22  assigned to the Second District, and I decided to take

23  the report.  But at the time I -- I cannot recall.

24    Q    Thank you.  We're at 00:09:37.  I'm going to

25  keep going.

Page 64

1  (Video played.)

2  BY MR. ROSEN:

3     Q    We just paused at 00:09:55.  Just before I

4  paused, you said to Officer Tong, so this is not a --

5  but then you stopped speaking, at that point.  Do you

6  remember what you were about to say?

7     A    No, sir.

8     Q    Okay.  Is it possible that you were about to

9  say that this is not a kidnapping?

10    A    I cannot -- I cannot recall.

11    Q    Okay.

12  (Video played.)

13  BY MR. ROSEN:

14    Q    Okay.  We are paused at 00:10:04.  I realize I

15  asked you this question a moment ago, but more things

16  have happened, so I'll ask another time.

17         At this point, what crime or crimes do you

18  have reasonable suspicion of?

19    A    So we were still investigating, and as Officer

20  Tong actually -- as he just noted on body-worn camera,

21  that you had kids that were kicking each other.  So

22  we're still -- we're still actively investigating the

23  scene.

24    Q    Okay.  So -- and just to make sure I

25  understand, the alleged behavior of the two girls

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 15**





**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JARED FISHMAN,

      Plaintiff,

-v-                             1:21-cv-01847-RJL

DISTRICT OF COLUMBIA,
PATRICK LOFTUS, MARCK JAEGER,
JEREMY BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

      Defendants.
_____

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



**DEPOSITION OF**

**PATRICK LOFTUS**


**TAKEN ON**
**THURSDAY, SEPTEMBER 28, 2023**
**11:38 A.M.**


**ATTORNEY GENERAL OFFICE**
**400 SIXTH STREET NORTHWEST**
**WASHINGTON, DISTRICT OF COLUMBIA, 20001**

USCA Case #25-7050    Document #2131053        Filed: 08/20/2025    Page 355 of 426

Case 1:21-cv-01847-RJL    Document 54-9    Filed 01/10/24    Page 3 of 6
Patrick Loftus    September 28, 2023    NDT Assgn # 68847    Page 7

22

1        (Whereupon, Exhibit B was marked for
2 identification.)
3 BY MR. GERSTEIN:
4    Q.  I am going to play this for about two
5 minutes, I think, before I stop it the first time.
6        (Video plays)
7        MR. GERSTEIN:  For the record, that
8 stopped at minute two.
9 BY MR. GERSTEIN:
10    Q.  Lieutenant Loftus, do you remember the
11 call you received that prompted you to drive over to
12 the scene as depicted in this video?
13    A.  Yes, sir.
14    Q.  Do you remember what you were told on that
15 call?
16    A.  Can you be more specific?  I'm sorry.
17 Like by who?
18    Q.  I don't actually know.  So who called you
19 that caused you to drive here?
20    A.  Okay.  The 911 caller, you know, placed a
21 call as to what she observed and then we were
22 dispatched to that scene of the 911 caller by the
23 dispatcher.
24    Q.  And do you remember what the dispatcher
25 told you?

23

1    A.  I don't remember all the transmissions,
2 but it was in reference to a kidnapping.
3    Q.  And as you were driving over in this video
4 we just watched, had you yet communicated with any
5 other police officers about the incident that was
6 reported?
7    A.  Yes.
8    Q.  And who were they?
9    A.  Well, over the radio.  I advised that I
10 was responding.  So everybody would have heard my
11 transmissions.
12    Q.  Okay.
13        And had you heard any other transmissions
14 from other officers responding to the case?
15    A.  I don't remember, you know, exactly what I
16 heard, but I was actively monitoring the radio.
17    Q.  Okay.
18        At this point in the video, stopping at
19 minute two when you've just arrived at the scene of
20 where the 911 caller was, what crimes did you
21 believe you had reasonable suspicion of?
22    A.  We were investigating a kidnapping.
23    Q.  Did you believe at that point that you had
24 reasonable suspicion of any other crimes?
25    A.  At that point, I don't remember.

24

1    Q.  So you don't remember that you had
2 reasonable suspicion of any other crimes?
3    A.  Well, we did, but not yet, in my
4 recollection.
5    Q.  I mean at this point in the video?
6    A.  Right.  At this point, I recall
7 kidnapping.
8    Q.  Okay.
9        I am going to play for another 17 seconds.
10        (Video plays)
11 BY MR. GERSTEIN:
12    Q.  Who's Falcon?
13    A.  Falcon is our helicopter.
14    Q.  And what were you thanking Falcon for?
15    A.  I believe they were -- well, they were
16 overhead.
17    Q.  And had you called for the helicopter to
18 respond to this incident?
19    A.  No, they were already -- well, I may have.
20 I don't know.  They were already up in our area
21 looking for something else.
22    Q.  Looking for something else in an unrelated
23 case?
24    A.  Unrelated, yes.
25    Q.  Okay.

25

1        And so you may have notified the
2 helicopter, but you're not sure?
3    A.  Correct.
4        I'm going to play for about 15 more
5 seconds.
6        (Video plays)
7 BY MR. GERSTEIN:
8    Q.  Okay.
9        At the point of the video I just stopped,
10 you just asked did it look like a dad with an
11 uncooperative kid.  Why did you ask that?
12    A.  Based on my experience in policing,
13 sometimes things are different than they appear,
14 really in life, but it's something we want to factor
15 in during our preliminary investigation.
16    Q.  So you thought it was possible that the
17 incident that was reported as a kidnapping might
18 have been a father with an uncooperative kid?
19    A.  Anything's possible, but when you're
20 dealing with a kidnapping or a possible kidnapping,
21 especially involving a little girl, we have to treat
22 that as seriously and that it's a legitimate
23 kidnapping until we're proven otherwise.
24    Q.  Had anyone yet mentioned to you related to
25 this incident that it might have involved a father



Patrick Loftus   September 28, 2023      NDT Assgn # 68847      Page 8

26

1  with an uncooperative kid?
2      A.  I don't believe so.
3      Q.  I'm going to play about another 40
4  seconds.
5          (Video plays)
6          MR. GERSTEIN:  We're back on the record.
7  BY MR. GERSTEIN:
8      Q.  I just stopped the video at minute three,
9  second 55.
10         After what you just watched, what did you
11 think had happened at the incident that was
12 reported?
13     A.  We have one of two situations.  Well, we
14 have a couple possible situations.  We have a
15 kidnapping, we have a parental kidnapping or we have
16 child abuse.
17     Q.  Okay.
18         I'm going to introduce what I would like
19 to mark as Exhibit 3.  Exhibit C, excuse me.
20         (Whereupon, Exhibit C was marked for
21 identification.)
22 BY MR. GERSTEIN:
23     Q.  I've just introduced Exhibit C, which for
24 the record reads:  "General order of the
25 Metropolitan Police, title Child Abuse and Neglect,

27

1  effective date November 18, 2010.  Series 309 number
2  06."
3          Did you review this document in
4  preparation for your deposition today?
5      A.  Yes, sir.
6      Q.  Okay.
7          And before preparing for your deposition
8  today, were you familiar with MPD's general orders
9  regarding child abuse?
10     A.  I'm generally familiar with our general
11 orders.  You know, we have thousands of pages of
12 policies, so a general working knowledge.
13     Q.  Can you define what you think child abuse
14 is?
15         MS. MULLEN:  Well, objection as to form.
16 BY MR. GERSTEIN:
17     Q.  Let me rephrase.
18         What do you think child abuse is?
19         MS. MULLEN:  Objection as to form.
20         THE WITNESS:  Based on my own
21 interpretation or can I reference the policy?
22 BY MR. GERSTEIN:
23     Q.  Either?
24     A.  Let's use the policy.
25         So abuse is classified into a couple of

28

1  different areas.  And I'm on Part 3 for definitions,
2  number 2.  And it says:  "Abuse:  Infliction of
3  physical or mental injury on a child that goes
4  beyond mere discipline administered by a parent or a
5  legal guardian in accordance with official D.C.
6  code.  Sexual exploitation of a child or negligent or
7  maltreatment of a child."
8      Q.  And does that definition comport with how
9  you would in your own opinion understand what child
10 abuse means?
11         MS. MULLEN:  Objection as to form.
12         You can answer.
13         THE WITNESS:  I think it's close.  I would
14 say if someone is doing something to a child,
15 whether you're the parent or a stranger, but in many
16 cases it's the parents, that inflicts injury, pain,
17 emotional distress, trauma, sexual abuse, could all
18 fall under that category.
19 BY MR. GERSTEIN:
20     Q.  On Page 2 of this document under number 2,
21 there is an all caps word written that says note and
22 next to the word next it reads:  "Whenever used in
23 reference to children, "it" -- referring to the
24 definition of abuse -- "does not include the
25 discipline administered by a parent, guardian or

29

1  custodian to his or her child, provided that the
2  discipline is reasonable in manner and moderate in
3  degree and otherwise does not constitute cruelty."
4          Does that definition surprise you?
5          MS. MULLEN:  Objection as to form.
6          You can answer.
7          THE WITNESS:  I would like to read it
8  again if you don't mind.
9  BY MR. GERSTEIN:
10     Q.  Sure.  Yes, of course.  Take your time.
11     A.  I think it's all about reasonableness, you
12 know -- that's the way I interpret this.  Discipline
13 should be reasonable.  And -- that's it.
14     Q.  Would you say that manhandling a child who
15 has run off by hoisting them over your shoulder and
16 putting them in the car would meet that definition
17 of abuse?
18         MS. MULLEN:  Objection to the form of this
19 entire line of questioning, but you can answer.
20         MR. GERSTEIN:  Could you wait for a
21 moment?
22         I need to ask you to stop speaking
23 objections.  You can note an objection to form, but
24 this is instructing the witness during a deposition
25 with a pending question by objecting to the line of



NAEGELI
DEPOSITION & TRIAL      (800) 528-3335
NAEGELIUSA.COM

**JA 352**

Patrick Loftus    September 28, 2023    NDT Assgn # 68847    Page 9

---

30

1 question. None of that was objectionable to begin
2 with, but regardless --
3          MS. MULLEN: It's all highly
4 objectionable.
5          MR. GERSTEIN: On what grounds?
6          MS. MULLEN: You're asking -- it's so
7 obvious, your theory. And --
8          MR. GERSTEIN: That's not objectionable,
9 Martha, that's lawyer talk. So please stop using
10 that in this deposition.
11          MS. MULLEN: It is not good lawyering to
12 ask questions out of context and asking this officer
13 to voice his opinion about written policies.
14          MR. GERSTEIN: Martha, do you believe that
15 bad lawyering is objectionable during a deposition?
16 It's my deposition. I'll ask the questions and if
17 they're objectionable, you can note them for the
18 record, right?
19          MS. MULLEN: You're right, I would say bad
20 lawyering is not objectionable, but I do find the
21 line of questioning objectionable, so I object to
22 the form of that question.
23          MR. GERSTEIN: Okay. I'm neither going to
24 rephrase it nor withdraw it. Could you please
25 answer? I'll repeat it though.

---

31

1 BY MR. GERSTEIN:
2     Q. Would you say that manhandling a child who
3 has run off by hoisting them over your shoulder and
4 putting them in a car would meet that definition of
5 abuse?
6          MS. MULLEN: Objection to the form of the
7 question and the hypothetical.
8          THE WITNESS: I think manhandle is a broad
9 term, so I would need more specifics.
10 BY MR. GERSTEIN:
11     Q. So it possibly might meet that definition
12 depending on those specifics?
13     A. For child abuse?
14     Q. Correct.
15     A. Manhandle, absolutely, depending on what
16 those specific situations are.
17          MR. GERSTEIN: So I'm going to note for
18 the record that counsel believes hypotheticals to be
19 objectionable, is that correct?
20          MS. MULLEN: No, I'm objecting to the
21 hypothetical that you provided him.
22          MR. GERSTEIN: What about that, what's
23 objectionable?
24          MS. MULLEN: It's objectionable because
25 you're giving -- as a hypothetical, you're

---

32

1 describing -- we should excuse the -- you need to
2 leave.
3          THE WITNESS: Okay.
4          MS. MULLEN: I can't do this in front of
5 you.
6          THE WITNESS: I'll just step outside.
7          MS. MULLEN: Okay.
8          MR. GERSTEIN: Why? Do you want to go off
9 the record?
10          MS. MULLEN: Yes -- I don't -- we can stay
11 on the record. That's fine. I don't think
12 Lieutenant Loftus should be here when I have this
13 exchange with you.
14          MR. GERSTEIN: Okay.
15          THE WITNESS: I'll just be right outside
16 the door. Just let me know when --
17          MS. MULLEN: Yes.
18          MR. GERSTEIN: For the record, Lieutenant
19 Loftus is leaving and I presume will be out of
20 earshot.
21          THE WITNESS: Yes, I will. Come and get
22 me when you guys are ready.
23          MR. GERSTEIN: We'll stay on the record.
24          MS. MULLEN: A citizen made a report and
25 gave a description. That triggered an

---

33

1 investigation. You are asking the officer to give an
2 opinion based on the description that was given
3 before the investigation was even completed. It's
4 totally wrong. You're trying to fit -- we had two --
5 yes, look at your watch. That's always the polite
6 thing to do. We had two good samaritans who
7 witnessed something that they believed to be wrong
8 and they made a 911 call. That's how serious of an
9 impact it was on them.
10          So asking this officer if at the point
11 when he's first learning about what these witnesses
12 saw, whether that in and of itself could be child
13 abuse is not only irrelevant, but you're asking him
14 to say oh -- and he's told you it could be, it could
15 not be. It always depends on the situation. There
16 were multiple officers investigating this. They
17 took it very seriously and they gained information
18 as they went long.
19          So I don't know why you're persisting in
20 asking him if based on what the witness saw --
21 you're asking him what's your opinion. At that
22 point in time, did you think it was child abuse?
23 Policing and police practices are collecting
24 information as you go along. You don't immediately
25 form an opinion. You gather information. That's

---



**NAEGELI**
DEPOSITION & TRIAL    *CELEBRATING 40 YEARS IN BUSINESS*    (800) 528-3335
NAEGELIUSA.COM

54

1  -- and the name has evolved, but youth division,
2  youth family services vision -- they investigate
3  child abuse and neglect. Basically, anytime that we
4  have a juvenile victim, they would be the ones to
5  conduct those investigations.
6      Q.  And what, in your understanding, is the
7  relationship between whether the parents are
8  separated and whether this is a youth division case?
9      A.  I'm not sure about whether separated or
10  not, but it's a different -- there is a kidnapping
11  squad of detectives. Say it's like a stranger,
12  there is a kidnapping squad of detectives that would
13  handle that. I've never had it -- well, I imagine
14  that youth and family services division, because
15  they investigate essentially all cases where
16  children are victims, would handle a parental
17  kidnapping case. Or child abuse as well. That all
18  falls under their purview.
19      Q.  Thank you.
20          I'm going to introduce another video that
21  we will mark as Exhibit D, I believe we were up to?
22      MS. MULLEN:  I think that's right.
23          (Whereupon, Exhibit D was marked for
24  identification.)
25      MR. GERSTEIN:  And I will represent to

55

1  your lawyer, Lieutenant Loftus, that this is a video
2  that was produced to us during discovery and it is
3  also from your body-worn camera footage when you
4  arrived at Jared Fishman's house on February 17,
5  2020.
6      THE WITNESS:  Can we take a break in a few
7  minutes or --
8      MS. MULLEN:  Do you want --
9      MR. GERSTEIN:  Do you want it now?
10      THE WITNESS:  This might be a good time,
11  just to hit the restroom.
12      MS. MULLEN:  Yes.
13      MR. GERSTEIN:  Off the record.
14          (Whereupon, a recess ensued.)
15      MR. GERSTEIN:  Back on the record.
16  BY MR. GERSTEIN:
17      Q.  Okay.
18          I'm going to play the video I just
19  described in the record.
20          (Video plays)
21      MR. GERSTEIN:  Just to save us three
22  minutes. Nothing happens here. I'm going to -- I
23  think there is somebody over there. Okay. I'm
24  stopping at minute two and playing at -- well, I'm
25  playing at minute two, excuse me.

56

1      (Video plays)
2      MR. GERSTEIN:  Back on the record.
3      MR. GERSTEIN:  I stopped at minute three,
4  second 11.
5  BY MR. GERSTEIN:
6      Q.  You're speaking to someone in this video.
7  Do you know who that is?
8      A.  Right there?
9      Q.  Yes.
10      A.  Yes, that's Sergeant Bray.
11      Q.  Sergeant Bray just said that another
12  officer had told him that the two people with the
13  girl in this investigation were the biological
14  mother and father of the girl, is that correct?
15      A.  I believe that's what they said.
16      Q.  Okay.
17          At this point, what crime or crimes do you
18  believe you had reasonable suspicion of?
19      MS. MULLEN:  Objection as to form.
20          You can answer.
21      THE WITNESS:  If it is the biological
22  parents, then we still have the issue of either
23  parental kidnapping that I previously described or
24  child abuse.
25  BY MR. GERSTEIN:

57

1      Q.  And you believed you had reasonable
2  suspicion of both of those crimes at this point?
3      A.  Yes.  One or the other.  We had reasonable
4  suspicion to have that fact that a crime had
5  occurred. We're still figuring out what exactly.
6      Q.  I'm going to play for 32 seconds.
7          (Video plays)
8      MR. GERSTEIN:  Okay, I stopped at minute
9  three, second 43.
10  BY MR. GERSTEIN:
11      Q.  I believe you just said that it concerned
12  you that the parents of the girl in the
13  investigation had not been immediately cooperative,
14  is that correct?
15      MS. MULLEN:  Well, objection as to the
16  form of the question.
17          You can answer.
18  BY MR. GERSTEIN:
19      Q.  Let me rephrase.  What is your
20  understanding of what you just said in the video?  I
21  can replay it if you want.
22      A.  Can you replay it?
23      Q.  Sure.
24          (Video plays)
25      A.  Do you need to go back further?



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 18**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**+ + + + +**

|  |  |
|---|---|
| IN THE MATTER OF: | : |
|  | : |
| JARED FISHMAN, | :   Case No. |
|  | :   1:21-cv-01847-RJL |
|     Plaintiff, | : |
|  | : |
|       v. | : |
|  | : |
| DISTRICT OF COLUMBIA, | : |
| PATRICK LOFTUS, MARCK | : |
| JAEGER, JEREMY BRADY, | : |
| MICHAEL TONG, & CHRISTOPHER | : |
| TODARO, | : |
|  | : |
|     Defendants. | : |

Monday,
October 23, 2023

via Video Teleconference

DEPOSITION OF:

**JARED FISHMAN**

called for examination by Counsel for the
Plaintiff, pursuant to Notice of Deposition, via
Video Teleconference, when were present on behalf
of the respective parties:

40

1  guy doesn't know what he's talking about"?  Do
2  you remember saying that?
3      A    Yes.
4      Q    And what guy were you referring to,
5  sir?
6      A    I was referring to the taxi driver in
7  the black SUV.
8      Q    The taxi driver in the black --
9           (Simultaneous speaking)
10     A    I believe it was a car for hire.
11     Q    All right.  So one and the same?
12     A    The guy --
13          MR. GERSTEIN:  Objection --
14          (Simultaneous speaking)
15          THE WITNESS:  -- in the black SUV, if
16  I recall correctly, his license plate had for
17  hire on the tag.
18          BY MS. MULLEN:
19     Q    And this was the same man that
20  approached you while your car was parked?
21     A    I believe so.
22     Q    Okay.  And sitting here today, you

41

1  found nothing odd about him blocking your car?
2          MR. GERSTEIN:  Objection.
3          (Simultaneous speaking)
4          MR. GERSTEIN:  Asked and answered.
5  Jared, you've already answered that.
6          MS. MULLEN:  You can answer again.
7          THE WITNESS:  Yeah, I found it odd
8  that this man that had nothing to do with my
9  family was intervening.
10          BY MS. MULLEN:
11     Q    Okay.  And did you find it odd when he
12  approached you when your car was parked?
13     A    I did not find it odd when he asked me
14  how I was doing or what was going on, but I did
15  find it odd that he continued to remain
16  interested in the situation.
17     Q    Thank you.
18     A    Particularly, after I told him that it
19  was my child who was acting up.
20     Q    You clearly remember saying that?
21     A    I told him words to the effect that
22  this was my child who was acting up, yes.

42

1      Q    Thank you.  The next sentence in your
2  complaint, paragraph 1, it states, "A passerby
3  called the police.  And based on that call,
4  Officer Marck Jaeger, who was at a nearby
5  7-Eleven, drove to Fishman's house."  Do you know
6  that to be a true and correct statement?
7      A    I believe that to be true based on the
8  videos that were provided, yes.
9      Q    Thank you.  "There, Jaeger encountered
10  Fishman sitting on the front stoop."  Is that a
11  correct statement?
12     A    Yes.
13     Q    Shoeless?  That's correct?
14     A    Yes.
15     Q    And you were playing Bob Dylan's
16  Simple Twist of Fate on an acoustic guitar; is
17  that correct?
18     A    Yes.
19     Q    That's -- is there any irony that you
20  see there?
21          MR. GERSTEIN:  Objection.  I can't
22  decipher -- well, you can answer if you can

43

1  answer.  I'll withdraw my objection.
2          BY MS. MULLEN:
3      Q    Do you see any irony that you were
4  playing Bob Dylan's song a Simple Twist of Fate?
5      A    Yes, I do find it quite telling.
6      Q    Well, in that song, like so many of
7  his, he's wishing that things had turned out
8  differently.  So is that the irony that you're
9  sensing?
10          MR. GERSTEIN:  Objection, assumes a
11  fact that is most certainly not in evidence.  But
12  if you happen to know the lyrics, Jared, you can
13  go ahead and answer.
14          MS. MULLEN:  He was singing the song
15  or playing it on his guitar.  Do you know the
16  lyrics to that song?
17          THE WITNESS:  Not by heart.  But go
18  ahead if you have a particular lyric you would
19  like me to comment on.
20          MS. MULLEN:  It's like many of Bob
21  Dylan's songs.  I'm a huge fan of Bob Dylan.  I'm
22  assuming you are too.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 16**



DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL

# INVESTIGATIVE SUMMARY | 24-002

**Findings of Misconduct by a then DOJ Trial Attorney for Conduct Prejudicial to the Government and Attempted Misuse of Position**

The Department of Justice (DOJ) Office of the Inspector General (OIG) initiated an investigation after receiving information from the DOJ Office of Professional Responsibility alleging that a then DOJ Trial Attorney engaged in behavior unbecoming of a federal employee during an investigation by local police in which the Trial Attorney was identified as a possible subject, and that the Trial Attorney made spontaneous statements about being a DOJ attorney in an attempt to influence the investigation.  During the course of their investigation, the local police determined that the allegations were unfounded and no charges were filed by police.

The OIG investigation substantiated the allegation that the Trial Attorney engaged in conduct prejudicial to the government in violation of federal ethics regulations and DOJ policy when the Trial Attorney ignored the instructions of a local police officer. The OIG investigation also found that the Trial Attorney misused the Trial Attorney's position as a DOJ attorney in an attempt to influence the police investigation when the Trial Attorney made reference to being a DOJ attorney while being questioned in handcuffs by police, in violation of federal ethics regulations.

The Trial Attorney resigned while the OIG's investigation was ongoing.

The OIG has completed its investigation and provided its report to the Trial Attorney's employing division for its information and to DOJ's Professional Misconduct Review Unit for appropriate action.

★   ★   ★

Unless otherwise noted, the OIG applies the preponderance of the evidence standard in determining whether DOJ personnel have committed misconduct.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JARED FISHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA; and | ) |
| LIETENANT PATRICK LOFTUS, | ) |
| OFFICER MARCK JAEGER, OFFICER | ) |
| JEREMY BRADY, OFFICER | ) Case No. 21-cv-1847 |
| MICHAEL TONG, and OFFICER | ) Jury Trial Demanded |
| CHRISTOPHER TODARO, all of the | ) |
| Metropolitan Police Department of the | ) |
| District of Columbia, all in his | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.    Preliminary Statement.................................................................................... 1

II.   Legal Standard ............................................................................................... 2

III.  Argument ....................................................................................................... 3

    A.    The Permissibility of Defendants' *Initial* Stop Is Undisputed and
        Irrelevant ............................................................................................... 3

    B.    Defendants Offer No Undisputed Material Facts or Relevant
        Legal Authority in Support of Their *Continued* Detention of
        Fishman................................................................................................ 4

IV.   Conclusion................................................................................................... 10

i

## I.    Preliminary Statement

Plaintiff Jared Fishman's amended complaint alleged, among other claims, that Defendants violated the Fourth Amendment by seizing him without reasonable suspicion (Count III) and arresting him without probable cause (Count IV), and that his detention constituted false imprisonment under District of Columbia law. (*See* Doc. 18 at 33-34, 35-36.) All three counts survived Defendants' motion to dismiss because this Court concluded that Fishman had alleged "sufficient facts to establish that Officers Jaeger, Brady, Todaro, and Tong each reached the conclusion that no crime had been committed well before the *Terry* stop was terminated." (Doc. 31 at 13.)

Defendants now move for summary judgment on all three counts. Their motion, however, is light on material facts and relevant law and heavy on innuendo. Defendants first argue the permissibility of their *initial* stop of Fishman, an issue that is no longer contested or relevant to this case. And when Defendants finally turn to the issues of Counts III, IV, and VI, they strenuously avoid this case's key, operative fact: that all three members of Fishman's family explained at the outset of Defendants' investigation that Fishman had not kidnapped *or harmed* anyone. Instead of offering undisputed material evidence that would justify the *continued* detention of Fishman long after his family's explanations, Defendants provide only vague, unsupported generalities about the complex nature of policework. Nor do Defendants meaningfully attempt to show, as they must, that they are entitled to judgment as a matter of law: Defendants do not cite a *single case* that purports to

authorize their continued detention of Fishman well after Fishman's family had explained the misunderstanding.

A successful motion for summary judgment requires both undisputed material facts and relevant, controlling law. Defendants have failed to produce either, and this Court should deny their motion for summary judgment.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, [that] 'the moving party is entitled to a judgment as a matter of law.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"When ruling on a motion for summary judgment, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Lindsey v. District of Columbia*, 810 F. Supp. 2d 189, 197-98 (D.D.C. 2011) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' Thus, although the court should review the record as

2

**JA 363**

a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51 (quoting *Anderson*, 477 U.S. at 255)).

## III.   Argument

### A.   The Permissibility of Defendants' *Initial* Stop Is Undisputed and Irrelevant

Defendants' first argument deals exclusively with an issue no longer in dispute. As this Court noted in its partial denial of Defendants' motion to dismiss, "the relevant question to resolve [Counts III, IV, and VI] is *not* whether the officers had reasonable suspicion to justify *initiating* the *Terry* stop." (Doc. 31 at 12 (emphasis added).) Despite that directive from this Court, Defendants have spent pages addressing this now-irrelevant question. (*See* Doc. 54 at 6–9.) They argue that the initiation of the *Terry* stop was justified by the seriousness of the alleged crime (*see* Doc. 54 at 7) and by Fishman's initial reaction to Officer Jaeger's questioning (*see* Doc. 54 at 7–8), and that Fishman's attempt to enter his home against the orders of Officer Jaeger justified placing Fishman in handcuffs (*see* Doc. 54 at 8–9).

These issues are irrelevant.[1] This has been obvious since this Court issued its partial denial of Defendants' motion to dismiss almost a year ago. (*See* Doc. 31 at 12 (Officer Jaeger "had reasonable suspicion to detain and question Fishman" and "the

---

[1] Also irrelevant to Counts III, IV, or VI are Defendants' decontextualized gestures to statements Fishman made about his profession to Sergeant Bray—who is not a party to this case—shortly before Sergeant Bray ordered that Fishman be removed from handcuffs; no one argues that telling Bray where he worked was a crime. (*See* Doc. 54 at 14–15.)

3

other officers on the scene were justified in relying on Officer Jaeger's 'assessment of circumstances sufficient to warrant' Fishman's seizure" (citations omitted)). Defendants' first argument, then, does nothing to bolster their case for summary judgment on Counts III, IV, or VI, and this Court need not consider it in ruling on this motion.

**B.      Defendants Offer No Undisputed Material Facts or Relevant Legal Authority in Support of Their *Continued* Detention of Fishman**

As discussed *supra*, Defendants begin their motion with a detailed argument about issues no longer relevant to this case. In support of these irrelevant arguments, Defendants marshal the material facts and applicable law that Rule 56 requires. But when Defendants finally turn to the actual heart of this case, their arguments are devoid of either: many of their citations are to materials outside of the record, and they offer no caselaw that would justify their *continued* detention of Fishman.

As this Court has asserted, "the relevant question to resolve these claims is not whether the officers had a reasonable suspicion sufficient to justify initiating the *Terry* stop; it is whether the officers prolonged the *Terry* stop after that reasonable suspicion was dispelled." (Doc. 31 at 12.) Specifically, the "crux of Fishman's argument is that the realization that the alleged kidnapping victim was Fishman's own daughter dispelled any reasonable suspicion [Defendants] may have held, and that Fishman's continued detention therefore violated his Fourth Amendment rights." (*Id.*) And, of course, this Court has already concluded that Fishman sufficiently alleged just such a violation. (*See Id.* at 13.)

Defendants do not—and cannot—point to any evidence uncovered in discovery that undermines Fishman's initial allegations. In fact, discovery has revealed only that Defendants' investigation—all of which was captured by body-worn cameras—unfolded precisely as Fishman has alleged. (*See* Doc. 53 at 1–4.) Nor have Defendants produced any legal authority that would entitle them to judgment under Rule 56. In place of material facts and relevant law, Defendants offer only vague principles. Specifically, Defendants argue that their continued detention of Fishman—over his family's immediate explanations that Fishman neither kidnapped nor harmed anyone—was justified because policework is complicated and crimes against children are serious. Neither argument even comes close to justifying a grant of summary judgment on Counts III, IV, or VI.

As this Court is aware, within two minutes of arriving on scene officers heard from each member of Fishman's family: Fishman's younger daughter, the alleged kidnapping victim, said, "please don't arrest him, *he hasn't done anything wrong*" (*see* Defs.' Ex. 5 at 3:36–3:39 (emphasis added)); Fishman's elder daughter told police, "I was in the car in the front seat. My sister was misbehaving, and she wouldn't get into the car and come home. We didn't want her to get taken or anything, and she was not listening, so my dad had to put her over his shoulder and bring her into the car. *He did nothing wrong*." (*Id.* at 4:06–4:20 (emphasis added)). Soon after, Fishman's wife consoled her younger daughter in front of police, saying, "Do you know what happened, sweetie? . . . Somebody saw Daddy pick you up and they didn't know he was Daddy." (*Id.* at 4:57–5:06).

Defendants offer no evidence that these crucial facts are in dispute, nor do they explain how, given these facts, a reasonable jury *could not possibly* rule in Fishman's favor. *See Steele*, 535 F.3d at 692. Instead, Defendants gesture—abstractly, ominously, and without concrete support—to the notion that things at the Fishman home were more sinister than they appeared. Defendants claim that ending their investigation on the basis of Fishman's family's explanations would have been improper because police "must not 'be lulled into a false sense of security.'" (Doc. 54 at 11.) This quotation, however, comes from general MPD guidance, not from evidence produced in discovery. No Defendant so much as mentioned it during the investigation or at his deposition, and Defendants offer no evidence that any of them are even aware that this guidance exists.[2] And no Defendant argues that this guidance alone could supply reasonable suspicion, and for good reason—if that were so, any father could be handcuffed and taken from his children at any time, for it is always the case that children who say nothing is wrong *might* not be telling the whole story. The issue here is whether there is any *evidence* that *these* children were. There is none at all.

Defendants repeatedly attempt this same type of obfuscation, invoking material with no connection to the record and treating broad maxims like controlling precedent. They claim that "[p]olice investigations are fluid and although officers may

---

[2] Defendants' invocation of Lieutenant Loftus's deposition testimony, during which he stated his belief that "sometimes things are different than they appear, really in life," does nothing to enter this specific MPD guidance into the record. (*See* Defs.' Ex. 3 at 25:1-22.)

6

respond to a call for a suspected crime, information may come to light that changes the circumstances of the officers' investigation, particularly serious ones [sic] where children are potential victims." (Doc. 54 at 12.) But for this novel and seemingly limitless theory of the police's power to extend *Terry* stops, Defendants offer no citation—no case, no statute, and no evidence from the record. They instead ask this Court to treat the statement as axiomatic, which it is not. And they further claim that they were permitted "to detain and remain with Plaintiff until all facts came to light, and all suspicion of *any crime* was dispelled." (Doc. 54 at 9. (emphasis added).) This statement contains no citation to any legal authority, and for good reason: "[a] *Terry* stop must (1) 'last no longer than is necessary to effectuate the purpose of a stop' and (2) employ 'the least intrusive means reasonably available to verify or dispel the officer's suspicion.'" *United States v. Devaugh*, 422 F. Supp. 3d 104, 114 (D.D.C. 2019) (quoting *United States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019)). These mandates would be meaningless if police could arbitrarily and indefinitely widen the aperture of an investigation to include "any crime," regardless of the objective facts before them or the specific crime for which they initially had reasonable suspicion.

Defendants, moreover, never say what new information "c[a]me to light" as they continued to detain Fishman after hearing his family's explanations (*see* Doc. 54 at 9.); they simply admit that the explanations "made 'sense,'" and offer no new information that could establish continued reasonable suspicion in light of those explanations (*id.* at 13). Instead, Defendants state that Defendant Todaro, after hearing from the family members, was justified in continuing to detain Fishman

because he learned "that Sergeant Bray was on the way" (Doc. 54 at 13),[3] and, vaguely, because the Officers "were continuing to investigate a kidnapping" (*id.* at 13). None of this information, however, relates to whether Fishman had kidnapped anyone, nor does it come close to establishing reasonable suspicion of any other, separate crime; Defendants are merely reprising their claim that police may extend a *Terry* stop simply and solely by continuing their investigation (or, worse, by simply waiting for a superior officer to arrive). (*See* Doc. 53 at 4-6.) The Constitution clearly says otherwise: "detaining officers must have *a particularized and objective basis* for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (emphasis added); *see also United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("assessing whether a detention is too long" involves examining "whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly"); *Florida v. Royer,* 460 U.S. 491, 499 (1983) ("investigative detention must be temporary and last no longer than is necessary to effectuate the *purpose of the stop*" (emphasis added)).

Defendants next attempt to waive away Fishman's daughters' statements that their father had done nothing wrong. They do so on the grounds that "[c]hildren may lie to protect a parent, particularly if the child believes she has put her parent in

---

[3] In their Motion, Defendants assert that, "[a]pproximately 15 minutes after Plaintiff's daughter told Officers Brady and Todaro what had happened, Sergeant Adam Bray arrived on the scene." (*Id.* at 14.) In other words, though Plaintiff's daughter had already told the officers what had happened, the officers waited 15 minutes for a sergeant to arrive, after which that sergeant released Plaintiff without learning any additional relevant information. (Defs.' Ex. 4 at 10:41-11:38; 12:00-12:18; 12:56-13:10.)

harm's way." (Doc. 54 at 12.) But, as with the claims discussed *supra*, Defendants offer no evidence that any of them actually harbored this suspicion, or that such a suspicion would have been reasonable, and none exists in the record. Defendants instead support this assertion by citing an academic article that attempts to link research on the brains of newborn rats to the neurological development of human infants. Unsurprisingly, no Defendant has testified that he is even aware that this article exists, yet Defendants claim, without any support, that its conclusions are "common knowledge among mental health professions and the legal justice system." (Doc. 54 at 12 & n7.) But simply stating this, without evidence, does not make it so. Rule 56 requires movants to support their arguments with undisputed material facts from the record, not whatever those movants are able to find on the internet. Regardless, to the extent that Defendants' argument is simply that sometimes children lie, the mere possibility that this is so cannot support reasonable suspicion, as explained above.

Defendants continue in this same way. They argue that Fishman's 25-minute detention was justified because of the (undeniably horrific) number of children who die each year from neglect and abuse (*see* Doc. 54 at 13); because police investigating a kidnapping "must exercise caution when interacting with family members" (*see id.* at 15); and because in the District of Columbia kidnapping is a felony (*see id*). All of these claims, like the rest of Defendants' arguments, are severely lacking in what Rule 56 requires: undisputed material facts and legal authority showing that "the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

9

**JA 370**

At the end of the day, the evidence is as Fishman pleaded it in the complaint: Defendants should have known immediately that Fishman had neither kidnapped his own daughter nor committed any child abuse. Fishman has therefore moved for summary judgment in his favor against Officer Todaro, who admitted under oath that he knew Fishman was the girls' father within roughly two minutes of arriving on the scene and that he never had reasonable suspicion of any crime other than kidnapping. (*See* Doc. 47.) At the very least, though, this case should proceed to trial, as this Court has effectively already ruled in denying Defendants' motions to dismiss a complaint based on the identical facts they seek to wave away here.

## IV.    Conclusion

For the foregoing reasons, this Court should deny Defendants' motion for summary judgment.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein (D.C. Bar No. 1033346)
Emily Gerrick (D.C. Bar No. 90010592)
Samuel Rosen (D.C. Bar No. 90012245)
GERSTEIN HARROW LLP
810 7th St. NE, Ste. 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

/s/ Jason Harrow
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste 800
Los Angeles, CA 90025
jason@gerstein-harrow.com

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JARED FISHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA; and | ) |
| LIETENANT PATRICK LOFTUS, | ) |
| OFFICER MARCK JAEGER, OFFICER | ) |
| JEREMY BRADY, OFFICER | )    Case No. 21-cv-1847 |
| MICHAEL TONG, and OFFICER | )    Jury Trial Demanded |
| CHRISTOPHER TODARO, all of the | ) |
| Metropolitan Police Department of the | ) |
| District of Columbia, all in his | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS'
OPPOSED MOTION FOR SUMMARY JUDGMENT**

Defendants' Statement:

1. On February 17, 2020, Plaintiff Jared Fishman took his two daughters to the Cactus Cantina restaurant on Wisconsin Avenue, Northwest Washington, D.C. Defs.' Ex. 3, Tong Body Worn Camera Video at 10:34-50.

Plaintiff's Response:

This statement is undisputed.

Defendants' Statement:

2. At some point, Plaintiff's younger daughter misbehaved, and Plaintiff and his children left the restaurant, but the commotion continued outside. Plaintiff picked up the child and put her in his car. *Id.* at 10:34-11:11.

Plaintiff's Response:

This statement is disputed to the extent that describes a "commotion" outside the restaurant. Nothing in the record establishes that any member of Plaintiff's family made any sort of "commotion" outside the restaurant, and at no point in the portion of the body-worn camera footage to which Defendants cite did Plaintiff say otherwise. Instead, the record establishes only that the younger daughter walked away, after which Plaintiff picked her up and put her in his car.

Defendants' Statement:

3. Moments after Plaintiff secured his younger daughter and got into the driver's seat, a car stopped in front of Plaintiff's car and asked if "there was a problem." Plaintiff told the man that his "kid was being a little shit." Plaintiff took his children home. *Id.* 10:50-11:06.

Plaintiff's Response:

This statement is disputed. It is incomplete and inaccurate. Plaintiff told Officer Tong that his first response to the driver's question of whether "there was a problem" was that "there was none." *See* Defs.' Ex. 3, Tong Body Worn Camera Video at 11:02-11:04. Moreover, Plaintiff reported to Officer Tong that he told the driver that his younger daughter was "being a shit," not that she was "being a little shit." *Id.* at 11:05.

1

Defendants' Statement:

4. A civilian 9-1-1 caller reported the possible "abduction" of a child. Defs.' Ex. 6, 9-1-1 recording. The witness told emergency services, "I don't know if it was an abduction, or a father manhandling his child in a really bad way […] I saw this little girl walking by herself, she was probably six or seven, so I pulled over to see if she was by herself or with an adult. Then I saw this guy pull up, and he tried to talk to her, then he started screaming at her, and she pushed him, and he just grabbed her, threw her over his shoulder, and just threw her into the car […] Then this other guy pulled over and tried to help, and he said, 'it's my daughter,' but the other guy wasn't convinced." *Id.*

Plaintiff's Response:

This statement is disputed because it is incomplete. There should be a bracketed ellipsis between "Then I saw this guy pull up," and "and he tried to talk to her." The caller's full statement was "Then I saw this guy pull up *and jumped out of his car and tried* to talk to her…" *See* Defs.' Ex. 6 at 0:42-0:47.

---

Defendants' Statement:

5. Surveillance video shows a male witness pull up in a black Chevrolet SUV in front of Plaintiff's Green Audi and approach Plaintiff's Green Audi. Within seconds, Plaintiff turns and speeds away. *See* Defs.' Ex. 17 at 2:30-2:45.

Plaintiff's Response:

This statement is disputed to the extent that the phrase "speeds away" suggests that Plaintiff turned or drove quickly to avoid the driver of the SUV. The surveillance video introduced by Defendants shows Plaintiff executing a slow, careful three-point turn and then driving away at a non-accelerated speed. *See* Defs.' Ex. 17 at 2:30-2:45.

---

Defendants' Statement:

6. The 9-1-1 caller gave a description of the vehicle, a Green Audi, license plate number, and physical description of the suspect, a white balding male in his forties. Defs.' Ex. 6.

Plaintiff's Response:

This statement is undisputed.

2

**JA 374**

Defendants' Statement:

7. Officer Jaeger heard the call with Plaintiff's address while he was parked in front of the 7-Eleven on 27th and P Street Northwest, and saw Plaintiff's home address registered to the license plate. *See* Defs.' Ex. 2, Jaeger Body Worn Camera Video; *see also* Defs.' Ex. 12, Jaeger Depo. Tr. at 22:6-12.

Plaintiff's Response:

This statement is undisputed.

Defendants' Statement:

8. As Jaeger approaches the home, a helicopter circled above and indicated over the radio that "they're watching the situation because the call is for a kidnapping. It's a very serious crime." Defs.' Ex. 12 at 26:20-23.

Plaintiff's Response:

This statement is disputed to the extent that it suggests that someone in the police helicopter stated that kidnapping is a "very serious crime." The portion of Officer Jaeger's deposition testimony referenced by Defendants is not clear regarding whether the "very serious crime" statement came from someone in the helicopter or instead is Officer Jaeger's own characterization of the crime of kidnapping. In its full context, however, this statement seems most reasonably read as a characterization made by Officer Jaeger. *See* Defs.' Ex. 12 at 26:20-23.

Defendants' Statement:

9. When Officer Jaeger reached the home, Plaintiff, sitting on the front steps, confirmed that he had just arrived home in the automobile identified by its license plate by the 9-1-1 caller, an Audi. See Def. Ex. 2. Plaintiff then self-identified as the kidnapping suspect. *Id.*

Plaintiff's Response:

This statement is disputed. Plaintiff did not "self-identif[y] as the kidnapping suspect." Plaintiff did not know that the police suspected a kidnapping had occurred, or that he was a suspect, and he was not told that he was a suspect in a potential kidnapping until the end of his detention. Defs.' Ex. 4, Bray Body Worn Camera Video

3

**JA 375**

at 10:48-11:23. Although Plaintiff did hypothesize that the driver of the SUV, discussed *supra*, might have contacted the police, that statement is not the same as "self-identif[ying] as the kidnapping suspect." Defendants fail to support this statement with any specific statements made by Plaintiff during either the investigation (as captured on body-worn camera footage) or at his deposition. Instead, Defendants offer only a general citation to the entirety of Officer Jaeger's body-worn camera footage. This general citation hardly establishes as undisputed the fact that Plaintiff "self-identified as the kidnapping suspect."

---

Defendants' Statement:

10. Plaintiff now realized that someone near Cactus Cantina must have called the police, and he figured it must have been the man he spoke to. Defs.' Ex. 18, Fishman Depo. Tr. 40:1-21. Plaintiff told Officer Jaeger that the "guy who called in has no idea what's going on." Defs.' Ex. 2 at 3:50.

Plaintiff's Response:

This statement is undisputed.

---

Defendants' Statement:

11. Instead of answering Jaeger's request for more information, Plaintiff told him to "hold on," and stood up to enter his home. *Id.* But before Plaintiff stepped over the threshold of his doorway, Officer Jaeger told Plaintiff not to go inside. *Id.* at 4:01.

Plaintiff's Response:

This statement is disputed. Plaintiff disputes Defendants' characterization of Plaintiff as having entered his house after Officer Jaeger told him not to. Plaintiff was already stepping over the threshold into his house when Officer Jaeger told him not to go inside.

---

Defendants' Statement:

12. Plaintiff disregarded Officer Jaeger and entered the house. *Id.* at 4:02. Officer Jaeger immediately followed him inside, seized Plaintiff, and handcuffed him. *Id.* at 4:03-4:07. Three other MPD officers—Jeremy Brady, Michael Tong, and Christopher Todaro—arrived while Officer Jaeger was handcuffing Plaintiff. Id.

Plaintiff's Response:

    This statement is disputed. Even if Officer Jaeger told Plaintiff not to go inside *before* Plaintiff did so, which is disputed, nothing in the record establishes either that Plaintiff heard what Officer Jaeger said to him or that Plaintiff heard what Officer Jaeger said but "disregarded" it. It is undisputed, however, that Officer Jaeger seized and handcuffed Plaintiff, and that Officers Brady, Tong, and Todaro arrived while this was happening.

Defendants' Statement:

13. While Officer Jaeger was handcuffing Plaintiff, Plaintiff's two daughters appeared in the doorway of the home. *Id*. at 4:17.

Plaintiff's Response:

    This statement is undisputed.

Defendants' Statement:

14. Her older sister told the officers that Plaintiff had done nothing wrong and that "it is my sister, she was misbehaving." Defs.' Ex. 5, Brady Body Worn Camera Video at 4:09; see also Defs.' Ex. 7, Todaro Body Worn Camera Video at 4:14.

Plaintiff's Response:

    This statement is undisputed.

Defendants' Statement:

15. Officers escorted Plaintiff around the corner for scene safety and to hear each person's story individually. Defs.' Ex. 9, Tong Depo. Tr. at 38:22-25; see also Defs.' Ex. 11, Todaro Depo. Tr. at 15:17-23.

Plaintiff's Response:

    This statement is disputed. First, Defendants' exhibits do not establish that Plaintiff was moved for those stated reasons. Defendants' cited excerpts of Exhibit 9 simply states that Defendant Tong was not sure if Fishman would argue in front of his kids and that he believed it was "best practice to move him to a separate location."

5

**JA 377**

It says nothing about the safety of the scene or the need to interview each person separately. And while Defendant's cited excerpts of Exhibit 11 does mention the desire to remove witnesses from eyesight of one another, there is again no mention of scene safety. Second, Officers did not in fact "hear each person's story individually." Although Plaintiff's wife did speak to police on the family's front steps while the children were inside, *see* Defs.' Ex. 5 at 10:14-23:18, Plaintiff's children spoke to Defendants almost exclusively in the presence of each other, their mother, or both. *See Id.* at 3:16-27:29. At no point did police explicitly separate any other family member besides Fishman for individual questioning (or for any other reason). *See Id.*

---

Defendants' Statement:

16. While Officer Tong steered Plaintiff away from the home, Officers Brady and Todaro stayed at the Plaintiff's front steps and spoke with Plaintiff's wife and children. *See generally* Defs.' Ex. 5; *see also* Defs.' Ex. 7.

Plaintiff's Response:

This is disputed because it is incomplete. During the investigation Officer Todaro split his time between speaking to Plaintiff's family on the front steps of their home and detaining Plaintiff on the corner of Plaintiff's street. *See* Defs.' Ex. 7 at 3:50-29:06.

---

Defendants' Statement:

17. Plaintiff was handcuffed because he was a fleeing suspect to a felony and a flight risk. *See* Def. Ex. 11 at 51:14-19.

Plaintiff's Response:

This statement is disputed. It does not state an objective fact. Although Officer Todaro testified at his deposition that Plaintiff was handcuffed because "he tried to flee when [police] first arrived on scene," that testimony states only Officer Todaro's subjective characterization of Plaintiff's actions and MPD's response to those actions. *See* Def. Ex. 11 at 51:14-15.

---

Defendants' Statement:

18. Both Plaintiff's wife and his older daughter explained to the officers that the girl whom the witness had observed being placed in the car was Plaintiff's younger daughter. *See generally* Defs.' Ex. 5; *see also* Defs.' Ex. 7.

6

**JA 378**

Plaintiff's Response:

This statement is undisputed.

Defendants' Statement:

19. Determining the relationship of the parties involved was but one aspect of the inquiry and the investigation did not cease when officers learned that the alleged victim was the Plaintiff's daughter. Defs.' Ex. 11, Todaro Depo. Tr. at 36:21-23.

Plaintiff's Response:

This statement is disputed to the extent that it suggests that "[d]etermining the relationship of the parties involved was but one aspect of the inquiry" is an objective fact rather than a subjective opinion. It is undisputed, however, that "the investigation did not cease when officers learned that the alleged victim was the Plaintiff's daughter."

Defendants' Statement:

20. The officers insisted that they needed to speak with the alleged kidnapping victim herself. Defs.' Ex. 5 at 20:00. After expressing reservations about her daughter being interviewed by police and after explaining to her daughter that "part of the police officer's job is to keep everybody safe," Plaintiff's wife agreed to let Officer Brady interview her younger daughter. *Id*. at 21:20-24:40.

Plaintiff's Response:

This statement is disputed to the extent that it suggests that officers had not spoken to Plaintiff's younger daughter, the alleged kidnapping victim, until this point in the investigation. Multiple officers spoke to Plaintiff's younger daughter within minutes of arriving on scene. *See, e.g.,* Defs.' Ex. 5 at 3:35-9:50; Defs.' Ex. 7 at 3:52-6:45.

Defendants' Statement:

21. The girl told Officer Brady that she had fought with her older sister, ran from the car, and was picked up by her father. *Id*. at 25:00- 27:37. She stated that she was not hurt and that her father had picked her up gently. *Id*.

Plaintiff's Response:

This statement is undisputed.

---

Defendants' Statement:

22. Officer Brady did not begin his interview of Plaintiff's daughter until approximately 20 minutes into Plaintiff's detention. *Id.* at 24:20.

Plaintiff's Response:

This statement is disputed. Officer Brady spoke to both of Plaintiff's daughters within minutes of arriving on scene. *See* Defs.' Ex. 5 at 3:35-9:50. During these exchanges Plaintiff's younger daughter said to Officer Brady, among other things, "please don't arrest him—he hasn't done anything wrong," *see id.* at 3:36-3:39; Plaintiff's elder daughter said, among other things, that she had been in the car with her father and sister, that Plaintiff had to pick up his younger daughter in order to get her in the car, and that Plaintiff had done "nothing wrong," *see id.* at 4:06-4:20. Furthermore, Brady delayed asking to interview the younger daughter further until approximately 16 minutes into Plaintiff's detention. *See* Defs.' Ex. 5 at 18:34-18:36.

---

Defendants' Statement:

23. Sergeant Adam Bray arrived on the scene with knowledge that officers were investigating a kidnapping, there was a helicopter in the air, the suspect's tag was run and returned an address. Bray had reasonable suspicion of a kidnapping and obtained information from the officers already on scene. Defs.' Ex. 13, Bray Depo. Tr. at 19-25.

Plaintiff's Response:

This statement is disputed to the extent it asserts that "[Sergeant] Bray had reasonable suspicion of a kidnapping" is a statement of fact rather than a legal argument. It is undeniably, and purely, a statement of law. Otherwise this statement is undisputed.

---

Defendants' Statement:

24. Lieutenant Loftus then arrived on scene and conferred with Sergeant Bray. *Id.* at 41.

Plaintiff's Response:

> This statement is undisputed.

---

Defendants' Statement:

25. After briefly conferring with Lieutenant Loftus, Sergeant Bray walked over to where Plaintiff was being held and began speaking with him. Defs.' Ex. 4, Bray Body Worn Camera Video at 9:00.

Plaintiff's Response:

> This statement is undisputed.

---

Defendants' Statement:

26. Plaintiff scoffed and laughed when Bray told him officers were investigating a kidnapping. *Id*. at 9:57.

Plaintiff's Response:

> This statement is undisputed.

---

Defendants' Statement:

27. Plaintiff was the only person laughing. *Id*.

Plaintiff's Response:

> This statement is undisputed.

---

Defendants' Statement:

28. Without prompting, Plaintiff stated that his family was likely reluctant to speak with officers because Plaintiff is a United States Department of Justice (DOJ) civil rights attorney and "I prosecute police officers who violate the Constitution as a job. My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child." *Id*. at 10:25.

9

**JA 381**

Plaintiff's Response:

This statement is disputed. The statement is inaccurate, as Plaintiff did not make this statement "[w]ithout prompting." To the contrary, Plaintiff made this statement in direct response to Sergeant Bray's mistaken statement that police "haven't spoken to anybody," meaning any members of Plaintiff's family. *See* Defs.' Ex. 4 at 10:10-10:34. The portion of this exchange quoted by Defendants—in which Plaintiff describes his profession as "probably why [Plaintiff's wife] doesn't want to speak [to police]"—itself makes clear that Plaintiff made this statement to offer an explanation for Sergeant Bray's mistaken claims about Plaintiff's family's silence. This statement was not made "without prompting."

---

Defendants' Statement:

29. Sergeant Bray explained the nature of the 9-1-1 call and ordered another unidentified officer to remove Plaintiff's handcuffs. *Id.* at 10:48-11:23.

Plaintiff's Response:

This statement is undisputed.

---

Defendants' Statement:

30. Bray ordered the removal of handcuffs because he felt that Plaintiff was starting to be cooperative and was no longer a flight risk. Defs.' Ex. 13, Bray Depo. Tr. at 84:8-85:8; Id. at 88:3-17.

Plaintiff's Response:

This statement is disputed to the extent that it suggests that Sergeant Bray's perception of Plaintiff as both cooperative and not a flight risk were the only (or even the primary) reasons why Sergeant Bray ordered that Plaintiff be removed from handcuffs. The primary reason that Segreant Bray ordered that Plaintiff be removed from handcuffs is that Sergeant Bray quickly ascertained—entirely on the basis of information already possessed by Defendants—that Plaintiff had not kidnapped or harmed anyone. *See, e.g.,* Ex. A at 96:5-25; Defs.' Ex. 4 at 10:41-11:38; 12:00-12:18; 12:56-13:10.

---

Defendants' Statement:

10

**JA 382**

31. Nevertheless, Bray continued with the investigation until he and Lieutenant Loftus were satisfied their investigation was complete and that MPD's Youth Division would have to be notified. *Id*. at 89:11-13; 51-54.

Plaintiff's Response:

Defendants have not included in their Exhibits any of the of the pages of the transcript of Sergeant Bray's deposition to which they cite here, and have therefore failed to support this statement with evidence from the record. Nevertheless, this statement is disputed to the extent that it purports to establish any objective facts. This statement simply describes Sergeant Bray's subjective understanding of how long the investigation of Plaintiff needed to continue, and Sergeant Bray and Lieutenant Loftus's subjective belief that police should contact MPD's Youth Division as part of its conclusion of its investigation. *See* Ex. A at 51-54, 89.

Defendants' Statement:

32. Fishman was detained for approximately 25 minutes while officers investigated a dangerous felony involving a child. See generally Defs.' Exs. 2-5, 7-8; see also Defs.' Ex. 15, Loftus Depo. Tr. at 33:8-18; Defs.' Ex. 13 at 62:22-23.

Plaintiff's Response:

This statement is disputed to the extent that it suggests that Defendants were actively investigating for the entirety of Fishman's 25-minute detention. For much of Fishman's 25-minute detention Defendants were not actively investigating. For example, Officers stood next to a handcuffed Fishman for roughly 14 minutes without asking Fishman any questions or otherwise investigating whether Fishman had kidnapped or harmed anyone. *See* Defs.' Ex. 7 at 10:59-25:04.

Defendants' Statement:

33. Officers maintained reasonable suspicion of a kidnapping throughout the entirety of the investigation until its conclusion. See Defs.' Ex. 9 at 19:5-15, 36:3-6; Defs.' Ex. 10 at 44:21-24; Defs.' Ex. 11 at 22:1-4, 31:9-10; Defs.' Ex. 12 at 17:3-7; Defs.' Ex. 13 at 23:24-24:1, 43:5-9; Defs.' Ex. 14 at 12:9-11, 64:17-23; Defs.' Ex. 15 at 23:18-22, 57:1-5.

Plaintiff's Response:

This statement is disputed. It contains no facts and is purely a legal argument.

11

**JA 383**

# EXHIBIT A

1      A    To answer the question -- the first part,

2    right now, I can't think of a time where we wouldn't

3    notify Youth Division when dealing with a juvenile, a

4    child, a juvenile, somebody under the age of 18, and it

5    doesn't necessarily need to be a kidnapping.  It could

6    be any time we're dealing with a juvenile, maybe a

7    juvenile steals something and we have them stopped.

8            So to answer that question, no, I don't

9    believe that there'd be a time when we have the

10   suspicion of a crime involving a juvenile that we

11   wouldn't make notification to Youth Division.

12     Q    Okay.

13     A    The notification of Youth Division in this --

14   in this case, it's just kind of when you're dealing with

15   certain case situations, certain crimes, alleged --

16   suspected crimes, you would notify or -- or call to the

17   scene, different entities of the Metropolitan Police

18   Department, and in this case, Youth Division is one of

19   those things.

20           Like you said, I can't -- I'm not inside of

21   Lieutenant's Loftus mind, now or then, but in my

22   experience in dealing with lieutenants that come to the

23   scene or any sort of managers that will come to a scene,

24   they are either thinking out loud or having a checklist

25   of things that are necessary on the scene.

1          And what he's saying right there, my

2    perception is, is he's saying, "I'm thinking Youth

3    Division," meaning, you know, that's one of the things

4    that we need to do, notify Youth Division.  And then

5    that kind of sets in motion that -- other things that

6    would need to be done.

7          Q    Okay.  Thank you.  I have another question

8    about this, but since it's now been a couple minutes

9    since we watched this, I'm just going to replay the last

10   20 seconds so that we'll have just watched it when we

11   talk about it.

12         (Video playback.)

13         Q    Okay.  So you and I just talked about sort of

14   what it means concretely to involve Youth Division and

15   why you would do that.  I hear in the clip we just

16   played, Lieutenant Loftus sort of describing his

17   thinking or giving his analysis about why he's thinking

18   about notifying the Youth Division.

19         Can you essentially describe to me what you

20   hear him saying as far as his analysis of the situation?

21   Not the situation broadly, but sort of what he basically

22   said to you in the 20 seconds that we just watched.

23         A    He's saying that we're going to notify Youth

24   Division because if this was a case of simply a

25   misunderstanding, then we would approach somebody, they

1    would say, "This is not what it seems," and we would

2    respond accordingly.

3           But considering this specific set of

4    circumstances, when this suspect was approached, that's

5    not what happened.  There was the resistance to

6    cooperating with the police, there was the attempt to

7    leave, and in that situation, that would lead us, you

8    know, reasonably to believe that we have potentially

9    more than a misunderstanding.

10           I believe I said before this that it was

11    confusing.  That's one of the aspects of this potential

12    -- this specific situation that's confusing, is if it's

13    indicative -- in fact, a witness seeing -- seeing

14    something and misunderstanding what they saw and then

15    notifying the police.  And then us having this response

16    and then determining that it was not a fact of

17    kidnapping, then great.

18           But at this point in real-time, that's not

19    what we have.  Instead, we have someone saying that they

20    think that they witnessed a kidnapping, we approach the

21    suspect, the suspect has been resistant to cooperate,

22    and that would lead us to believe that maybe there's

23    something more.

24    Q    So the extent to which you perceive the

25    suspect as cooperating or not cooperating bears on the

1  question of whether something like this would be

2  referred ultimately or eventually to the Youth Division?

3      A    No.  No, not necessarily.  I apologize if I'm

4  -- if I'm -- led you to believe that.

5      Q    No.  No.  In a situation where we have a crime

6  that's been committed or suspected of being committed

7  and it involves a juvenile, we would notify Youth

8  Division.

9          To help be more clear with that, for instance,

10  would be maybe and we're not aware of it, this specific

11  address has been associated with past calls of the

12  similar nature, Youth Division would have that

13  information because that's what they -- they deal with.

14          So that, in instance, is just one of probably

15  many reasons why notifying our specific division within

16  the department that deals with -- with juveniles would

17  then help us.  We have -- a division like Youth Division

18  is -- is important, and we have it specifically for

19  juveniles because they're a vulnerable population.

20          We have other divisions that deal with

21  vulnerable populations, and if there is a crime that was

22  committed or suspected of being committed involving that

23  population, we would notify that specific division as

24  well.

25          That's all.  That's all that this is.  Okay.

1    going to go talk to the kids or the wife but -- but the

2    officers obviously had.  By the time I got there, you

3    can see, or I could see that that had already happened.

4    I believe the Lieutenant is already over there and

5    there's other officers already over there.

6              So I think if you rewind it a couple of

7    seconds, I think I told him like stay here or the

8    officer is going to stay with you, I'll be right back or

9    something.  So he's out of handcuffs because I'm making

10   the decision as the supervisor on scene to say, "You

11   don't have to be in handcuffs anymore."  But I'm going

12   to go and talk to -- I'm going to continue the

13   investigation over here with the other involved people.

14       Q    Okay.  One moment and we'll go back a few

15   seconds here.

16       (Video playback.)

17   BY MR. ROSEN:

18       Q    So you say that you are going to go talk to

19   Mr. Fishman's wife.  What was your objective in deciding

20   to do that?

21              I realize that when you, you know, when you

22   get there, you don't ultimately -- well, I don't want to

23   put words in your mouth.  Other people have spoken to

24   her by the time you get there, but in that moment when

25   you said I'm going to go -- said to Mr. Fishman, "I'm

1   go back a tiny bit.

2              THE WITNESS:  Mm-hmm.

3       (Video playback.)

4   BY MR. ROSEN:

5       Q    Okay.  You tell them that Mr. Fishman has

6   explained the situation in a way that you say makes more

7   sense.  Can you just walk me through what you -- sort of

8   what -- to the extent that you're referencing sort of

9   discrepancies or confusion being cleared up, what the

10  sort of most important sort of pieces of information or

11  different sort of aspects of the confusion that have

12  been cleared up in your mind?

13      A    Well, for one, the --- this --- this -- the

14  idea that he's -- he's communicating, one of the most

15  confusing parts of this whole thing was why would you

16  not -- why would you not express all of this stuff to

17  the police right away?  And now that he is, it makes

18  more sense.

19          It makes sense that a reasonable person would

20  explain the things that he's explained, and I have two

21  children, one was being difficult, and now all things

22  that could have been expressed immediately, or at least

23  sooner have now been expressed.  There's been some

24  consistencies with the story -- or the telling of the

25  story.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JARED FISHMAN,

      *Plaintiff,*

   v.

DISTRICT OF COLUMBIA, *et al.*

      *Defendants.*

1:21-cv-01847-RJL

---

**DEFENDANTS' REPLY IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

    No reasonable juror could find in Plaintiff's favor because the evidence shows that each

Defendant officer maintained reasonable suspicion of a kidnapping.  SUMF No. 33.  That

reasonable suspicion did not dissipate until the investigation concluded and Plaintiff was

released.  SUMF No. 31. Plaintiff's parental relationship was but one component in the larger

inquiry.  SUMF Nos. 19, 33.  Indeed, as Lieutenant Loftus testified, the situation was either a

parental kidnapping or child abuse.  Defs.' Ex. 15, Loftus Depo. Tr. 25:1–22, 26:1–16; *see also*

SUMF No. 4 (describing a child kidnapping "or a father manhandling his child in a really bad

way.").  Plaintiff remained in handcuffs throughout his detention because he was a flight risk,

having already disregarded a lawful police order not to re-enter his house.  SUMF Nos. 12, 17.

He was not released from handcuffs until Sergeant Bray, a supervisor on the scene, determined it

was safe.  SUMF Nos. 13, 30.  The gist of Plaintiff's argument—that "the realization that the

alleged kidnapping victim was Fishman's own daughter dispelled any reasonable suspicion" as

articulated by the Court in its order granting in part and denying in part Defendants' motion to

**JA 391**

dismiss—has not changed since the Court's order was issued. *See* 2/2/2023 Opinion at 12 [31]. But this competent evidence disclosed in discovery makes that finding no longer controlling at the summary judgment stage.

Indeed, Plaintiff overreaches when arguing that Defendants are "light on the facts and relevant law and heavy on innuendo." Pl.'s Opp'n at 2 [55]. To the contrary, Defendants have met the relevant facts head on, provided them in their statement of undisputed facts, and cited authorities supporting their entitlement to summary judgment: Lieutenant Patrick Loftus, Officer Marck Jaeger, Officer Jeremy Brady, Officer Michael Tong, and Officer Christopher Todaro lawfully carried out their constitutional duties on February 17, 2020. They investigated an eyewitness report of a suspected child kidnapping. And if not kidnapping, then possible child abuse. The officers had to complete that investigation *before* releasing Plaintiff. Once complete, they did so.

## ARGUMENT

### I.    The Evidence Must be Considered in Totality, Not Isolation.

The Court found that Officer Jaeger did not violate Plaintiff's rights under the Fourth Amendment and dismissed Counts I–II. *See* 2/2/2023 Opinion at 8 [31]. While that finding exonerates Officer Jaeger, the Court declined qualified immunity for the remaining Defendants on Plaintiff's Fourth Amendment claims, making all facts leading up to and during the *Terry* stop relevant to determine whether they violated his Fourth Amendment rights.

The Supreme Court has held that viewing factors in isolation departs from the meaning of "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 275 (2002). The nuanced circumstances here must "be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Hall*, 525

F.2d 857, 859 (D.C. Cir. 1976) (citing *United States v. Davis*, 458 F.2d 819 (D.C. Cir. 1972)). Plaintiff tries to compartmentalize the evidence by isolating it. But "in judging the reasonableness of the actions of the officer, the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole." *Id.* This incident was a rapidly developing situation where Defendants, based on training and experience, proceeded cautiously to investigate a child kidnapping or abuse. *See generally* SUMF Nos. 4–31. The totality of the circumstances must be viewed in light of the information supporting the initial stop, Plaintiff's behavior at the time of the initial stop until the detention ended, the investigatory steps taken during the detention, and the generalized guidance available to MPD officers at the time. And each of these considerations must be taken *together* in the context of a quickly unfolding situation. *See Graham v. Connor*, 490 U.S. 386, 388, 395–98 (1989) (describing in context of uses of force that "[t]he calculus of reasonableness" must allow consideration of "circumstances that are tense, uncertain, and rapidly evolving. . .").

## II.    <u>The Information Supporting the Initial Stop Remained a Justification.</u>

Plaintiff concedes the seriousness of the allegations against him, describing them as "undeniably horrific." Pl.'s Opp'n at 9 [55]. Yet, he tries to avoid the importance of these serious offenses by characterizing them as resolved at the initiation of the stop. Given the serious nature of the offenses alleged, time was needed to sufficiently investigate. And Plaintiff's detention lasted no more than 24 minutes and 47 seconds, allowing officers to sufficiently interview each family member and make a thoughtful determination about whether the crimes occurred. Defs.' SUMF No. 15–25, 32. To release Plaintiff based on initial, startled statements of potentially frightened (or abused) family members would be a dereliction of police duty and would risk allowing a kidnapper or child abuser to go free.

### III.  **Plaintiff's Initial Behavior Remained a Justification.**

Plaintiff seeks to ignore evidence of his conduct when Officer Jaeger arrived at his home, painting it as irrelevant.  Pl.'s Opp'n at 3–4.  It is not.  The more likely reason Plaintiff wants that evidence set aside is that the body-worn camera footage (BWC) shows him acting suspiciously, being uncooperative, taking flight, and being handcuffed.  Defs.' SUMF Nos. 11–12.  Those initial actions by Plaintiff remained a consideration for how the officers should investigate the alleged child kidnapping or abuse.

Plaintiff also asserts that because Sergeant Bray is not a defendant, his conduct when questioned by Sergeant Bray is irrelevant because "no one argues that telling Bray where he worked was a crime."  Pl.'s Opp'n at 3, fn. 1 [55].  Plaintiff misses the mark because that conduct supporting his admonishment by the Department of Justice describes his demeanor as the officers had to consider it.  Defs.' Ex. 16.  Even more, as shown by that admonishment and BWC footage, Plaintiff was uncooperative and immature as the father of a little girl who two members of the public thought was in danger of being kidnapped, or abused, which Defendants were there to investigate. *See* Defs.' SUMF Nos. 4–7.

As seen on BWC footage, all events on the home stoop began benignly.  Def.'s Exs. 1–8.  They quickly escalated because Plaintiff fled into his house against a lawful police order only to be stopped and handcuffed by Officer Jaeger.  Defs.' SUMF Nos. 11–12.  These events are confusing, intense, and concerning in light of the need to investigate a possible kidnapping or child abuse case.  These facts do not vanish from consideration merely because the Court already found the initial stop to be justified.

IV.     **The Detention Lasted Only as Long as the Investigation.**

Defendants do not "strenuously ignore the operative facts" that Plaintiff was detained for "approximately 25 minutes. . ." including approximately 21 minutes after Officer Brady elicited a description of the day's events. *See* Pl.'s Opp'n at 1 [55]. Officer Brady only began interviewing Plaintiff's younger daughter—the alleged kidnapping or abuse victim as reported to 9-1-1—approximately 20 minutes into Plaintiff's detention. *See* SUMF Nos. 20–21. Plaintiff's conclusory claim that Officer Brady "delayed asking to interview the younger daughter further until approximately 16 minutes into Plaintiff's detention" does not create a dispute about when the interview actually began or the fact that all investigatory steps were taken in light of the totality of the circumstances during a child kidnapping or abuse investigation. *See* Pl.'s Resp. to Defs.' SUMF No. 22.

It is undisputed that after expressing reservations about her youngest daughter being interviewed by police, and after explaining to her daughter that "part of the police officer's job is to keep everybody safe," Plaintiff's wife agreed to let Officer Brady interview the younger daughter. Defs.' SUMF No. 20. To be exact, Officer Brady was not allowed to speak with the younger daughter until 24:15 minutes after he arrived. Defs.' SUMF No. 22. It was reasonable for Officer Brady to speak with the alleged kidnapping or abuse victim after she calmed down and once her mother spoke with her about the interview, reassured her, and it was agreed that she would be present. The officers took care throughout the investigation, as shown by Officer Brady sitting on the stoop to see the younger daughter at her eye level, for which her mother thanked him. Defs.' SUMF No. 20.

Every officer defendant and non-defendant maintained reasonable suspicion of a kidnapping throughout the investigation, and officers had to ensure the safety of the child

involved in this 9-1-1 call before concluding the *Terry* stop.  SUMF Nos. 1–7, 22, 33; *see also*

Defs.' Ex. 10, Brady Depo Tr. 82:1–6 ("there's a lot more to work through in the investigation.

[the younger daughter] is the alleged victim."); Defs.' Ex. 14, Welch Depo Tr. 87:8–21 ("we

were conducting our investigation of a felony […]a kidnapping[…]").  In total, multiple

officers gathered information from two separate scenes based on a call about a felony.  Defs.'

SUMF No. 7–17.  Before Officer Brady concluded his interview of the youngest daughter,

officers had not yet interviewed the alleged victim.  Defs.' SUMF No. 22.

     Indeed, because this investigation involved a juvenile, the matter was referred to the

Youth Division for follow-up.  *See* Defs.' Ex. 15, Loftus Depo. Tr. 54:1–5, 59:2–14; *see also*

SUMF No. 4 (describing a child kidnapping "or a father manhandling his child in a really bad

way."); Officer Welch authored MPD's report for a check on the welfare of a juvenile, rather

than a kidnapping, because the investigation into a kidnapping had concluded.  *See* Defs.' Ex.

14, Welch Depo Tr. 58:15–20 ("we still have to check on the welfare of the juvenile…to make

sure [she] is okay.").  Police officers can maintain or continue a *Terry* stop at the direction of a

fellow officer who initiated the stop.  *See, e.g.*, *United States v. Colon*, 250 F.3d 130, 135 (2d

Cir. 2001) (arresting officer in a large police department "might not be aware of all the

underlying facts that provided probable cause or reasonable suspicion but may nonetheless act

reasonably in relying on information received by other law enforcement officials") (cited with

approval by *Chang v. United States*, Civ. Action No. 02 2010 EGS, 2007 WL 2007335, at *8

(D.D.C. July 10, 2007)).

     During the final 4–5 minutes of his detention, BWC shows Plaintiff talking to Sergeant

Bray.  *See* Ex. 4.  They both stand at the end of the block, Plaintiff is uncuffed, released, and

free to walk back to his home.  *See id.*  Had Defendants released Plaintiff before completing a

thorough investigation of such serious allegations, they risked Plaintiff once again retreating and barricading himself inside his home with a possibly kidnapped or abused daughter.  At the time, Plaintiff was a suspected felon who had shown himself as willing to disregard police orders.  Under those circumstances, his handcuffing for no more than 24 minutes and 47 seconds during a time when it is undisputed that MPD officers were continuing to proceed with investigatory steps was reasonable, there was no Fourth Amendment violation, and each Defendant is entitled to qualified immunity.

**V.    MPD Guidance is a Relevant Consideration.**

In analyzing the facts underlying a *Terry* stop, "the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418 (1981).  Thus, contrary to Plaintiff's unsupported argument, the guidance documents on law enforcement considerations are appropriate when determining summary judgment.  *See* MPD training materials, Defs.' MSJ at 9–11, nn. 1–6 (MPD officers are trained to conduct investigations, maintain situational awareness, pinpoint warning signs for flight risk, and effectively respond to intrafamily calls for service).  These guidance documents directed the officers' consideration of Plaintiff's immature and callous demeanor.  *See* Defs.' SUMF Nos. 11–13.  So too would they shed light on how the officers evaluated Plaintiff's disregard for a lawful police order and flight into the house requiring them to stop and handcuff him.  Defs.' SUMF No. 17.  And how the officers would assess their interviews with the mother and the two daughters.  Defs.' SUMF Nos. 13–14, 18–21.  Each consideration is relevant to the timing of Plaintiff's detention, rendering Defendants' actions at all times lawful.  *See* Defs.' Ex. 9 at 19:5–15, 36:3–6; Defs.'

Ex. 10 at 44:21–24; Defs.' Ex. 11 at 22:1–4, 31:9–10; Defs.' Ex. 12 at 17:3–7; Defs.' Ex. 13 at

23:24–24:1, 43:5–9; Defs.' Ex. 14 at 12:9–11, 64:17–23; Defs.' Ex. 15 at 23:18–22, 57:1–5.

## VI.   The Undisputed Facts and Supporting Law Show No Fourth Amendment Violation.

Defendants did in fact offer legal authority supporting the entire duration of Plaintiff's

detention, who was held for only five minutes after all interviews with the family ended.

Defendants cited these cases as support in their motion for summary judgment, not one of which

was distinguished by Plaintiff:

- *Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less

  demanding standard than probable cause not only in the sense that reasonable

  suspicion can be established with information that is different in quantity or content

  than that required to establish probable cause, but also in the sense that reasonable

  suspicion can arise from information that is less reliable than that required to show

  probable cause.").[1]

- *United States v. Sharpe*, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not

  of course, a guarantee against *all* searches and seizures, but only against

  *unreasonable* searches and seizures.") (emphasis in original).

- *Id.* at 675 – 76 ("In evaluating the reasonableness of an investigative stop, this Court

  examines "whether the officer's action was justified at its inception, and whether it

---

[1]     The substantive description of the original citation on page 8 of the Motion for Summary
Judgment was correct.  However, it has since come to undersigned counsel's attention that the
specific wording was misquoted.  It has been corrected in this string cite to reflect an accurate
quotation, but as the original description of the holding was accurate, that citation still supports
summary judgment for Defendants.

was reasonably related in scope to the circumstances which justified the interference in the first place.") (citations omitted).[2]

- *Florida v. Royer*, 460 U.S. 491, 500 (1983) ("…investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop").

- *United States v. Place*, 462 U.S. 696, 709 (1983) ("…in assessing the effect of the length of the detention we take into account whether the police diligently pursue their investigation").

- *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

- *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion).[3]

---

[2]    The substantive description of the original citation on page 8 of the Motion for Summary Judgment was correct.  However, it has since come to undersigned counsel's attention that the specific wording was misquoted.  It has been corrected in this string cite to reflect an accurate quotation, but as the original description of the holding was accurate, that citation still supports summary judgment for Defendants.

[3]    The substantive description of the original citation on page 6 of the Motion for Summary Judgment was correct.  However, it has since come to undersigned counsel's attention that the specific wording was misquoted.  It has been corrected in this string cite to reflect an accurate quotation, but as the original description of the holding was accurate, that citation still supports summary judgment for Defendants.

- *United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976) ("handcuffing [Plaintiff] was reasonable, as a corollary of the lawful '[*Terry* stop]'" to maintain "the status quo while further inquiry was made").[4]

- *Miles v. United States*, 181 A.3d 633, 637–638 (D.C. 2018) ("The court considers various factors when deciding whether a *Terry* stop is justified) (citing *Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011)).

- *Id.* at 638 ("'Although each factor is useful in determining whether there were articulable facts justifying the stop, these factors ''are not elements of a conjunctive test,'' and no one factor is ''outcome determinative.'''") (quoting *Umanzor v. United States*, 803 A.2d 983, 993 (D.C. 2002) (quoting *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C. 2000))).

- *Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) ("the 'reasonable, articulable suspicion' standard 'requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence.'") (citing *Henson v. United States*, 55 A.3d 859, 867 (D.C. 2012)).

- *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C. 1993) ("an arrest is effected when the police have [decided] to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court") (citations omitted).

---

[4]     The substantive description of the original citation on page and 8 of the Motion for Summary Judgment was correct.  However, it has since come to undersigned counsel's attention that the specific wording was misquoted.  It has been corrected in this string cite to reflect an accurate quotation, but as the original description of the holding was accurate, that citation still supports summary judgment for Defendants.

- *Id.* (*Terry* seizure involves more temporary detention designed to last only until preliminary investigation generates probable cause or results in suspect's release) (citations omitted).

Plaintiff failed to submit his own statement of facts in dispute or of undisputed facts, so the facts cited by Defendants establish the record for consideration. *See* Fed. R. Civ. P. 56(e)(2).  And here, Defendants, as members of the Metropolitan Police Department (MPD), did their job without violating Plaintiff's rights under the Fourth Amendment.  They are entitled to qualified immunity.

Based on this law and the totality of the circumstances as described in the preceding section, the officers who remain as Defendants at this summary judgment stage lawfully detained Plaintiff.  Thus, Plaintiff's case fails as a matter of law.

## CONCLUSION

For these reasons and those set forth in their opening brief, Defendants are entitled to judgment as a matter of law and this case should be dismissed with prejudice.

February 16, 2024                    Respectfully submitted,

                                      BRIAN L. SCHWALB
                                      Attorney General for the District of Columbia

                                      STEPHANIE E. LITOS
                                      Deputy Attorney General
                                      Civil Litigation Division

                                      */s/ Charles J. Coughlin*
                                      CHARLES J. COUGHLIN [1016993]
                                      Chief, Civil Litigation Division, Section IV

                                      */s/ Martha J. Mullen*
                                      MARTHA J. MULLEN [419036]
                                      Senior Assistant Attorney General
                                      AMANDA L. TORRES [1562702]
                                      Assistant Attorney General

400 Sixth Street, NW
Washington, DC 20001
202-724-6612
202-735-7390
martha.mullen@dc.gov
amanda.torres@dc.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JARED FISHMAN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 21-1847 (RJL)** |
| | ) | |
| **THE DISTRICT OF COLUMBIA, and** | ) | |
| **LIEUTENANT PATRICK LOFTUS,** | ) | |
| **OFFICER MARCK JAEGER,** | ) | |
| **OFFICER JEREMY BRADY,** | ) | |
| **OFFICER MICHAEL TONG, and** | ) | |
| **OFFICER CHRISTOPHER TODARO,** | ) | |
| **of the Metropolitan Police Department,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## MEMORANDUM OPINION
March 12, 2025 [Dkt. ##47, 54]

Before the Court are the parties' motions for summary judgment, which revolve

around the question of whether an initially valid *Terry* stop by a bevy of Metropolitan

Police Department officers remained lawful during the approximately twenty-five

minutes they detained plaintiff in handcuffs. For the reasons that follow, the Court finds

it did not and therefore **GRANTS** plaintiff's motion for partial summary judgment and

**DENIES** defendants' motion for summary judgment.

## BACKGROUND

Plaintiff Jared Fishman filed his complaint in this case on September 7, 2021,

against the District of Columbia (the "District") and multiple Metropolitan Police

**JA 403**

Department officers: Lieutenant Patrick Loftus and Officers Marck Jaeger, Jeremy Brady, Christopher Todaro, and Michael Tong (collectively, "Defendant Officers"). First Am. Compl. ("Compl.") [Dkt. #18]. Fishman brought eight counts: five § 1983 claims and three claims under D.C. law. The Court has dismissed five of Fishman's claims, but determined that he has sufficiently pled Count III (seizure without reasonable suspicion), Count IV (arrest without probable cause), and Count VI (false imprisonment). *See* Mem. Op. [Dkt. #31] (February 2, 2023). Defendants filed their answer on April 14, 2023, with the Defendant Officers asserting qualified immunity. Answer [Dkt. #38] at 21. Defendants have moved for summary judgment on all counts. Plaintiffs have moved for partial summary judgment as to Officer Todaro. Both motions are fully briefed and ripe.[1.]

## LEGAL STANDARD

The Court must view each motion for summary judgment separately and in the light most favorable to the non-moving party, then determine whether it can enter judgment under Rule 56's standard for each party. *Howard Town Ctr. Dev., LLC v. Howard Univ.*, 267 F. Supp. 3d 229, 236 (D.D.C. 2017). Under Rule 56, summary judgment is due "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). Each movant "bears the initial responsibility of informing the district court of the basis

---

[1] As to defendants' motion, see Defs.' Mem. of P. & A. in Supp. of Their Mot. for Summ. J. ("Defs.' Mot. & Br.") [Dkt. #54]; Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") [Dkt. #55]; Defs.' Reply in Supp. of Their Mot. for Summ. J. ("Defs.' Reply") [Dkt. #56].

As to plaintiff's motion, see Mem. of P. & A. in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Br.") [Dkt. #47-1]; Def. Officer Christopher Todaro's Opp'n to Pl.'s Mot. for Partial Summ. J. ("Todaro's Opp'n") [Dkt. #50]; Pl.'s Reply in Supp. of Summ. J. ("Pl.'s Reply") [Dkt. #53].

for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to "come forward 'with specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. Proc. 56(e)). If the facts are disputed, the Court must make all justifiable inferences in favor of the non-movant, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), unless the non-movant's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 380 (2007). Of course, if the Court finds no genuine dispute of material fact, it can assess whether a movant is entitled to judgment as a matter of law. If the movant is so entitled, summary judgment will issue. Fed. R. Civ. Proc. 56.

## FINDINGS OF FACT

The Court finds that the following facts are beyond dispute at summary judgment based on the record in this case. *See* Fed. R. Civ. Proc. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Scott v. Harris*, 550 U.S. 372 (2007).

On February 17, 2020, Fishman took his two daughters to the popular Tex-Mex restaurant, Cactus Cantina, in the heart of Northwest Washington, D.C. Compl. ¶ 14; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Opposed Mot. for Summ. J. ("Pl.'s Resp. to SUMF") [Dkt. #55-1] at 1. Fishman's younger daughter, approximately eight years old, was misbehaving when the three left the

restaurant, and she refused to get into her father's car.  Compl. ¶ 15; Pl.'s Resp. to SUMF

¶ 2.  As such, Fishman picked up his child and put her in the car.  Compl. ¶ 17; Pl.'s

Resp. to SUMF ¶ 2.  An apparently concerned civilian knocked on Fishman's window to

ask whether there was a problem.  Compl. ¶ 18.  Indeed, another concerned civilian

witnessing this situation called 9-1-1, reporting the events as a possible abduction of a

child in a green Audi, providing the license plate number and the physical description of

the suspect as a white balding male in his forties.  Pl.'s Resp. to SUMF ¶ 6; Defs.' Mot.

& Br., Ex. 6 ("911 Call Recording") [Dkt. #54-2].  The caller reported, "I don't know if it

was an abduction, or a father manhandling his child in a really bad way . . . ."  Defs.'

Mot. & Br., Ex. 6 at 0:00:10-21.  As such, the 9-1-1 dispatcher put out a call using a code

to indicate a possible kidnapping, providing a description of Fishman, his license plate,

and his home address based on his vehicle registration.  Compl. ¶ 25.

     Officer Jaeger was the first responder to arrive at Fishman's home in the

Georgetown section of the city.  He approached Fishman, who was sitting on his front

doorstep.  *See* Defs.' Mot. & Br., Ex. 2 ("Jaeger BWC") [Dkt. #54-2] at 3:40; Compl.

¶ 30.  Fishman confirmed that he drove an Audi and had just returned home.  Jaeger

BWC 3:40-50; Compl. ¶¶ 33–36.  Fishman—realizing that someone near Cactus Cantina

must have called the police, Pl.'s Resp. to SUMF ¶ 10, Compl. ¶ 37—then exclaimed,

"And that guy that called in has no idea what's going on."  Jaeger BWC 3:50-54; Compl.

¶ 38; Pl.'s Resp. to SUMF ¶ 10.  Officer Jaeger replied, "Maybe you can help me out

with what's going on."  Jaeger BWC 3:54-56; Compl. ¶ 39.  Fishman said, "hold on one

sec," rose, and stepped inside his house.  Compl. ¶ 40.  Officer Jaeger told him not to go

inside. Compl. ¶¶ 41–42; Jaeger BWC 3:57–4:00. Fishman entered his home anyway,
and Officer Jaeger seized him, bringing him back outside. Compl. ¶¶ 44–48; Jaeger
BWC 4:00-10; Pl.'s Resp. to SUMF ¶ 12.[2]

    Jaeger began to handcuff Fishman when Defendant Officers Brady, Tong, and
Todaro arrived. Pl.'s Resp. to SUMF ¶ 12. Fishman repeatedly yelled, "I am not doing
anything," and "You do not have the right to enter my house," as officers placed him in
handcuffs. Jaeger BWC 4:05-31. During this commotion, Fishman's two daughters
came outside onto the stoop. Compl. ¶¶ 49–52; Pl.'s Resp. to SUMF ¶ 13. The older
daughter exclaimed, "[I]t is my sister, she was misbehaving." Compl. ¶ 51; Jaeger BWC
4:17-21; Pl.'s Resp. to SUMF ¶ 14. The younger daughter then said, "He hasn't done
anything wrong," and professed, "It's my fault." Defs.' Mot. & Br., Ex. 5 ("Brady
BWC") [Dkt. #54-2] at 3:35-52. Unfortunately, this inquiry did not end with the younger
daughter's confession. Instead, Officer Tong then walked Fishman, now in handcuffs, to
the end of block and out of sight as a "best practice" to remove him from the situation.
Defs.' Mot. & Br., Ex. 9 ("Tong Dep.") [Dkt. #54-3] at 38–39. Officer Brady remained
on Fishman's front steps to speak with Fishman's wife (Fiona Macaulay) and the two
children. Pl.'s Resp. to SUMF ¶ 16; Brady BWC 3:35ff.

    Body-worn camera footage paints a clear picture of the events just described and
what transpired throughout the rest of Fishman's detention: Less than one minute after

---

[2] The parties dispute whether Plaintiff had crossed the threshold to enter his home when Officer Jaeger told
him not to enter. However, because the officer's initial seizure of Fishman is not at issue on summary
judgment, this is not material.

Fishman is moved down the block, Officer Brady asks the younger daughter for her name and introduces himself. The mother Macaulay, however, asks that her younger daughter be permitted to drink some water before they continue talking. Brady BWC 4:21-41. Over the next five-and-a-half minutes, Macaulay and her older daughter try to explain the situation to, and calm down, the younger daughter until Macaulay settles both children inside so that she can speak with Officer Brady on the front steps. Brady BWC 4:42–10:12. Macaulay and the older daughter confirmed "that the girl whom the witness had observed being placed in the car was Plaintiff's younger daughter." Pl.'s Resp. to SUMF ¶ 18. For the next three minutes, Officer Brady answered Macaulay's questions, explaining that he needs to interview everyone and that he cannot bring Fishman back to the house at that time. Brady BWC 10:13–13:36. Twelve minutes after the stop began, Officer Brady obtains Macaulay's name and information, the children's information, and learns that Fishman is indeed the children's biological father. Brady BWC 13:37–15:10.

Next, Officer Brady spends three minutes explaining to Macaulay more about what is happening, asking her what she knows about the incident, and answering more questions. Brady BWC 15:11–18:33. Officer Brady—specifying that Macaulay can be present—asks Macaulay if he can talk to the younger daughter, and she replies, "absolutely not." Brady BWC 18:33-37. Officer Brady then spends over four-and-a-half minutes answering more questions from Macaulay and explaining that he "need[s]" to hear from her younger daughter what happened and whether she has been harmed. Brady BWC 18:38–23:15. Then, between 21 and 22 minutes after the stop began, Officer Brady finally begins questioning the younger daughter. Brady BWC 24:15. Officer

6

**JA 408**

Brady speaks with the younger daughter for over three minutes. Brady BWC 24:15–27:38. The younger daughter "told Officer Brady that she had fought with her older sister, ran from the car, and was picked up by her father. She stated that she was not hurt and that her father had picked her up gently." Pl.'s Resp. to SUMF ¶ 21 (citation omitted). In total, it took over 24 minutes for an officer to interview the younger daughter and hear directly from her that she had not been harmed. Brady BWC 3:00–27:38.

While Officer Brady was trying to speak with the younger daughter, Sergeant Adam Bray and Lieutenant Loftus arrived on scene as the ranking investigating officers. *See* Pl.'s Resp. to SUMF ¶¶ 23–24. "After briefly conferring with Lieutenant Loftus, Sergeant Bray walked over to where [Fishman] was being held and began speaking with him." Pl.'s Resp. to SUMF ¶ 25. "Without prompting, Plaintiff stated that his family was likely reluctant to speak with officers because [he] is a United States Department of Justice (DOJ) civil rights attorney and 'I prosecute police officers who violate the Constitution as a job.'" Pl.'s Resp. to SUMF ¶ 28. He continued, "My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child.'" Pl.'s Resp. to SUMF ¶ 28. Sergeant Bray explained the nature of the 9-1-1 call and had Fishman released from his handcuffs. Pl.'s Resp. to SUMF ¶¶ 29. This occurred about one minute after Officer Brady concluded his interview of Fishman's younger daughter. *See* Brady BWC 28:51.

In total, Fishman was detained for approximately 25 minutes and held in handcuffs for almost that entire time. *See* Pl.'s Resp. to SUMF ¶ 32. After Fishman

returned to his home from the end of the block, Lieutenant Loftus concluded that the officers were finished and would write a report as one checking on the welfare of a juvenile.  Defs.' Mot. & Br., Ex. 4 ("Bray BWC") [Dkt. #54-2] at 13:38-46.

### DISCUSSION

Finding no genuine dispute as to any material facts, the Court evaluates whether plaintiff and defendants, respectively, have made a showing that they are entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56(a).  First, a brief discussion of how the law governs the three claims at issue on summary judgment.

**I.     Claims Under 42 U.S.C. § 1983**

Plaintiff brings two claims (Counts III & IV) under 42 U.S.C. § 1983, which requires showing that a defendant deprived him of a right protected by federal law or the Constitution and that the defendant was acting under the color of state law.  *Miller v. Marriott Int'l LLC*, 378 F. Supp. 3d 1, 9 (D.D.C. 2019), *aff'd*, 2019 WL 6492628 (D.C. Cir. Nov. 15, 2019).  Here, plaintiff alleges constitutional violations against proper § 1983 defendants—the Defendant Officers in their official capacity and the District.  Officers may be sued under § 1983 in their official capacity, *see Pollard v. District of Columbia*, 191 F. Supp. 3d 58, 67 (D.D.C. 2016), *aff'd*, 698 F. App'x 616 (D.C. Cir. 2017), as can the District, *see Barnhardt v. District of Columbia*, 560 F. Supp. 2d 15, 17 (D.D.C. 2008).  The District, however, is only liable under § 1983 where an official policy both causes plaintiff's deprivation of a constitutional right and is the "moving force of the constitutional violation."  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *see Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986);

8

**JA 410**

*Barnhardt*, 560 F. Supp. 2d at 18.

"The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff's alleged constitutional deprivations are that his detention in handcuffs for over twenty minutes constituted (1) an unconstitutional investigative stop without the necessary reasonable suspicion and (2) an unconstitutional arrest without probable cause.

While the Fourth Amendment protects against *unwarranted* search and seizure, police officers "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). This is known as an investigative stop or a *Terry* stop, and its reasonable suspicion standard is a "less demanding standard than probable cause." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). To have reasonable suspicion, an officer, considering "the totality of the circumstances," must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001).

There is no firm line as to how long a *Terry* stop can last. *See United States v. Montoya-Hernandez*, 473 U.S. 531, 542–43 (1985); *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985). Investigative stops, however, must be "sufficiently limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). While "[t]he point at which an investigative stop becomes an arrest is not marked with a bright

9

line," "a stop that is unduly prolonged or intrusive transforms from an investigative stop

into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153

(D.C. Cir. 2017). Accordingly, an investigative stop "must (1) 'last no longer than is

necessary to effectuate the purpose of a stop' and (2) employ 'the least intrusive means

reasonably available to verify or dispel the officer's suspicion.'" *United States v. Smith*,

373 F. Supp. 3d 223, 238 (D.D.C. 2019) (quoting *Royer*, 460 U.S. at 500).

      If an investigatory stop becomes an arrest, an officer must have probable cause.

*See District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). As explained, this

transformation from investigatory stop to formal arrest occurs when a stop "is unduly

prolonged or intrusive." *Hall*, 867 F.3d at 153. "Probable cause is more than bare

suspicion but less than beyond a reasonable doubt and, indeed, is less than a

preponderance of the evidence." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C.

Cir. 2016). "Probable cause exists where the arresting officer has facts and

circumstances within his or her knowledge that would lead a reasonable person to believe

that an offense has been or is being committed." *United States v. Gorrell*, 360

F. Supp. 2d 48, 52 (D.D.C. 2004). This standard is an objective inquiry, *Lin v. District of

Columbia*, 47 F.4th 828, 840 (D.C. Cir. 2022), that considers the totality of the

circumstances and requires "only a probability or substantial chance of criminal activity,

not an actual showing of such activity," *Wesby*, 583 U.S. at 57 (quoting *Illinois v. Gates*,

462 U.S. 213, 243 n.13 (1983)).

      To prevail in their summary judgment motion as to Count III, the Defendant

Officers must show that their initially valid *Terry* stop of Fishman remained lawful for

10

Fishman's entire detention.[3]  In other words, they must show that: (1) officers "had a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30); and (2) officers' twenty-five minute detention of Fishman in handcuffs lasted only as long as necessary to effectuate its purposes via "the least intrusive means reasonably available to verify or dispel the officer[s'] suspicion," *Smith*, 373 F. Supp. 3d at 238 (quoting *Royer*, 460 U.S. at 500).

Considering the totality of the circumstances, the material, undisputed facts in this "particular situation," *Sharpe*, 470 U.S. at 686 (quoting *Place*, 462 U.S. at 709 n.10), are that: (1) officers responded to a potential kidnapping with reports of the "manhandling" of a child; (2) Fishman was identified as a suspect; (3) Fishman ignored an officer's demands that he remain outside and walked away from the officer into his home; (4) the officers pulled Fishman back outside and placed him in handcuffs; (5) while officers restrained Fishman, Fishman's wife and two daughters came outside, and his daughters pleaded with the officers to stop, with the older one explaining that the younger one was at fault for the reported incident by misbehaving and the younger daughter acknowledging that she was in the wrong; (6) some officers remained at Fishman's front step to speak with Fishman's wife and daughters, while other officers held Fishman in handcuffs down the block; and (7) in total, officers held Fishman in handcuffs for around

---

[3] To be clear, the Court is addressing only the *Defendant Officers'* summary judgment claims. The District, of course, is also a Defendant who moved for summary judgment on all counts.  Under *Monell*, the standard for liability is different for the District than for the Defendant Officers' themselves.  The District, however, did not brief or explain why it is due summary judgment under *Monell*, so it has waived those arguments on summary judgment.

twenty-five minutes.

With these material facts and the totality of the circumstances in mind, the Court cannot find that defendants are entitled to judgment as a matter of law because the Defendant Officers have not shown that they had and maintained reasonable suspicion that Fishman had kidnapped anyone for the full period they detained him. *See Smith*, 373 F. Supp. 3d at 238. Indeed, reasonable suspicion ended when the officers learned that plaintiff was the father and that the younger daughter was acting up and at fault. *See Weaver v. Hanna*, 122 F. Supp. 2d 1, 4 (D.D.C. 2000) (demonstrating that reasonable suspicion ends in the investigation of a kidnapping when a parent's identity is determined).

Fishman's wife and both daughters were present as officers placed Fishman in handcuffs. Officers quickly learned from the family that the younger daughter had been misbehaving and could see for themselves that both girls were not only present but did not appear to have been physically harmed. Further, the Defendant Officers have not shown that their detention of Fishman lasted only as long as necessary or that holding Fishman in handcuffs for over twenty minutes at the end of the block was "the least intrusive means reasonably available to verify or dispel" their suspicions of criminal activity. Therefore, the Court cannot award the Defendant Officers summary judgment on Count III. Since probable cause is a higher standard than reasonable suspicion, it necessarily follows that the Court cannot award the Defendant Officers summary

judgment on Count IV either.[4]

On the other hand, plaintiff has shown that Officer Todaro lacked the necessary justification to hold Fishman in handcuffs for approximately twenty-five minutes for the reasons just described.  Officer Todaro arrived second on the scene and helped detain Fishman in handcuffs.  *See* Defs.' Resp. to Pl.'s SUMF [Dkt. #50-1] ¶¶ 4–5.  Officer Todaro remained on the front steps and spoke with Macaulay and the couple's two daughters.  Officer Todaro heard from them that the younger daughter was misbehaving and that Fishman "did not take" the younger daughter.  Defs.' Resp. to Pl.'s SUMF ¶¶ 7–8, 12–13, 15–16.  Todaro admitted in his deposition that he had no reason to believe the girls were lying.  Pl.'s Br., Ex. B. [Dkt. 47-4] at 33:14-17.  Therefore, after these first couple minutes, Officer Todaro believed that Fishman and Macaulay were the girls' father and mother.  *See* Pl.'s Br., Ex. B. 37:3-9.  At that point, as explained *supra*, there was no reasonable suspicion of a kidnapping.  *See Weaver*, 122 F. Supp. 2d at 4. Accordingly, plaintiff has proven that Officer Todaro's continued detention of him was unconstitutional because the officer lacked the reasonable suspicion necessary to hold him under *Terry*.  It follows, of course, that Officer Todaro thus also lacked probable cause to hold plaintiff.  Plaintiff is thus entitled to summary judgment as a matter of law on Counts III and IV against Officer Todaro.

## II.      False Imprisonment

False imprisonment claims are "indistinguishable as a practical matter" from false

---

[4] Regarding the District's summary judgment claims on Counts III and IV, see *supra* note 3.

arrest claims. *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010). The elements of both claims are "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911–12 (D.C. Cir. 2015). Indeed, "the central issue is whether the arresting officer was justified in ordering the arrest of the plaintiff." *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (quoting *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C. 1985)). To defeat a false imprisonment claim, an officer can "demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable." *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 256 (D.D.C. 2018) (quoting *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993)).

Defendants have not shown that they are entitled to judgment as a matter of law as to plaintiff's false imprisonment claim. As explained, false imprisonment claims are "indistinguishable as a practical matter" from false arrest claims. *Enders*, 4 A.3d at 461 (D.C. 2010). Because defendants clearly have not demonstrated the lawfulness of their arrest of Fishman lasting over 20 minutes, they cannot succeed on defeating Fishman's false imprisonment claim at summary judgment. *See Sherrod*, 334 F. Supp. 3d at 256.

Plaintiff, however, has successfully shown at this stage that Officer Todaro falsely imprisoned him. Todaro's detention of Fishman was unlawful because it was neither a lawful continued investigative stop nor a lawful arrest. Therefore, there is no question or genuine dispute of material fact that Officer Todaro was responsible for detaining Fishman against his will without a lawful purpose. *Sherrod*, 334 F. Supp. 3d at 256.

14

**JA 416**

Accordingly, plaintiff merits judgment against Officer Todaro on this claim.

**III.    Qualified Immunity**

All defendants assert qualified immunity. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts undergo a two-step process for evaluating qualified immunity claims, and they possess "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236. The first prong considers whether plaintiff's alleged facts demonstrate that the officer's conduct violated a constitutional right. *Id.* at 232. The second prong asks whether that right was clearly established. *Id.*

A right is clearly established if in that case's specific context, *Lash v. Lemke*, 786 F.3d 1, 5 (D.C. Cir. 2015), its "contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Richard*, 572 U.S. 765, 779 (2014). Further, "the right allegedly violated must be established, 'not as a broad general proposition,' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam); then quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In this assessment, our Court looks to cases from the Supreme Court, our Circuit, and other courts if they exhibit a consensus view. *Lash*, 786 F.3d at 7.

For the following reasons, I have concluded that defendants cannot avail themselves of qualified immunity.  In assessing qualified immunity, I must consider two questions: (1) whether "the facts alleged show the officer's conduct violated a constitutional right"; and (2) "whether the right was clearly established." *Saucier*, 533 U.S. at 201.  Therefore, if defendants wish to avail themselves of qualified immunity, they cannot have violated a constitutional right that is clearly established.  *See id.* Unfortunately for defendants, they violated Fishman's Fourth Amendment right to be free from unreasonable restraint and seizure.  The only question remaining is whether the right at issue is clearly established.

Admittedly, I am unaware of a case with parallel facts to this one.  Fortunately, however, "a case directly on point" is *not* required.  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Instead, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 741).  And here, existing precedent clearly places the question beyond debate whether officers need to be able to articulate *a single reason* to hold an individual in handcuffs for over twenty minutes under either a reasonable suspicion or probable cause standard.  It's a requirement baked into the standards themselves, with reasonable suspicion requiring "articulable facts," *Sokolow*, 490 U.S. at 7, and probable cause requiring "facts and circumstances within [one's] knowledge," *Gorrell*, 360 F. Supp. 2d at 52.  The record in this case shows not one reason!  Qualified immunity does not entitle an officer to exercise unreasonable caution that leads to unlawful detention where "any reasonable official in the defendant's

16

shoes would have understood that he was violating" a right. Any reasonable officer

knows that it requires at least one articulable fact or reason to hold someone in handcuffs

for twenty minutes. Therefore, defendants do not have qualified immunity in this case.

**CONCLUSION**

For these reasons, I **GRANT** plaintiff's motion for partial summary judgment and

**DENY** defendants' motion for summary judgment.


RICHARD J. LEON
United States District Judge

17

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JARED FISHMAN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 21-1847 (RJL)** |
| | ) | |
| **THE DISTRICT OF COLUMBIA, and** | ) | |
| **LIEUTENANT PATRICK LOFTUS,** | ) | |
| **OFFICER MARCK JAEGER,** | ) | |
| **OFFICER JEREMY BRADY,** | ) | |
| **OFFICER MICHAEL TONG, and** | ) | |
| **OFFICER CHRISTOPHER TODARO,** | ) | |
| **of the Metropolitan Police Department,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## ORDER

March 12, 2025 [Dkt. ##47, 54]

For the reasons set forth in the Memorandum Opinion accompanying this Order, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Dkt. #47] is **GRANTED**.  It is further

**ORDERED** that Defendants' Motion for Summary Judgment [Dkt. #54] is **DENIED**.

**SO ORDERED**.


RICHARD J. LEON
United States District Judge

**JA 420**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JARED FISHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-cv-01847-RJL |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| PATRICK LOFTUS, | ) | |
| MARCK JAEGER, | ) | |
| JEREMY BRADY, | ) | |
| MICHAEL TONG, and | ) | |
| CHRISTOPHER TODARO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOTICE OF APPEAL**

Please take notice that Defendants the District of Columbia, Lieutenant Patrick Loftus, and

Officers Marck Jaeger, Jeremy Brady, Michael Tong, and Christopher Todaro, hereby appeal to the

United States Court of Appeals for the District of Columbia Circuit this Court's March 13, 2025

Memorandum Opinion and Order, [ECF Nos. 59 and 60] granting Plaintiff's motion for partial

summary judgment and denying Defendants' motion for summary judgment.

Date:   April 10, 2025                    Respectfully submitted,

                                         BRIAN L. SCHWALB
                                         Attorney General for the District of Columbia

                                         CHAD COPELAND
                                         Deputy Attorney General
                                         Civil Litigation Division

                                         */s/ Charles J. Coughlin*
                                         CHARLES J. COUGHLIN [1016993]
                                         Chief, Section IV

**JA 421**

_/s/ Michelina Partipilo_
MICHELINA PARTIPILO [90017562]
Assistant Attorney General
400 6th St., NW
Washington, D.C.  20001
(202) 805-7619
michelina.partipilo@dc.gov

_Counsel for Defendants_

**JA 422**