# 25-7050

## United States Court of Appeals for the District of Columbia Circuit

JARED FISHMAN, *Plaintiff–Appellee,*

*v.*

THE DISTRICT OF COLUMBIA, et al., *Defendant–Appellants.*

Appeal From the United States District Court for the District of Columbia

## APPELLEE'S BRIEF

Jason Harrow
  GERSTEIN HARROW LLP
  12100 Wilshire Blvd. Suite 800
  Los Angeles, CA 90025
  (323) 744-5293
  jason@gerstein-harrow.com

Charles Gerstein
Sam Rosen
  GERSTEIN HARROW LLP
  400 7th St. NW, Suite 304
  Washington, DC 20004
  (202) 670-4809
  charlie@gerstein-harrow.com

Dated: October 10, 2025

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF THE CASE ............................................................. 2

I.      The Undisputed Facts ............................................................. 2

        A.      Fishman Takes His Own Children Home From a
                Restaurant ................................................................... 2

        B.      Officers Respond to a Kidnapping Accusation ...................... 4

        C.      Within at Most Three Minutes, Officers Know There
                Has Been no Kidnapping ............................................... 6

        D.      Elsewhere Someone Baselessly Accuses Fishman of
                Child Abuse ................................................................. 9

        E.      Officers, Knowing There Has Been no Kidnapping And
                Concededly Suspecting no Other Crime, Detain
                Fishman Anyway ......................................................... 10

        F.      Superior Officers Arrive And Order Fishman Released ...... 13

II.     Procedural History ............................................................... 15

SUMMARY OF ARGUMENT ........................................................... 17

ARGUMENT ................................................................................ 21

I.      Defendants Waived Nearly Every Argument They Make on
        Appeal .............................................................................. 21

A.     Todaro Did Not So Much as Mention "Cruelty to Children" or Assault Below .................................................. 21

B.     To The Extent Defendants Rely on Evidence Known by Other Officers They Failed to Cite Any of It Below ............. 28

II.     Defendants' New Arguments Are Meritless ................................. 34

A.     The Officers at Fishman's House Are Not Entitled to Retroactively Rely on Facts They Knew Nothing About ..... 34

B.     Even Considering the Facts the Officers Knew Nothing About, No Reasonable Officer Could Possibly Have Harbored Reasonable Suspicion of a Crime Considering The Totality of The Circumstances ....................................... 44

III.     Fishman's Common-Law Claims May Proceed Against the District .................................................................................... 54

CONCLUSION ......................................................................................... 57

CERTIFICATE OF COMPLIANCE ........................................................ 59

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................. 51

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006)................................. 52

*Bryant v. Gates* 532 F.3d 888 (D.C. Cir 2008).......................................... 23

*Coffin v. United States*, 917 A.2d 1089 (D.C. 2007)................................. 50

*Commonwealth v. Privette,* 491 Mass. 501 (2023) ................................... 42

*Dent v. May Dep't Stores Co.*, 459 A.2d 1042 (D.C. 1982) ...................... 55

*District of Columbia v. Murphy*, 631 A.2d 34 (D.C. 1993)............... 55, 56

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ........................... 52, 54

*Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118 (D.C.
    Cir. 2011) ........................................................................... 23, 33, 34

*Florida v. Royer*, 460 U.S. 491 (1983)...................................................... 46

*Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907 (D.C.
    Cir. 2015) ...................................................................................... 55

*Illinois v. Wardlow*, 528 U.S. 119 (2000)................................................. 45

*In re S.K.*, 564 A.2d 1382 (D.C. 1989)...................................................... 32

*Jones v. United States*, 67 A.3d 547 (D.C. 2013).................................... 50

*Lamb v. State*, 613 A.2d 402 (Md. Ct. Spec. App. 1992)........................ 51

*Lee v. United States*, 831 A.2d 378 (D.C. 2003) ..................................... 50

*Liser v. Smith*, 254 F. Supp. 2d 89 (D.D.C. 2003).................................. 56

*Nemariam v. Fed. Democratic Republic of Ethiopia,* 491
    F.3d 470 (D.C. Cir. 2007) .............................................................. 26

iii

*NRM Corp. v. Hercules, Inc.*, 758 F.2d 676 (D.C. Cir. 1985) .................. 33

*Ohio v. Robinette*, 519 U.S. 33 (1996) ...................................................... 53

*Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d
    386 (D.C. Cir. 2020) ........................................................................ 22

*Perez Hernandez v. United States*, 286 A.3d 990 (D.C.
    2022) ........................................................................................... 50, 51

*Potter v. District of Columbia*, 558 F.3d 542 (D.C. Cir.
    2009) ................................................................................... 23, 29, 33

*Rodriguez v. United States*, 575 U.S. 348 (2015) .................................... 53

*Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d
    431 (D.C. Cir. 2010) ........................................................................ 26

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................. 45

*United States v. Bey*, 911 F.3d 139 (3rd Cir. 2018) ........................... 46, 53

*United States v. Burnett*, 827 F.3d 1108 (D.C. Cir. 2016) ............... 18, 40

*United States v. Castle*, 825 F.3d 625 (D.C. Cir. 2016) ............ 32, 45, 47

*United States v. Cook*, 277 F.3d 82 (1st Cir. 2002) ................................. 43

*United States v. Devaugh*, 422 F. Supp. 3d 104 (D.D.C.
    2019) ................................................................................... 19, 35, 37

*United States v. Edwards*, 885 F.2d 377 (7th Cir. 1989) ....................... 43

*United States v. Gorham*, 317 F. Supp. 3d 459 (D.D.C.
    2018) .................................................................................... passim

*United States v. Hensley*, 469 U.S. 221 (1985) ....................................... 36

*United States v. Hutchinson*, 408 F.3d 796 (D.C. Cir. 2005) ........... 46, 53

*United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011) ................. 41

*United States v. Whitfield,* 634 F.3d 741 (3d Cir. 2010) ........................ 43

*United States v. Williams,* 951 F.2d 1287 (D.C. Cir. 1991) .................... 40

*Wade v. District of Columbia*, 310 A.2d 857 (D.C. 1973)........................ 55

*Wilson v. Layne,* 526 U.S. 603 (1999) ...................................................... 52

### Statutes

D.C. Code § 22–1101(b)(1)........................................................................ 49

### Rules

Federal Rule of Civil Procedure 56.................................................... 22, 31

Local Rule 7(h)(1) of the United States District Court for
    the District of Columbia........................................................... 22, 24

## PRELIMINARY STATEMENT

This is an appeal from the denial of qualified immunity to four MPD officers in a case alleging that they detained Plaintiff Jared Fishman well after they lost reasonable suspicion that Fishman had kidnapped one of his own children. But Defendants do not challenge the district court's conclusion that reasonable officers could not possibly have believed that clearly established law allowed them to detain Fishman for kidnapping for as long as these officers did. Instead, Defendant Officers ("Officers") argue that the district court erred by failing to conclude that they had reasonable suspicion of two crimes—"assault" and "second-degree cruelty to children"—that they never once mentioned in their statement of material facts and that they barely gestured to in their briefing. Defendants' entire argument on appeal was thus forfeited below. Regardless, their new argument is without merit because it relies nearly exclusively on facts of which the Officers had no actual knowledge. And those facts, even if considered, cannot reasonably support suspicion of any crime. This Court should affirm.

## STATEMENT OF THE CASE

### I.    The Undisputed Facts

Nearly all the relevant events in this case were captured on MPD officers' body-worn cameras, and so they are not in any factual dispute. The events took place in two locations simultaneously—Fishman's house in Georgetown, where he was illegally detained, and near the Cactus Cantina on Wisconsin Avenue, where officers responded to a mistaken 9-1-1 call accusing Fishman of kidnapping his own child.

### A.    Fishman Takes His Own Children Home From a Restaurant

February 17, 2020, was a school holiday, and so after visits to the library and the park, Plaintiff Jared Fishman took his two young daughters out to lunch at Cactus Cantina on Wisconsin Avenue. (Ex. 3 at 19:46:11 to 19:46:58; 19:53:24 to 19:53:29.) The outing was difficult; Fishman's eight-year-old daughter spent much of the meal kicking her older sister, and she refused to get in the car after the family left the restaurant. (Ex. 3 at 19:46:11 to 19:46:58.) Fishman and his older daughter allowed the younger daughter to walk around for a few minutes, hoping that she would calm down. (Ex. 3 at 19:46:11 to 19:46:58.) Fishman's younger daughter did not calm down—instead, for

2

the next 20 minutes or so, Fishman tried in vain to get her to agree to get in the car. (Ex. 3 at 19:46:11 to 19:46:58.) Eventually, Fishman did what nearly every responsible parent of a young child would do under these circumstances: He picked up his recalcitrant daughter and put her in the backseat of his car. (Ex. 3 at 19:46:11 to 19:46:58.)

The 20-minute struggle to get Fishman's younger daughter in the car left Fishman frustrated and evidently aroused the suspicion of two passersby. One of them, a middle-aged man driving a Chevrolet Suburban, pulled his car in front of Fishman's (Ex. 17 at 2:20) and asked him if there was a problem (Ex. 6 at 1:14–1:20 (passerby's explanation); Ex. 3 at 19:46:11–19:46:58 (Fishman's explanation)). Fishman responded that there was no problem "other than [that his] kid was being a shit." (Ex. 3 at 19:46:11 to 19:46:58.) Fishman then made a U-turn and drove home. (Ex. 17 at 2:20.)

Unbeknownst to Fishman, however, a different passerby on 36th Street and Woodley Road had called 9-1-1 to report a child abduction. (*See generally*, Ex. 6.) This woman said she "saw a little girl" about "six or seven" years old "walking by herself" when a "guy pull[ed] up" and "grabbed [her], threw her over his shoulder, and just threw her into the

car and then she tried to get out on the other side." (Ex. 6 at 00:30–1:03.) The 9-1-1 operator said "I mean, there's not much we can do with the information you gave, but I am gonna send an officer to the location." (Ex. 6 at 4:02–4:06.) The operator then put out a radio run for nearby police officers to respond to a suspected kidnapping. JA 229.

### B. Officers Respond to a Kidnapping Accusation

At about 2:35 in the afternoon on February 17, 2020, Officer Marck Jaeger was at a convenience store in Georgetown. (Ex. 2 at 19:36:33.) He received a radio run that there had been a kidnapping committed by "a white balding male in his forties" who drove a Green Audi with DC tags. JA 374–75. Jaeger drove to the address associated with the Audi's license plate, which was right around the corner. (Ex. 2 at 19:38:36–50.) When he arrived, Jaeger could hear a helicopter overhead, and he saw a white balding man in his forties sitting on his front stoop in his socks playing an acoustic guitar. (*Id.* at 19:39:00.) The door to the house was ajar. (*Id.*) Jaeger parked his car and radioed to dispatch that he was "in the block of that vehicle" and that "the person is sitting on the front steps at that address. I'm going to go up and speak to him." (*Id.*)

Jaeger then calmly walked up to Fishman's house. (*Id.* at 19:40:14.) Jaeger could hear Fishman strumming *Simple Twist of Fate* by Bob Dylan. *Compare* (*id.* at 19:40:14–16), *with Simple Twist of Fate* (Bob Dylan, Blood on the Tracks, Columbia Records 1975). Jaeger said "Hey how are you doing sir?" Fishman responded "How's it going?" "You don't drive an Audi, do you?," Jaeger asked. "Yep, I do," Fishman responded. "Did you just get home?," Jaeger asked. Fishman responded: "I did just get home. And that guy who called in has no idea what's going on." Jaeger asked: "Maybe you can help me with what's going on." (Ex. 2 at 19:40:14–19:40:30.)

Fishman then stood up to go into his house and said "hold on a sec." (*Id.* at 19:40:30.) As he walked up the steps and reached for his door, which was ajar, Fishman muttered "[y]ou have to be fucking kidding me." The parties dispute the legal characterization of exactly what happened next (and that legal dispute is not relevant to this appeal), but all agree that Jaeger asked Fishman to "hang tight for a second" and told him "don't go inside" and that Fishman was at least on his way inside when Jaeger "followed him over the threshold of his home, grabbed him by the arm, and pulled him back outside." App. Br. at 7. Fishman shouted "[y]ou

5

do not have the right to enter my house, I am not doing anything and you do not have the right to enter my house," as Jaeger dragged him down the steps and handcuffed him. (Ex. 2 at 19:40–45.)

### C. Within at Most Three Minutes, Officers Know There Has Been no Kidnapping

At the very moment Jaeger was handcuffing Fishman, three other MPD officers—Officer Jeremy Brady, Officer Michael Tong, and Officer Christopher Todaro—arrived at Fishman's house. (Ex. 7 at 19:40:43 to 19:40:54.) As all four officers surrounded Fishman, his wife and daughters appeared in the doorway. (*Id.* at 19:40:50.) Todaro asked the three people in the doorway to move away from the house's front stairs, where Fishman sat handcuffed, and to "come back in the house." JA 231 (noting this fact undisputed). Fishman's wife and daughters complied, and his younger daughter fell to the floor and pleaded with Todaro— "Please don't arrest him, please. He hasn't done anything wrong." JA 231 (acknowledging this fact is "undisputed"). Fishman's older daughter then said, "He did not take my sister. My sister was misbehaving, so he brought her into the car." JA 231.

Todaro then told the older daughter, "We got a call that there was a male who picked up a child, put her over his shoulder, and took her into

6

the car—abducted her. Of course we take that very seriously." JA 231. Todaro asked the older daughter if she had been with Fishman and the younger daughter the whole time. JA 232. In response, the older daughter said, "I was in the car in the front seat. My sister was misbehaving and she wouldn't get into the car and come home. We didn't want her to get taken or anything, and she was not listening, so my dad had to put her over his shoulder and bring her into the car. He did nothing wrong." JA 232.

At this point in the investigation, Todaro knew what any reasonable officer—indeed any reasonable person—in his situation would: "[T]hat [Fishman] was the girls' father," JA at 232 (defendants' statement), that the woman was their mother, JA 231, and that there had therefore been no kidnapping. At his deposition, Todaro conceded more than nine times that he was investigating no crime other than kidnapping, JA 102–164, that he had no reason to think the girls were lying, JA 135:14–17, and that the girls' description matched what he had been told about the incident at Cactus Cantina, JA 135:10–13.

As Fishman's older daughter continued her description—saying, of Fishman, "and he was frustrated, so when the person asked what was

happening . . ."—her younger sister once again appeared in the doorway, begging officers to not arrest her father. (Ex. 7 at 19:42:00 to 19:42:05.) Fishman's younger daughter then sat down by the front door of her home and began to sob. Fishman's wife knelt to console her, in full view of Brady and Todaro. "What happened, sweetie, is that somebody misunderstood," the mother said. "Somebody saw Daddy pick you up and they didn't know he was Daddy. They didn't know he was Daddy, and so they thought, *Oh, maybe it's just, like, a man who's taking a child.*" (Ex. 7 at 19:42:36 to 19:42:50.) When Fishman's younger daughter cried out the word "no," her mother said, "no, no, these officers know. They know the situation now. They know the situation. Everything is ok. Somebody misunderstood." The mother once again explained to her younger daughter that someone had seen Fishman pick her up and "didn't know that he was your daddy." (Ex. 7 at 19:42:50 to 19:43:54.) As the mother was saying this, Todaro, who heard every word of this exchange, noticed that Brady's car was blocking the road, and went over to move it. (Ex. 7 at 19:43:54 to 19:44:38.)

At this point, fewer than four minutes had elapsed since Fishman had been put in handcuffs, and the officers knew every piece of

information that they would ever learn during their investigation: The children were Fishman's, the woman was their mother, they had not been kidnapped, and Fishman had "d[one] nothing wrong," JA 232. Defendants' concession on appeal that "reasonable suspicion of kidnapping dissipated at some point during Fishman's detention," and their failure to contest that qualified immunity was inappropriate on this point, is thus a concession that the facts just described—which were undisputed below, admitted by the Officers, and based on incontrovertible video evidence—are insufficient to justify qualified immunity for detaining Fishman on suspicion of kidnapping. *See* App. Br. at 28.

### D. Elsewhere Someone Baselessly Accuses Fishman of Child Abuse

While the Officers were at Fishman's house, Defendant (but not Appellant) Lieutenant Patrick Loftus responded to the woman who called the police on Fishman. (Ex. 1 at 19:43:23–19:44:20.) The woman told Loftus that Fishman had "manhandl[ed]" a "six- or seven-year old" and "throw[n] her in the car." (Ex. 1 at 19:43:23–19:44:20.) She described this treatment as "not normal," and said that "if it wasn't an abduction, it was child abuse." (Ex. 1 at 19:44:00–19:44:05.) Defendants do not dispute that

9

this information was never relayed to anyone who was detaining Fishman.

### E. Officers, Knowing There Has Been no Kidnapping And Concededly Suspecting no Other Crime, Detain Fishman Anyway

Meanwhile, back at Fishman's house, Defendant Officer Michael Tong walked Fishman to the end of his block while Fishman's wife and child explained to Todaro and Brady what happened. A little over one minute after Todaro moved Brady's car out of the street and joined Tong at the end of the block with Fishman, Tong asked Fishman, "Can you tell me what happened in the past, like, hour?" (Ex. 3 at 19:46:07.) In response, Fishman gave a calm, detailed answer that, unbeknownst to him, matched completely the account his older daughter had just given to the other officers:

> I went to lunch with my two children. During that lunch, my youngest daughter kept irritating her older sister. Refusing to stop kicking her. We left. My younger daughter refused to get in the car. Walked down 36th street, started to walk up towards Wisconsin [Avenue]. She refused . . . She refused to get in the car. I was trying to get her in the car safely. It took us about twenty minutes trying to get her in the car. She didn't. I picked her up, I put her in the car. That was the time that big car stopped in front of me. Asked me if there was a problem. I said there was none other than [that]

10

> my kid was being a shit. And then we came home.
> My daughter calmed down in the car and we're
> now in the house. Both of my kids are now in the
> house, and we're moving on with our day.

(Ex. 3 at 19:46:11 to 19:46:58.)

After hearing Fishman's description of the previous hour, Tong asked no other substantive questions of Fishman. Instead, Tong walked up the street and relayed to other officers what Fishman had just told him. "That was it? Okay," said one officer (not a defendant here), in response, adding, "I'll handle the report and stuff." (Ex. 3 at 19:49:13 to 19:49:38.) Tong, along with Jaeger, then stood by Fishman's front steps and did nothing. (*Id.*) Todaro remained at the corner with Fishman. For the next 14 minutes, the two men stood beside each other in near-total silence. Todaro briefly thanked Fishman for his "patience" and, moments later, a different MPD officer repositioned Fishman because a passerby was attempting to take a photograph of him. (Ex. 3 at 19:55:43–19:55:52; 19:56:20–19:56:25.)

Officer Jeremy Brady, who remained in front of Fishman's house, attempted to conduct a detailed interview of Fishman's younger daughter. The mother initially resisted—when Brady said that he "just want[ed] to talk to her to make sure everything is okay," the mother said

"what did you just hear her expressing?" (Ex. 5 at 14:56–14:57.) Brady admitted "she said nothing happened, but I would like to actually talk to her." (*Id.*) The mother was concerned that talking to the Officers, who had firearms and loud radios, would be scary to an already terrified little girl. (*Id.*) But when Brady told her that "you can deny speaking with us, [but] that may delay everything," she relented. (*Id.*)

Brady then interviewed Fishman's younger daughter. (Ex. 5 at 15:04:30–36.) He learned nothing from this exchange that he had not already learned from Fishman's family: the younger daughter reported that she and her father had a "tiny fight" over her "kicking" her older sister; that Fishman "didn't hurt" her, and indeed that "nobody" got hurt; that she "didn't want to go home" and so she "ran away from the car"; and that as a result her father had to "lift me up and put me in the car." (Ex. 5 at 15:02:11 to 15:04:49.) When Brady asked the younger daughter if there had been "any yelling," she responded, "I might have yelled, but I don't think I did." (Ex. 5 at 15:04:51 to 15:05:05.) When he asked whether Fishman lifting her into the car had been an "easy pickup," she replied that it had been. (Ex. 5 at 15:04:51 to 15:05:05.) She confirmed she had not been hurt. (*Id.*)

12

### F.  Superior Officers Arrive And Order Fishman Released

Eventually Sergeant Adam Bray, who is not a defendant in this case, arrived at the scene. After speaking to some of his colleagues, Bray spoke to Fishman, asking him, "What is the situation, from your perspective, right now?" (Ex. 4 at 20:02:28 to 20:02:32.) Fishman described his initial encounter with Jaeger; when he finished, Bray responded, "So, we're investigating a kidnapping right now." (Ex. 4. at 20:03:06 to 20:03:09.) When Fishman scoffed in response, Bray said, "That might seem silly to you, but we take it pretty seriously." At this, Fishman explained that the two children in the house were his daughters, adding, "I'm sure that they've told you that, or told whoever they've spoken to." (Ex. 4. at 20:03:15 to 20:03:20.)

Sergeant Bray, unaware of everything his colleagues had already done, responded, "No, we haven't spoken to anybody; that's kind of why you're still in cuffs, and I want to get you out of cuffs," adding, in reference to Fishman's wife, "I don't know who the woman is in the purple." (Ex. 4. at 20:03:20 to 20:03:26.) Shortly afterwards, Bray explained to Fishman that "the way it was conveyed to the police is that . . . somebody matching your description grabbed a kid . . . [and] threw the kid into the car, which

13

then alerted us." (Ex. 4. at 20:03:57 20:04:17.) After a further exchange of information, Bray said, to Fishman, "The only thing we need to do is make sure that the child is okay, and is yours." (Ex. 4. at 20:04:34 to 20:04:41.) Fishman then gave Bray a shorter version of the same account of the afternoon that he had already given, almost 20 minutes prior, to Tong. (Ex. 4. at 20:04:53 to 20:04:58.) After hearing this explanation, Bray ordered that Fishman's handcuffs be removed, so that, as he explained to the officers nearby, Fishman could "have both kids in question . . . come down," by which Bray presumably meant down from their house to the street to speak with an officer—something both children had already done. (Ex. 4 at 20:05:38 to 20:05:42.)

Sergeant Bray then walked over to a large group of MPD colleagues that included Lieutenant Loftus and Officers Jaeger, Brady, and Tong. "He's being calm, he's being totally cooperative," Bray told the group, of Fishman. "He explained the situation in [a] way that makes more sense, now that he's actually talking." Bray was evidently unaware that Fishman had previously given Tong a nearly identical account of his afternoon. (Ex. 4 at 20:06:09 to 20:06:20.) "He has two kids," Bray continued. "We just need to see both kids—that's all that needs to

14

happen." (Ex. 4 at 20:06:20 to 20:06:28.) Officers confirmed that this had already happened, and Fishman sat back down on his front steps, released from custody. He had been detained, in total, for roughly 26 minutes.

## II. Procedural History

Fishman filed suit in 2021. As relevant to this appeal, three counts from his first amended complaint ultimately survived Appellants' motion to dismiss: claims against Officers Todaro, Tong, Jaeger, and Brady, brought under 42 U.S.C. § 1983, for violating the Fourth Amendment by seizing him without reasonable suspicion (Count III) and by arresting him without probable cause (Count IV); and a claim against the District of Columbia for the common law tort of false imprisonment (Count VI). *See* JA 54–75.[1]

After discovery, all remaining parties moved for summary

---

[1] The district court also concluded that Loftus had violated Fishman's First Amendment rights when he filed multiple retaliatory and misleading bar complaints against Fishman, who is an attorney, months after Fishman's detention. *See* JA 67–70. The district court granted Loftus qualified immunity for the violations stemming from these bar complaints, JA 71–72, and that decision is not relevant to this appeal.

judgment. Appellants moved for summary judgment on all three remaining claims; Fishman moved for partial summary judgment on all three claims but against only Officer Todaro and only as to liability, not damages. *See* JA 78–92. Appellants distilled their argument in the introduction to their motion for summary judgment: "Because [the officers] were investigating a credible report of child kidnapping, they had reasonable suspicion to justify . . . [the] short, continuous detention" of Fishman, a detention which did not require "probable cause." JA 297. The district court rejected this argument, and denied Appellants' summary judgment motion in full, on the grounds that the officers had "not shown that they had and maintained reasonable suspicion that Fishman had kidnapped anyone for the full period they detained him." JA 414.

The district court also granted Fishman's motion for partial summary judgment against Officer Todaro. It did so on the grounds that after Todaro helped detain Fishman, he spoke to both of Fishman's daughters and learned that "Fishman and [his wife] were the girls' father and mother." JA 415. At that point, the court concluded, "there was no reasonable suspicion of a kidnapping." *Id.* The district court further

16

concluded that Fishman was entitled to summary judgment on Counts IV (arrest without probable cause) and VI (false imprisonment) for the same reasons, JA 415–417, and denied qualified immunity to all Defendants because "existing precedent clearly places the question beyond debate whether officers need to be able to articulate *a single reason* to hold an individual in handcuffs for over twenty minutes . . ." and "[t]he record in this case shows not one reason!" JA 418 (emphasis in original). This interlocutory appeal, from the district court's denial of qualified immunity, followed.

## SUMMARY OF ARGUMENT

On appeal, Defendants concede, as they must, that reasonable suspicion of kidnapping fully dissipated before they released Fishman, App. Br. at 26, and they concede, as they must, that whatever suspicion of kidnapping they may have had was insufficient to afford them qualified immunity, *id.* at 45. But Defendants now argue that although "[r]easonable suspicion of a kidnapping may have dissipated sometime during" Fishman's detention, "suspicion of second-degree cruelty to children and assault existed throughout the stop." *Id.* at 19. To support their argument that reasonable suspicion of these new crimes existed,

17

Defendants argue that "reasonable suspicion . . . 'may be based on the collective knowledge of the police,'" *id.* at 27 (quoting *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016)); that this allows them to retroactively claim reliance on events of which they had no knowledge, *id.*; and that, taken together with their own knowledge, they reasonably believed that Fishman committed a crime by putting his own child in a car to prevent her from dangerously running off in public.

The first problem with these new arguments is that Defendants did not make them below. Defendants describe the district court's "failure to consider [these] other crimes" as "inexplicable and erroneous," App. Br. at 33, as the "fatally flawed central premise" of its summary judgment order, *id.* at 2, and as the "key error that infected" its entire analysis, *id.* at 45. But Defendants' summary judgment briefing, both in support of their motion for summary judgment and in opposition to Fishman's, lacks even a single assertion that the Officers possessed reasonable suspicion of or probable cause for the crimes on which they now focus. And Todaro, who conceded many times below that he was investigating *only kidnapping*, cited *none* of the new evidence on which he now relies in his statement of material facts. So too for the other Officers, whose own

18

motion for summary judgment contains not a single factual assertion about either of the crimes on which Defendants now base their argument on appeal. These arguments have been forfeited.

And these arguments fail on the merits besides. Contrary to Defendants' flat assertion, this Court "has not yet endorsed a particular interpretation of the collective knowledge rule"—the common shorthand for the question whether, and to what extent, officers may retroactively claim knowledge of information they did not actually have at the time of a stop. *See United States v. Devaugh*, 422 F. Supp. 3d 104, 113 (D.D.C. 2019) (explaining the doctrine); *see also United States v. Gorham*, 317 F. Supp. 3d 459, 471 (D.D.C. 2018) (collecting cases). Although this Court need not reach the question because this entire category of argument was not made below, if this Court does reach the question it should adopt the better-reasoned rule that officers may rely on directions from superiors and other police departments but not on information known only to other officers and never communicated to them. Finally on this point, the facts here could not possibly support reasonable suspicion anyway: Taken together, the facts show that Fishman put his own child in a car for her own safety. That is not even close to a crime under District of Columbia

law. This Court should affirm the district court's grant of summary judgment against Todaro and denial of summary judgment to the other Officers.

Last, Defendants appeal from the district court's summary-judgment decision on Fishman's common-law claims, arguing that they rise and fall together with Fishman's Section 1983 claims. But Fishman did not seek summary judgment against the Officers on this count because they are individually immune from suit under D.C. common law, but instead against *the District*, which answers as *respondeat superior*. And, unlike under federal law, under D.C. law Todaro's subjective beliefs are dispositive. This Court should therefore reverse the grant of summary judgment against Todaro on Count VI and remand with instructions to enter summary judgment against the District on that count.

## ARGUMENT

I. **Defendants Have Forfeited Nearly Every Argument They Make on Appeal**

A. **Todaro Did Not So Much as Attempt to Make an Argument About "Cruelty to Children" or "Assault" Below**

Todaro claims that the district court erred in entering summary judgment against him because it failed to consider whether Todaro possessed reasonable suspicion of second-degree cruelty to children or assault. *See* App. Br. at 46 (stating that the arguments in support of granting summary judgment to all the officers—that they possessed reasonable suspicion and probable cause that Fishman had committed second-degree cruelty to children or assault—"apply fully to Officer Todaro"). But the district court never considered these other crimes because Todaro never even mentioned them below and because Todaro never presented the facts that he now supposes support those new arguments. Absent exceptional circumstances, this Court treats arguments not raised in district court as forfeited, and no such circumstances exist here. Because Todaro, like the other Officers, does not contest the district court's order or analysis regarding the dissipation of suspicion for *kidnapping*, and because that issue is the only one Todaro

21

preserved below, this Court should affirm the grant of summary judgment against Todaro.

Under Federal Rule of Civil Procedure 56, a party moving for summary judgment must show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." And Local Rule 7(h)(1) of the United States District Court for the District of Columbia states that

> Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.

This Court has long held that although a district court *may* excuse compliance with these rules, it is "under no obligation to do so, and it act[s] perfectly within its authority to 'consider [a] fact undisputed for purposes of the motion'" when a party fails to comply. *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 397 (D.C. Cir. 2020). And it is also "well settled that issues and legal theories not

22

asserted at the District Court level ordinarily will not be heard on appeal." *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009); *see also Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011) (Tatel, J., concurring) ("To deny a summary judgment motion based on an evidentiary theory the nonmoving party never developed would necessarily deprive the moving party of the opportunity to poke holes in that theory"); *Bryant v. Gates* 532 F.3d 888, 898 (D.C. Cir 2008) (argument "forfeit[ed]" because it was "never raised . . . in the district court").

Fishman, in support of his partial motion for summary judgment against Todaro, submitted a statement of material facts that included the assertion, supported by citations to the record, that "[a]t all points during Fishman's detention, the only crime [Officer] Todaro was investigating and believed he had reasonable suspicion of was a potential kidnapping." JA 99. Todaro responded only: "This is disputed. Officer Todaro was present to investigate any crime, including the alleged kidnapping, and he had reasonable suspicion of a kidnapping until the investigation concluded. Def.'s Opp'n at 5-8." JA 236. Todaro cited no evidence, only a

few pages of his own brief, and cited no specific crimes other than kidnapping of which he had so much as a hint.

His response therefore forfeits his new argument for at least three reasons. First, and most obviously, it contains no mention of either of the crimes for which Defendants now claim they possessed reasonable suspicion and probable cause. And, of course, the question on summary judgment was whether qualified immunity protects the conclusion that Todaro could have possessed reasonable suspicion or probable cause that Fishman had committed a crime, not whether, in Todaro's words, he was merely "present to investigate" a crime. *Id.*

Second, the response fails to meet the requirement that, in disputing a movant's statement of material fact, parties must "*include references to the parts of the record* relied on to support the statement." Local Rule 7(h)(1) (emphasis added). Instead of directing the district court to anything in the record that would credibly dispute the fact that Todaro was only ever investigating Fishman for kidnapping, Todaro referenced only his own opposition motion.

Finally, even if such a citation were permissible—which it is clearly not—the cited pages of Todaro's motion also fail to either dispute this key

fact or establish that Todaro was even *investigating* whether Fishman had committed second-degree cruelty to children or assault. These four pages do not even contain the words "cruelty" or "assault." *See* JA 223–226. In fact, these pages repeatedly—and exclusively—discuss Todaro's investigation of a *kidnapping*: Todaro first notes that 23 minutes into his body-worn camera footage, "officers were continuing to investigate a kidnapping." JA 223. They next state that "[t]he evidence in discovery shows that Officer Todaro had reasonable suspicion of a kidnapping until superior officers arrived on scene and conducted their own investigation." *Id.* Later, Todaro asserts that "the officers' duty to further investigate the potential kidnapping did not cease within the first three minutes of the interaction," before finally describing Fishman as a "fleeing suspect to a suspected kidnapping." JA 225.

Even the pages of Todaro's opposition to which Todaro did *not* cite fail to assert that Todaro ever reasonably suspected that Fishman had committed any crime besides kidnapping. Todaro's opposition states that "[t]he District of Columbia also recognizes child abuse and neglect . . . and cruelty to children." JA 220. But simply listing crimes, without more, does not come close to warranting a grant of summary judgment in a case

25

that turns on reasonable suspicion and probable cause. Soo too for Todaro's non sequitur mention, in a footnote, that the federal Department of Justice cautions that police "should not 'rule out the possibility of child abuse with a domestic dispute complaint.'" JA 219–220. This case has never involved a "domestic dispute complaint," and the mere mention of this irrelevant guidance does not amount to an assertion that Todaro was investigating Fishman for a non-kidnapping crime, let alone that he reasonably believed Fishman had committed one. This is especially true given that, as discussed in detail below, in the District of Columbia there is no such thing as the crime of "child abuse." *See infra*, Section II(B).

"Generally, an argument not made in the trial court is forfeited and will not be considered absent 'exceptional circumstances.'" *Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 436–37 (D.C. Cir. 2010) (quoting *Nemariam v. Fed. Democratic Republic of Ethiopia,* 491 F.3d 470, 483 (D.C. Cir. 2007)). Here, no such circumstances exist; Todaro simply failed to make the relevant arguments below. And now, in this Court, he has not even acknowledged this failure or so much as gestured to "exceptional" circumstances that would warrant this Court

26

entertaining his brand-new arguments. *See Nemariam*, 491 F.3d at 483.
(explaining that this Court "decline[s] to address" claims not made below
when "appellants have offered no explanation for their failure to pursue
[them] . . . in district court").

Todaro has thus forfeited the entirety of his argument about these
two new crimes. In attempting to dispute that Todaro investigated
Fishman for kidnapping only, Todaro named no other crime, failed to
identify any portions of the record that supported his position, and
directed the district court to a portion of his brief that repeatedly named
kidnapping as the only relevant crime. Now, on appeal, Todaro faults the
district court for considering only whether he had reasonable suspicion
of kidnapping and Todaro concedes that no grounds exist to reverse the
district court's conclusion that he was not entitled to qualified immunity
for his detention of Fishman on suspicion of kidnapping. This Court
should affirm the district court's grant of summary judgment against
Todaro, as the district court correctly addressed only the arguments and
factual assertions that Todaro actually made.

27

### B. To The Extent Defendants Rely on Evidence Known by Other Officers They Failed to Cite Any of It Below

Defendants fare no better in seeking summary judgment in their favor because their motion for summary judgment features the same defects as Todaro's opposition to Fishman's motion. Like Todaro, Defendants forfeited the entire argument on which they now base their appeal.

First, their statement of material facts is devoid of any assertion that *any* officer was investigating cruelty to a child or assault. *See* JA 292–296. In fact, as with Todaro's statement of material facts, the only crime any officer is mentioned as investigating is *kidnapping*: Defendants state that Officer Jaeger, in his deposition, said that "the [9-1-1] call [was] for a kidnapping," which is a "very serious crime," JA 292; that Fishman "*self-identified* as the kidnapping suspect," JA 292 (emphasis in original); that Sergeant Bray "arrived on the scene with the knowledge that officers were investigating a kidnapping," JA 294; that "Bray had reasonable suspicion of a kidnapping," JA 294; that Fishman "scoffed and laughed when Bray told him officers were investigating a kidnapping," JA 295; and that "[o]fficers maintained reasonable

28

suspicion of a kidnapping throughout the entirety of the investigation until its conclusion," JA 296.[2] The statement of material facts also describes Fishman's younger daughter as "the alleged kidnapping victim." JA 294. There is no mention *whatsoever* of either cruelty to a child or assault.

Because a motion for summary judgment must be supported by statements of material fact featuring citations to the record, these deficiencies themselves amount to forfeiture of Defendants' new arguments. *See, e.g., Potter,* 558 F.3d at 550. But Defendants' motion itself also failed to raise—let alone establish—that Officers had reasonable suspicion or probable cause that Fishman had committed second-degree cruelty to a child or assault. The motion features cursory mentions of other crimes and offenses, unsupported by any relevant citations to the record; none come close to putting the issue before the district court, let alone to carrying the officers' burden on summary judgment.

First, the Officers state that Fishman, in moving for partial

---

[2] In his opposition to the officers' motion for summary judgment, Fishman disputed these characterizations. *See* JA 372–383.

summary judgment against Todaro, "veers off course when making his case that kidnapping is the only relevant crime separate and apart from child abuse."[3] JA 308. But here the officers cite only Fishman's motion, not anything from the record, nor do they name either of the crimes they now contend are central to this case. As discussed above, this is insufficient to warrant a grant of summary judgment. So too for the Officers' handful of gestures to an "investigation" for "child abuse"—gestures that are not (and indeed could not possibly be) supported by legitimate record citations, because, as discussed above, the Officers mentioned *only* kidnapping in their statement of material facts. *See, e.g.,* JA 305 (no citation for assertion that Officers "gather[ed] information about . . . . potential . . . child abuse); JA 392 (no citation for assertion that Officers "investigated . . . possible child abuse"). Finally, just as Todaro did in opposing Fishman's motion for summary judgment, the Officers' motion states that "[t]he District of Columbia also recognizes child abuse and neglect . . . and cruelty to children." JA 309. As discussed

---

[3] Here Defendants devoted some of their own motion for summary judgment to refuting arguments that Fishman made in *his* motion for summary judgment.

30

above, this is wholly insufficient to meet the Officers' burden on summary judgment.

Fishman repeatedly addressed these exact deficiencies in his response in opposition to the officers' motion for summary judgment. *See* JA 362–371. The district court was thus aware of these deficiencies when it denied the Officers' motion. And "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P 56(e).

Defendants may argue in their forthcoming reply brief that the record below contains two instances of Officers either mentioning "child abuse" or suggesting that the on-scene officers were investigating "multiple crimes." *See* JA 250 (Brady discussing "child abuse"); JA 252 (Jaeger responding affirmatively when asked, at deposition, whether officers were investigating "multiple crimes"). But if Defendants do indeed attempt to resuscitate their new, forfeited argument on these grounds, the attempt would fail for at least two reasons.

First, these brief mentions of some Officers' subjective belief that they were investigating anything besides kidnapping falls well short of

31

the *objective* standard for reasonable suspicion, discussed in detail below. *See, e.g., United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016). This is especially true here, where the specific infraction mentioned by Officer Brady—"child abuse"—is distinct from the new crime, "second-degree cruelty to children," on which Defendants now focus their appeal. In the District of Columbia, in fact, there is no such thing as the crime of "child abuse": parents "may be criminally prosecuted for cruelty to children" or "[a]lternatively, or in addition, the appropriate governmental authority may institute a civil action alleging neglect or abuse under remedial legislation designed to protect the welfare of the child." *In re S.K.*, 564 A.2d 1382, 1388 (D.C. 1989). "These two types of proceedings may be triggered by the same kind of conduct, but they are profoundly different in purpose and character." *Id.*; *compare* D.C. Code § 16-2301, *with* D.C. Code § 22-1101.

Second, and as discussed above, even if the record below did contain material facts to support Defendants' new argument—which it does not—Defendants failure to raise any of those facts at the summary judgment stage now amounts to forfeiture. This Court "routinely refuse[s] to consider evidence relied on for the first time on appeal *even if that*

32

*evidence was in the record before the district court*." *Estate of Parsons*, 651 F.3d at 137 (D.C. Cir. 2011) (Tatel, J., concurring) (emphasis added) (citing *Potter*, 558 F.3d at 549–51).

As with their opposition to Fishman's motion, therefore, Defendants have forfeited the argument on which they now rely. *See Potter*, 558 F.3d at 547. But it bears emphasizing that here Defendants' argument is even more extreme than their request that this Court reverse the district court's grant of summary judgment against Todaro. Defendants ask this Court to grant summary judgment *in their favor*, ending the case and awarding them total victory, on the basis of arguments they did not present to the district court. If, as this Court long ago concluded, reversing a *grant* of summary judgment in this context "would be clearly inappropriate," *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 680 (D.C. Cir. 1985), then reversing a *denial* of summary judgment would be even less appropriate.

This forfeiture issue is one of fairness, not formalism. "Fairness is implicated" where "the nonmoving party develops an adequate evidentiary theory in defense of one but not another claim—at least where the two claims have different elements. After all, an argument

33

useless for attacking a theory in the context of one claim may be devastating to that same theory in the context of the other claim." *Estate of Parsons*, 651 F.3d at 137 (Tatel, J., concurring). Defendants had ample opportunity, at the summary judgment stage, to establish that officers reasonably believed that Fishman had committed the crimes of second-degree cruelty to a child or of assault. They repeatedly failed to even claim this, let alone establish it, and so Fishman did not develop a case to contest it. The district court did not err in considering only the arguments actually before it, and decades of this Court's precedent establish that the district court's order should be affirmed on this basis.

## II. Defendants' New Arguments Are Meritless

### A. The Officers at Fishman's House Are Not Entitled to Retroactively Rely on Facts They Knew Nothing About

Defendants build much of their new argument around the account of the 9-1-1 caller, both in her initial call to the dispatcher and her subsequent brief exchange with Lieutenant Loftus. *See e.g.*, App. Br. at 32. Virtually none of this information, however, was ever actually communicated to any of the Officers. In invoking this information, Defendants simply assume, without justification, that they may now retroactively rely on this uncommunicated information, years after the

34

fact, to justify Fishman's prolonged detention. This assumption is baseless. Although Defendants briefly cite two cases in support of this proposition, *see id.* at 27, both pertain to an entirely different scenario: one in which officers act on a *direct order* from someone who possesses, but does not share, information that justifies reasonable suspicion or probable cause.

But this Court "has not yet endorsed a particular interpretation of the collective knowledge rule"—the common shorthand for the question of whether, and to what extent, officers may retroactively claim knowledge of information they did not actually have at the time of a stop. *United States v. Devaugh*, 422 F. Supp. 3d 104, 113 (D.D.C. 2019); *see also United States v. Gorham,* 317 F. Supp. 3d 459, 471 (D.D.C. 2018) (explaining the doctrine). And although this Court may affirm the district court's order without addressing the issue of collective knowledge, if it does address the issue it should adopt the well-reasoned rule of the Fourth Circuit and other courts that officers may not retroactively justify a stop or arrest on the basis of information those officers did not actually have at the time.

35

All federal appellate courts agree that an officer may retroactively justify a stop on the basis uncommunicated information when that information was in fact possessed by the colleague or superior *who ordered the stop*. *See United States v. Hensley*, 469 U.S. 221, 231 (1985). This uncontroversial form of collective knowledge is often called "vertical" collective knowledge. *See Gorham,* 317 F. Supp. 3d at 472–73.

Courts diverge, however, regarding retroactive reliance on uncommunicated information in the absence of a direct order—so-called "horizonal" knowledge. *Id.* at 472. The Second, Fourth, and Tenth Circuits forbid this type of reliance. *Id.* (collecting cases). The Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits allow it only when the officers attempting to pool their uncommunicated information were actually in communication before the stop or arrest—even if the information establishing reasonableness went uncommunicated. *Id.* at 471–72 (collecting cases). And the First and Third Circuits allow officers to rely on uncommunicated information even when officers did not actually communicate with each other prior to the stop. *Id.* at 471. As mentioned above, however, *this* Court "has not yet endorsed a particular

interpretation of the collective knowledge rule." *Devaugh*, 422 F. Supp. 3d at 113.

Defendants do not engage with any of these distinctions. Instead, they simply assume, with scant justification, that they are entitled to the broadest possible form of retroactive aggregation. *See, e.g.,* App. Br. at 27. But virtually none of the information on which Defendants rely was communicated to the Officers, and Defendants have barely even attempted to argue for the collective knowledge standard to which they wrongly assume they are entitled.

The 9-1-1 caller reported to the dispatcher that, among other things, a man had "grabbed" a "little girl," "threw her over his shoulder," and "threw her into the car," actions she characterized as "manhandling." (Ex. 6 at 00:10-01:00.) The caller similarly told Lieutenant Loftus that she saw someone "manhandling his child in a really bad way and "thr[owing] her into the car," and said that if Fishman's conduct "wasn't an abduction, it was child abuse." (Ex. 1 at 19:43:34-19:44:15.) The 9-1-1 caller also added that this behavior had caught the attention of another passerby, who attempted to block Fishman from driving away. (*Id*.)

Defendants build much of their new argument around these statements. They repeatedly reference them as the key facts justifying Fishman's detention and describe officers' interviews with Fishman and his older daughter as probative because they "*corroborated*" the account. App. Br. at 32 (emphasis in original); *see also id.* at 41 ("[T]he eyewitness's report gave the officers probable cause to believe that Fishman had committed cruelty to children or assault."); *id.* at 45 ("[T]he officers here plainly had a reason for detaining Fishman: a reliable eyewitness reported seeing Fishman commit an act of possible child abuse.").)

Although Defendants lean heavily on the 9-1-1 caller's statements, they do not claim that anything but the barest description of the 9-1-1 call was ever communicated to them; that Loftus ever communicated with *any* on-site officer, let alone any of the Officer Defendants, about his brief conversation with the 9-1-1 caller; or that they detained or arrested Fishman at Loftus's, or anyone else's, direction. Nor could they: the record is entirely devoid of any such communication or order. Officer Jaeger reported that he learned from the dispatcher that someone had "grabbed a girl, threw her over his shoulder, and threw her into a car,

38

and drove off," (JA 334), and Officer Todaro learned as he was approaching Fishman's home that a "small child was thrown into a green Audi SUV," (JA 326). The record, however, features no evidence that the caller's description to the dispatcher of a someone "manhandling" a child ever reached any of the officers. So too for any part of the caller's subsequent conversation with Lieutenant Loftus, including any use of the word "abuse." Loftus was not with any of the other Officer Defendants when he spoke to the caller, and he never communicated the contents of the conversation to any other Officer Defendant. (*See generally,* Ex. 1 and Ex. 8.)[4]

Defendants, however, claim that they may retroactively justify their detention and arrest of Fishman "based on [their] collective knowledge" of this uncommunicated information. App. Br. at 27. For this

---

[4] Defendants reference a portion of Lieutenant Loftus's body-worn camera footage that shows him, in Defendants' words, "checking in from the 36th Street location." App. Br. at 35. Like the rest of the footage, this excerpt features no instance of Loftus sharing the contents of his conversation with the 9-1-1 caller or discussing either of the new crimes on which Defendants base their new theory of this case. Lieutenant Loftus, in fact, spends the entirety of the brief phone call obtaining basic information from an on-scene officer, rather than sharing information himself. (*See* Ex. 1 at 19:46:46 to 19:47:33.)

proposition they cite two cases, both of which deal only with *vertical* collective knowledge. In *United States v. Williams,* 951 F.2d 1287 (D.C. Cir. 1991), one officer observed a man trafficking narcotics and "asked" a second officer—who was "one of the few people in the unit who had some success in engaging in foot chases after people"—to "go after" the suspect. *Id.* at 1288. After apprehending the suspect, the second officer presented the suspect to the first officer to "confirm[]" that the man "was in fact the individual [the first officer] wanted stopped." *Id.* On appeal, this Court agreed with the government that the second officer "was justified in stopping [the suspect] in light of what [the first officer] had seen." *Id.* at 1289–90. And in *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016), federal agents, after a monthslong investigation, "asked the Maryland state police to stop and search" a car that the agents believed was carrying illegal drugs from Philadelphia to Washington, D.C. In upholding the stop, this Court asserted that Maryland police could rely on the "collective knowledge" of both the arresting officers and the federal agents who ordered the arrest. *Id.* at 1114–15. Neither decision on which Defendants rely, then, allows officers to retroactively claim unknown

40

information in the absence of a direct order from someone who actually possessed the relevant information.

This Court should decline Defendants' unsupported invitation to embrace the most expansive form of collective knowledge. Instead, it should side with the courts—including the Second, Fourth, and Tenth Circuits, as well as the district court within this Circuit—that have concluded that allowing horizontal collective knowledge "perversely reward[s] officers acting in bad faith according to the result of an after-the-fact aggregation inquiry that is simply academic" and "create[s] an incentive for officers to conduct search and seizures they believe are likely illegal"—an incentive "directly contrary to the purposes of longstanding Fourth Amendment jurisprudence." *United States v. Massenburg*, 654 F.3d 480, 494 (4th Cir. 2011); *see also Gorham* 317 F. Supp. 3d at 472–73 (agreeing with the reasoning of *Massenburg*). But Defendants lose here even if this Court instead sides with the Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits in concluding that officers may aggregate key information so long as they were communicating *other* information to each other during the relevant time period. As discussed above, Loftus never communicated with *any* of the Officers until roughly

41

two minutes before Sergeant Bray ordered that Fishman's handcuffs be removed. (*Compare* Ex. 8 at 20:03:22 with Ex. 4 at 20:05:36.)

Defendants, moreover, are not just asking this Court for a new standard for which they offer no justification; they are asking this Court for a broader conception of horizontal knowledge than *any* federal appellate court appears to have *ever* granted the police. Only two circuits, the First and the Third, allow the retroactive aggregation of officer knowledge in the absence of any actual communication. *See, e.g., Commonwealth v. Privette,* 491 Mass. 501, 512 (2023) ("[T]he minority view, which has been adopted by the United States Courts of Appeals for the First and Third Circuits . . . has allowed information to be aggregated amongst officers even absent evidence of any sort of communication between them").[5] The mine run of horizontal knowledge cases in the First

---

[5] Fishman respectfully disagrees with Judge Moss's addition of the Seventh Circuit to the list of federal appellate courts that have embraced the minority view. *See United States v. Gorham,* 317 F. Supp. 3d 459, 471 (D.D.C. 2018) ("The First, Third, and Seventh Circuits have held that information may be aggregated 'horizontally' among officers working closely together even absent evidence of a communication or directive."). In the only Seventh Circuit case cited by Judge Moss, the court explicitly rejected the officers' horizontal knowledge argument, concluding that a "supervising officer's knowledge about a defendant cannot be relied upon

and Third Circuits, however, allow aggregation of uncommunicated information only when the officers in question are physically together. *See, e.g., United States v. Whitfield,* 634 F.3d 741, 743 (3d Cir. 2010) (officers traveling in separate cars, but "in a 'caravan,' so that all three cars were in a line moving down the street"); *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) (collective knowledge imputed to "all of the officers who participate[d] directly in carrying out the stop"). Here, in contrast, Loftus did not participate in Fishman's detention or arrest, and indeed was not even on scene for nearly all of Fishman's detention. (*See generally,* Ex. 1 and Ex. 8.)

Almost all of the statements made by the 9-1-1 caller, then, have no place in this Court's analysis of the lawfulness of Fishman's detention. Defendants never justify the assumption that they may aggregate uncommunicated information in the absence of a direct order. Nor do they address, or even acknowledge, both that this Court has never allowed this kind of aggregation and that lower courts in this Circuit have

---

to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest." *United States v. Edwards*, 885 F.2d 377, 382 (7th Cir. 1989).

explicitly rejected the very argument they treat as settled in their favor. And, as discussed above, the specific information that they now attempt to retroactively impute to all the Officers is notably absent from their summary judgment briefing. Defendants are not entitled to rely on the uncommunicated information on which they ground so much of their appeal.

### B. Even Considering the Facts the Officers Knew Nothing About, No Reasonable Officer Could Possibly Have Harbored Reasonable Suspicion of a Crime Considering The Totality of The Circumstances

Even if the Officers could retroactively claim knowledge of all the 9-1-1 caller's statements, they possessed reasonable suspicion that Fishman had committed either second-degree cruelty to a child or assault only for, at most, the initial minutes of their investigation. Defendants, however, now argue—again, for the first time—that although "[r]easonable suspicion of a kidnapping may have dissipated sometime during [Fishman's] detention," reasonable "suspicion of second-degree cruelty to children and assault existed *throughout the stop*." App. Br. at 19 (emphasis added); *see also id.* at 28 ("*[A]t all relevant times* reasonable suspicion existed for two other crimes: second-degree cruelty to children

and assault.") (emphasis added).) Defendants are wrong. Reasonable suspicion of these new crimes dissipated at the same time the Officers learned that Fishman had not kidnapped anyone: when the other members of Fishman's family explained the situation. This made their subsequent 20-minute detention of Fishman plainly unconstitutional.

"Pursuant to the Fourth Amendment, a police officer who seizes a person on less than probable cause 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' support 'a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *Castle*, 825 F.3d at 634 (citations omitted). Courts must "assess those facts within an objective framework: '[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in his belief' that the suspect is breaking, or is about to break, the law.'" *Id.* at 635 (citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968) (establishing standard for constitutionality of investigative stops); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (explaining reasonable-suspicion standard). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v.*

45

*Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 499 (1983)). Therefore, "[o]nce reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment." *United States v. Bey*, 911 F.3d 139, 147 (3rd Cir. 2018).

Through this lens, most of the facts on which Defendants rely have little bearing on the reasonable suspicion analysis because they predate the moment at which all reasonable suspicion of any crime had dissipated. Defendants, for instance, argue that the description of the 9-1-1 call received by Jaeger and Todaro—namely the claim that Fishman "threw [a little girl] over his shoulder and "threw her into the car"— helped establish reasonable suspicion of the two new crimes. App. Br. at 29–30. So too for what Defendants describe as "Fishman's own peculiar conduct" during his exchange with Officer Jaeger on his front steps. App. Br. at 31. Even the information on which Defendants most focus happened in this brief pre-dissipation period: by the time Fishman's older daughter had concluded her calm, detailed explanation of the relevant events, Lieutenant Loftus had not even begun his short conversation with the 9-1-1 caller. (Compare Ex. 7 at 19:42:05 and Ex. 1 at 19:42:05.)

46

When all the pre-dissipation events are stripped away, Defendants offer only two relevant assertions, which, taken together, are wholly inadequate for reasonable suspicion. First, Defendants suggest, without explicitly stating, that Fishman's children might have been lying about what really happened. *See* App. Br. at 32. Tellingly, however, Defendants produce no facts to support this suggestion; they simply state, with no citation to the record, or to anything else, that "[i]t is common knowledge that children sometimes falsely deny or downplay parental abuse for various reasons." *Id*. Missing here is any fact that would support the idea that *Fishman's children* were lying; indeed, Officer Todaro said at his deposition that he had no reason to believe that the children weren't telling the truth. *See* JA 135. Simply put, the broad, unsupported assertion that children sometimes lie is not the kind of "specific and articulable fact[]" to which Defendants are required to point. *See Castle*, 825 F.3d at 634.

Second, Defendants claim that the officers' interviews of Fishman and his older daughter "*corroborated*" the 9-1-1 caller's account. App. Br. at 32 (emphasis in original). But this argument warps both interviews beyond recognition. Defendants note that Fishman was angry during

47

part of his interview, and they assert that his coarse language "could" lead a reasonable officer to suspect that Fishman "had been angry enough to physically throw" his younger daughter "into the car." *Id.* at 32–33. But Fishman's account to Officer Tong wholly undermines this argument:

> I went to lunch with my two children. During that lunch, my youngest daughter kept irritating her older sister. Refusing to stop kicking her. We left. My younger daughter refused to get in the car. Walked down 36th street. Started to walk up towards Wisconsin. She refused . . . She refused to get in the car. I was trying to get her in the car safely. It took us about twenty minutes trying to get her in the car. She didn't. I picked her up, I put her in the car. That was the time that big car stopped in front of me. Asked me if there was a problem. I said there was none other than my kid was being a shit. And then we came home. My daughter calmed down in the car and we're now in the house. Both of my kids are now in the house, and we're moving on with our day.

(Ex. 3 at 19:46:11 to 19:46:58.)

As to Fishman's older daughter, Defendants claim that her description of her father as "frustrated" and "angry" and needing "to put [Fishman's younger daughter] over his shoulder and bring into the car" was, in Defendants' words, "consistent with the eyewitness's observation of 'manhandling.'" App. Br. at 32 (emphasis in original). This argument is meritless, even on its own terms: putting one's child "over [one's]

shoulder" in order to "bring [her] into the car" is plainly not a crime. In the broader context of the older daughter's account, however, Defendants' argument is brazen. Fishman's older daughter was answering a question from Officer Todaro: "So you were there the whole time, with your sister?" (Ex. 7 at 19:41:45.) "I was in the car, in the front seat," the older daughter responded. "My sister was misbehaving, and she wouldn't get into the car and come home. We didn't want her to get taken or anything, and she was not listening, so my dad had to put her over his shoulder and bring her into the car. He did nothing wrong." (Ex. 7 at 19:41:46-19:41:59.) No reasonable officer could have possibly concluded that this description "corroborated" the 9-1-1 caller's account of "manhandling."

Taken together then, these two assertions—one of which is a broad principle, not a fact—cannot support Defendants' argument regarding either of the crimes they now say that this case has always been about.

First, putting a recalcitrant child into a car—after that child has tried to run away on a busy street—does not give rise to reasonable suspicion of, let alone probable cause for, second-degree cruelty to children, which is defined as conduct that "causes a grave risk of bodily injury to a child." *See* D.C. Code § 22–1101(b)(1). The three cases

49

Defendants cite in support of this argument show the extremity of their position. In *Lee v. United States*, a mother beat her daughter with a wooden dowel for skipping a family event, 831 A.2d 378, 380 (D.C. 2003); in *Coffin v. United States*, a man drove drunk with no headlights on, ran a stop sign, swerved across the center line, and attempted to drive in the direction of traffic while two un-seat-belted children and a pit bull rode along with him, 917 A.2d 1089, 1090–91 (D.C. 2007); and in *Jones v. United States*, a mother pulled her daughter's hair, repeatedly punched her, and pepper sprayed her in the face, all while a small child, the attacker's granddaughter, sat on the sidewalk next to them, 67 A.3d 547, 549–50 (D.C. 2013). To describe those cases is to distinguish them from this one.

Nor did the older daughter's description preserve any possibility that Fishman had assaulted his younger daughter. The District of Columbia Court of Appeals, in the very case on which Defendants chiefly rely, has noted that assault "is a chameleon concept that no one should attempt to describe too precisely" because it "takes on different colorations in different factual settings." *Perez Hernandez v. United States*, 286 A.3d 990, 995 (D.C. 2022) (quoting *Lamb v. State*, 613 A.2d

50

402, 411 (Md. Ct. Spec. App. 1992)).[6] Defendants do not direct this Court to any remotely similar case that would support their assault argument—an argument for which they supply no limiting principle—and for good reason: if Defendants are correct, then any parent who puts an unwilling or misbehaving child into the car against their will can be detained and investigated by police for the "offensive touching" included in the crime of assault, *see* App. Br. at 29. Worse, on Defendants' argument a parent could be *convicted* on those facts. Defendants have failed to show that a reasonable officer could have harbored suspicion that Fishman had committed a crime, let alone that "the evidence . . . is so one-sided that [they] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

None of the Officers, moreover, are entitled to qualified immunity. Defendants' qualified immunity argument is just a repackaged version of

---

[6] The court in *Perez Hernandez* noted that although the District of Columbia's assault statute "does not set forth the elements of the crime" the court has "long construed it to prohibit common law assault." *Perez Hernandez*, 286 A.3d at 996 (D.C. 2022).

51

their merits argument—not, as required, an argument that Defendants are immune from suit even if their conduct violated the Constitution.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (internal quotations omitted). "Even though in the light of pre-existing law the unlawfulness [of the officer's conduct] must be apparent, there is no need that the very action in question [have] previously been held unlawful." *Wilson v. Layne,* 526 U.S. 603, 615 (1999) (cleaned up). And, as this Court has explained, "[p]rior decisional law need not have supplied a precise formulation of the applicable constitutional standard in order to overcome an official's qualified immunity, but the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006) (internal quotations omitted).

The district court, therefore, properly concluded that Fishman had a clearly established right to be free from detention once officers lacked

"*a single reason* to hold [him] in handcuffs . . . under either a reasonable suspicion or probable cause standard." JA 418 (emphasis in original). The law was clearly established that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Ohio v. Robinette*, 519 U.S. 33, 50 n.8 (1996); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Authority for [a] seizure" ends when the investigation is "or reasonably should have been . . . completed."). Indeed, this is the *essence* of the Fourth Amendment's protection against unwarranted detention. *See, e.g., Hutchinson*, 408 F.3d at 800; *Bey*, 911 F.3d at 147.

Defendants do not meaningfully contest this principle. Instead, they use their qualified immunity argument to reassert the claim that the district court should have considered whether reasonable suspicion or probable cause existed for their two new crimes. Specifically, they argue that the "district court's contrary conclusion [on qualified immunity] can be explained *only* as the product of the same key error that infected the rest of its analysis: the refusal to consider any crime other than kidnapping." App. Br. at 45 (emphasis added). "When other possible crimes are taken into consideration," Defendants argue, "it

becomes clear that officers in this scenario could not know that their conduct violated the Fourth Amendment in the absence of factually similar case law." *Id.* This is little more than Defendants' merits argument, not—as required here—an argument that the officers should be protected from suit *even if their conduct violated the Constitution. See, e.g. Wesby*, 583 U.S. at 62–63. Defendants are not entitled to qualified immunity, and the district court properly denied their motion for summary judgment on the constitutional claims.

### III. Fishman's Common-Law Claims May Proceed Against the District

The district court, in its summary judgment order, mistakenly treated Fishman's common-law false imprisonment claim as if it were against the Officers individually, rather than the District of Columbia. *See* JA 415–417; *see also* ECF 23 at 25–27 (Fishman acknowledging, in opposing Defendants' motion for summary judgment, that only the District is liable for tort of false imprisonment). But because the District is liable for false imprisonment under the doctrine of *respondeat superior*, and the district court correctly decided the common law claim when it granted Fishman's motion for summary judgment and denied the District's.

54

Under D.C. law, "[t]he elements of the torts of false arrest and false imprisonment are: (1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911–12 (D.C. Cir. 2015); *see also Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982) (the "gist of any complaint for false arrest or false imprisonment is an unlawful detention," and the "unlawful detention of a person without a warrant or for any length of time . . . constitutes false imprisonment" (cleaned up)). And "the District of Columbia may be sued under the common law doctrine of respondeat superior for the intentional torts of its employees acting within the scope of their employment." *Wade v. District of Columbia*, 310 A.2d 857, 863 (D.C. 1973).

The District of Columbia recognizes a doctrine is known as "qualified privilege" under which an officer's actions may not be actionable even if they meet the elements of the tort of false arrest. *See, e.g. District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993), *aff'd on rehearing*, 635 A.2d 929. But unlike with qualified immunity, the doctrine of qualified privilege applies only where "the officer can demonstrate that (1) he or she 'believed, in good faith, that his [or her]

conduct was lawful, *and* (2) this belief was reasonable." *Id.* (emphasis added) (internal quotations omitted); *see also Liser v. Smith*, 254 F. Supp. 2d 89, 104 (D.D.C. 2003) ("[T]he federal qualified immunity standard is an objective one . . . [i]n contrast to the subjective 'good faith' standard that governs false arrest claims under D.C. law . . . .").

Because Officer Todaro cannot meet this standard, the District is liable to Fishman. As discussed above, Todaro's detention of Fishman was objectively unlawful, as any reasonable officer would have known. Moreover—and crucially—Todaro *knew* within minutes of Fishman's detention that Fishman had not committed any crime: he admitted at his deposition that after speaking to both of Fishman's daughters, he had no reason to believe that either girl was lying about what had happened earlier that day. JA 135; *see also* Ex. 7 at 19:41:17 to 19:43:04. Because Todaro's professed belief in the truthfulness of the girls' statements is fundamentally incompatible with the belief that Fishman had committed *any* crime, including the two new crimes on which Defendants now focus, Todaro cannot demonstrate that he "believed, in good faith" that his subsequent 20-minute detention of Fishman was "lawful." *See Murphy*, 631 A.2d at 36. Because Todaro committed the tort of false imprisonment

and is not entitled to qualified privilege, this Court should reverse the grant of summary judgment against Todaro on Count VI and remand with instructions to enter summary judgment against the District on that count.

## CONCLUSION

The district court's grant of partial summary judgment in favor of Fishman and its denial of summary judgment for Defendants on Fishman's federal claims should be affirmed, the court's grant of summary judgment against Todaro reversed with instructions to enter judgment against the District, and this case remanded for trial.

Dated: October 10, 2025

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Sam Rosen
GERSTEIN HARROW LLP
400 7th St. NW, Suite 304
Washington, DC 20004
(202) 670-4809
charlie@gerstein-harrow.com

Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Suite 800
Los Angeles, CA 90025

57

(323) 744-5293
jason@gerstein-harrow.com

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

Counsel certifies that this brief complies with the word limitation set forth in the Federal Rules of Appellate Procedure because it contains 11,746 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f) according to the word-processing system used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Century Schoolbook 14-point font.

*/s/ Charles Gerstein*

*Attorney for Plaintiff–Appellee*

59