# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2026          Decided August 11, 2026

No. 25-7050

JARED FISHMAN,
APPELLEE

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01847)

———

*Lucy E. Pittman*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With her on the briefs were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General.

*Charles Gerstein* argued the cause for appellee. With him on the brief was *Jason S. Harrow*.

Before: SRINIVASAN, *Chief Judge*, GARCIA, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  Responding to a 9-1-1 call from a bystander who had witnessed what she thought might have been a kidnapping or abuse of a child by an adult, D.C. Metropolitan Police Department officers quickly tracked down the adult, Jared Fishman, based on vehicle license plate information.  The officers detained Fishman outside his home while questioning him and his family, including the child involved in the incident, who turned out to be his young daughter.  Upon concluding that Fishman had not committed a crime, the officers released him.  He had been detained for around twenty-five minutes.

Fishman then brought this action against the officers, alleging that they continued to detain him after reasonable suspicion had dissipated in violation of his Fourth Amendment rights.  The district court denied the officers qualified immunity, ruling that clearly established law required the officers to release Fishman before they did.  We disagree and conclude that the officers are entitled to qualified immunity.  In detaining Fishman to investigate whether he had committed a child-abuse-related offense, and in continuing his detention until they could speak with his daughter, the officers did not violate clearly established law.

I.

A.

The following facts are undisputed.  On February 17, 2020, Jared Fishman took his two daughters to lunch at a restaurant in D.C.'s Cleveland Park neighborhood.  The girls argued during the meal, and Fishman's younger daughter, J.M.-

3

F., remained upset after leaving the restaurant. J.M.-F. refused to get into Fishman's car, and he allowed her to walk on a sidewalk near the restaurant to calm down. After several minutes, J.M.-F. still declined to get into the car, so Fishman drove the car next to her, exited the car, picked her up over her protest, and put her into the car.

As Fishman got into the driver's seat, a man in another car who had noticed the incident blocked Fishman's car with his own and asked whether everything was alright. Fishman responded that he was taking his younger daughter home, made a U-turn, and drove off. A second bystander called 9-1-1 to report the incident, stating that she did not know whether she had witnessed "an abduction" or "a father manhandling his child in a really bad way." Ex. 6 (9-1-1 Call Recording) at 00:10–00:22. She described seeing "a little girl" "walking by herself," and then a man pulling up and getting out of his car to talk to her. *Id.* at 00:30–00:45. The caller explained that the man "started screaming at her," the girl "pushed him," and then he "grabbed her," "threw her over his shoulder, and just threw her in the car." *Id.* at 00:45–1:00. The caller recounted that the girl then "tried to get out" of the car but the man continued "grabbing her." *Id.* at 1:00–1:05. The caller described the suspect, reported that his vehicle was a dark green Audi, and provided the license plate number on the car. *Id.* at 2:23–3:00.

In response to the 9-1-1 call, Metropolitan Police Department (MPD) officers were dispatched to investigate "a call for a kidnapping." Jaeger Dep. 22:7 (J.A. 334). The dispatch directed officers to look for "an older white male" who was "balding," and indicated that the suspect "grabbed a girl, threw her over his shoulder, [] threw her into a car, and drove off." *Id.* at 22:8–9 (J.A. 334). The dispatch also provided the suspect's license plate number, which matched an address in MPD's system. MPD officers went to the site of the incident

4

in Cleveland Park and the address associated with the license plate.

Upon hearing the dispatch, Lieutenant Patrick Loftus went to the site of the incident, where he interviewed the 9-1-1 caller. The witness confirmed the description of the incident she had provided during the call, explaining that the other bystander on the scene had "intentionally blocked" Fishman with his car because "he could tell" that the interaction between Fishman and the young girl "was not normal." Ex. 1 (Loftus BWC Footage at 36th Street) at 19:43:45–19:43:48. While recounting the incident, the witness told Lieutenant Loftus that "if it wasn't abduction, it was child abuse." *Id.* at 19:44:01–19:44:03.

Around the same time, Officer Marck Jaeger heard the radio dispatch and went to the address linked to the Audi, which was Fishman's residence. The vehicle, which matched the dispatcher's description, was parked outside. Fishman was sitting on his front steps.

Officer Jaeger approached Fishman and asked whether Fishman drove the vehicle. Fishman said that he did and had just returned home. He added, unprompted, that "that guy who called in has no idea what's going on." Ex. 2 (Jaeger BWC Footage) at 19:40:25–19:40:28. When Officer Jaeger responded that Fishman could help him understand "what's going on," Fishman stood up, told Officer Jaeger to "hold on a sec," and began opening the front door to his house. *Id.* at 19:40:30. Despite Officer Jaeger's repeated directive, "don't go inside," Fishman took steps into his home. *Id.* at 19:40:33–19:40:36. Officer Jaeger followed Fishman and pulled him outside. As Fishman began to scream, other officers—Christopher Todaro, Jeremy Brady, and Michael Tong—arrived and helped Officer Jaeger put Fishman in handcuffs.

5

Presumably hearing the commotion, Fishman's daughters came to the doorway from inside the house. The older daughter, A.M.-F., said that her sister had been misbehaving, while J.M.-F. screamed and cried.

Once handcuffed, Fishman did not resist the officers, who—over his objection—moved him around the corner from his house and out of his family's view. Officer Tong questioned Fishman there. Fishman gave his biographical information but repeatedly asked why he was being detained and whether he needed a lawyer, questions Officer Tong did not answer. Fishman then gave an account consistent with the 9-1-1 call in key respects, explaining that he had gone to lunch with his two children, during which his youngest daughter fought with her older sister. Fishman said that J.M.-F. had declined to get into the car and, after twenty minutes of trying to get her into the car, he "picked her up" and "put her in the car." Ex. 3 (Tong BWC Footage) at 19:46:23–19:46:25, 19:46:37–19:46:42. Officer Tong later relayed Fishman's account to the other officers.

While Officer Tong was with Fishman around the corner, Officers Todaro and Brady attempted to question Fishman's wife Fiona Macaulay and their two daughters. Officer Todaro first spoke with Macaulay and the two girls on the steps of the home. J.M.-F. cried and pleaded that her father be brought back, insisting that he had done nothing wrong. A.M.-F. tried to explain to Officer Todaro that Fishman had not abducted J.M.-F., and repeated that, because J.M.-F. had been misbehaving and refused to get into the car, Fishman "had to put her over his shoulder and bring her into the car." Ex. 5 (Brady BWC Footage) at 14:41:50–14:41:59.

Officer Brady explained that they needed to "talk to everybody individually." *Id.* at 14:43:09–14:43:13. When

6

J.M.-F. continued crying, Macaulay brought her inside and soon asked A.M.-F. to come inside as well.  After moving both daughters inside, Macaulay returned to the doorway and spoke with Officer Brady.  Macaulay confirmed that Fishman was her husband and the father of both girls.  When Officer Brady asked to speak directly with J.M.-F., Macaulay responded "absolutely not."  *Id.* at 14:56:13–14:56:17.  She continued to resist Officer Brady's request to speak with J.M.-F., but later relented after he explained that refusing to answer questions "may delay everything" and that the officers were "trying to get this over as fast as [they could]."  *Id.* at 14:57:54–14:57:56, 14:58:03–14:58:06.

About twenty-two minutes into the investigation, Officer Brady spoke directly with J.M.-F., who explained that she had been in a "tiny fight" with her father but that "he didn't hurt" her.  *Id.* at 15:02:28–15:02:33, 15:02:47–15:02:48.  After recounting that she had fought with her sister and run away from her father's car, J.M.-F. explained that Fishman "had to lift [her] up" to put her into the car.  *Id.* at 15:04:30–15:04:36.  In response to Officer Brady's questions about the way in which Fishman had picked her up, J.M.-F. confirmed that it was "an easy pick up" and reiterated that she was unhurt.  *Id.* at 15:04:45–15:05:14.

As the officers spoke with Macaulay and the two girls, Fishman continued to be held at the end of the block.  During this period, Sergeant Adam Bray and Lieutenant Loftus separately arrived at the scene and were briefed on the investigation.  Sergeant Bray, unaware that Officer Brady had begun questioning J.M.-F., explained to Fishman that it was important to speak with J.M.-F. in light of the report that a man had "grabbed a kid" and "threw the kid . . . into the car."  Ex. 4 (Bray BWC Footage) at 20:04:00–20:04:16; Am. Compl. ¶ 150 (J.A. 41).  Sergeant Bray further explained that Fishman's

7

refusal to speak with officers when they arrived "start[ed] raising flags" and that they had to "make sure the kid is okay." Bray BWC Footage at 20:04:23–20:04:30. Fishman recounted his side of the story again, and Sergeant Bray ordered that Fishman be released from handcuffs.

The officers escorted Fishman back toward his house and shared with one another the information they had learned. After confirming that Officer Brady had seen both daughters and that they had no visible injuries, Lieutenant Loftus concluded the investigation and directed the officers to prepare a report and notify the Child and Family Services Agency and MPD's Youth Division. In total, Fishman was detained for approximately twenty-five minutes.

### B.

In July 2021, Fishman filed this suit against the District of Columbia and five MPD officers: Lieutenant Loftus and Officers Jaeger, Brady, Tong, and Todaro. On February 2, 2023, the district court dismissed all of Fishman's claims other than those alleging that (i) the officers prolonged their detention of Fishman after reasonable suspicion dissipated in violation of the Fourth Amendment; (ii) the officers arrested Fishman without probable cause in violation of the Fourth Amendment; and (iii) the officers committed the common-law tort of false imprisonment.

After discovery, Fishman moved for partial summary judgment against Officer Todaro, and the defendants cross-moved for summary judgment, contending that the officers were entitled to qualified immunity. On March 12, 2025, the district court granted Fishman's motion and denied the defendants'.

8

Although the defendants had contended that Fishman's detention was justified by reasonable suspicion of both kidnapping and child abuse, the district court confined its analysis to kidnapping.  The court held that the officers lacked reasonable suspicion to detain Fishman for the full duration of the stop because any suspicion of kidnapping dissipated once officers learned Fishman was the girls' father.  As for its decision to grant summary judgment to Fishman against Officer Todaro, the court relied on Officer Todaro's deposition testimony that he came to believe Fishman and Macaulay were J.M.-F.'s parents within the first few minutes of the investigation, which meant that Fishman could not be guilty of kidnapping.  Finally, the court concluded that the officers were not entitled to qualified immunity because, in the court's view, precedent clearly established that officers lacked any reason to hold Fishman in handcuffs for over twenty minutes.

The District and all five officers now appeal the district court's denial of qualified immunity to the officers.  They may do so now even though the proceedings in the district court have not been completed because a denial of qualified immunity is immediately appealable.  *Mitchell v. Forsyth*, 472 U.S. 511, 526–30 (1985).

II.

Qualified immunity shields officers from liability unless a plaintiff shows both that the officers violated a constitutional right and that the right was "clearly established" at the time of the challenged conduct.  *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (citation omitted).  A right counts as clearly established only if its contours are "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 779

9

(2014); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006).  In determining whether a right is clearly established, we ordinarily ask whether either controlling precedent or "the clearly established weight of authority from other courts" establishes the parameters of the right with sufficient specificity that the defendants have "clear warning of unconstitutional conduct." *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015) (first quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001); then quoting *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015)).

The defendants here contend that they are entitled to qualified immunity on both of Fishman's Fourth Amendment claims.  With respect to his prolonged-detention claim, the defendants maintain that the officers had reasonable suspicion Fishman had committed a child-abuse-related crime and that no clearly established law demonstrates the suspicion dissipated before the stop ended.  With respect to Fishman's unlawful-arrest claim, the defendants submit that the detention remained only an investigatory stop and never became an arrest.  We agree with the defendants as to the first claim, and Fishman has forfeited any argument as to the second.

A.

We first address Fishman's prolonged-detention claim.  A pre-arrest investigative stop is subject to "the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).  In assessing whether such a "*Terry* stop" violates the Fourth Amendment, we ask whether the officer had reasonable suspicion the suspect had committed a crime. *See id.* at 21–22; *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  The presence of reasonable suspicion turns not on an officer's

10

subjective motivation but on whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *United States v. Hill*, 131 F.3d 1056, 1059 (D.C. Cir. 1997) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).    Reasonable suspicion must justify both the initiation of the stop and its scope. *See Terry*, 392 U.S. at 20.  Once reasonable suspicion has dissipated, continued detention without consent violates the Fourth Amendment.  *United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018).

In the district court, the defendants raised two theories of reasonable suspicion:  they argued that the officers had reasonable suspicion both that Fishman had kidnapped the young girl who turned out to be his daughter and that he had committed a child-abuse-related offense.  In denying summary judgment to the defendants and granting it in part to Fishman, the district court concluded only that suspicion of kidnapping could not justify the twenty-five-minute detention; the court did not affirmatively address whether there was reasonable suspicion of child abuse.  On appeal, the defendants press only their child-abuse theory, disclaiming any argument that suspicion of kidnapping could justify the duration of the stop.  We thus assume the officers' entitlement to qualified immunity turns solely on whether reasonable suspicion of a child-abuse-related crime justified the detention.

1.

Before addressing the merits of the defendants' qualified-immunity defense, we first consider—and reject—Fishman's argument that the defendants forfeited their ability to rely on a child-abuse theory by failing to meaningfully develop it in the district court.  In their summary-judgment briefing, the officers expressly rejected the notion that kidnapping was the only

11

pertinent offense, arguing that "child abuse" was another "relevant crime" and that the officers began the investigation in part to "gather information about [] potential . . . child abuse." Defs.' Mem. Supp. Summ. J. 9, 12 (J.A. 305, 308). They disagreed that their knowledge of Fishman's parental relationship with J.M.-F. required ending his detention while investigating if "a crime had been committed, whether it be parental kidnapping *or child abuse*." *Id.* at 12 (J.A. 308) (emphasis added). And they cited D.C. statutes criminalizing child abuse and cruelty to children in arguing that suspicion of child abuse justified the detention. Officer Todaro's separate opposition to Fishman's motion for summary judgment against him likewise noted that D.C. "recognizes child abuse and neglect . . . and cruelty to children" and cited Department of Justice guidance cautioning officers not to "rule out the possibility of child abuse with a domestic dispute complaint." J.A. 219–20 & n.1 (quoting U.S. Dep't of Just. Off. of Just. Programs, *Law Enforcement Response to Child Abuse* 8 (2001), https://perma.cc/Y3TA-WWQN).

To be sure, the officers predominantly focused their arguments on reasonable suspicion of kidnapping, not child abuse. But that choice of emphasis did not forfeit their ability to now rely—even exclusively—on what had previously been a distant fallback theory, so long as they sufficiently apprised the district court of the argument and afforded Fishman a fair opportunity to respond, which we conclude they did. And the officers' shift of focus to suspicion of a child-abuse-related offense does not rely on facts that were inadequately raised in the district court. Instead, there is no genuine dispute about the relevant facts, and they were mostly captured on the officers' body cameras. In these circumstances, the defendants did not forfeit their argument that reasonable suspicion of child abuse justified Fishman's detention.

12

2.

To overcome qualified immunity, Fishman must show both that the officers violated his Fourth Amendment rights and that those rights were clearly established in the circumstances. We can bypass the first step if Fishman falls short at the second step regardless, which we conclude is the case. The question at the latter step is whether clearly established law demonstrates that reasonable suspicion of child abuse never existed or dissipated before the end of Fishman's detention. We answer that question no.

D.C. law establishes two relevant child-abuse-related crimes: second-degree cruelty to children and assault. A person commits second-degree cruelty to children if he "intentionally, knowingly, or recklessly . . . [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child." D.C. Code § 22-1101(b)(1). The offense does not require intent to harm the child, only "intent to do the act that constituted the offense." *Lee v. United States*, 831 A.2d 378, 382 (D.C. 2003). It also does not require actual injury—creating a grave risk of bodily injury suffices. *See Coffin v. United States*, 917 A.2d 1089, 1093–94 (D.C. 2007); *Jones v. United States*, 67 A.3d 547, 549–50 (D.C. 2013). As for assault under D.C. law, *see* D.C. Code § 22-404(a)(1), the offense encompasses any offensive touching, however minor, and the defendant need not have a specific intent to injure the victim, nor need the victim suffer actual injury. *See Perez Hernandez v. United States*, 286 A.3d 990, 997–1001 (D.C. 2022) (en banc).

Here, clearly established law at no point denied the officers authority to stop and detain Fishman to investigate those D.C. child-abuse-related offenses. The investigation began with a radio dispatch describing an incident of suspected

13

"kidnapping" by "an older white male" who "grabbed a girl, threw her over his shoulder, [] threw her into a car, and drove off." Jaeger Dep. 22:7 (J.A. 334). Also, Lieutenant Loftus—the officer ultimately involved in supervising the scene at Fishman's residence—personally interviewed the 9-1-1 caller, who described the altercation between Fishman and his daughter as sufficiently concerning that a bystander intervened to physically block Fishman's car, and who also told Lieutenant Loftus that if it "wasn't abduction, it was child abuse." Loftus BWC Footage at 36th Street at 19:44:01–19:44:03.

Regardless of whether the information Lieutenant Loftus learned during his in-person interview of the 9-1-1 caller can be directly attributed to other officers already at the scene of the detention, their decision to temporarily detain someone who engaged in behavior characterized by witnesses in the manner relayed over the radio dispatch is not so manifestly unreasonable as to contravene clearly established law. The dispatch's description is consistent with the kind of conduct that could involve "grave risk of bodily injury to a child," D.C. Code § 22-1101(b)(1), and offensive touching, *see Perez Hernandez*, 286 A.3d at 997–1001—the sort of conduct officers could reasonably want to investigate.

Additionally, Fishman's reaction to Officer Jaeger's arrival at his home, as Sergeant Bray later put it, "start[ed] raising flags." Bray BWC Footage at 20:04:23–20:04:40. Before being informed of the purpose of Officer Jaeger's visit, Fishman demonstrated knowledge that someone had "called in" a police report about his behavior. Jaeger BWC Footage at 19:40:25. And rather than cooperate with answering Officer Jaeger's questions, Fishman disobeyed multiple requests from Officer Jaeger to remain outside and attempted to retreat inside his home, where the potential victim may have been. Faced

14

with an uncooperative individual matching the description of someone who may have engaged in child-abuse offenses, the officers at Fishman's Georgetown residence reasonably decided to detain him so they could investigate.

Given that the officers' initiation of the *Terry* stop was not manifestly unreasonable, the question is whether either the manner or duration of the stop violated clearly established Fourth Amendment law. *See Terry*, 392 U.S. at 19–20, 28–30. We have no occasion to consider any potential objections to the manner of the stop: Fishman does not argue that the officers' decision to restrain him with handcuffs around the corner from his home—after he attempted to retreat into the house and began screaming at them—was unreasonable under clearly established Fourth Amendment law. As for the duration of the stop, it did not infringe clearly established Fourth Amendment principles.

Nothing that transpired over the course of Fishman's detention clearly dispelled the officers' suspicion that he may have committed a child-abuse-related offense. Rather, the statements by A.M.-F. and Fishman himself to the investigating officers corroborated in substance the 9-1-1 caller's description of the incident. Fishman's own account to Officer Tong confirmed that he had physically picked up J.M.-F.—over her protests and after a standoff—and put her into his car. A.M.-F.'s contemporaneous account to Officer Todaro, while exculpatory in her own estimation, described Fishman as "frustrated" and "angry" and explained that he "put [J.M.-F.] over his shoulder and br[ought] her into the car." Brady BWC Footage at 14:41:50–14:41:59, 14:46:19–14:46:28. That A.M.-F. told the officers her father "did nothing wrong" did not itself cause reasonable suspicion to dissipate: police officers of course need not immediately accept at face value a child's defense of her parent.

15

The officers also repeatedly explained their need to speak with everyone—including J.M.-F.—before they could conclude the investigation. Officer Brady, Sergeant Bray, and Lieutenant Loftus each independently, and reasonably, believed they should speak with J.M.-F. and confirm she was unharmed before ending the stop. And, for the first twenty-two minutes after restraining Fishman, the officers attempted to do just that. Macaulay, though, initially declined to allow Officer Brady to speak with J.M.-F. Officer Brady attempted to explain that the officers were "trying to get this over as fast as [they could]" and that their inability to confirm directly that J.M.-F. was unhurt "may delay everything." *Id.* at 14:57:54–14:57:56, 14:58:03–14:58:06. After Macaulay allowed Officer Brady to speak with J.M.-F., the officers' actions confirm that the duration of Fishman's detention stemmed from their desire to evaluate the possibly abused child. Shortly after Officer Brady was able to speak with J.M.-F., the stop ended and Fishman was released.

For qualified-immunity purposes, the question is whether the officers' actions were so manifestly unreasonable as to violate clearly established Fourth Amendment principles. In light of the reasons to suspect Fishman may have committed a child-abuse-related crime, his initial behavior at the scene, and the relevance of J.M.-F.'s condition and account to the investigation, the officers' actions did not fall so far outside the bounds of reasonableness as to defeat their assertion of qualified immunity, which is all we need to determine.

There is no "controlling authority" or "a robust consensus of cases of persuasive authority" indicating otherwise. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *al-Kidd*, 563 U.S. at 741–42) (internal quotation marks omitted). The inquiry "must be undertaken in light of the specific context

16

of the case, not as a broad general proposition," *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (citation omitted), and asks whether the relevant authority is "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," *Wesby*, 583 U.S. at 63.   Fishman identifies no authority placing "beyond debate," *al-Kidd*, 563 U.S. at 741, the unconstitutionality of his detention.   The absence of such authority takes on added significance in light of the fact-bound judgment call the officers faced:  how urgently to treat an eyewitness's report that a small child had been forcibly thrown into a car; how much weight to give reassurances from family members with a potential interest in minimizing the incident; and how important it is to wait to hear from the child herself. We thus conclude that the officers are entitled to qualified immunity.

B.

Fishman brought an alternate claim under the Fourth Amendment:  that his detention became an unlawful arrest without probable cause.  On appeal, the defendants argued in their opening brief that Fishman's detention did not cross the line from a *Terry* stop into an arrest because the officers diligently pursued their suspicions and reasonably restrained Fishman during the investigation.  Fishman did not address the issue in his response brief, forfeiting any argument that an arrest occurred.  *See Adams v. Rice*, 531 F.3d 936, 949 (D.C. Cir. 2008).  And absent an arrest in the first place, there can be no arrest without probable cause, so Fishman's alternate Fourth Amendment claim cannot afford a basis to deny the officers qualified immunity.

17

C.

Finally, Fishman and the defendants advance arguments about Fishman's common-law false-imprisonment claim. We may exercise pendent appellate jurisdiction to review that D.C. law claim only if it is "inextricably intertwined" with an appealable qualified-immunity ruling or if review is necessary to ensure meaningful review of the immunity decision. *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 31 (D.C. Cir. 2000) (citation omitted). Fishman's false-imprisonment claim turns on distinct factual inquiries that are not inextricably intertwined with the qualified-immunity question presented in this appeal. We thus decline to exercise jurisdiction over the claim, though we note that Fishman has conceded in his briefing that the district court's grant of summary judgment against Officer Todaro on the D.C. law claim should be reversed.

\* \* \* \* \*

For the foregoing reasons, we reverse the district court's grant of partial summary judgment against Officer Todaro and remand for the court to enter summary judgment in favor of the officers on Fishman's Fourth Amendment claims and to consider the false-imprisonment claim.

*So ordered.*